# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**BRIGHT DATA LTD.,**
Patent Owner/Appellant

**Appeal Nos. 2023-2144[1]**

**v.**                                                 **2023-2145**

**2023-2146**

**CODE200, UAB, TESO LT, UAB,**                       **2023-2147**
**METACLUSTER LT, UAB, OXYSALES, UAB,**               **2023-2414[2]**
**THE DATA COMPANY TECHNOLOGIES INC.,**               **2023-2415**
**MAJOR DATA UAB, CORETECH LT, UAB,**                 **2023-2442**
Petitioners/Appellees                                 **2023-2443**

**Proceeding Nos.:**
**IPR2022-00103, IPR2022-00135, IPR2022-00138, IPR2022-00353,**
**IPR2022-00915, IPR2022-00916, IPR2021-01492, and IPR2021-01493**

———————————————————————

## NOTICE FORWARDING CERTIFIED LISTS

Notices of Appeal to the United States Court of Appeals for the Federal

Circuit were timely filed by Appellant on September 18, 2023 (Appeal Nos. 2023-

2414 and 2023-2415), and September 27, 2023 (Appeal Nos. 2023-2442 and 2023-

2443), in the United States Patent and Trademark Office in connection with *Inter*

*Partes Review* (IPR) Proceeding Nos. IPR2022-00915, IPR2022-00916, IPR2021-

---

[1] Appeal No. 2023-2144 (Lead) was initially consolidated with Appeal Nos. 2023-2145, 2023-2146 and 2023-2147 (Member cases) pursuant to Court Order (ECF No. 10) and Note to File (ECF No. 11) dated July 27, 2023. The Certified Lists for Appeals Nos. 2023-2144, 2023-2145, 2023-2146, and 2023-2147 were served on August 22, 2023 (ECF No. 14), and will not be re-submitted under this cover.

[2] Appeal Nos. 2023-2414, 2023-2415, 2023-2442, and 2023-2443 (Member cases) were further consolidated with the earlier-consolidated appeals [Lead: Appeal No. 2023-2144], pursuant to Court Order (ECF No. 16) and Note to File (ECF No. 17) dated October 3, 2023.

01492, and IPR2021-01493. The Certified Lists for Appeals Nos. 2023-2144, 2023-2145, 2023-2146, and 2023-2147 were served on August 22, 2023 (ECF No. 14), and will not be re-submitted under this cover.

Pursuant to 35 U.S.C. § 143, and as instructed by the Court Order (ECF No. 16) dated October 3, 2023, the Certified Lists for Appeal Nos. 2023-2414, 2023-2415, 2023-2442, and 2023-2443 are this day being forwarded to the Federal Circuit.

Date: November 8, 2023

Respectfully submitted,

Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office

By: *Orchideh Rushenas*

Orchideh Rushenas
Paralegal Specialist
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
Orchideh.Rushenas@uspto.gov
571-272-9035

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE FORWARDING CERTIFIED LISTS, for Appeal Nos. 2023-2414, 2023-2415, 2023-2442, and 2023-2443, has been served via electronic mail, on counsel for Appellant and Appellees on this 8th day of November, 2023, as follows:

| PATENT OWNER: | PETITIONERS: |
|---|---|
| Robert M. Harkins, Jr.<br>Thomas M. Dunham<br>CHERIAN LLP<br>bobh@cherianllp.com<br>tomd@cherianllp.com | Jonathan S. Franklin<br>Stephanie DeBrow<br>Daniel S. Leventhal<br>Mark T. Garrett<br>NORTON ROSE FULBRIGHT US LLP<br>jonathan.franklin@nortonrosefulbright.com<br>stephanie.debrow@nortonrosefulbright.com<br>daniel.leventhal@nortonrosefulbright.com<br>mark.garrett@nortonrosefulbright.com<br><br><u>PETITIONER (Data Company Technologies)</u>:<br><br>Michael N. Rader<br>Adam Wichman<br>WOLF GREENFIELD & SACKS, PC<br>mrader@wolfgreenfield.com<br>awichman@wolfgreenfield.com<br><br><u>PETITIONER (Major Data UAB)</u>:<br><br>Jason R. Bartlett<br>MAURIEL KAPOUYTIAN WOODS LLP<br>jbartlett@mkwllp.com |

By: *Orchideh Rushenas*
    Orchideh Rushenas
    Paralegal Specialist
    Office of the Solicitor
    U.S. Patent and Trademark Office
    Mail Stop 8, P.O. Box 1450
    Alexandria, Virginia 22313-1450
    Orchideh.Rushenas@uspto.gov
    571-272-9035

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

November 8, 2023

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**MAJOR DATA UAB,**
**Petitioner,**

**v.**

**BRIGHT DATA LTD.,**
**Patent Owner.**

**Case: IPR2022-00915**
**Patent 10,257,319 B2**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*

***Certifying Officer***

## Prosecution History for IPR2022-00915

| Date | Document |
|------|----------|
| 04/21/2022 | Petition for *Inter Partes* Review of U.S. Patent No. 10,257,319 |
| 04/21/2022 | Petitioner's Power of Attorney |
| 04/21/2022 | Petitioner's Motion for Joinder to *Inter Partes* Review |
| 05/04/2022 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 05/09/2022 | Patent Owner's Power of Attorney |
| 05/09/2022 | Patent Owner's Mandatory Notices |
| 05/23/2022 | Patent Owner's Opposition to Motion for Joinder |
| 05/23/2022 | Petitioner's Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 05/23/2022 | Petitioner's Declaration in Support of Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 05/25/2022 | Order – Conduct of the Proceedings – *37 C.F.R. § 42.70* |
| 06/22/2022 | Patent Owner's Updated Mandatory Notices |
| 06/23/2022 | Patent Owner's Preliminary Response |
| 06/23/2022 | Petitioner's Reply in Support of Motion for Joinder |
| 07/29/2022 | Decision Denying Motion for Joinder – *35 U.S.C. § 315(c); 37 C.F.R. § 42.122* |
| 08/01/2022 | Panel Change Order – Conduct of the Proceedings – *37 C.F.R. § 42.5* |
| 08/26/2022 | Petitioner's Preliminary Reply to Preliminary Response |
| 09/02/2022 | Patent Owner's Preliminary Sur-Reply |
| 09/15/2022 | Decision Granting Institution of *Inter Partes* Review |
| 09/15/2022 | Scheduling Order |
| 09/29/2022 | Petitioner's Objections to Patent Owner's Evidence Submitted with Patent Owner's Preliminary Response |
| 10/20/2022 | Patent Owner's Updated Mandatory Notices |
| 11/03/2022 | Order Granting Petitioner's Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 11/15/2022 | Patent Owner's Notice of Deposition of Mr. Keith J. Teruya |
| 11/17/2022 | Petitioner's Updated Power of Attorney |
| 11/22/2022 | Patent Owner's Updated Mandatory Notices |
| 11/23/2022 | Patent Owner's Updated Notice of Deposition of Mr. Keith J. Teruya |
| 12/01/2022 | Revised Joint Scheduling Order |
| 12/06/2022 | Petitioner's Notice of Joint Stipulation to Modify Schedule |
| 12/30/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Robert M. Harkins |

| Date | Document |
|------|----------|
| 01/06/2023 | Patent Owner's Response (Private Version) |
| 01/06/2023 | Patent Owner's Response (Public Version) |
| 01/06/2023 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 02/01/2023 | Order Conditionally Granting Patent Owner's Motions for Admission *Pro Hac Vice* of Robert M. Harkins |
| 02/06/2023 | Patent Owner's Updated Power of Attorney |
| 02/06/2023 | Patent Owner's Updated Mandatory Notices |
| 02/16/2023 | Petitioner's Notice of Deposition of Dr. Tim A. Williams |
| 03/20/2023 | Petitioner's Reply to Patent Owner's Response |
| 05/01/2023 | Patent Owner's Sur-Reply |
| 05/04/2023 | Petitioner's Request for Oral Argument |
| 05/04/2023 | Patent Owner's Request for Oral Argument |
| 05/08/2023 | Petitioner's Objections to New Evidence in Patent Owner's Sur-Reply |
| 05/15/2023 | Order Granting Requests for Oral Argument – *37 C.F.R. § 42.70(a)* |
| 05/25/2023 | Petitioner's Motion to Exclude Evidence |
| 06/01/2023 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 06/06/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 06/06/2023 | Petitioner's Notice of Filing of Demonstrative Exhibit |
| 06/08/2023 | Patent Owner's Updated Mandatory Notices |
| 07/13/2023 | Oral Hearing Transcript |
| 07/20/2023 | Patent Owner's Updated Mandatory Notices |
| 09/13/2023 | Final Written Decision (Private Version) |
| 09/15/2023 | Final Written Decision (Public Version) |
| 09/18/2023 | Patent Owner's Notice of Appeal |

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

November 8, 2023

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**MAJOR DATA UAB,**
**Petitioner,**

**v.**

**BRIGHT DATA LTD.,**
**Patent Owner.**

**Case: IPR2022-00916**
**Patent 10,484,510 B2**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*

***Certifying Officer***

## Prosecution History for IPR2022-00916

| Date | Document |
|------|----------|
| 04/21/2022 | Petition for *Inter Partes* Review of U.S. Patent No. 10,484,510 |
| 04/21/2022 | Petitioner's Power of Attorney |
| 04/21/2022 | Petitioner's Motion for Joinder to *Inter Partes* Review |
| 05/04/2022 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 05/09/2022 | Patent Owner's Power of Attorney |
| 05/09/2022 | Patent Owner's Mandatory Notices |
| 05/23/2022 | Patent Owner's Opposition to Motion for Joinder |
| 05/23/2022 | Petitioner's Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 05/23/2022 | Petitioner's Declaration in Support of Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 05/25/2022 | Order – Conduct of the Proceedings – *37 C.F.R. § 42.70* |
| 06/22/2022 | Patent Owner's Updated Mandatory Notices |
| 06/23/2022 | Patent Owner's Preliminary Response |
| 06/23/2022 | Petitioner's Reply in Support of Motion for Joinder |
| 07/29/2022 | Decision Denying Motion for Joinder – *35 U.S.C. § 315(c); 37 C.F.R. § 42.122* |
| 08/01/2022 | Panel Change Order – Conduct of the Proceedings – *37 C.F.R. § 42.5* |
| 08/26/2022 | Petitioner's Preliminary Reply to Preliminary Response |
| 09/02/2022 | Patent Owner's Preliminary Sur-Reply |
| 09/15/2022 | Decision Granting Institution of *Inter Partes* Review |
| 09/15/2022 | Scheduling Order |
| 09/29/2022 | Petitioner's Objections to Patent Owner's Evidence Submitted with Patent Owner's Preliminary Response |
| 10/20/2022 | Patent Owner's Updated Mandatory Notices |
| 11/03/2022 | Order Granting Petitioner's Motion for *Pro Hac Vice* Admission of Jason R. Bartlett |
| 11/15/2022 | Patent Owner's Notice of Deposition of Mr. Keith J. Teruya |
| 11/17/2022 | Petitioner's Updated Power of Attorney |
| 11/22/2022 | Patent Owner's Updated Mandatory Notices |
| 11/23/2022 | Patent Owner's Updated Notice of Deposition of Mr. Keith J. Teruya |
| 12/01/2022 | Revised Joint Scheduling Order |
| 12/06/2022 | Petitioner's Notice of Joint Stipulation to Modify Schedule |
| 12/30/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Robert M. Harkins |

| Date | Document |
|------|----------|
| 01/06/2023 | Patent Owner's Response (Private Version) |
| 01/06/2023 | Patent Owner's Response (Public Version) |
| 01/06/2023 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 02/01/2023 | Order Conditionally Granting Patent Owner's Motions for Admission *Pro Hac Vice* of Robert M. Harkins |
| 02/06/2023 | Patent Owner's Updated Power of Attorney |
| 02/06/2023 | Patent Owner's Updated Mandatory Notices |
| 02/16/2023 | Petitioner's Notice of Deposition of Dr. Tim A. Williams |
| 03/20/2023 | Petitioner's Reply to Patent Owner's Response |
| 05/01/2023 | Patent Owner's Sur-Reply |
| 05/04/2023 | Petitioner's Request for Oral Argument |
| 05/04/2023 | Patent Owner's Request for Oral Argument |
| 05/08/2023 | Petitioner's Objections to New Evidence in Patent Owner's Sur-Reply |
| 05/15/2023 | Order Granting Requests for Oral Argument – *37 C.F.R. § 42.70(a)* |
| 05/25/2023 | Petitioner's Motion to Exclude Evidence |
| 06/01/2023 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 06/06/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 06/06/2023 | Petitioner's Notice of Filing of Demonstrative Exhibit |
| 06/08/2023 | Patent Owner's Updated Mandatory Notices |
| 07/13/2023 | Oral Hearing Transcript |
| 07/20/2023 | Patent Owner's Updated Mandatory Notices |
| 09/13/2023 | Final Written Decision (Private Version) |
| 09/15/2023 | Final Written Decision (Public Version) |
| 09/18/2023 | Patent Owner's Notice of Appeal |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

November 8, 2023

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**CODE200, UAB; TESO LT, UAB; METACLUSTER LT, UAB;**
**OXYSALES, UAB; AND CORETECH LT, UAB,**
**Petitioner,**

**v.**

**BRIGHT DATA LTD.,**
**Patent Owner.**

**Case: IPR2021-01492[1]**
**Patent 10,257,319 B2**



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*

*Certifying Officer*

---

[1] Joined by the Petitioners in IPR2022-00861.

# Prosecution History for IPR2021-01492

| Date | Document |
|------|----------|
| 09/03/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 10,257,319 |
| 09/03/2021 | Petitioner's Power of Attorney by NetNut Ltd. |
| 09/27/2021 | Patent Owner's Power of Attorney |
| 09/27/2021 | Patent Owner's Mandatory Notices |
| 09/27/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 10/22/2021 | Patent Owner's Updated Mandatory Notices |
| 11/24/2021 | Patent Owner's Updated Mandatory Notices |
| 11/30/2021 | Patent Owner's Updated Mandatory Notices |
| 12/27/2021 | Patent Owner's Preliminary Response |
| 01/18/2022 | Petitioner's Preliminary Reply |
| 01/28/2022 | Patent Owner's Preliminary Sur-Reply |
| 03/21/2022 | Decision Granting Institution of *Inter Partes* Review |
| 03/21/2022 | Scheduling Order |
| 04/07/2022 | Order Staying Concurrent *Ex Parte* Reexamination – *37 C.F.R. § 42.122(a)* |
| 05/09/2022 | Patent Owner's Updated Mandatory Notices |
| 05/18/2022 | Patent Owner's Notice of Settlement and Related Court Order |
| 05/24/2022 | Patent Owner's Joint Motion to Terminate as to Petitioner due to Settlement |
| 05/24/2022 | Patent Owner's Joint Request to File Settlement Agreement as Business Confidential Information and be Kept Separate from the Patent Files |
| 05/25/2022 | Order Modifying Scheduling Orders – *37 C.F.R. § 42.5* |
| 05/27/2022 | Order Dismissing Petitioner from the Proceeding – *37 C.F.R. § 42.5* |
| 06/22/2022 | Patent Owner's Updated Mandatory Notices |
| 07/11/2022 | Order Modifying Scheduling Orders – *37 C.F.R. § 42.5* |
| 08/22/2022 | Order Modifying Schedule – *37 C.F.R. § 42.5* |
| 08/31/2022 | Order – Stay of Proceedings – *37 C.F.R. § 42.5* |
| 10/19/2022 | Decision Granting Institution of *Inter Partes* Review and Grant of Joinder, IPR2022-00861 (joined with IPR2021-01492; terminated) |
| 10/20/2022 | Patent Owner's Updated Mandatory Notices |
| 11/16/2022 | Revised Joint Scheduling Order |
| 12/01/2022 | Patent Owner's Notice of Deposition of Mr. Keith J. Teruya |
| 12/06/2022 | Patent Owner's Notice of Joint Stipulation |
| 12/30/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Robert M. Harkins |

| Date | Document |
|------|----------|
| 01/06/2023 | Patent Owner's Response (Private Version) |
| 01/06/2023 | Patent Owner's Response (Public Version) |
| 01/06/2023 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 02/01/2023 | Order Conditionally Granting Patent Owner's Motions for Admission *Pro Hac Vice* of Robert M. Harkins |
| 02/06/2023 | Order Adjusting One-Year Pendency Due to Joinder |
| 02/06/2023 | Patent Owner's Updated Power of Attorney |
| 02/06/2023 | Patent Owner's Updated Mandatory Notices |
| 02/10/2023 | Petitioners' Notice of Deposition of Dr. Tim A. Williams |
| 03/20/2023 | Petitioners' Updated Mandatory Notice |
| 03/20/2023 | Petitioners' Reply to Patent Owner's Response |
| 05/01/2023 | Patent Owner's Sur-Reply |
| 05/03/2023 | Petitioners' Request for Oral Argument |
| 05/04/2023 | Patent Owner's Request for Oral Argument |
| 05/08/2023 | Petitioners' Objections to New Evidence in Patent Owner's Sur-Reply |
| 05/15/2023 | Order Granting Requests for Oral Argument – *37 C.F.R. § 42.70(a)* |
| 05/25/2023 | Petitioners' Motion to Exclude Evidence in Sur-Reply |
| 06/01/2023 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 06/06/2023 | Petitioners' Notice of Filing of Demonstrative Exhibits |
| 06/06/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 06/08/2023 | Patent Owner's Updated Mandatory Notices |
| 07/13/2023 | Oral Hearing Transcript |
| 07/20/2023 | Patent Owner's Updated Mandatory Notices |
| 09/22/2023 | Final Written Decision (Private Version) |
| 09/27/2023 | Final Written Decision (Public Version) |
| 09/27/2023 | Patent Owner's Updated Mandatory Notices |
| 09/27/2023 | Patent Owner's Notice of Appeal |

## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

November 8, 2023

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

### CODE200, UAB; TESO LT, UAB; METACLUSTER LT, UAB; OXYSALES, UAB; AND CORETECH LT, UAB,
**Petitioner,**

**v.**

### BRIGHT DATA LTD.,
**Patent Owner.**

### Case: IPR2021-01493[1]
### Patent 10,484,510 B2



By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

*Orchideh Rushenas*

*Certifying Officer*

---

[1] The Petitioners in IPR2022-00862 were joined to this case, with IPR2022-00862 then terminated.

## Prosecution History for IPR2021-01493

| Date | Document |
|------|----------|
| 09/03/2021 | Petition for *Inter Partes* Review of U.S. Patent No. 10,484,510 |
| 09/03/2021 | Petitioner's Power of Attorney by NetNut Ltd. |
| 09/27/2021 | Patent Owner's Power of Attorney |
| 09/27/2021 | Patent Owner's Mandatory Notices |
| 09/27/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 10/22/2021 | Patent Owner's Updated Mandatory Notices |
| 11/30/2021 | Patent Owner's Updated Mandatory Notices |
| 12/27/2021 | Patent Owner's Preliminary Response |
| 01/18/2022 | Petitioner's Preliminary Reply |
| 01/28/2022 | Patent Owner's Preliminary Sur-Reply |
| 03/21/2022 | Decision Granting Institution of *Inter Partes* Review |
| 03/21/2022 | Scheduling Order |
| 04/07/2022 | Order Staying Concurrent *Ex Parte* Reexamination – *37 C.F.R. § 42.122(a)* |
| 05/09/2022 | Patent Owner's Updated Mandatory Notices |
| 05/18/2022 | Patent Owner's Notice of Settlement and Related Court Order |
| 05/24/2022 | Patent Owner's Joint Motion to Terminate as to Petitioner due to Settlement |
| 05/24/2022 | Patent Owner's Joint Request to File Settlement Agreement as Business Confidential Information and be Kept Separate from the Patent Files |
| 05/25/2022 | Order Modifying Scheduling Orders – *37 C.F.R. § 42.5* |
| 05/27/2022 | Order Dismissing Petitioner from the Proceeding – *37 C.F.R. § 42.5* |
| 06/22/2022 | Patent Owner's Updated Mandatory Notices |
| 07/11/2022 | Order Modifying Scheduling Orders – *37 C.F.R. § 42.5* |
| 08/22/2022 | Order Modifying Schedule – *37 C.F.R. § 42.5* |
| 08/31/2022 | Order – Stay of Proceedings – *37 C.F.R. § 42.5* |
| 10/19/2022 | Decision Granting Institution of *Inter Partes* Review and Grant of Joinder, IPR2022-00862 (joined with IPR2021-01493; terminated) |
| 10/19/2022 | Revised Joint Scheduling Order |
| 10/20/2022 | Patent Owner's Updated Mandatory Notices |
| 12/01/2022 | Patent Owner's Notice of Deposition of Mr. Keith J. Teruya |
| 12/06/2022 | Patent Owner's Notice of Joint Stipulation |
| 12/30/2022 | Patent Owner's Unopposed Motion for *Pro Hac Vice* Admission of Robert M. Harkins |
| 01/06/2023 | Patent Owner's Response (Private Version) |

| Date | Document |
|------|----------|
| 01/06/2023 | Patent Owner's Response (Public Version) |
| 01/06/2023 | Patent Owner's Motion to Seal and to Enter the Joint Protective Order |
| 02/01/2023 | Order Conditionally Granting Patent Owner's Motions for Admission *Pro Hac Vice* of Robert M. Harkins |
| 02/06/2023 | Order Adjusting One-Year Pendency Due to Joinder |
| 02/06/2023 | Patent Owner's Updated Power of Attorney |
| 02/06/2023 | Patent Owner's Updated Mandatory Notices |
| 02/10/2023 | Petitioners' Notice of Deposition of Dr. Tim A. Williams |
| 03/20/2023 | Petitioners' Updated Mandatory Notice |
| 03/20/2023 | Petitioners' Reply to Patent Owner's Response |
| 03/20/2023 | Petitioners' Reply to Patent Owner's Response |
| 05/01/2023 | Patent Owner's Sur-Reply |
| 05/03/2023 | Petitioners' Request for Oral Argument |
| 05/04/2023 | Patent Owner's Request for Oral Argument |
| 05/08/2023 | Petitioners' Objections to New Evidence in Patent Owner's Sur-Reply |
| 05/15/2023 | Order Granting Requests for Oral Argument – *37 C.F.R. § 42.70(a)* |
| 05/25/2023 | Petitioners' Motion to Exclude Evidence in Sur-Reply |
| 06/01/2023 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 06/06/2023 | Petitioners' Notice of Filing of Demonstrative Exhibits |
| 06/06/2023 | Patent Owner's Notice of Filing Demonstrative Exhibits |
| 06/08/2023 | Patent Owner's Updated Mandatory Notices |
| 07/13/2023 | Oral Hearing Transcript |
| 07/20/2023 | Patent Owner's Updated Mandatory Notices |
| 09/22/2023 | Final Written Decision (Private Version) |
| 09/22/2023 | Notice Determining All Challenged Claims Unpatentable |
| 09/25/2023 | Final Written Decision (Public Version) |
| 09/27/2023 | Patent Owner's Updated Mandatory Notices |
| 09/27/2023 | Patent Owner's Notice of Appeal |

Trials@uspto.gov
Tel: 571-272-7822

Paper 51
Entered: September 15, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MAJOR DATA UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

---

IPR2022-00915
Patent 10,257,319 B2

---

Before THOMAS L. GIANNETTI, KEVIN C. TROCK, and
SHEILA F. McSHANE, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motion to Seal and Protective Order
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

Case: 23-2146    Document: 16    Page: 18    Filed: 11/13/2023

## I.  INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons discussed herein, we determine that Petitioner, Major Data UAB, has shown by a preponderance of the evidence that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of U.S. Patent No. 10,257,319 B2 (Ex. 1001, "the '319 patent") are unpatentable. *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

## II.  BACKGROUND

### A.  *Procedural History*

Major Data UAB ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1, 2, 12, 14, 15, 17–19, and 21–29 of the '319 patent (the "challenged claims").  Bright Data Ltd.[1] ("Patent Owner") filed a Preliminary Response.  Paper 12.  With authorization from the panel, Petitioner filed a Preliminary Reply (Paper 16), and Patent Owner filed a Preliminary Sur-reply (Paper 17).  Based upon the record at that time, we instituted *inter partes* review on all challenged claims on grounds presented in the Petition.  Paper 18 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response (Paper 30, "PO Resp."), Petitioner filed a Reply (Paper 37, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 38, "PO Sur-reply").

---

[1] According to Petitioner, Bright Data Ltd. was formerly known as Luminati Networks, Ltd. *See* Pet. 1.

Case: 23-2146    Document: 16    Page: 19    Filed: 11/13/2023

On June 9, 2023, an oral hearing was held. A transcript of the hearing is made part of the record. *See* Paper 48.

## B. *Related Matters*

The parties identify several district court proceedings involving the '319 patent and a related patent, U.S. Patent No. 10,484,510 ("the '510 patent"), including *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) (the "NetNut Litigation"); and *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation"). Pet. 3–4; Paper 6, 2–3. The parties also identify a number of district court actions involving patents related to the '319 patent. *Id.*

According to the parties, the '319 patent has been before the Board in IPR2020-01266, IPR2021-01492, IPR2022-00135, and IPR2022-00861. Pet. 4; Paper 6, 1–2. The parties also identify a number of other USPTO proceedings involving patents related to the '319 patent. *See* Pet. 4–6; Paper 6, 1–2.

In addition, Patent Owner identifies *ex parte* reexaminations requested and ordered for the '319 and '510 patents, respectively, Control No. 90/014,875 and Control No. 90/014,876, and which have been stayed. Paper 6, 2; IPR2021-01492, Paper 14; IPR2021-01493, Paper 13.

## C. *Real Parties-in-Interest*

Petitioner identifies Major Data UAB as the real party-in-interest. Pet. 2. Patent Owner "certifies that Bright Data Ltd. is the real party-in-interest." Paper 6, 1. In its Response, Patent Owner does not challenge Petitioner's identification of Major Data UAB as the real party-in-interest. *See generally* PO Resp.

*D. The '319 Patent*

The '319 patent is titled "System Providing Faster and More Efficient Data Communication." Ex. 1001, code (54). According to the '319 patent, there is a "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs." *Id.* at 1:54–56. The patent states that other "attempts at making the Internet faster for the consumer and cheaper for the broadcaster," such as proxy servers and peer-to-peer file sharing, have various shortcomings. *Id.* at 1:58–59; 2:24–2:32; 2:59–3:3.

The '319 patent describes a system and method "for faster and more efficient data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below (*id.* at 4:41–44):

Case: 23-2146    Document: 16    Page: 20    Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 21    Filed: 11/13/2023



**FIG. 3**

Figure 3 is a schematic diagram depicting communication network 100 including a number of communication devices. *Id.* at 4:43–45. Due to the functionality provided by software stored within each communication device, "each device may serve as a client, peer, or agent, depending upon requirements of the network 100." *Id.* at 4:46–50.

Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:56–58. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." *Id.* at 4:63–67.

Acceleration server 162 includes an acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein." *Id.* at 5:8–14.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser. *See id.* at 12:62–13:3. If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162. *Id.* at 13:8–15. Acceleration server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36.

Each agent responds to the client with information which "can help the client to download the requested information from peers in the network." *Id.* at 13:53–57. "Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have." *Id.* at 13:57–61.

The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request,

Case: 23-2146     Document: 16     Page: 22     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 23    Filed: 11/13/2023

it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

E. *Illustrative Claim*

The '319 patent has 29 claims. Claim 1 is the only independent claim of the '319 patent, and is illustrative of the claimed subject matter.[2]

> 1. [Preamble] A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:
>
> [a] receiving, from the second server, the first content identifier;
>
> [b] sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;
>
> [c] receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and
>
> [d] sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.

Ex. 1001, 19:16–32.

---

[2] Paragraph references in brackets proposed by Petitioner. *See* Pet. 25–34.

*F. Prior Art References and Other Evidence*

Petitioner relies on the following references:

1. Michael Reiter & Aviel Rubin, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds");

2. Marc Rennhard, *MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access* (2004) (Ex. 1008, "MorphMix");

3. Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border"); and

4. Fielding, et al., RFC 2616, *Hypertext Transfer Protocol -- HTTP/1.1*, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

In addition to these references, Petitioner relies on a Declaration of Keith J. Teruya. Ex. 1005 ("Teruya Decl."). Patent Owner relies on the Declaration of Tim A. Williams, Ph.D. Ex. 2065 ("Williams Decl.").

Case: 23-2146     Document: 16     Page: 24     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 25    Filed: 11/13/2023

## G. *Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability. Pet. 11.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)[3] |
|---|---|---|
| 1, 19, 21–22, 24–29[4] | 102[5] | Crowds |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | Crowds, RFC 2616 |
| 1, 12, 14, 21, 22, 24, 25, 27–29 | 102 | Border |
| 1, 12, 14, 15, 17–18, 21, 22, 24, 25, 27–29[6] | 103 | Border, RFC 2616 |
| 1, 17, 19, 21–29 | 102 | MorphMix |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | MorphMix, RFC 2616 |

---

[3] Petitioner's obviousness challenges additionally refer to the "[k]nowledge of [a person of ordinary skill in the art]." Pet. 11. We understand this to refer to a person of ordinary skill in the art's understanding of the applied references and not to supplying missing limitations or incorporating an unspecified disclosure by reference to supply missing claim limitations. General knowledge in the art, unsupported by the references, cannot supply a missing limitation. *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide 36 (Nov. 2019), *available at* https://www.uspto.gov/ TrialPracticeGuideConsolidated.

[4] We note that Petitioner's listing of the asserted grounds excludes claim 23 for this ground. *See* Pet. 11. However, Petitioner includes claim 23 in its analysis of anticipation based on Crowds (*see id.* at 35).

[5] Because the application from which the '319 patent issued has an earliest effective filing date before March 16, 2013 (Ex. 1001, code (60)), citations to 35 U.S.C. §§ 102 and 103 are to the pre-AIA versions. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29.

[6] We note that Petitioner's listing of the asserted grounds excludes claim 19 for this ground. *See* Pet. 11. However, Petitioner includes claim 19 in its analysis of obviousness based on Border (*see id.* at 57).

Case: 23-2146    Document: 16    Page: 26    Filed: 11/13/2023

## III. ANALYSIS OF THE CHALLENGED CLAIMS

*A. Applicable Legal Standards*

The Federal Circuit addressed the legal standard for anticipation in

*Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331 (Fed. Cir. 2016):

> Under 35 U.S.C. § 102(b), a prior art reference will anticipate if
> it "disclose[s] each and every element of the claimed invention
> . . . arranged or combined in the same way as in the claim."

815 F.3d at 1341 (citation omitted) (footnote omitted).  The Federal Circuit

went on to explain:

> However, a reference can anticipate a claim even if it 'd[oes]
> not expressly spell out' all the limitations arranged or combined
> as in the claim, if a person of skill in the art, reading the
> reference, would at 'once envisage' the claimed arrangement or
> combination.

*Id.* (quoting *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376,

1381 (Fed. Cir. 2015)).

A claim is unpatentable as obvious under 35 U.S.C. § 103 "if the

differences between the claimed invention and the prior art are such that the

claimed invention as a whole would have been obvious before the effective

filing date of the claimed invention to a person having ordinary skill in the

art to which the claimed invention pertains."  35 U.S.C. § 103 (2011).  The

question of obviousness is resolved on the basis of underlying factual

determinations, including:  (1) the scope and content of the prior art; (2) any

differences between the claimed subject matter and the prior art; (3) the level

of skill in the art; and (4) so-called "secondary considerations," including

commercial success, long-felt but unsolved needs, failure of others, and

unexpected results.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

*B. Level of Ordinary Skill in the Art*

According to Petitioner, a person of ordinary skill in the pertinent art "would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems as of the Priority Date." Pet. 16. Petitioner continues that "[s]uch a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols." *Id.* at 16–17 (citing Ex. 1005 ¶¶ 25–27).

Patent Owner submits that a person of ordinary skill in the art would have had "a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet Communications." PO Resp. 2 (citing Ex. 2065 ¶ 25). Patent Owner notes that its analysis does not change under the Board's preliminary assessment of a person of ordinary skill in the art in the Institution Decision, wherein Petitioner's proposed level of qualifications was adopted. *Id.*; Dec. 15.

We regard Petitioner's more specific definition as consistent with the '319 patent and the prior art before us. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill). Therefore, we adopt Petitioner's formulation.

*C. Claim Construction*

Pursuant to 37 C.F.R. § 42.100(b) (2023), we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303

11

Case: 23-2146    Document: 16    Page: 28    Filed: 11/13/2023

(Fed. Cir. 2005) (en banc).  Under *Phillips*, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention.  *Id.* at 1312–13 (citations omitted).  "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).  Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (citation omitted).

Only those terms that are in controversy need be construed, and only to the extent necessary to resolve the controversy.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Petitioner contends that the district court's constructions in *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation")[7], are appropriate for use in this case.  Pet. 17–19.  In particular, Petitioner points to two claim construction orders in that case— the "*Teso* Order" (Ex. 1017) and the "*Teso* Supplemental Order" (Ex. 1020). According to Petitioner, the parties in the Teso Litigation agreed to certain

---

[7] The case caption in the Teso Litigation was later changed to identify the plaintiff as Bright Data Ltd.  *See* Ex. 1020, 1.

constructions that were subsequently adopted by the district court. Pet. 17. There, the district court construed the preamble of claim 1 of the '319 patent to be limiting and construed certain other terms to have their "plain and ordinary meaning." *Id.*

Petitioner also points out that the district court in the Teso Litigation construed certain disputed claim terms, including "client device" and "second server." *Id.* at 17–18. There, the district court construed "client device" as a "communication device that is operating in the role of a client." *Id.*; Ex. 1017, 12. The district court also initially construed "second server" as a "server that is not the client device." Pet. 18. Later, the court granted defendants' request for clarification as to the scope of this construction, and determined that a "second server" is "a device that is operating in the role of a server and that is not the first client device." *Id.* (emphasis omitted); Ex. 1020, 8, 11.

Patent Owner now proposes constructions for the claim terms "client device" and "second server" that are different than those determined by the district court in the Teso Litigation. *See* PO Resp. 22–31. We discuss Patent Owner's proposed constructions below.

### 1. Client Device

In our Institution Decision, we concurred with the district court's reasoning and agreed with its construction for the claim term "client device" as a "communication device that is operating in the role of a client." Dec. 17–18.

In its Response, Patent Owner contends that a person of ordinary skill in the art "would understand the term 'client device' to mean a 'consumer

Case: 23-2146     Document: 16     Page: 30     Filed: 11/13/2023

computer,'" or alternatively, "would understand the term 'client device' to mean a 'consumer communication device.'" PO Resp. 22. Patent Owner argues that "[t]hese proposed constructions are consistent with the claim language, the specification, and the prosecution histories distinguishing client devices and servers." *Id.* at 22–23.

Patent Owner's proposed construction of the claim term "client "device" as a "consumer computer," however, was previously considered, and rejected, by the district court in the Teso Litigation. *See, e.g.,* Ex. 1017, 10–12. Patent Owner takes issue with the evidence and the reasoning used by the district court to reject Patent Owner's previously proposed construction. *See, e.g.,* PO Resp. 23–27.

Patent Owner argues that the district court's rejection of its proposed construction of a "client device" as "consumer computer" is wrong for three reasons. *Id.* at 23–24. First, Patent Owner asserts that, although the district court found that there was no express lexicography in the specification, the specification states that "computers of consumers" are "referred to herein as client devices" and the term "client device" is used in the claims. *Id.* at 23 (citing Ex. 1001, 2:44–46). Patent Owner asserts that "the term 'client device' has a special meaning in the context of the '319 Patent" and that, therefore, upon reading the specification, a person of ordinary skill in the art "would understand a 'client device' is a consumer computer in the context of the '319 Patent." PO Resp. 23 (citing Ex. 2065 ¶ 112).

Second, Patent Owner disagrees with the district court's finding that in the specification the term "consumer" refers to a consumer of content as opposed to a broadcaster of content. PO Resp. 24 (citing Ex. 1017, 11).

Case: 23-2146    Document: 16    Page: 31    Filed: 11/13/2023

Patent Owner argues, instead, that the common understanding of "consumer" is "a person who buys goods or services for their own use" or "someone who buys goods or services for personal use." PO Resp. 24 (citing Ex. 2007; Ex. 2035, 5; Ex. 2037, 4; Ex. 2065 ¶ 119.

Third, Patent Owner disagrees with the district court's finding that the term "consumer" does not appear in connection with the description of the claimed invention, contending instead that the specification "defines client devices as consumer computers." PO Resp. 24.

Patent Owner argues that a person of ordinary skill in the art "would understand a client device is a 'communication device' in the context of the specification" and that "a client device is a consumer computer with specific software to operate in accordance with the claims." PO Resp. 25 (citing Ex. 2065 ¶¶ 113, 114; Ex. 1017; Ex. 1020; Ex. 2006; *see also* Ex. 1001 at 4:44–50; 5:21–29; 9:12–50). Patent Owner argues that "[i]n the context of the specification, a client device would be understood to be, more specifically, a consumer computer like a laptop, desktop, tablet, or smartphone." PO Resp. 25 (citing Ex. 2065 ¶ 118). Patent Owner further argues that a person of ordinary skill in the art "would understand that a client device is typically portable and easily moved, like, for example, a laptop, desktop, tablet or smartphone." PO Resp. 26 (citing Ex. 2065 ¶ 122).

Patent Owner also argues that a person of ordinary skill in the art

would understand that a client device is typically understood (a) to be regularly switched off and taken offline; (b) to be capable of processing only a limited number of requests at any given time, which may for example include a single user login; and/or (c) to have lesser fault tolerance, lesser reliability, and lesser

Case: 23-2146     Document: 16     Page: 32     Filed: 11/13/2023

> scalability, prioritizing value to client device users over system
> costs. EX.2065 at ¶ 123.

PO Resp. 27. "These client device-attributes," Patent Owner argues,
"distinguish a client device from a server." *Id.*

Patent Owner argues that a person of ordinary skill in the art "would
understand there are structural differences between client devices and
servers in the context of the specification and there is no contradictory
disclosure in the specification or in the prosecution histories." *Id.* (citing Ex.
2065 ¶ 126). "Rather," Patent Owner argues, "client devices are repeatedly
distinguished from servers in the specification and the prosecution
histories." PO Resp. 27.

We have considered Patent Owner's evidence and arguments that the
district court's construction of the claim term "client device" is incorrect.
For the reasons discussed below, however, we determine that the evidence of
record supports the district court's construction of the term "client device" as
a "communication device that is operating in the role of a client" that we
adopted in our Institution Decision and continue to apply here. Conversely,
we find that the evidence does not support Patent Owner's view that a
"client device" is a "consumer computer," or alternatively, a "consumer
communication device," where the "client device" cannot be a server.

### a)   Claim Language

Under *Phillips*, we begin with the language of the claims themselves.
*See Phillips*, 415 F.3d at 1314. In claim 1, the method is for use with a "first
client device." In step 1[b], the first client device, "send[s], to the first
server over the Internet, a Hypertext Transfer Protocol (HTTP) request that

16

comprises the first content identifier," which serves to request content from the first server (web server). *See* Ex. 1001, 19:24–26. In step 1[b], the first client device is acting as a client in requesting content. In step 1[d], the first client device "send[s], the first content by the first client device to the second server, in response to the receiving of the first content identifier." *See id.* at 19:30–32. In step 1[d], the first client device is acting as a server to forward content.

The parties address the issue that the "first client device" acts in differing roles in claim 1. Petitioner asserts that the claim's required functionality is consistent with the district court's determinations on the role-based nature of the term and the specification. Pet. Reply 13–16. Patent Owner agrees that under a role-based construction, "a client device may operate in the role of a server at some points in time." PO Resp. 25.

According to Petitioner, in district court Patent Owner "*affirmatively argued* in its claim-construction brief that the claimed 'second server' mapped to the Client 102 role (in green) and the 'client device' mapped to the Agent 122 role (in red), per PO's annotated Figure 3" confirming a role-based construction. Pet. Reply 14–15 (citing Ex. 1126, 8; Ex. 1004, 19–20). Patent Owner's annotated version of Figure 3 of the '319 patent is shown below.

Case: 23-2146    Document: 16    Page: 34    Filed: 11/13/2023



**FIG. 3**

As shown above, Patent Owner's annotated Figure 3 of the '319 patent, presented in the district court litigation, equates the claimed "first client device" (shown in red) to agent 122, which sends the first content identifier to the web server (arrow C), receives content requested from the web server (arrow D), and sends that content to client 102 (the second server) (arrow E). Ex 1126, 4. Thus, under this understanding, the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102 in response to a request for the content from client 102. This reflects a role-based interpretation of the claim

18

terms; different devices are defined by their function and can be either clients or servers depending on the function they perform.

Patent Owner argues that "the district court briefing was taken out of context and merely used to illustrate the lines of communication." PO Sur-reply 9, n.4 (citing PO Resp. 6–7, n.1). We do not agree. We find that the cited district court testimony speaks for itself and is consistent with the role-based nature of the "first client device" and "second server" claim terms.[8]

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function of a component serves to define the term. Ex. 1020, 7–10. For instance, the district court found that, under the steps of claim 1, the "client device" operates as an intermediary to perform steps including "send[ing], to [a] web server over an Internet, the first content identifier" to request content and also to "send[] the received first content." Ex. 1017, 3–4 (second two alterations in original). Consistent with the claim language, the district court recognized that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020,

---

[8] We note that Patent Owner's argument that "a server is not a client device and that a client device is not a server" (PO Resp. 15) is not supported by the claim language, which describes a "client device" that acts as a client to request content from the web server as well as a server to forward content. We discuss this issue in more detail below.

Case: 23-2146    Document: 16    Page: 36    Filed: 11/13/2023

10 (emphasis omitted). That is, although the district court determined that a single component could not simultaneously serve more than one function at any particular time, components could operate in different roles, such as the claimed "client device." *Id.* For related patents that share substantially identical specifications to that of the '319 patent, the district court similarly found that the role-based construction applies "regardless of any additional role the device may serve, including as a server." Ex. 1112, 13. We agree with the district court's construction of "client device" as "a device that is operating in the role of a client" because this interpretation is consistent with the limitations of the claims. *See* Ex. 1020, 10.

> b)    *Specification*

The district court's interpretation of the term "client device," adopted here, is also consistent with the '319 patent specification. The '319 specification, when describing the "multiple communication devices" depicted in Figure 3, states that the same components may assume different roles: "[d]ue to the functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve *as a client, peer, or agent*, depending upon the requirements of the network." Ex. 1001, 4:46–50 (emphases added). Thus, the '319 specification indicates that the components identified in Figure 3 may play different roles that perform different functions based on their stored software. *Id.*

Further, according to the '319 specification, a communication device includes memory 210, which stores software 212 with accelerator application 220, which includes client, peer and agent modules. Ex. 1001,

Case: 23-2146     Document: 16     Page: 37     Filed: 11/13/2023

5:58–6:40, 9:20–26, Fig. 4, Fig. 6. The '319 specification also explains that "each of the [software modules] comes into play *according to the specific role that the communication device 200 is partaking* in the communication network 100 *at a given time.*" *Id.* at 9:23–25 (emphasis added). The '319 specification thus supports the role-based function of the network components, with components operating in different roles at different times, which is consistent with the claim language.

In contrast, Patent Owner argues that a person of ordinary skill in the art, when considering Figures 1 and 3 of the '319 patent, would understand that a server is not a client device and that a client device is not a server. PO Resp. 15 (citing Ex. 2065 ¶ 82). Patent Owner argues that proxy server 6 of Figure 1 "must be structurally different from agent 122 of Figure 3," and that "purely role-based constructions do not account for the structural differences between a proxy server (in Figure 1) and a proxy client device (in Figure 3) and therefore, the purely role-based constructions are not appropriate." *Id.*

For example, Patent Owner asserts with respect to Figure 1 that "proxy server 6 (i) receives requests from client devices 14,16 and (ii) sends requests to web server 32." PO Resp. 16 (citing Ex. 2065 ¶ 85). Patent Owner argues that if a person of ordinary skill in the art "were to apply the purely role-based constructions, proxy server 6 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.*

Patent Owner makes a similar argument with respect to Figure 3. With respect to Figure 3, Patent Owner asserts that "agent 122 (i) receives requests from client devices and (ii) sends requests to web server 152." PO

Resp. 17 (citing Ex. 2065 ¶ 90). Patent Owner argues that if a person of ordinary skill in the art "were to apply the purely role-based constructions, agent 122 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.*

Patent Owner's expert, Dr. Williams, testifies that if a person of ordinary skill in the art "were to apply the purely role-based constructions, proxy server 6 (in Figure 1) and agent 122 (in Figure 3) would be operating in the same roles at a given point in time," and that "there is nothing to distinguish the architectures of Figure 1 and Figure 3." Ex. 2065 ¶ 92. According to Dr. Williams, purely role-based constructions are not appropriate because they fail to account for structural differences between proxy servers and proxy client devices. *Id.* ¶ 93.

We do not find that the evidence of record supports Patent Owner's assertions on this issue. Dr. Williams's testimony, and Patent Owner's arguments, are based upon a modified version of Figure 3, which inserts "proxy server 6" between "client device" and "agent." Patent Owner's modified version of Figure 3 is shown below.

Case: 23-2146    Document: 16    Page: 39    Filed: 11/13/2023



Patent Owner's modified version of Figure 3, shown above, inserts "proxy server 6" outlined in green, between "client 102" outlined in purple and "agent 122" outlined in red. *See* PO Resp. 8. Patent Owner's modified configuration of Figure 3 is not shown in any figure of the '319 patent or disclosed anywhere in the specification. Dr. Williams testifies that a person of ordinary skill in the art "would understand that proxy server 6 of Figure 1 *could be* inserted between client 102 and agent 122 of Figure 3." Ex. 2065 ¶ 59 (emphasis added). Dr. Williams combines the "proxy server 6" of the prior art shown in Figure 1 and an embodiment of the claimed invention depicted in Figure 3. *See* Ex. 1001, 2:8–18, 2:24–32, 4:41–50. Dr. Williams, however, provides no explanation or rationale for combining the

Case: 23-2146    Document: 16    Page: 40    Filed: 11/13/2023

prior art with an embodiment of the claimed invention. Further, Dr. Williams testifies that different "client devices," i.e., a "requesting client device" and a "proxy client device" are disclosed, but we do not discern that these characterizations are disclosed in the '319 specification. In view of the lack of support, we afford little weight to Dr. Williams's testimony on this issue.

Thus, in view of the '319 patent specification's disclosures, we do not agree with Patent Owner that it discloses the architecture of a requesting client (102) ↔ proxy server (6) ↔ agent (122) ↔ web server (152), as Patent Owner asserts. *See* PO Resp. 7–8. Moreover, we do not agree that Patent Owner's argument based upon "architecture" should govern the construction of "client device" in light of the claim language and the specification's disclosures demonstrating that communications devices may serve in different roles due to the functionality provided by software stored within each communication device, which come into play depending on the specific role that the communication device takes at a given time. *See* Ex. 1001, 4:46–50, 9:20–25. The district court agreed, finding that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* litigation (Ex. 2012) are consistent with its understanding of the architecture required by the claims of the '319 patent and its "novel" use of a client device as an intermediary. PO Resp. 12–13, 20. We do not

find that the district court's *Alice* order alters or modifies the claim construction the court adopted there, and that we adopt here. The *Alice* order addressed patent eligibility, not claim construction. *See* Ex. 2012. Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as a "communication device that is operating in the role of a client," and did not modify that construction. *Id*. at 5. Further, after the *Alice* order issued, in February 2021, the district court consistently maintained its claim constructions. *See* Exs. 1020, 1115.

We agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server." Ex. 1112, 13. Petitioner points to buttressing evidence in RFC 2616, which defines a "server" as an "application program that accepts connections in order to service requests by sending back responses," where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." Pet. Reply 15 (citing Ex. 1013, 9) (emphases omitted)). We agree with Petitioner that RFC 2616 serves as intrinsic evidence because it is cited in the '319 patent in its discussion on the operation of the agent, client, or peer, particularly, in how these devices can use the HTTP protocol to determine whether an HTTP request they have received is still valid. Ex. 1001, 16:21–28; *see V-Formation v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005). Accordingly, we determine that the weight of the evidence supports the

Case: 23-2146    Document: 16    Page: 41    Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 42    Filed: 11/13/2023

conclusion that a "client device" as recited in the claims of the '319 patent may act as a server as well as a client.

Patent Owner asserts that the term "client device" means "consumer computer" which is distinct from a server, and that a person of ordinary skill would understand a "consumer computer" to be "a laptop, tablet, or smartphone." PO Resp. 25. Patent Owner asserts that a person of ordinary skill in the art "would understand that a client device is typically portable and easily moved," and "is not a dedicated network element, unlike a server," and "typically uses a single or relatively few connections." *Id.* at 26. Patent Owner cites to Dr. Williams' testimony as support for these assertions. *See* Ex. 2065 ¶¶ 112–126.

Dr. Williams testifies that his understanding is "consistent with the claim language, the specification, and the prosecution histories distinguishing servers from client devices." *Id.* ¶ 112. We discuss the prosecution history below, but note here that Dr. Williams does not identify any specific portions of the '319 specification that supports Patent Owner's assertions as to the alleged structure and nature of the client device. Rather, Dr. Williams merely asserts that "[i]n my opinion a POSA would understand" or "I also agree with the applicant's statements." *See, e.g., id.* ¶¶ 122–123.

Dr. Williams testifies that a person of ordinary skill in the art "would understand the term 'client device' to mean a 'consumer computer'" because the '319 specification states that "files are stored on computers of consumers, referred to herein as client devices." *Id.* ¶ 112 (citing Ex. 1001, 2:44–46); *see also* PO Resp. 22. Our view is that the Patent Owner takes the

specification's disclosure out of context. The "computers of consumers" discussed are computers used in the prior art peer-to-peer filing sharing system known as BitTorrent. Ex. 1001, 2:40–52. The '319 specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the invention. *See id.* at 2:40–3:9, 4:1–2, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the description of the claimed inventions." Ex. 1017, 11 (emphasis omitted). We also agree with the district court's finding that the specification discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. *Id.*; *see also* Ex. 1001, 1:54–59; PO Resp. 24.

Accordingly, we find that the '319 patent specification's disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client" as construed by the district court and as adopted here. We also find that the '319 patent specification does not support Patent Owner's position that a person of ordinary skill in the art would understand the term "client device" to mean a "consumer computer" or a "consumer communication device." *See* PO Resp. 22–27.

### c) *Prosecution History*

Patent Owner argues that the prosecution history of the '319 patent, its parent (U.S. Patent No. 10,069,936 ("the '936 patent")), and a child patent (U.S. Patent No. 10,484,510 ("the '510 patent")), support the conclusion

that the claimed "client device" should be distinguished from a server. *See* PO Resp. 18–22; PO Sur-reply 19–21.

Patent Owner points to statements in the prosecution history of the parent '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection. PO Resp. 19–21. Patent Owner asserts that the applicant responded to rejections over the Garcia reference, stating that the cache server 306 of Garcia "is clearly a dedicated device and performs a server functionality. The Garcia reference is silent, and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id.* at 19 (citing Ex. 2009, 215) (emphasis omitted).

Patent Owner argues that "[t]he examiner recognized a server cannot be equated to a client device regardless of the role being performed at a given moment in time." PO Resp. 19 (citing Ex. 2065 ¶ 98). Patent Owner argues that the applicant clearly distinguished servers from client devices, arguing that "server devices are known in the art to be dedicated devices to store information objects, to be provided to clients upon request." PO Resp. 20 (citing Ex. 2009, 163). Patent Owner asserts that in the Notice of Allowance, the examiner stated that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art," and further asserts that "the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture." PO Resp. 20 (citing Ex. 2065 ¶ 101).

Case: 23-2146    Document: 16    Page: 44    Filed: 11/13/2023

The claims that were under consideration in the '936 patent prosecution, however, were significantly different than the claims at issue here. The claims originally recited "devices," which were then amended to "clients." Ex. 2009, 692–697. Moreover, a "client device" is not recited in the claims that were under examination; rather, the claims recited either a "device" or separate "requesting client" and "client." *See id.* at 57–65. Similarly, the issued claims in the '936 patent recite a "requesting client" and a separate "client" and the issued claims have multiple steps that differ from those of the '319 patent. *See, e.g.*, Ex. 2011, 19:16–52. Given these material differences, we discount the significance of statements made during the patentability assessment of the '936 patent prosecution to the assessment of claim construction for the '319 patent. Further, considering the varying terms used, we do not find that the applicant's statements during prosecution of the '936 patent distinguishing a recited "device" or "client" from the devices disclosed in Garcia are sufficient to act as a disclaimer of the scope of the "client device" term as used in the claims of the '319 patent here. *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction."). Also, the examiner's statements do not reflect an understanding of any disavowal of the scope of any claim terms. *See* Ex. 2009, 741.

Additionally, as discussed above, the '319 patent's claim language and specification clearly support a role-based interpretation of the term "client device." In contrast, the '936 patent prosecution is for the parent of the '319 patent and involved evolving claim term amendments. *See*

Case: 23-2146    Document: 16    Page: 45    Filed: 11/13/2023

*Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365, 1375
(Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the plain
language of the claims and the direct teaching of the specification."). For
this reason, we find the '936 prosecution history to be less pertinent to the
construction of the '319 patent claims than the claim language and
specification of the '319 patent itself. As the Federal Circuit has explained,
because the prosecution history represents an ongoing negotiation between
the PTO and the applicant, rather than the final product of that negotiation, it
often lacks the clarity of the specification and thus is less useful for claim
construction purposes. *See Inverness Med. Switz. GmbH v. Warner Lambert
Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002) (the ambiguity of the
prosecution history made it less relevant to claim construction); *Phillips*, 415
F.3d at 1317. This is particularly true here, where the prosecution history at
issue involves a parent application with different claims having different
claim language from the patent and claims under review.

Patent Owner also presents arguments based on the prosecution
history of the '319 patent. PO Resp. 21–22. Patent Owner refers to
applicant's argument that "the claims involve specific networking of
physical elements such as servers and clients, connected via various
networks forming a specific structure and relationships, which are physical
apparatuses, and are NO[T] a 'generic computer' as stated in the Action."
*Id.* at 21 (citing Ex. 1002, 282) (alteration in original). Patent Owner further
cites to the examiner's statement in the Notice of Allowance that "the
limitations of the independent claims, within its environment, is allowable

subject matter over the prior art, in light of the specification." *Id.* (citing Ex. 1002, 50) (emphasis omitted).

Patent Owner's arguments based on the '319 patent prosecution, however, concern patent eligibility, not claim construction. Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated a disclaimer of the scope of the claim term "client device." *See* Ex. 1002, 163–164.

Patent Owner additionally refers to the prosecution history of the '510 child patent and the examiner's statement that the "environment" of the claimed methods supported patentability. PO Resp. 22. We do not discern that there is any disavowal of claim scope by the applicant in the prosecution history of the '510 patent, nor does the examiner indicate an understanding of any disclaimer.

*d)    Conclusion*

Based on the evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

*2.    Second Server*

In our Institution Decision, we concurred with the district court's reasoning and agreed with its clarified construction of the claim term "second server" as a "device that is operating in the role of a server and that is not the client device." Dec. 18–19.

In its Response, Patent Owner asserts that a person of ordinary skill in the art "would understand the term 'second server' to mean [a] 'server that is not **a** client device.'" PO Resp. 28 (citing Ex. 2065 ¶ 131). Patent Owner argues that this proposed construction "is consistent with the claim language, the specification, and the prosecution histories distinguishing servers from client devices." PO Resp. 28. "For example," Patent Owner argues, "the Court construed 'client device' as a communication device and based on that construction, a server is not a client device at least in part because a server is not a communication device." *Id.*

Patent Owner argues that "[a] server is structurally different from a client device," and that " [e]ven if, under the purely role-based constructions, a server may operate in the role of a client at some points in time, that does not transform a server into a 'client device' in the context of the '319 Patent." *Id.* at 29 (citing Ex. 2065 ¶¶ 129–130).

Patent Owner also argues that a person of ordinary skill in the art "would understand that a server is not a consumer computer," and "would consider a server to be a commercial network element, rather than a consumer device," because a server has a number of "server-attributes [that] distinguish a server from a client device." PO Resp. 29–30 (citing Ex. 2065 ¶¶ 132–133). "Treating client devices and servers as interchangeable, general purpose computers," Patent Owner argues, "is inconsistent with the disclosure in the '319 Patent, the prosecution histories, and the Court's Orders." PO Resp. 31 (citing Ex. 2065 ¶ 135).

Petitioner takes the position that the district court's claim construction of "second server" as a "device that is operating in the role of a server and

Case: 23-2146      Document: 16      Page: 48      Filed: 11/13/2023

that is not the first client device" is appropriate and that the Board should adopt and apply that construction. *See* Pet. 18–19; Pet. Reply 13–16.

Petitioner argues that Patent Owner's proposed construction is inappropriate, highly subjective, indefinite, and not supported by the '319 specification. *See* Pet. Reply 1–10. Petitioner argues that Patent Owner's "second server" characteristics cannot be found in the specification. *Id.* at 9. Petitioner argues that the '319 patent's "Figure 3 provides 'an example of a communication network in accordance with the present invention,' but does not show any "second server" under PO's construction." *Id.* (citing Ex. 1001, 4:3–5). According to Petitioner, Dr. Williams at his deposition conceded this point.

> Q. Do any of the components drawn in Figure 3 correspond to the second server of Claim 1 of the '319 patent under your construction of second server?
>
> A. No.

Ex. 1111, 110:17–21.

Petitioner also points out that Patent Owner "*altered* Figure 3 by adding a "Proxy Server 6" between the "Client" and "Agent." Pet. Reply 9–10 (citing PO Resp. 8; Ex, 2065 ¶ 59). According to Petitioner, Dr. Williams admitted that "he cut Proxy Server 6 out of prior art Figure 1 and pasted it into Figure 3." Pet. Reply 10 (citing Ex. 1111, 112:20–24). Petitioner points out that the '319 specification "never describes Proxy Server 6 communicating with the Agent 122 or Client 102" as shown in Patent Owner's altered Figure 3. Pet. Reply 10 (citing Ex. 1111, 114:2–14, 117:11–118:2).

Case: 23-2146    Document: 16    Page: 49    Filed: 11/13/2023

Patent Owner's arguments, for the most part, repeat those presented for construction of the "client device" claim term. *See* PO Resp. 9–22, 28–31. That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer ↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a consumer computer and would be a commercial device with certain operational properties. *Id.*

We continue to agree with the district court's interpretation of the claim term, which we have adopted, because it is consistent with the evidence in the record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is operating in the role of a server." Ex. 1017, 14; Ex. 1020, 8. This construction is consistent with the role-based interpretation of the claim components, which we discuss in Section II.C.1, above. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, short of being able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the first content . . . to the second server" in limitation 1[d], so the "second server" has to be a separate component.

In Section II.C.1 above, we addressed Patent Owner's arguments that concern alleged required architecture, structural requirements, and the assertion that a "client device" cannot be a server. Patent Owner also argues

Case: 23-2146    Document: 16    Page: 51    Filed: 11/13/2023

that the district court indicated that servers are not a type of communication device. PO Resp. 11 (citing Ex. 2065 ¶ 70). However, the district court found, and we agree, that "a component can be *configured* to operate in different roles," so long as it does not serve in different roles simultaneously, and although the specification does "not include servers as a type of 'communication device,' that is not sufficient to construe 'client device' as unable to act as a server in all cases." Ex. 1020, 10. Additionally, in view of the role-based construction for the components, we reject Patent Owner's other arguments on the required structure and characteristics of a server. *See* PO Resp. 28–31; PO Sur-reply 8–10.

*D. Prior Art References*

  *1. Crowds (Ex. 1006)*

  Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions." Ex. 1006, 2. In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server. *Id.* In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator." *Id.* In Crowds, "[a] user is represented by a process on her computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)." *Id.* at 8. "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd." *Id.* Exemplary paths for web requests from crowd users are shown in Figure 2 (*id.* at 9), reproduced below:

Case: 23-2146    Document: 16    Page: 52    Filed: 11/13/2023



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." *Id.* at 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "$1 \rightarrow 5 \rightarrow$ server; $2 \rightarrow 6 \rightarrow 2 \rightarrow$ server; $3 \rightarrow 1 \rightarrow 6 \rightarrow$ server; $4 \rightarrow 4 \rightarrow$ server; $5 \rightarrow 4 \rightarrow 6 \rightarrow$ server; and $6 \rightarrow 3 \rightarrow$ server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

### 2. Border (Ex. 1012)

Border is a patent titled "System and Method of Reading Ahead of Objects for Delivery to an HTTP Proxy Server." Ex. 1012, code (54). Border describes "a system for retrieving web content." *Id.* at code (57). In Border, "[a] downstream proxy server receives a URL request message from a web browser." *Id.* at 3:35–36. Thereafter, "[a]n upstream proxy server receives the URL request message from the downstream proxy server" and

36

"selectively forwards the URL request message to a web server and receives the URL content from the web server." *Id.* at 3:38–42. Then, "[t]he upstream proxy server forwards the URL content to the downstream proxy server." *Id.* at 3:42–43. An exemplary system employing downstream and upstream proxy servers for accessing a web server is shown in Figure 1, reproduced below:

*FIG. 1*



As depicted in Border's Figure 1, user station 101, for example, a personal computer, uses standard web browser 103. *Id.* at 3:55–61. User station 101 is connected to downstream proxy server 105, which communicates over network 111 with upstream proxy server 107. *Id.* at 3:61–66. Proxy servers 105 and 107 are HTTP proxy servers with HTTP caches 115 and 117. *Id.* at 4:8–11. Upstream proxy server 107 is connected to web server 109 through IP network 113, for example, the Internet. *Id.* at 4:5–7. In this system,

Case: 23-2146     Document: 16     Page: 53     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 54    Filed: 11/13/2023

proxy servers 105 and 107 "act as an intermediary between one or more browsers and many web servers (e.g., server 109)." *Id.* at 4:30–32.

  *3.  MorphMix (Ex. 1008)*

  MorphMix is a doctoral thesis that identifies the lack of anonymity on the Internet as a problem that "limits the privacy protection of Internet users." Ex. 1008, Abstract.  Accordingly, MorphMix is focused on "achieving anonymous Internet access for low-latency applications such as web browsing." *Id.* MorphMix describes "a peer-to-peer-based mix network" where "[e]very node joining the system can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time." *Id.* at 118.  An exemplary system is illustrated in Figure 5.1, reproduced below:



**Figure 5.1:** *Basic idea of MorphMix.*

Case: 23-2146    Document: 16    Page: 55    Filed: 11/13/2023

As depicted in Figure 5.1 of MorphMix, participating nodes have a virtual link to one or more other nodes at any time. Ex. 1008, 119. This "means that (1) there is a TCP [Transfer Control Protocol] connection between the two nodes and (2) they share a symmetric key that is only known to these two nodes." *Id.* In Figure 5.1, node *a* has five neighbors with which it has established virtual links. *Id.* In the example shown, "node *a* has established an anonymous tunnel via *b* and *c*." *Id.* "Within an anonymous tunnel, anonymous connections can be set up to anonymously communicate with a server." *Id.* at 120.

### 4.    *RFC 2616 (Ex. 1013)*

RFC 2616 is a request for comments document concerning version 1.1 of the Hypertext Transfer Protocol (HTTP), which is "foundational to the World Wide Web." Pet. 36–37; Ex. 1005 ¶ 53. HTTP is an application-level protocol for distributed, collaborative, hypermedia information systems. Ex. 1013, 1. HTTP is a generic, stateless, protocol which can be used for many tasks beyond its use for hypertext, such as name servers and distributed object management systems. *Id.* RFC 2616 specifies Internet standards track protocol for the Internet community, and requests discussion and suggestions for improvements. *Id.*

### E.    *Anticipation Based on Crowds*

#### 1.    *Independent Claim 1*
#### *Preamble*

The preamble of claim 1 reads as follows:

*A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first*

> *server stores a first content identified by a first content identifier,*
> *and for use with a second server, the method by the first client*
> *device comprising:*

Ex. 1001, 19:16–21.

Petitioner contends the preamble of claim 1 is met by Crowds. Pet.
25–27. Petitioner asserts "Crowds discloses a layout in which (e.g., in one
instance) jondo 6 serves as the first client device, jondo 4 serves as the
second server, and Web Server 5 is the first server." *Id.* at 26. Petitioner
provides an annotated version of Crowds's Figure 2 to illustrate the
correspondences between Crowds' disclosure and portions of the preamble's
language recited in claim 1. *Id.* This annotated figure is reproduced below:



Petitioner's annotated Figure 2 of Crowds, above, is a diagram
showing multiple paths between jondos and Web servers. *Id.* Figure 2 has
been annotated by Petitioner to show the elements in Crowds corresponding
to the "first client device," "first server," and "second server" recited in

Case: 23-2146     Document: 16     Page: 56     Filed: 11/13/2023

claim 1. *Id.* Specifically, Petitioner identifies the recited "first client device" with jondo 6. *Id.* at 27. Petitioner identifies the "first server" with Web server 5. *Id.* Petitioner identifies the "second server" with jondo 4. *Id.* Petitioner explains that "[j]ondo 4 may be regarded as a server (and thus the second server) for at least the reason that jondo 4 provides a service to requesting jondo 5." *Id.*

In its Response, Patent Owner argues that Crowds does not disclose the limitations of claim 1. *See* PO Resp. 31–36. With respect to the preamble, Patent Owner argues that "Crowds does not disclose a 'first client device' or a 'second server' as recited in the preamble of claim 1 under the purely role-based constructions." *Id.* at 31 (citing Ex. 2065 ¶ 150). Patent Owner argues that "[t]here is no way for a [person of ordinary skill in the art] to determine whether jondos 6 and 4 are client devices or servers under the purely role-based constructions because . . . jondos 6 and 4 operate in different roles at different points in time." *Id.* Patent Owner argues that "[t]he 'first client device' is necessarily and consistently a client device during the performance of method claim 1," and that "[s]imilarly, the 'second server' is necessarily and consistently a server during the performance of method claim 1." *Id.* (citing Ex. 2065 ¶¶ 142–148).

We disagree with Patent Owner because Patent Owner's arguments reject the role-based claim construction adopted by the district court and applied here, wherein the recited "client device" is a "communication device that is operating in the role of a client" and the recited "second server" is a "device that is operating in the role of a server and that is not the client device." Patent Owner's argument improperly limits the operation of the

41

"client device" and the "second server" to a single role, even though the district court recognized, consistent with the claim language, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

We, therefore, agree with Petitioner that Crowds meets the subject matter described in the preamble.

### a) *receiving, from the second server, the first content identifier*

Petitioner contends this step is disclosed by the path "5→4→6→ server" in Figure 2 of Crowds. Pet. 27. Petitioner explains that "Crowds discloses that jondo 6 (first client device) receives a 'request' (first content identifier or 'FCI') from jondo 4 (the second server)." *Id.* Petitioner further explains that "[t]he arrows in Fig. 2 of Crowds each represent 'requests,' i.e., requests for content residing on a web server, originating from one of the jondos and forwarded over a randomized path of jondos to the web server." *Id.* at 28 (citing Ex. 1006, 73[9]; Ex. 1005 ¶¶ 58–59). Petitioner explains that "each 'request' contains a URL," and that "[t]he 'requests' are clearly *HTTP requests* as understood by a [person of ordinary skill in the art], as reflected, *e.g.*, where Crowds notes that the requests have 'HTTP headers.'" Pet. 28 (citing Ex. 1006, 90). Petitioner explains that "[a]n *HTTP request* for

---

[9] Petitioner's citations to Crowds (Ex. 1006) in the Petition are to Crowds' original, internal pagination (66–92), and not to the pagination (1–27) applied by counsel.

Case: 23-2146    Document: 16    Page: 59    Filed: 11/13/2023

content available from a web server by definition contains a URL." Pet. 28 (citing Ex. 1005 ¶¶ 61–64).

Patent Owner argues that "when jondo 6 receives a request from jondo 4, jondo 6 is operating in the role of a server, not a client." PO Resp. 32 (citing Ex. 2065 ¶ 153). "Moreover," Patent Owner argues, "when jondo 4 sends a request to jondo 6, jondo 4 is operating in the role of a client, not a server." *Id.* (citing Ex. 2065 ¶ 154). Therefore, Patent Owner concludes, "jondo 6 cannot be a client device during performance of this method step" and "jondo 4 cannot be a server during performance of this method step." *Id.*

We disagree with Patent Owner's argument for several reasons. First, Patent Owner's argument requires the recited "client device" to operate in the client role at all times and that the recited "second server" must operate in the server role at all times. But such a rigid restriction on the operational roles of the client device and the second server are contradicted by the express language of claim 1 and would make claim 1 "incapable of ever being practiced," as Petitioner argues. *See* Pet. 18–19. For example, Claim 1 requires that the "first client device" receive a request (with the content identifier) from the "second server" in step 1, and expressly requires the "first client device" to send a response (with the content) back to the "second server" in step 4. Thus, claim 1 expressly requires that the "first client device" must sometimes operate in the role of a server and that the "second server" must sometimes operate in the role of a client.

Second, Patent Owner's rigid application of operational roles is inconsistent with the claim construction adopted by the district court and

applied here. The district court expressly acknowledged, and we agree, that consistent with the claim language "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Accordingly, we agree with Petitioner that Crowds discloses the subject matter described in limitation 1[a].

> b) *sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier*

Petitioner contends that this step is disclosed by Crowds when "[j]ondo 6, having received the FCI per step (a), then sends it in an HTTP request to the web server, according to step (b)." Pet. 30. Petitioner explains that the jondos "operate as HTTP proxies." *Id.* Petitioner explains further, "[i]n the example '5→4→6→server' path discussed above, the 'first client device' (jondo '6') sends the web request via HTTP to the target web server, or 'first server.'" *Id.* at 31 (citing Ex. 1006, 73–74, Fig. 2).

Petitioner illustrates this step by annotating Figure 2 of Crowds, shown below.

Case: 23-2146    Document: 16    Page: 61    Filed: 11/13/2023



Figure 2 of Crowds (annotated)

Petitioner's annotated Figure 2 of Crowds, shown above, illustrates (circled in red) first client device (jondo 6) sending the HTTP request comprising the FCI to first server (target web server 5).

Patent Owner does not specifically dispute Petitioner's evidence and arguments with respect to limitation 1[b]. *See* PO Resp. 31–36.

We agree with Petitioner that Crowds discloses the subject matter described in limitation 1[b]. Petitioner's arguments are supported by the testimony of Mr. Teruya, which we credit. *See* Ex. 1005 ¶¶ 65–69.

> c)    *receiving, the first content from the first server over the Internet in response to the sending of the first content identifier*

Petitioner contends limitation 1[c] is disclosed by Crowds: "Having made the content request of the web server per step (b), jondo 6 now receives the requested content in response, per step (c)." Pet. 32. Petitioner explains that "the 'first client device' (jondo '6' above) sends the FCI to the

45

first server, or target web server '5'. The last jondo in the path then receives the 'first content,' such as the user specified web page." *Id.* at 32–33. Petitioner further explains that "[t]he initiating jondo establishes the random path of jondos 'that carries its users' transactions to **and from** their intended web servers.'" *Id.* at 33 (citing Ex. 1006, 73). "Further," Petitioner explains, "server replies traverse the **same path as the requests, only in reverse**." Pet. 33 (citing Ex. 1006, 74). "Accordingly," Petitioner explains, "the first client device in Crowds (the last jondo in the path before the target web server) receives the requested web page (first content) for sending back down the path to the requesting user." Pet. 33 (citing Ex. 1005 ¶¶ 70–72).

Patent Owner does not specifically dispute Petitioner's evidence and arguments with respect to limitation 1[c]. *See* PO Resp. 31–36.

We agree with Petitioner that Crowds discloses the subject matter described in limitation 1[c]. Petitioner's arguments are supported by the testimony of Mr. Teruya, which we credit. *See* Ex. 1005 ¶¶ 70–72.

> *d) sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier*

Petitioner contends this step is disclosed by Crowds where Crowds explains "[a]s discussed regarding step (c) above, the first client device (jondo 6) receives the first content from the web server. In response, it then sends the content on to the requester, jondo 4, per step (d)." Pet. 33.

Petitioner explains that

> Jondo "6" previously receives the FCI from the second server (jondo "4" in the above example path). Further, as explained immediately above, the random path of jondos "carries its users' transactions to **and from** their intended web servers." Ex. 1006

Case: 23-2146    Document: 16    Page: 62    Filed: 11/13/2023

at 73. "[S]erver replies traverse the **same path as the requests, only in reverse.**" *Id.* at 74. The first client device (here, jondo "6") sends the first content (web page content) back to the second server (here, jondo "4," the prior jondo). The second server, jondo "4," can then send the web page content back to the requesting user (here, jondo "5").

Patent Owner argues that

[u]nder the purely role-based constructions, when jondo 6 is sending a response to jondo 4, jondo 6 is operating in the role of a server, not a client. EX.2065 at ¶158. Therefore, under the purely role-based constructions, jondo 6 cannot be a client device during performance of this method step. *Id.* Moreover, under the purely role-based constructions, when jondo 4 is receiving a response from jondo 6, jondo 4 is operating in the role of a client, not a server. EX.2065 at ¶159. Therefore, jondo 4 cannot be a server during performance of this method step. *Id.*

PO Resp. 33.

We do not agree with Patent Owner's argument. The district court's claim construction for the "server" terms, which we adopted, makes it clear that a server is defined by its function, not its structure. Ex. 1020, 7–11. Thus, the district court clarified that the second server is "a device that is *operating in the role of a server* and that is not the first client device." *Id.* at 8, 11 (emphasis added). Patent Owner's argument is unavailing because it rigidly focuses on an alleged requirement that devices cannot operate in different roles, an argument that was rejected by the district court in its claim construction. Rather, the district court explained that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first

Case: 23-2146     Document: 16     Page: 63     Filed: 11/13/2023

server/second server, and the web server." *Id.* at 11 (internal quotation marks omitted).

Petitioner's anticipation analysis is persuasive because it is based on the operation of jondos 4 and 6, and whether this operation meets the steps of the claimed method. In contrast, Patent Owner's opposition is based on a construction rejected by us and the district court.

We have considered Petitioner's evidence and arguments that each step of claim 1 is disclosed by Crowds, as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses all the limitations of independent claim 1.

> 2. *Dependent Claims 21–29*
>
> a) *Dependent Claim 21*

Dependent claim 21 recites the following limitations:

> *The method according to claim 1, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates respectively with the first or second server over the Internet based on, or according to, TCP/IP protocol or connection.*

Ex. 1001, 21:9–17.

Petitioner contends that Crowds confirms the use of TCP/IP when Crowds states that "failures are detected by the TCP/IP connection to the jondo breaking or being refused." Pet. 34 (citing Ex. 1006, 81). Petitioner argues that "[b]ecause the second server and first client device are jondos . . .

Case: 23-2146    Document: 16    Page: 64    Filed: 11/13/2023

this discloses that they establish a TCP connection with each other." Pet. 34. Petitioner also contends that "Crowds discloses the use of the HTTP protocol for communications between jondos and web servers." *Id.* According to Petitioner, a person of ordinary skill in the art "would have understood at the time that HTTP works on top of TCP, at the application layer of the TCP/IP networking model." Pet. 34–35 (citing Ex. 1005 ¶¶ 78– 80). "Like HTTP," Petitioner argues, "the TCP/IP networking model was well known" to a person of ordinary skill in the art. *Id.* According to Petitioner, "Crowds' disclosure of usage of HTTP would therefore additionally disclose usage of TCP/IP (with both the first and second servers)." Pet. 35 (citing Ex. 1005 ¶ 81).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 21. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Having considered Petitioner's evidence and arguments, in particular Crowds' disclosure that a jondo's communication path may be rerouted "when the failure of a jondo is unmistakenly detected . . . by the TCP/IP connection to the jondo breaking or being refused," (Ex. 1006, 81) we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 21.

### b) Dependent Claim 22

Dependent claim 22 recites the following limitations: "*[t]he method according to claim 1, wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.*" Ex. 1001, 21:18–21.

Case: 23-2146     Document: 16     Page: 65     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 66     Filed: 11/13/2023

Petitioner points out that Crowds states that FTP requests must also go through the crowd. Pet. 35 (citing Ex. 1006, 73 n.1). Petitioner argues that "[t]he first client device therefore also *communicates over the Internet based on . . . FTP* (as well as TCP)." *Id.*

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 22. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Having considered Petitioner's evidence and arguments, in particular Crowds' disclosure that FTP services must be proxied (Ex. 1006, 73 n.1), we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 22.

c)    *Dependent Claim 23*

Dependent claim 23 recites the following limitations: "*[t]he method according to claim 1, wherein the first content comprises web-page, audio, or video content, wherein the first content identifier comprises a Uniform Resource Locator (URL), and wherein the method further comprising executing, by the first client device, a web browser application or an email application.*" Ex. 1001, 21:22–22:2.

Petitioner asserts that Crowds discloses the first content being a web page. Pet. 35 (citing Ex. 1006, 79). Petitioner also asserts that "Crowds also discloses the first content identifier being a URL and the first client device executing a web browser application." *Id.* (citing Ex. 1006, 89) (using Netscape browser to browse a web page at a URL). According to Petitioner, a person of ordinary skill in the art "would thus understand Crowds to disclose claim 23." Pet. 35 (citing Ex. 1005 ¶¶ 83–84).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 22. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Having considered Petitioner's evidence and arguments, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 23.

### d) Dependent Claim 24

Dependent claim 24 recites the following limitations: "*[t]he method according to claim 1, further comprising establishing, by the first client device, a Transmission Control Protocol (TCP) connection with the second server using TCP/IP protocol.*" Ex. 1001, 22:3–6.

For dependent claim 24, Petitioner cites to the same evidence in Crowds as it did for dependent claim 21.

Patent Owner argues that

> [t]he portions of Crowds cited and relied upon by Petitioner only disclose establishing a TCP connection in the context of a jondo sending a request for content. Petition at 34-35; EX.2065 at ¶186; EX.1004 at 8. At that point in time, under the purely role-based constructions, jondo 4 is operating in the role of a client and jondo 6 is operating in the role of a server. EX.2065 at ¶187. Therefore, under the purely role-based constructions, jondo 4 cannot correspond to the "second server" and jondo 6 cannot correspond to the "first client device" as Petitioner alleges. *Id.* Under Patent Owner's proposed constructions, as discussed above, jondo 4 is not a server. EX.2065 at ¶188.

PO Resp. 41.

Patent Owner's argument is unavailing because it rigidly focuses on an alleged requirement that components, such as jondos, cannot operate in

Case: 23-2146    Document: 16    Page: 67    Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 68     Filed: 11/13/2023

different roles, an argument that was rejected by the district court in its claim construction. The district court explained, and we agree, that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." Ex. 1020, 10.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 24 for the same reasons explained above for dependent claim 21.

### e)     Dependent Claim 25

Dependent claim 25 recites the following limitations: "*[t]he method according to claim 1, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server, wherein the first client device communicates over the Internet with the first or second server based on, or according to, using TCP/IP protocol or connection.*" Ex. 1001, 22:7–12.

For dependent claim 25, Petitioner cites to the same evidence in Crowds as it did for dependent claim 21.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 25. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 25 for the same reasons discussed above for dependent claim 21.

    *f) Dependent Claim 26*

  Dependent claim 26 recites the following limitations: *"[t]he method according to claim 1, further comprising storing, operating, or using, a client operating system."* Ex. 1001, 22:13–14.

  Petitioner asserts that "Crowds discloses jondos '*storing, operating, or using, a client operating system,*' specifically SunOS 4.1.4." Pet. 35 (citing Ex. 1006, 82). Petitioner asserts that "Crowds further discloses that the jondo software application was programmed to allow for 'portability across Unix and Microsoft platforms.'" Pet. 34–35 (citing Ex. 1006, 81). According to Petitioner, a person of ordinary skill in the art "would understand Unix, Microsoft, and SunOS to refer to client operating systems." Pet. 36 (citing Ex. 1005 ¶¶ 85–86).

  Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 26. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

  We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 26, in particular where Crowd discloses a crowd of four jondos operating on SunOS 4.1.4.

    *g) Dependent Claim 27*

  Dependent claim 27 recites the following limitations: *"[t]he method according to claim 1, wherein the steps are sequentially executed."* Ex. 1001, 22:15–16.

Case: 23-2146     Document: 16     Page: 70     Filed: 11/13/2023

Petitioner contends that Crowds discloses the four method steps of claim 1 executed sequentially as further required by dependent claim 27. Petitioner explains that

> [t]he web request is forwarded along the path (*e.g.*, 5→4→6→server) such that the "first client device" (here, jondo "6") receives the web request (and content identifier in the URL) from the "second server" (here, jondo "4"), and sends the web request to the "first server" or target web server. Ex. 1006 at 73 and Fig. 2. "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 74. The "first client device" receives the web content from the web server, and sends it back to the "second server."

Pet. 36 (citing Ex. 1005 ¶¶ 87–89).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 27. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 27, in particular where the four method steps of claim 1 are sequentially executed by Crowds in the manner described by Petitioner.

### h)  *Dependent Claim 28*

Dependent claim 28 recites the following limitations: "*[a] non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.*" Ex. 1001, 22:17–20.

Petitioner asserts that Crowds "discloses . . . a software package that implements a jondo, whose operation is per claim 1, meeting the limitations

Case: 23-2146     Document: 16     Page: 71     Filed: 11/13/2023

of [claim 28]." Pet. 34 (citing Ex. 1006, 91). Mr. Teruya provides supporting testimony. *See* Ex. 1005 ¶ 76–77.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 28. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Crowds states that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at http://www.researchy.att.com/projects/crowds." Ex. 1006, 91.

This statement by Crowds clearly indicates that the Crowds' code has been distributed free-of-charge in response to user requests and that the Crowds' blender is being maintained on the Internet for an active crowd. Mr. Teruya testifies that this statement by Crowds discloses a software package that implements a jondo, "whose operation is per Claim 1." Ex. 1005 ¶ 76.

Based on this record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 28. The evidence shows that the Crowds' code has been distributed to users and the Crowds' blender is being maintained on the Internet for the operation of an active crowd. Crowds' disclosure of the method of claim 1 is discussed in Section III.E.1, above.

i)     *Dependent Claim 29*

Dependent claim 29 recites the following limitations: "*[a] client device comprising a non-transitory computer readable medium containing*

*computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.*" Ex. 1001, 22:21–24.

Petitioner asserts that Crowds "discloses . . . a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of [claim 29]." Pet. 34 (citing Ex. 1006, 91). Mr. Teruya provides supporting testimony. *See* Ex. 1005 ¶ 76–77.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 29. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Crowds states that "we have distributed over 1400 copies of the Crowds' code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds' code can be found at http://www.researchy.att.com/projects/crowds." Ex. 1006, 91.

This statement by Crowds clearly indicates that the Crowds' code has been distributed free-of-charge in response to user requests and that the Crowds' blender is being maintained on the Internet for an active crowd. Mr. Teruya testifies that this statement by Crowds discloses a software package that implements a jondo, "whose operation is per Claim 1." Ex. 1005 ¶ 76.

Based on this record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 29, because the evidence shows that the Crowds' code has been distributed to users and the Crowds' blender is being

Case: 23-2146     Document: 16     Page: 72     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 73    Filed: 11/13/2023

maintained on the Internet for the operation of an active crowd. Crowds disclosure of the method of claim 1 is discussed in Section III.E.1, above.

### 3.    *Conclusion on Anticipation - Crowds*

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments and evidence, and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1 and 21–29 are anticipated by Crowds.

## F.    *Obviousness Based on Crowds and RFC 2616*

Petitioner contends that claims 1, 2, 14, 15, 17–19, and 21–29 would have been obvious in light of Crowds and RFC 2616. Pet. 36–41. Because we have already determined that independent claim 1 is anticipated by Crowds, we only consider whether dependent claims 2, 14, 15, and 17–19[10] would have been obvious in light of Crowds and RFC 2616 as Petitioner contends. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1373 (Fed. Cir. 2019) ("[I]t is well settled that a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for anticipation is the epitome of obviousness." (citations and internal quotation marks omitted)).

### 1.    *Rationale to Combine*

Petitioner explains that working in the field of the '319 patent assumes a basic understanding of computers and Internet communications, including the standards governing HTTP. Indeed, based in part upon the

---

[10] We have also found that dependent claims 21–29 are anticipated by Crowds. *See* Section II.E.3, above.

Case: 23-2146     Document: 16     Page: 74     Filed: 11/13/2023

technology addressed by the '319 patent, we determined that a person of ordinary skill in this art would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems. *See* Section III.B. Such a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including HTTP and TCP/IP protocols. *Id.*

Petitioner points out that the '319 patent contemplates a web server as "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." Pet. 37 (citing Ex. 1001, 4:64–67). The '319 patent acknowledges that HTTP and TCP/IP are known to a person of ordinary skill in the art, stating "[a]*s is known by those having ordinary skill in the art*, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol." Ex. 1001, 17:22–24 (emphasis added). Indeed, the '319 patent cites to RFC 2616 for a definition of HTTP. *Id.*, 16:21–28; 20:44–46 (Claim 15 referring to an HTTP header "according to, or based on, IETF RFC 2616").

Petitioner points out that "Crowds concerns communications using these same protocols." Pet. 37 (citing Ex. 1006, 81 (TCP), 88–89 (HTTP)). Petitioner contends that "[s]ince Crowds was directed at improving the same types of communications, a [person of ordinary skill in the art] developing software for like applications would have had a powerful motivation to combine its disclosure with knowledge of Internet standards governing HTTP." Pet. 37 (citing Ex. 1005 ¶¶ 90–94).

Patent Owner does not specifically address Petitioner's stated rationale for combining the teachings of Crowds and RFC 2616. *See* PO Resp. 36–39. Instead, Patent Owner argues that "Crowds does not teach that a jondo may be a server," that "Crowds does not disclose or teach putting a server in the "mix," or that "Crowds also does not disclose or teach a crowd member that does not run its own web browser." *Id.* at 36. None of these arguments, however, addresses Petitioner's stated rationale for combining the teachings of Crowds and RFC 2616 described directly above. Rather, Patent Owner's arguments only address a contingent alternative proffered by Petitioner with respect to claim 1 "if the Board were to construe 'second server' as requiring a specialized data-center class device," which we did not adopt. *See* Pet. 38.

We find that Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to combine the teachings of Crowds and RFC 2616 in the manner described by Petitioner because both Crowds and RFC 2616 are directed to improving networked communications so that a person of ordinary skill in the art developing software for similar applications would have had an incentive to combine the disclosure of Crowds with the knowledge of Internet standards governing HTTP described by RFC 2616.

### 2. *Teaching Away*

Patent Owner argues that Crowds teaches away from the claimed methods of the '319 patent because: 1) Crowds does not provide the initiator with anonymity as to the target web server; 2) Crowds teaches that an increase in deniability results in an increase in latency; and 3) Crowds does

59

Case: 23-2146    Document: 16    Page: 76    Filed: 11/13/2023

not teach the initiator to purposefully select a jondo to form a pathway. PO Resp. 38–39.

For the first issue, Patent Owner argues that Crowds does provide anonymity, but anonymity is not a limitation of the claims. As to the third issue, a "purposeful" selection of a device is also not claimed. Evidence concerning whether the prior art teaches away from a given invention must relate to and be commensurate in scope with the ultimate claims at issue. *See, e.g., MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264–65 (Fed. Cir. 2013).

As to the second issue of Crowds' latency, Patent Owner does not explain, nor does Dr. Williams provide support, for why Crowds would teach away from the claimed invention, that is, "a person of ordinary skill, upon reading the reference . . . would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013). Moreover, Crowds discusses ways to mitigate latency problems in its system (Ex. 1006, 19) and in Crowds there is no criticizing, discrediting, misdirecting or otherwise discouraging of the approach taken in the claims. *See Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017); *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Accordingly, we do not find that Crowds teaches away from the claimed invention of the '319 patent as Patent Owner contends.

### 3.    *Objective Indicia of Nonobviousness*

Patent Owner asserts that non-obviousness is supported by objective indicia, including commercial success, long-felt need, copying, and industry praise. PO Resp. 57–74; PO Sur-reply 27–29. Petitioner disagrees,

contending that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which do not have a nexus to the claims, and that Patent Owner's arguments regarding commercial success, long-felt need, copying, and industry praise suffer from additional evidentiary infirmities. Pet. Reply 24–26.

### a)   Legal Standards

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). "[O]bjective indicia 'may often be the most probative and cogent evidence of nonobviousness in the record,'" and "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378. Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, their proponent must establish a nexus between the evidence and the merits of the claimed

Case: 23-2146     Document: 16     Page: 77     Filed: 11/13/2023

invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)).

On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.* Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of

Case: 23-2146    Document: 16    Page: 79    Filed: 11/13/2023

secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

### b)    *Commercial Success*

Patent Owner argues that nonobviousness is supported by the fact that it commercialized a "'residential proxy service" that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or personal computer having a residential IP address, as a proxy client device according to the claimed methods. PO Resp. 57 (citing Ex. 2065 ¶ 262). According to Patent Owner, it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service." *Id.* (citing Ex. 2065 ¶ 263; Ex. 2038). Patent Owner asserts that its "residential proxy service has grown to dominate the market." *Id.* at 70. According to Patent Owner, in 2021 Bright Data's "residential proxy service generated revenues of $53.7 million." *Id.* Patent Owner further contends that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is evidence of commercial success. *Id.* (citing Ex. 2065 ¶ 269).

Patent Owner asserts that it "provides a residential proxy service that practices the methods claimed in the '319 [p]atent," and provides claim charts purporting to show how "this commercial embodiment practices at least claims 1–2, 17–18, and 21–29 of the '319 [p]atent." PO Resp. 57–68. Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '319 [p]atent where the requesting client device corresponds to client 102, the

Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122." *Id.* at 68. According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims'" and "embodies the claimed features of the '319 [p]atent and is coextensive with them." *Id.*

Additionally, Patent Owner argues that the features driving the commercial success of [its] residential proxy service are (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses. *Id.* Finally, Patent Owner argues that "the district court found that sufficient nexus was established." PO Sur-reply 27 n.11.

Petitioner points out that Patent Owner "asserts that two things 'driv[e]' the commercial success of its 'residential proxy service': use of 'residential IP addresses' and 'scalability' from the 'large number' of clients with 'residential IP addresses.'" Pet. Reply, 24–25 (citing PO Resp. 68–69). Petitioner argues that Patent Owner "therefore admits a lack of nexus, because neither the use of 'residential IP addresses' or 'scalability' from a 'large number' of clients with residential IP addresses are claimed." Pet. Reply 25.

Petitioner alleges that Dr. Williams "admits that use of 'residential' IP addresses is not claimed." *Id.* (citing Ex. 1111, 56:4–6, 56:19–57:6). Petitioner argues that Dr. Williams "cites to 2021 sales figures as showing 'commercial success,' but provides no analysis tying those sales figures to any allegedly embodying PO product." Pet. Reply, 25 (citing Ex. 2065

¶ 270). Petitioner argues that Dr. Williams "did nothing to determine commercial 'success,' other than observing 'revenues in the millions of dollars per month.'" Pet. Reply, 26 (citing Ex. 1111, 168:23–169:3). Petitioner points out that Dr. Williams "did not have 'the data' to know what feature(s) drove revenue." Pet. Reply, 26 (citing Ex. 1111, 176:7–177:21).

Based on this record, we find that Patent Owner has failed to establish a nexus between the challenged claims and the products that Patent Owner relies on to show commercial success. First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products that it relies on for commercial success embody and are coextensive with the challenged claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner relies on features of its products that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products.

For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing] residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses." PO Resp. 68; *see id.* at 57 (pointing to Patent Owner's "residential proxy service [that] provides various user's client devices, such as a laptop, desktop, tablet, or smartphone, as a proxy to other user's requesting client devices"), 70 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" wherein its "residential proxy service generated revenues of $53.7 million in the year 2021").

Case: 23-2146     Document: 16     Page: 81     Filed: 11/13/2023

The challenged claims, however, do not recite any limitations requiring residential proxies, residential computers, or residential IP addresses. Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer computer" or "consumer communication device." *See* Section III.C. At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to establish a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims. *See* PO Resp. 57–59, 68–71. Therefore, Patent Owner has failed to demonstrate that commercial success of its products is the "direct result" of the claimed invention's unique characteristics.

We also are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established." PO Sur-reply 27 n.11 (citing Ex. 2014, 4). Patent Owner relies on the district court's ruling

Case: 23-2146    Document: 16    Page: 82    Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 83    Filed: 11/13/2023

on defendants' motion to strike the opinions of Patent Owner's expert Dr. Rhyne, where the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of nonobviousness" because it "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention." Ex. 2014, 4. The district court's order, however, does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing such an explanation. It is also not clear from the record whether the district court's finding was that nexus had been established, or simply that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony to establish nexus at trial.

### c) Long-Felt Need

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 71. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target web site," but "that website could still likely identify data center server IP addresses as proxy addresses" because they "were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic location." *Id.* (citing Ex. 2065 ¶ 187). "In contrast," Patent Owner asserts, its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." *Id.* Patent Owner further contends that its "residential IP network" solves the need to "dramatically increase the [number] of IP addresses that can be included in a proxy network." *Id.*

Case: 23-2146    Document: 16    Page: 84    Filed: 11/13/2023

For similar reasons as for commercial success, Patent Owner has not established that there is a nexus between Patent Owner's evidence of long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a "long-felt need" are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 71. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

### d)    Copying

Patent Owner argues that "[d]uring the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service, then under the name as 'Hola,' was presented." PO Resp. 72 (citing Ex. 2065 ¶ 273). Specifically, Patent Owner argues that its representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas Okmanas) to incorporate its software development kit (SDK) in Oxylabs' applications, but that instead Oxylabs "subsequently released their own SDK for Oxylabs' own residential proxy network." *Id.* (citing Ex. 2049, 202:12–204:8; Ex. 2047, 131:23–132:7; 152:8–153:6; Ex. 2065 ¶ 273). Patent Owner also asserts that Mr. Okmanas testified that he was looking for "a system that works like hola.org," that Oxylabs "wanted to develop its own residential proxy service," and that "he believed that he needed to do what Bright Data (previously known as Luminati and Hola) were doing to be successful." *Id.* at 73 (citing Ex. 2047, 95:20–97:1, 103:18–104:10, 149:13–150:8; Ex. 2065

Case: 23-2146    Document: 16    Page: 85    Filed: 11/13/2023

¶ 274). "This testimony," according to Patent Owner, "is strong evidence of copying." *Id.* (citing Ex. 2065 ¶ 274).

For similar reasons as for commercial success and long-felt need, no nexus has been shown between Patent Owner's evidence of copying and the challenged claims. Although Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied, it refers generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 72–73. As explained above, however, the challenged claims do not recite or require a residential proxy service. Therefore, Patent Owner has failed to make the requisite showing that the claimed invention was copied.

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '319 [p]atent as described above." PO Resp. 74 (citing Ex. 2065 ¶ 276). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." *Id.*

For similar reasons as for the other objective indicia, no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. PO Resp. 74. Therefore, Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

Case: 23-2146    Document: 16    Page: 86    Filed: 11/13/2023

e)    *Conclusion*

For the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise is entitled to little weight in our obviousness analysis because Patent Owner has not shown a sufficient nexus to the evidence presented and the claimed invention.

4.    *Dependent Claim 2*

Dependent claim 2 recites the following limitations:

> [t]he method according to claim 1, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first client device, during, as part of, or in response to, a start-up of the first client device, a first message to the second server, and wherein the first messages comprises the first IP address, the MAC address, or the hostname.

Ex. 1001, 19:33–40.

According to Petitioner, Crowds discloses that jondos have host names: "[t]he user selects this jondo as her web proxy by specifying its host name and port number in her web browser as the proxy for all services." Pet. 39 (citing Ex. 1006, 73; *see also* Fig. 6 (identifying host names of multiple available jondos). Petitioner asserts that "Crowds also discloses a setup phase for new jondos, such that other jondos learn information including their IP address shared password, and use this information when selecting a jondo as a proxy." Pet. 39. "In the setup phase," Petitioner explains, "the Blender gets the IP address of the joining jondo." *Id.* (citing Ex. 1006, 87). According to Petitioner, "[t]he blender then informs the other jondos of the new member and shared key, so that 'all members are

equipped with the data they need for the new member to participate in the crowd.'" Pet. 39 (quoting Ex. 1006, 87).

According to Petitioner, it would be obvious to a person of ordinary skill in the art "that the other jondo (e.g., the one participating as the second server) would receive a message from the first jondo (first client device), during the first jondo's initialization period, which includes the first jondo's IP address." Pet. 39 (Ex. 1005 ¶¶ 100–102).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. See PO Resp. 40–41. Neither does Dr. Williams. See Ex. 2065 ¶¶ 180–189.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 2, wherein during the setup phase a user selects a jondo as a web proxy by specifying a host name as the proxy for all services such that other jondos learn this information including their IP address shared password, and use this information when selecting a jondo as a proxy.

### 5. Dependent Claim 14

Dependent claim 14 recites the following limitations: "*[t]he method according to claim 1, further comprising determining, by the first client device, that the received first content, is valid.*" Ex. 1001, 20:41–43.

Petitioner asserts that RFC 2616 discloses headers that implement the subject matter of claim 14. Pet. 40 (citing Ex. 1013 § 14.9). Petitioner argues that "the techniques for this taught by RFC 2616 are identical to the 'Cache-Control' directives utilized in the ['319] Patent to implement this

functionality." Pet. 40. The cache-control directives described in RFC 2616 include "[c]ontrols over cache revalidation and reload." Ex. 1013 § 14.9.

Figure 12 of the '319 patent provides a flow chart illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid. The '319 patent acknowledges that "the HTTP protocol, *defined by RFC 2616*, outlines specific methods . . . within the HTTP headers signifying the validity of certain data, such as, but not limited to, by using HTTP header information." Ex. 1001, 16:21–25 (emphasis added).

Petitioner argues that it "would have been obvious for [a person of ordinary skill in the art] faced with a like issue of data validation for retrieved web content to take advantage of this widely adopted standard to accomplish that end, as set forth in RFC 2616." Pet. 40 (citing Ex. 1005 ¶ 103).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 14. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 14.

### 6. *Dependent Claim 15*

Dependent claim 15 recites the following limitations: "*[t]he method according to claim 14, wherein the determining is based on the received*

Case: 23-2146     Document: 16     Page: 89     Filed: 11/13/2023

*HTTP header according to, or based on, IETF RFC 2616.*" Ex. 1001, 20:44–46.

Petitioner uses the same arguments and evidence for dependent claim 15 that it used for dependent claim 14.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 15. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 15.

### 7. Dependent Claim 17

Dependent claim 17 recites the following limitations: "*[t]he method according to claim 1, further comprising periodically communicating between the second server and the first client device.*" Ex. 1001, 20:56–58.

Petitioner asserts that Crowds discloses that jondos periodically communicate with each other to ensure the liveness of other jondos. Pet. 40 (citing Ex. 1006, 87) (referring to line 25 of Figure 3). Petitioner argues that a person of ordinary skill in the art "would have known that such verification could be easily done by using standard 'keep-alive' messaging." Pet. 40. Petitioner also argues that "[t]he random path retrieval mechanism itself (discussed above), especially where a web page with multiple embedded objects (images, etc.) is involved, entails periodic communication between the first client device and the second server, separately meeting the limitations of claim 17." *Id.* (citing Ex. 1005 ¶ 104).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 17. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 17.

### 8. *Dependent Claim 18*

Dependent claim 18 recites the following limitations: "*[t]he method according to claim 17, wherein the periodically communicating comprises exchanging 'keep alive' messages.*" Ex. 1001, 20:59–61.

Petitioner asserts that a "keep-alive" mechanism for TCP connections (involving "periodically probing the other end of a connection") is disclosed in RFC 1122. Pet. 40 (citing Ex. 1016 § 4.2.3.6). Petitioner asserts that Crowds "confirms that jondos communicate over TCP/IP connections: in discussing potential points of failure, Crowds states that 'such failures are detected by the TCP/IP connection to the jondo breaking or being refused,' reflecting that Crowds relies upon TCP connections." Pet. 41 (emphasis omitted)(citing Ex. 1006, 81). Petitioner argues "[i]t would have been obvious to [a person of ordinary skill in the art] to have performed this disclosed 'detecting' by using the 'keep-alive' implementation taught by RFC 1122." Pet. 41 (citing Ex. 1005 ¶ 105).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 17. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 180–189.

Case: 23-2146     Document: 16     Page: 90     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 91     Filed: 11/13/2023

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 18.

### 9. *Dependent Claim 19*

Dependent claim 19 recites the following limitations:

> *The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by:*
>
> *downloading, by the first client device from the Internet, the software application; and*
>
> *installing, by the first client device, the downloaded software application.*

Ex. 1001, 20:62–21:6.

Petitioner asserts that Crowds discloses the additional limitations of claim 19. Pet. 41 (citing Pet. Secs. 8.1.3–8.1.6; Ex. 1005 ¶ 106). Petitioner argues that Crowds "discloses (and states how a user could download from the Internet for installation) a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of [claim 19]." Pet. 34 (citing Ex. 1006, 91; Ex. 1005 ¶¶ 76–77).[11]

---

[11] Petitioner indicates that "[f]or purposes hereof, Petitioner will treat the steps recited in the first clause of claim 19 as corresponding to steps (b)-(d) of claim 1." Pet. 34, n.3.

Case: 23-2146    Document: 16    Page: 92    Filed: 11/13/2023

Patent Owner argues that "Petitioner fails to show that Crowds discloses or teaches 'storing of the first content' and 'sending… the stored first content' as recited in claim 19." PO Resp. 40 (citing Pet. 34). Patent Owner argues that "Petitioner does not show that the software package causes the processor on the jondo to store the first content or send the stored first content as recited in claim 19." PO Resp. 40 (citing Ex. 2065 ¶ 183).

> In its Reply, Petitioner argues that
>
> claim 19 "adds two method steps regarding software application downloading and installation. PO does not dispute that the prior art discloses those steps, but instead refers to the language "the receiving and storing of the first content" used in claim 19 to refer back to claim 1 (even though "the storing" has no antecedent basis). POR, 40, 55. PO's argument fails because claim 19 does not specify any particular means of storing the HTTP content, and therefore the use of typical computer memory satisfies this step. Williams admits that typical "user computers" are disclosed in Crowds (EX-2065, ¶ 161).

Pet. Reply 23.

In its Sur-reply, Patent Owner states that it "focuses on independent claim 1 and defers to its analysis of the dependent claims as set forth in the [Patent Owner Response]. PO Sur-reply 22, n.9 (citing PO Resp. 40–41; 48; 54–55).

Claim 19 does not specify any particular means of "storing of the first content" and "sending . . . the stored first content." We agree with Petitioner that Crowds discloses "user computers" and that the use of typical computer memory would satisfy the storing step. Dr. Williams also acknowledges that the jondos of Crowds are "user computers". Ex. 2065 ¶ 161. A person of ordinary skill in the art at the time of the invention would understand that a

"user computer" such as those described in Crowds would typically have computer memory and storage capabilities in order to function in the manner that Crowds operates. *See* Section III.B, above.

For downloading of the software application, Crowds expressly discloses that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at http://www.research.att.com/projects/crowds." Ex. 1006, 91. Mr. Teruya testifies that this statement discloses a software package that implements a jondo, "whose operation is per Claim 1." Ex. 1005 ¶ 76. Patent Owner presents no argument to rebut this evidence.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 19.

### 10. *Conclusion on Obviousness - Crowds and RFC 2616*

Based upon consideration of the entire record, including Petitioner's arguments and evidence and Patent Owner's arguments and evidence of secondary considerations, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2, 14, 15, and 17–19 would have been obvious over the combined teachings of Crowds and RFC 2616 and that a person of ordinary skill in the art would have combined the teachings of Crowds and RFC 2616 in the manner described by Petitioner. As noted above, we give little weight to Patent Owner's evidence of secondary considerations in our obviousness analysis because Patent Owner

Case: 23-2146    Document: 16    Page: 93    Filed: 11/13/2023

has failed to establish a sufficient nexus between that evidence and the challenged claims.

## G. *Anticipation Based on Border*

Petitioner asserts that claims 1, 12, 14, 21, 22, 24, 25, and 27–29 are anticipated by Border. Pet. 41–53. Because we have already determined that claims 1, 14, and 21–29 are unpatentable based on other grounds, we only consider whether claim 12 is anticipated by Border as Petitioner contends. However, in order to anticipate claim 12, Border must first disclose the limitations of independent claim 1, which dependent claim 12 incorporates. For ease of reference, Figure 1 from Border is set out below.

*FIG. 1*



Figure 1 from Border, above, is a diagram depicting a communication system employing a downstream proxy server and an upstream proxy server for accessing a web server.

Case: 23-2146     Document: 16     Page: 94     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 95    Filed: 11/13/2023

### 1. Independent Claim 1

The preamble of claim 1 reads as follows:

> *A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:*

Ex. 1001, 19:16–21.

Petitioner asserts that the preamble of claim 1 is disclosed by Border. Pet. 44. Petitioner identifies the first client device recited in the preamble as upstream server 107 in Border. *Id.* Petitioner identifies the recited second server as downstream server 105. *Id.* Petitioner identifies the recited first server as web server 109. *Id.* Petitioner identifies the recited first content identifier as the requested URL. *Id.* And Petitioner identifies the recited first content as the requested web page at the requested URL. *Id.* (citing Ex. 1005 ¶¶ 107–108).

The remaining steps of claim 1 are as follows:

> *[a] receiving, from the second server, the first content identifier;*

> *[b] sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;*

> *[c] receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and*

> *[d] sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.*

Ex. 1001, 19:22–32.

Case: 23-2146    Document: 16    Page: 96    Filed: 11/13/2023

Petitioner's analysis continues by showing that each step of claim 1 is disclosed in Border. Pet. 44–49. Petitioner asserts that the "receiving, from the second server" (step a) is met when "[w]eb content is retrieved from a web server that stores the web content by forwarding a 'URL request message to a web server and receiv[ing] the URL content from the web server.'" *Id.* at 44 (citing Ex. 1012, 2:52–54). Similarly, the "sending, to the first server" (step b) is met when "[u]pstream server 107 (the first client device) issues a GET request to web server 109 for the content at a specified URL." Pet. 47 (citing Ex. 1012, Fig. 2, 5:33–36) (footnote omitted). "Receiving, the first content" (step c) is met when "[i]n response to upstream server 107 'issu[ing] the GET URL HTML request the web server 109 for the HTML page . . . the web server 109 transmits the requested HTML page to the upstream server.'" Pet. 48 (citing Ex. 1012, 5:34–37). "Sending, the first content" (step d) is met "[a]fter receiving the web page at the requested URL from web server 109, upstream server 107 'forwards the HTML page to the downstream server 105,'" and "[d]ownstream server 105 then forwards the first content to web browser 103, in response to web browser 103's original GET request, per the second server's role as a 'server.'" Pet. 49 (citing Ex. 1012, 5:38–40). Mr. Teruya provides supporting testimony. Ex. 1005 ¶¶ 109–123.

These communication steps are depicted in Border's Figure 2, shown below.

Case: 23-2146    Document: 16    Page: 97    Filed: 11/13/2023



Border's Figure 2, above, is a sequence diagram showing the communications between the web server, upstream and downstream servers, and browser of Border.

For the preamble, Patent Owner relies on the same arguments it made with respect to Crowds. PO Resp. 42 ("For the same reasons discussed above regarding Crowds, Border does not disclose a 'first client device' or a 'second server' as recited in the preamble") (citing Ex. 2065 ¶ 197). Patent Owner's arguments are unavailing for the same reasons we discussed with respect to Crowds. *See* Section III.E.1, above.

For "receiving, from the second server" step 1[a], Patent Owner argues that "[f]or the same reasons discussed above regarding Crowds, during performance of this method step, under the purely role-based constructions, downstream server 105 is operating in the role of a client, not a server, and therefore downstream server 105 cannot be a server." PO Resp. 42. Patent Owner's arguments with respect to claim 1 step [a] are unavailing for the same reasons discussed above with respect to Crowds. *See* Section III.E.1.a, above.

Patent Owner also makes the same arguments with respect to the "sending, the first content" step 1[d] that it made with respect to Crowds. *See* PO Resp. 43 ("[f]or the same reasons discussed above regarding Crowds"). Patent Owner's arguments with respect to claim 1 step [d] are unavailing for the same reasons discussed above with respect to Crowds. *See* Section III.E.1.d, above.

Patent Owner's other arguments with respect to Border, for example that "Border does not disclose the architecture of claim 1 under Patent Owner's proposed constructions" (PO Resp. 44–45) are unavailing because they argue proposed claim constructions that we did not adopt. *See* Section III.C, above.

We have considered Petitioner's evidence and arguments that each step of claim 1 is disclosed by Border, as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Border discloses all the limitations of independent claim 1.

Case: 23-2146   Document: 16   Page: 99   Filed: 11/13/2023

2. *Dependent Claim 12*

Dependent claim 12 recites the following limitations: "*[t]he method according to claim 1, further comprising storing, by the first client device in response to the receiving from the first server, the first content, and wherein the sending, of the HTTP request is in response to the receiving of the first content identifier.*"

Petitioner contends that Border discloses these limitations because

> Border discloses upstream server 107 sending the GET request to web server 109 after it receives the requested URL from downstream server 105, where upstream server 107 further comprises HTTP cache 117. Ex. 1012, 4:8-11. In response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117. *Id.*, 5:36-38.

Pet. 50 (citing Ex. 1005 ¶ 124).

With respect to claim 12, Patent Owner argues that "[b]ecause Border does not disclose or teach independent claim 1, Border does not disclose or teach dependent claim[] 12." PO Resp. 48 (citing Dec. 9; Ex. 2065 ¶ 218). Because we have already determined that Border discloses all the limitations of independent claim 1, Patent Owner's argument is unavailing. *See* Section III.G.1, above.

We have considered Petitioner's evidence and arguments as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Border discloses all the limitations of dependent claim 12.

Case: 23-2146     Document: 16     Page: 100     Filed: 11/13/2023

*H.  Obviousness Based on Border and RFC 2616*

Petitioner contends that claims 1, 12, 14, 15, 17, 18, 21, 22, 24, 25, and 27–29 would have been obvious in light of Border and RFC 2616.  Pet. 53–57.  Because we have already determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

*I.  Anticipation Based on MorphMix*

Petitioner asserts that claims 1, 17, 19, and 21–29 are anticipated by MorphMix.  Pet. 58–61.  Because we have already determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

*J.  Obviousness Based on MorphMix and RFC 2616*

Petitioner contends that claims 1, 2, 14, 15, 17–19, 21–29 would have been obvious over MorphMix in light of RFC 2616.  Pet. 70–75.  Because we have already determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

IV. MOTION TO SEAL AND PROTECTIVE ORDER[12]

Patent Owner has filed a Motion to Seal and to Enter the Joint Protective Order (Paper 32, "Motion"), which seeks to seal Exhibits 2039, 2041–2044, and 2065 and associated portions of the Patent Owner Response, and to enter an agreed-upon Joint Protective Order (Ex. 2071). Paper 32, 1.  Patent Owner asserts that Exhibit 2039 contains sensitive

---

[12] Petitioner has filed a Motion to Exclude Evidence (Paper 43), which was withdrawn at the Oral Hearing without objection by Patent Owner.  *See* Paper 48, 5.

Case: 23-2146    Document: 16    Page: 101    Filed: 11/13/2023

technical network information, Exhibits 2041–2044 contain source code and related files, Exhibit 2065 is an expert declaration that references some of the sensitive information in the exhibits, and portions of the Patent Owner Response incorporate some of the sensitive information. *Id.* at 2–6. Patent Owner argues that it would be harmed by the public disclosure of its highly sensitive information, that it has taken steps to guard against disclosure, which outweighs the public's interests. *Id.* This Motion is unopposed.

We have reviewed the exhibits at issue, including the portions of the exhibits and Patent Owner Response, and the explanations of the confidential nature of the materials for which sealing is sought, as discussed in the Motion. We grant the Motion to Seal (Paper 32) and the associated request to enter the Protective Order (Ex. 2071).

## V. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of U.S. Patent No. 10,257,319 B2 are unpatentable on the bases set forth in the following table.[13]

---

[13] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 19, 21–29 | 102 | Crowds | 1, 21–29 | |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | Crowds, Knowledge of POSITA, RFC 2616 | 2, 14, 15, 17–19 | |
| 1, 12, 14, 21, 22, 24, 25, 27–29 | 102 | Border | 12 | |
| 1, 12, 14, 15, 17, 18, 21, 22, 24, 25, 27–29 | 103 | Border, Knowledge of POSITA, RFC 2616[14] | | |
| 1, 17, 19, 21–29 | 102 | MorphMix | | |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | MorphMix, Knowledge of POSITA, RFC 2616 | | |
| **Overall Outcome** | | | 1, 2, 12, 14, 15, 17–19, 21–29 | |

---

[14] Because each of these challenged claims is held unpatentable on other grounds, we do not reach grounds 4–6 in the Petition.

Case: 23-2146    Document: 16    Page: 102    Filed: 11/13/2023

## VI. ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of U.S. Patent No. 10,257,319 B2 are unpatentable;

FURTHER ORDERED that the Motion to Seal (Patent Owner's Response (Paper 30), Exs. 2039, 2041–2044, and 2065) is *granted*;

FURTHER ORDERED that the request to enter the Protective Order (Ex. 2071) is *granted*;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Case: 23-2146     Document: 16     Page: 103     Filed: 11/13/2023

IPR2022-00915
Patent 10,257,319 B2

PETITIONER:

Liang Huang
Wensheng Ma
MAURIEL KAPOUYTIAN WOODS LLP
rhuang@mkwllp.com
wma@mkwllp.com


PATENT OWNER:

Thomas Dunham
Elizabeth O'Brien
CHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MAJOR DATA UAB,

Petitioner

v.

BRIGHT DATA LTD.,

Patent Owner

---

Case IPR2022-00915

Patent No. 10,257,319

---

**PATENT OWNER'S NOTICE OF APPEAL**


Mail Stop PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Pursuant to 35 U.S.C. §§ 141, 142, and 319, and 37 C.F.R. §§ 90.2 and 90.3, notice is hereby given that Patent Owner Bright Data Ltd. appeals to the U.S. Court of Appeals for the Federal Circuit from the Final Written Decision (Paper 50) entered on September 13, 2023 in IPR2022-00915, and from all underlying orders, decisions, ruling, and opinions that are adverse to Patent Owner.[1,2] The public version of the Final Written Decision (Paper 51) entered on September 15, 2023 is

---

[1] Lead Case No. 23-2144, pending in its early stages before the Fed. Cir., involves the same patent, the same disputed claim terms, and the same primary prior art reference (Crowds).

[2] Patent Owner is simultaneously filing a Notice of Appeal in IPR2022-00915 and IPR2022-00916, which involve related patents having the same specification, the same disputed claim terms, and the same prior art references. There are also similar claim construction issues in pending administrative matters: IPR2021-01492, IPR2021-01493, and IPR2022-00687; as well as Reexamination Control Nos. 90/014,652, 90/014,816, 90/014,624, and 90/014,827; all which involve related patents having the same specification. There are also similar claim construction issues in stayed Reexamination Control Nos. 90/014,875 and 90/014,876, as well as stayed district court matters: Case Nos. 2:19-cv-395, 2:19-cv-396, and 2:19-cv-414 in the Eastern District Court of Texas.

Case: 23-2146    Document: 16    Page: 107    Filed: 11/13/2023

attached to this Notice as Exhibit A.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner intends to appeal at least the following issues:

i. Whether the Board's construction of the claim term "client device" was incorrect and/or not reasonable in light of the evidence of record;

ii. Whether the Board's construction of the claim term "second server" was incorrect and/or not reasonable in light of the evidence of record;

iii. Whether the Board erred in determining that Petitioner established by a preponderance of the evidence that claims 1 and 21-29 of U.S. Patent No. 10,257,319 ("the '319 Patent") are unpatentable as anticipated by Crowds[3];

iv. Whether the Board erred in determining that Petitioner established by a preponderance of the evidence that claims 2, 14, 15, and 17-19 of the '319 Patent are unpatentable as obvious over the combination of

---

[3] Michael Reiter & Aviel Rubin, Crowds: Anonymity for Web Transactions, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds").

Crowds and RFC 2616[4];

v.   Whether the Board erred in determining that Petitioner established by a preponderance of the evidence that claim 12 of the '319 Patent is unpatentable as anticipated by Border[5]; and

vi.  Whether the Board erred in any further findings or determinations supporting or relating to the issues above, including the Board's consideration of the expert testimony, prior art, secondary considerations of non-obviousness, and other evidence in the record.

Pursuant to 37 C.F.R. § 90.3, this Notice is timely, having been duly filed within 63 days after the date of the Final Written Decision.

A complete and entire copy of this Notice is being filed simultaneously with each of the Patent Trial and Appeal Board and the Clerk's Office for the U.S. Court of Appeals for the Federal Circuit, along with the required fee. A complete and entire copy of this Notice is being served simultaneously on each of the Director of the

---

[4] Fielding, et al., RFC 2616, Hypertext Transfer Protocol -- HTTP/1.1, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

[5] Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border").

Case: 23-2146     Document: 16     Page: 108     Filed: 11/13/2023

U.S. Patent and Trademark Office and the petitioner.

No fees are believed to be due to the U.S. Patent and Trademark Office in connection with this filing, but authorization is hereby given for any requisite fees to be charged to Deposit Account No. 603803 (Customer No. 144371).

Respectfully submitted,

Date: September 18, 2023

By: /s/ *Thomas M. Dunham*
Thomas M. Dunham
Reg. No. 39,965

Cherian LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEY FOR PATENT OWNER,
BRIGHT DATA LTD.

## CERTIFICATE OF FILING AND SERVICE

The undersigned hereby certifies a complete and entire copy of this paper was served on the undersigned date by hand on the Director of the USPTO at the following address:

> Office of the General Counsel
> United States Patent and Trademark Office
> Madison Building East, Room 10B20
> 600 Dulany Street
> Alexandria, VA 22314

The undersigned hereby certifies a complete and entire copy of this paper was filed on the undersigned date with the Clerk's Office for the United States Court of Appeals for the Federal Circuit and that the required docket fee was paid electronically through the Court's CM/ECF system.

The undersigned hereby certifies a complete and entire copy of this paper was served on the undersigned date via email, as authorized by Petitioner, at the following email addresses:

> rhuang@mkwllp.com
>
> vma@mkwllp.com
>
> jbartlett@mkwllp.com

Case: 23-2146     Document: 16     Page: 111     Filed: 11/13/2023

Respectfully submitted,

Date:  September 18, 2023

By: /s/ *Thomas M. Dunham*
Thomas M. Dunham
Reg. No. 39,965

Cherian LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEY FOR PATENT OWNER,
BRIGHT DATA LTD.

Trials@uspto.gov
Tel: 571-272-7822

Paper 51
Entered: September 15, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

MAJOR DATA UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

_____

IPR2022-00916
Patent 10,484,510 B2

_____

Before THOMAS L. GIANNETTI, KEVIN C. TROCK, and
SHEILA F. McSHANE, *Administrative Patent Judges.*

TROCK, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motion to Seal and Protective Order
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

Case: 23-2146    Document: 16    Page: 113    Filed: 11/13/2023

# I.  INTRODUCTION

We have authority to hear this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision issues pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons discussed herein, we determine that Petitioner, Major Data UAB, has shown by a preponderance of the evidence that claims 1, 2, 6–11, 13, and 15–24 of U.S. Patent No. 10,484,510 B2 (Ex. 1001, "the '510 patent") are unpatentable.  *See* 35 U.S.C. § 316(e) (2018); 37 C.F.R. § 42.1(d) (2019).

# II.  BACKGROUND

## A.  *Procedural History*

Major Data UAB ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1, 2, 6–11, 13, and 15–24 of the '510 patent (the "challenged claims").  Bright Data Ltd.[1] ("Patent Owner") filed a Preliminary Response.  Paper 12.  With authorization from the panel, Petitioner filed a Preliminary Reply (Paper 16), and Patent Owner filed a Preliminary Sur-reply (Paper 17).  Based upon the record at that time, we instituted *inter partes* review on all challenged claims on grounds presented in the Petition.  Paper 18 ("Institution Decision" or "Dec.").

After institution, Patent Owner filed a Response (Paper 31, "PO Resp."), Petitioner filed a Reply (Paper 37, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 38, "PO Sur-reply").

---

[1] According to Petitioner, Bright Data Ltd. was formerly known as Luminati Networks, Ltd.  *See* Pet. 1.

On June 9, 2023, an oral hearing was held. A transcript of the hearing is made part of the record. *See* Paper 48.

B. *Related Matters*

The parties identify several district court proceedings involving the '510 patent and a related patent, U.S. Patent No. 10,257,319 ("the '319 patent"), including *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) (the "NetNut Litigation"); and *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation"). Pet. 2–3; Paper 6, 2–3. The parties also identify a number of district court actions involving patents related to the '510 patent. *Id.*

According to the parties, the '510 patent has been before the Board in IPR2020-01358, IPR2021-01493, IPR2022-00138, and IPR2022-00862. Pet. 4; Paper 6, 1–2.

In addition, Patent Owner identifies an *ex parte* reexamination proceeding involving the '510 patent, Control No. 90/014,876, which has been stayed. Paper 6, 2; IPR2021-01493, Paper 13.

C. *Real Parties-in-Interest*

Petitioner identifies Major Data UAB as the real party-in-interest. Pet. 2. Patent Owner "certifies that Bright Data Ltd. is the real party-in-interest." Paper 6, 1.

D. *The '510 Patent*

The '510 patent is titled "System Providing Faster and More Efficient Data Communication." Ex. 1001, code (54). According to the '510 patent, there is a "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require

Case: 23-2146     Document: 16     Page: 114     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 115    Filed: 11/13/2023

infrastructure investment for ISPs." *Id.* at 1:57–59. The patent states that other "attempts at making the Internet faster for the consumer and cheaper for the broadcaster," such as proxy servers and peer-to-peer file sharing, have various shortcomings. *Id.* at 1:61–62.

The '510 patent describes a system and method "for faster and more efficient data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below (*id.* at 4:43–45):



**FIG. 3**

Figure 3 is a schematic diagram depicting communication network 100 including a number of communication devices. *Id.* at 4:5–7. Due to the

Case: 23-2146     Document: 16     Page: 116     Filed: 11/13/2023

functionality provided by software stored within each communication device, "each device may serve as a client, peer, or agent, depending upon requirements of the network 100." *Id.* at 4:50–52.

Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:58–60. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." *Id.* at 4:67–5:2. Acceleration server 162 includes an acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein." *Id.* at 5:10–18.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser. *See id.* at 12:65–13:3. If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162. *Id.* at 13:8–15. Acceleration server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36.

Each agent responds to the client with information which "can help the client to download the requested information from peers in the network." *Id.* at 13:53–57. "Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such

5

a case, the agent may then provide the client with the list of peers and checksums of the chunks that each of them have." *Id.* at 13:57–61.

The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

*E. Illustrative Claim*

Claim 1 is the only independent challenged claim of the '510 patent, and is illustrative of the claimed subject matter.[2]

> 1. [Preamble] A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:
>
> [a] establishing a Transmission Control Protocol (TCP) connection with a second server;
>
> [b] sending, to the web server over an Internet, the first content identifier;
>
> [c] receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and
>
> [d] sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.

---

[2] Paragraph references in brackets proposed by Petitioner. *See* Pet. 25–31.

Case: 23-2146     Document: 16     Page: 117     Filed: 11/13/2023

Ex. 1001, 19:18–31.

*F.   Prior Art References and Other Evidence*

Petitioner relies on the following references:

1.   Michael Reiter & Aviel Rubin, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds");

2.   Marc Rennhard, *MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access* (2004) (Ex. 1008, "MorphMix");

3.   Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border"); and

4.   Fielding, et al., RFC 2616, *Hypertext Transfer Protocol -- HTTP/1.1*, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

In addition to these references, Petitioner relies on a Declaration of Keith J. Teruya. Ex. 1005 ("Teruya Decl."). Patent Owner relies on the Declaration of Tim A. Williams, Ph.D. Ex. 2065 ("Williams Decl.").

Case: 23-2146     Document: 16     Page: 118     Filed: 11/13/2023

*G. Asserted Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability. Pet. 11.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)[3] |
|---|---|---|
| 1, 6, 7, 15, 16, and 18–24[4] | 102[5] | Crowds |
| 1, 2, 6–11, 13, 15, 16, and 18–24 | 103 | Crowds, RFC 2616 |
| 1, 6, 10, 15–20, 23, and 24 | 102 | Border |
| 1, 6, 8–11, 13, 15–20, and 22–24 | 103 | Border, RFC 2616 |
| 1, 6–8, 13, 15, 16, and 18–24 | 102 | MorphMix |
| 1, 2, 6–11, 13, 15, 16, and 18–24 | 103 | MorphMix, RFC 2616 |

---

[3] Petitioner's obviousness challenges additionally refer to the "[k]nowledge of [a person of ordinary skill in the art]." Pet. 11. We understand this to refer to a person of ordinary skill in the art's understanding of the applied references and not to supplying missing limitations or incorporating an unspecified disclosure by reference to supply missing claim limitations. General knowledge in the art, unsupported by the references, cannot supply a missing limitation. *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide 36 (Nov. 2019), *available at* https://www.uspto.gov/ TrialPracticeGuideConsolidated.

[4] We note that Petitioner's listing of the asserted grounds excludes claim 13 for this ground. *See* Pet. 11. However, Petitioner includes claim 13 in its analysis of anticipation based on Crowds (*see id.* at 33).

[5] Because the application from which the '510 patent issued has an earliest effective filing date before March 16, 2013 (Ex. 1001, (60)), citations to 35 U.S.C. §§ 102 and 103 are to the pre-AIA versions. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29.

Case: 23-2146    Document: 16    Page: 119    Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 120    Filed: 11/13/2023

### III. ANALYSIS OF THE CHALLENGED CLAIMS

*A. Applicable Legal Standards*

The Federal Circuit addressed the legal standard for anticipation in *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331 (Fed. Cir. 2016), stating that "[u]nder 35 U.S.C. § 102(b), a prior art reference will anticipate if it "disclose[s] each and every element of the claimed invention . . . arranged or combined in the same way as in the claim." 815 F.3d at 1341 (alteration in original). The Federal Circuit went on to explain:

> However, a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would at 'once envisage' the claimed arrangement or combination.

*Id.* (quoting *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015)) (alteration in original).

A claim is unpatentable as obvious under 35 U.S.C. § 103 "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103 (2011). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) so-called "secondary considerations," including commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

Case: 23-2146    Document: 16    Page: 121    Filed: 11/13/2023

### B. Level of Ordinary Skill in the Art

According to Petitioner, a person of ordinary skill in the pertinent art "would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems as of the Priority Date." Pet. 16. Petitioner continues that "[s]uch a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols." *Id.* (citing Ex. 1005 ¶¶ 25–27, 51–54).

Patent Owner submits that a person of ordinary skill in the art would have had "a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet communications." PO Resp. 2 (citing Ex. 2065 ¶ 25). Patent Owner notes that its analysis does not change under the Board's preliminary assessment of a person of ordinary skill in the art in the Institution Decision, wherein Petitioner's proposed level of qualifications was adopted. PO Resp. 2; Dec. 13–14.

We regard Petitioner's more specific definition as consistent with the '510 patent and the prior art before us. *See Okajima v. Bourdeau,* 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill). Therefore, we adopt Petitioner's description.

### C. Claim Construction

Pursuant to 37 C.F.R. § 42.100(b) (2023), we apply the claim construction standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303

Case: 23-2146    Document: 16    Page: 122    Filed: 11/13/2023

(Fed. Cir. 2005) (en banc). Under *Phillips*, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Id.* at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317.

Only those terms that are in controversy need be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Petitioner contends that the district court's constructions in *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "Teso Litigation")[6], are appropriate for use in this case. Pet. 16–19. In particular, Petitioner points to two claim construction orders in that case—the "*Teso* Order" (Ex. 1017) and the "*Teso* Supplemental Order" (Ex. 1020). According to Petitioner, the parties in the Teso Litigation agreed to certain constructions that were subsequently adopted by the district court. Pet. 16–

---

[6] The case caption in the Teso Litigation was later changed to identify the plaintiff as Bright Data Ltd. *See* Ex. 1020, 1.

11

17. There, the district court construed the preamble of claim 1 of the '510 patent to be limiting and construed certain other terms to have their "plain and ordinary meaning." *Id.*

Petitioner also points out that the district court in the Teso Litigation construed certain disputed claim terms, including "client device" and "second server." *Id.* at 17. There, the district court construed "client device" as a "communication device that is operating in the role of a client." *Id.*; Ex. 1017, 12. The district court also initially construed "second server" as a "server that is not the client device." Pet. 17. Later, the court granted defendants' request for clarification as to the scope of this construction, and determined that a "second server" is "a device that is operating in the role of a server and that is not the first client device." *Id.*; Ex. 1020, 8, 11.

Patent Owner now proposes constructions for the claim terms "client device" and "second server" that are different than those determined by the district court in the Teso Litigation. *See* PO Resp. 23–31. We discuss Patent Owner's proposed constructions below.

### 1. Client Device

In our Institution Decision, we concurred with the district court's reasoning and agreed with its construction for the claim term "client device" as a "communication device that is operating in the role of a client." Dec. 17–18.

In its Response, Patent Owner contends that a person of ordinary skill in the art "would understand the term 'client device' to mean a 'consumer computer,'" or alternatively, "would understand the term 'client device' to mean a 'consumer communication device.'" PO Resp. 23. Patent Owner

Case: 23-2146    Document: 16    Page: 123    Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 124     Filed: 11/13/2023

argues that "[t]hese proposed constructions are consistent with the claim language, the specification, and the prosecution histories distinguishing client devices and servers." *Id.*

Patent Owner's proposed construction of the claim term "client "device" as a "consumer computer," however, was previously considered, and rejected, by the district court in the Teso Litigation. *See, e.g.*, Ex. 1017, 10–12. Patent Owner takes issue with the evidence and the reasoning used by the district court to reject Patent Owner's previously proposed construction. *See, e.g.*, PO Resp. 23–28.

Patent Owner argues that the district court's rejection of its proposed construction of a "client device" as "consumer computer" is wrong for three reasons. *Id.* at 23–25. First, Patent Owner asserts that, although the district court found that there was no express lexicography in the specification, the specification states that "computers of consumers" are "referred to herein as client devices" and the term "client device" is used in the claims. *Id.* at 23 (citing Ex. 1001, 2:47–49). Patent Owner asserts that "the term 'client device' has a special meaning in the context of the '510 Patent" and that, therefore, upon reading the specification, a person of ordinary skill in the art "would understand a 'client device' is a consumer computer in the context of the '510 Patent." PO Resp. 24 (citing Ex. 2065 ¶ 114).

Second, Patent Owner disagrees with the district court's finding that in the specification the term "consumer" refers to a consumer of content as opposed to a broadcaster of content. PO Resp. 24 (citing Ex. 1017, 11). Patent Owner argues, instead, that the common understanding of "consumer" is "a person who buys goods or services for their own use" or

13

"someone who buys goods or services for personal use." PO Resp. 24 (citing Ex. 2007; Ex. 2035, 5; Ex. 2036, 4; Ex. 2008; Ex. 2037, 4; Ex. 2065 ¶ 121.

Third, Patent Owner disagrees with the district court's finding that the term "consumer" does not appear in connection with the description of the claimed invention, contending instead that the specification "defines client devices as consumer computers." PO Resp. 25.

Patent Owner argues that a person of ordinary skill in the art "would understand a client device is a 'communication device' in the context of the specification," and that "a client device is a consumer computer with specific software to operate in accordance with the claims." PO Resp. 26 (citing Ex. 2065 ¶¶ 115, 116; Ex. 1017; Ex. 1020; Ex. 2006; *see also* Ex. 1001, 4:56–52; 5:23–31; 9:14–51). Patent Owner argues that "[i]n the context of the specification, a client device would be understood to be, more specifically, a consumer computer like a laptop, desktop, tablet, or smartphone." PO Resp. 26 (citing Ex. 2065 ¶ 120). Patent Owner further argues that a person of ordinary skill in the art "would understand that a client device is typically portable and easily moved, like, for example, a laptop, desktop, tablet or smartphone." PO Resp. 26 (citing Ex. 2065 ¶ 124).

Patent Owner also argues that a person of ordinary skill in the art

would understand that a client device is typically understood (a) to be regularly switched off and taken offline; (b) to be capable of processing only a limited number of requests at any given time, which may for example include a single user login; and/or (c) to have lesser fault tolerance, lesser reliability, and lesser scalability, prioritizing value to client device users over system costs. EX.2065 at ¶125.

Case: 23-2146    Document: 16    Page: 126    Filed: 11/13/2023

PO Res. 27. "These client device-attributes," Patent Owner argues, "distinguish a client device from a server." *Id.*

Patent Owner argues that a person of ordinary skill in the art "would understand there are structural differences between client devices and servers in the context of the specification and there is no contradictory disclosure in the specification or in the prosecution histories." *Id.* at 28 (citing Ex. 2065 ¶ 128). "Rather," Patent Owner argues, "client devices are repeatedly distinguished from servers in the specification and the prosecution histories." PO Resp. 28.

We have considered Patent Owner's evidence and arguments that the district court's construction of the claim term "client device" is incorrect. For the reasons discussed below, however, we determine that the evidence of record supports the district court's construction of the term "client device" as a "communication device that is operating in the role of a client" that we adopted in our Institution Decision and continue to apply here. Conversely, we find that the evidence does not support Patent Owner's view that a "client device" is a "consumer computer," or alternatively, a "consumer communication device," where the "client device" cannot be a server.

### a)    Claim Language

Under *Phillips*, we begin with the language of the claims themselves. *See Phillips*, 415 F.3d at 1314. In claim 1, the steps of the claims are performed by a "first client device." In step 1[b], the first client device, "send[s], to the web server over the Internet, the first content identifier," which serves to request content from the web server. *See* Ex. 1001, 19:24–25. In step 1[b], the first client device is acting as a client in requesting

15

content. In step 1[d], the first client device "send[s] the received first content, to the second server." *See id.* at 19:29–30. In step 1[d], the first client device is acting as a server to forward content.

The parties address the issue that the "first client device" acts in differing roles in claim 1. Petitioner asserts that the claim's required functionality is consistent with the district court's determinations on the role-based nature of the term. Pet. Reply 13–14. Patent Owner notes that under a role-based construction, "a client device may operate in the role of a server at some points in time." PO Resp. 25.

According to Petitioner, in district court Patent Owner "affirmatively argued in its claim-construction brief that the claimed 'second server' mapped to the Client 102 role (in green) and the 'client device' mapped to the Agent 122 role (in red), per PO's annotated Figure 3 below," confirming a role-based construction. Pet. Reply 14–15.

Case: 23-2146     Document: 16     Page: 127     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 128     Filed: 11/13/2023



**FIG. 3**

Patent Owner's annotated Figure 3, above, presented in the district court litigation equates the claimed "first client device" (shown in red) to agent 122, which sends the first content identifier to the web server (arrow C), receives content requested from the web server (arrow D), and sends that content to client 102 (the second server shown in green) (arrow E). Ex. 1126, 4. Thus, given this understanding, the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102 in response to a request for the content from client 102.

17

This reflects a role-based interpretation of the claim terms; different devices are defined by their function and can be either clients or servers depending on the function they perform.

Patent Owner argues that "the district court briefing was taken out of context and merely used to illustrate the lines of communication." PO Sur-reply 9, n.4 (citing PO Resp. 6–7, n.1). We do not agree. We find that the district court testimony speaks for itself and is consistent with the role-based nature of the "first client device" and "second server" claim terms.[7]

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function of a component serves to define the term. Ex. 1020, 7–10. For instance, the district court found that, under the steps of claim 1, the "client device" operates as an intermediary to perform steps including "sending, to [a] web server over an Internet, the first content identifier" to request content and also to "send[] the received first content." Ex. 1017, 3–4. Consistent with the claim language, the district court recognized that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first

---

[7] We note that Patent Owner's argument that "a server is not a client device and that a client device is not a server" (PO Resp. 15) is not supported by the claim language, which describes a "client device" that acts as a client to request content from the web server as well as a server to forward content. We discuss this issue in more detail below.

Case: 23-2146     Document: 16     Page: 129     Filed: 11/13/2023

server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted). That is, although the district court determined that a single component could not simultaneously serve more than one function at any particular time, components could operate in different roles, such as the claimed "client device." *Id.* We agree with the district court's construction of "client device" as "a device that is operating in the role of a client" because this interpretation is consistent with the limitations of the claims. *See id.* at 10–11.

> b) *Specification*

The district court's interpretation of the term "client device," adopted here, is also consistent with the '510 patent specification. The specification, when describing the "multiple communication devices" depicted in Figure 3, states that the same components may assume different roles: "[d]ue to the functionality provided by software stored within each communication device, which may be the same in each communication device, each communication device may serve as a client, peer, or agent, depending upon the requirements of the network." Ex. 1001, 4:47–52 (emphases added). Accordingly, the specification states that the components identified in Figure 3 may play different roles that perform different functions based on their stored software. *Id.*

Moreover, a communication device as described in the '510 patent includes memory 210, which stores software 212 with accelerator application 220, which includes client, peer and agent modules. *See* Ex. 1001, 5:60–6:42, 9:21–27, Fig. 4, Fig. 6). The specification explains that "each of the [software modules] comes into play *according to the specific*

19

Case: 23-2146    Document: 16    Page: 131    Filed: 11/13/2023

*role that the communication device 200 is partaking* in the communication network 100 *at a given time.*" *Id.* at 9:21–26 (emphasis added). The specification thus supports the role-based function of the network components, with components operating in different roles at different times, which is consistent with the claim language.

In opposition, Patent Owner argues that a person of ordinary skill in the art, when considering Figures 1 and 3 of the '319 patent, would understand that a server is not a client device and that a client device is not a server. PO Resp. 15. Patent Owner argues that proxy server 6 of Figure 1 "must be structurally different from agent 122 of Figure 3," and that "purely role-based constructions do not account for the structural differences between a proxy server (in Figure 1) and a proxy client device (in Figure 3) and therefore, the purely role-based constructions are not appropriate." *Id.*

For example, Patent Owner asserts with respect to Figure 1 that "proxy server 6 (i) receives requests from client devices 14,16 and (ii) sends requests to web server 32." PO Resp. 16 (citing Ex. 2065 ¶ 86). Patent Owner argues that if a person of ordinary skill in the art "were to apply the purely role-based constructions, proxy server 6 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.*

Patent Owner makes a similar argument with respect to Figure 3. With respect to Figure 3, Patent Owner asserts that "agent 122 (i) receives requests from client devices and (ii) sends requests to web server 152." PO Resp. 17 (citing Ex. 2065 ¶ 91). Patent Owner argues that if a person of ordinary skill in the art "were to apply the purely role-based constructions,

agent 122 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.*

Patent Owner's expert, Dr. Williams, testifies that if a person of ordinary skill in the art "were to apply the purely role-based constructions, proxy server 6 (in Figure 1) and agent 122 (in Figure 3) would be operating in the same roles at a given point in time," and that "there is nothing to distinguish the architecture of Figure 1 and Figure 3." Ex. 2065 ¶ 93. According to Dr. Williams, purely role-based constructions are not appropriate because they fail to account for structural differences between proxy servers and proxy client devices. *Id.* ¶ 94.

We do not find that the evidence of record supports Patent Owner's assertions on this issue. Dr. Williams's testimony, and Patent Owner's arguments, are based upon a modified version of Figure 3, which inserts "proxy server 6" between "client device" and "agent." Patent Owner's modified version of Figure 3 is shown below. *See* PO Resp. 7–8.

Case: 23-2146    Document: 16    Page: 133    Filed: 11/13/2023



Patent Owner's modified version of Figure 3, shown above, inserts "proxy server 6" outlined in green, between "client 102" outlined in purple and "agent 122" outlined in red. Patent Owner's modified configuration of Figure 3 is not shown in any figure of the '510 patent or disclosed anywhere in the specification. Dr. Williams testifies that a person of ordinary skill in the art "would understand that proxy server 6 of Figure 1 *could be* inserted between client 102 and agent 122 of Figure 3." Ex. 2065 ¶ 59 (emphasis added). Dr. Williams combines the "proxy server 6" of the prior art shown in Figure 1 and an embodiment of the claimed invention depicted in Figure 3. *See* Ex. 1001, 2:8–18, 2:24–32, 4:41–50. Dr. Williams, however, provides no explanation or rationale for combining the prior art with an

22

embodiment of the claimed invention. Further, Dr. Williams testifies that different "client devices," i.e., a "requesting client device" and a "proxy client device" are disclosed (*see* Ex. 2065 ¶ 59), but we do not discern that these characterizations are described in the '510 specification. In view of the lack of support, we afford little weight to Dr. Williams's testimony on this issue.

Thus, in view of the '510 patent specification, we do not agree with Patent Owner that it discloses the architecture of a requesting client (102) ↔ proxy server (6) ↔ agent (122) ↔ web server (152), as Patent Owner asserts. *See* PO Resp. 7–8. Moreover, we do not agree that Patent Owner's argument that the "architecture" should govern the construction of "client device" in light of the claim language and the specification's disclosures demonstrating that communications devices may serve in different roles due to the functionality provided by software stored within each communication device, which come into play depending on the specific role that the communication device takes at a given time. *See* Ex. 1001, 4:46–50, 9:20–25. The district court agreed, finding that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* litigation (Ex. 2012) are consistent with its understanding of the architecture required by the claims of the '510 patent and its "novel" use of a client device as an intermediary. PO Resp. 12–13. We do not find that the district court's *Alice* order alters or modifies the claim construction

Case: 23-2146     Document: 16     Page: 134     Filed: 11/13/2023

the court adopted there, and that we adopt here. The *Alice* order addressed patent eligibility, not claim construction. *See* Ex. 2012. Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as a "communication device that is operating in the role of a client," and did not modify that construction. *Id.* at 5. Further, after the *Alice* order issued, in February 2021, the district court consistently maintained its claim constructions. *See* Exs. 1020, 1115.

We agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server." Ex. 1112, 13. Petitioner points to buttressing evidence in RFC 2616, which defines a "server" as an "application program that accepts connections in order to service requests by sending back responses," where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." Pet. Reply 15 (citing Ex. 1013, 9 (emphases omitted)). We agree with Petitioner that RFC 2616 serves as intrinsic evidence because it is cited in the '510 patent in its discussion on the operation of the agent, client, or peer, particularly, in how these devices can use the HTTP protocol to determine whether an HTTP request they have received is still valid. Ex. 1001, 16:21–28; *see V-Formation v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005). Accordingly, we determine that the weight of the evidence supports the

Case: 23-2146     Document: 16     Page: 135     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 136     Filed: 11/13/2023

conclusion that a "client device" as recited in the claims of the '510 patent may act as a server as well as a client.

Patent Owner also asserts that the term "client device" means "consumer computer" which is distinct from a server, and that a person of ordinary skill would understand a "consumer computer" to be "a laptop, tablet, or smartphone." PO Resp. 25. Patent Owner asserts that a person of ordinary skill in the art "would understand that a client device is typically portable and easily moved," and "is not a dedicated network element, unlike a server," and "typically uses a single or relatively few connections." *Id.* at 26. Patent Owner cites to Dr. Williams' testimony as support for these assertions. *See* Ex. 2065 ¶¶ 114–125.

Dr. Williams testifies that his understanding is "consistent with the claim language, the specification, and the prosecution histories distinguishing servers from client devices." *Id.* ¶ 114. We discuss the prosecution history below, but note here that Dr. Williams does not identify any specific portions of the '510 specification that supports Patent Owner's assertions as to the alleged structure and nature of the client device. Rather, Dr. Williams merely asserts that "[i]n my opinion a POSA would understand" or other similar statement. *See, e.g.,* Ex. 2065 ¶¶ 124–128.

Dr. Williams testifies that a person of ordinary skill in the art "would understand the term 'client device' to mean a 'consumer computer'" because the '319 specification states that "files are stored on computers of consumers, referred to herein as client devices." *Id.* ¶ 114 (citing Ex. 1001, 2:47–49); *see also* PO Resp. 23. Our view is that the Patent Owner takes the specification's disclosure out of context. The "computers of consumers"

discussed are computers used in the prior art peer-to-peer filing sharing system known as BitTorrent. Ex. 1001, 2:43–61. The '510 specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the invention. *See id.* at 2:43–3:6, 4:3–4, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the description of the claimed inventions." Ex. 1017, 11 (emphasis omitted). We also agree with the district court's finding that the specification discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. *Id.*; *see also* Ex. 1001, 1:57–62; PO Resp. 24.

Accordingly, we find that the '510 patent's specification disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client" as construed by the district court and as adopted here. We also find that the '510 patent's specification does not support Patent Owner's assertion that a person of ordinary skill in the art would understand the term "client device" to mean a "consumer computer" or a "consumer communication device."

### c) Prosecution History

Patent Owner argues that the prosecution history of the '510 patent, its parent (the '319 patent), and its grandparent (U.S. Patent No. 10,069,936 ("the '936 patent")), support the conclusion that the claimed "client device" should be distinguished from a server. PO Resp. 18–23.

Case: 23-2146    Document: 16    Page: 138    Filed: 11/13/2023

Patent Owner points to statements in the prosecution history of the '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection. *Id.* at 19–21. More specifically, Patent Owner asserts that the applicant argued that the cache server 306 of Garcia "is clearly a dedicated device and performs a server functionality. The Garcia reference is silent, and actually teaches away from identifying and using another client device for supporting a content request by a specific client." *Id.* at 19 (citing Ex. 2009, 215 (emphasis omitted)).

Patent Owner contends that "[t]he examiner recognized a server cannot be equated to a client device regardless of the role being performed at a given moment in time." PO Resp. 20 (citing Ex. 2065 ¶ 99). Patent Owner points out that in the Notice of Allowance, the examiner stated that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art," and further asserts that "[t]he examiner's acknowledgement of the 'environment' in which the claims operate shows that the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture. PO Resp. 21 (quoting Ex. 2009, 44; citing Ex. 2065 ¶ 102).

The claims that were under consideration in the '936 patent prosecution, however, were significantly different than the claims at issue here. The issued claims in the '936 patent recite "requesting client" and a separate "client" and have multiple steps that differ from those of the '510 patent. *See, e.g.*, Ex. 2011, 19:16–52. Given these differences, we discount the applicability of statements made during the patentability assessment of

Case: 23-2146    Document: 16    Page: 139    Filed: 11/13/2023

the '936 patent prosecution to the assessment of claim construction for the '510 patent.[8]  Further, considering the varying terms used, we do not find that the applicant's statements during prosecution distinguishing a recited "device" or "client" from the devices disclosed in Garcia are sufficient to act as a disclaimer of the scope of the "client device" term as used in the claims of the '510 patent here.  *In re Am. Acad. Of Sci. Tech Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004); *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction.").  Also, the examiner's statements do not reflect an understanding of any disavowal of the scope of any claim terms.

Additionally, as discussed above, the '510 patent's claim language and specification clearly support a role-based interpretation of the term "client device."  In contrast, the '936 patent prosecution is for a grandfather of the '510 patent and involved evolving claim term amendments.  *See Telcordia Technologies, Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365, 1375 (Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the plain language of the claims and the direct teaching of the specification.").  For this reason, we find the '969 prosecution history to be less pertinent to the construction of the '510 patent claims than the claim language and specification of the '510 patent itself.  As the Federal Circuit has explained, the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often

---

[8] We note that although the examiner found that Garcia alone did not teach some steps of the claim, the examiner nonetheless found that Garcia alone taught a "client" for many of the limitations. Ex. 1072, 314, 593–594.

Case: 23-2146     Document: 16     Page: 140     Filed: 11/13/2023

lacks the clarity of the specification and thus is less useful for claim construction purposes. *See Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim construction); *Phillips*, 415 F.3d at 1317. This is particularly true here, where the prosecution history at issue involves a grandfather application with different claims having different claim language from the patent and claims under review.

Patent Owner also presents arguments based on the prosecution history of the '319 patent, which is a parent to the '510 patent. PO Resp. 21–22. Patent Owner refers to applicant's argument that "the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id.* at 21 (citing Ex. 2066, 282). Patent Owner cites to the examiner's statement in the Notice of Allowance that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification." PO Resp. 22 (citing Ex. 2066, 50).

Patent Owner's arguments based on the '319 patent prosecution concern patent eligibility, not claim construction. Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated disclaimer of the scope of the claim term "client device."

Patent Owner additionally refers to the prosecution history of the '510 patent and again references the examiner's statement that the "environment" of the claimed methods supported patentability. PO Resp. 22 (citing Ex. 1002, 41). We do not discern that there is any disavowal of claim scope by the applicant in the prosecution history of the '510 patent, nor does the examiner indicate an understanding of any disclaimer.

### d) Conclusion

Based on the evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

### 2. Second Server

In our Institution Decision, we concurred with the district court's reasoning and agreed with its clarified construction of the claim term "second server" as a "device that is operating in the role of a server and that is not the client device." Dec. 18–19.

Patent Owner appears to propose that a server is not a client device, and, more specifically, that a server is structurally different than a client device. *See* PO Resp. 28. Patent Owner's arguments, for the most part, repeat the same arguments presented for "client device." *See id.* at 28–31. That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer ↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a consumer computer and would be a commercial device with certain operational properties. *Id.*

Case: 23-2146     Document: 16     Page: 141     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 142     Filed: 11/13/2023

We continue to agree with the district court's interpretation of the claim term "second server," which we have adopted, because it is consistent with the evidence of record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is operating in the role of a server." Ex. 1017, 14; Ex. 1020, 8. This construction is consistent with the role-based interpretation of the claim components, which we discuss in Section II.C.1, above. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, but is able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the received first content, to the second server" in limitation 1[d], so the "second server" has to be a separate component.

We have addressed the majority of Patent Owner's arguments in Section II.C.1, above, that concern alleged required architecture, structural requirements, and the assertion that a "client device" cannot be a server. Additionally, Patent Owner argues that in the *NetNut* litigation, the district court stated that it "hereby expressly rejects Defendant's proposal of referring generically to 'a device,'" and that the server "is not the client device," so client devices and servers are distinguished. PO Resp. 11 (citing Ex. 2006, 23). We do not agree with this argument because, in context, the district court there only indicated that the use of the term "device" was too generic with regard to the term "server," which we take to mean that the

server had to be capable of acting in the role of a server, and that a device could not "act as a server and as a client simultaneously." Ex. 2013, 20–21.

Patent Owner also argues that the district court indicated that a "server" is not a communication device. PO Resp. 28 (citing Ex. 2065 ¶ 133). However, the district court found, and we agree, that "a component can be *configured* to operate in different roles," so long as it does not serve in different roles simultaneously, and although the specification does "not include servers as a type of 'communication device,' that is not sufficient to construe 'client device' as unable to act as a server in all cases." Ex. 1020, 10. Additionally, in view of the role-based construction for the components, we reject Patent Owner's other arguments on required structure and characteristics of a server. *See* PO Resp. 28–31.

D. *Prior Art References*

1. *Crowds (Ex. 1006)*

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions." Ex. 1006, 2. In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server. *Id.* In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator." *Id.* In Crowds, "[a] user is represented by a process on her computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)." *Id.* at 8. "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd." *Id.*

Case: 23-2146    Document: 16    Page: 144    Filed: 11/13/2023

Exemplary paths for web requests from crowd users are shown in Figure 2 (*id.* at 9), reproduced below:



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." *Id.* at 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "1 → 5 → server; 2 → 6 → 2 → server; 3 → 1 → 6 → server; 4 → 4 → server; 5 → 4 → 6 → server; and 6 → 3 → server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

### 2. Border (Ex. 1012)

Border is a patent titled "System and Method of Reading Ahead of Objects for Delivery to an HTTP Proxy Server." Ex. 1012, code (54). Border describes "a system for retrieving web content." *Id.* at code (57). In Border, "[a] downstream proxy server receives a URL request message from

a web browser. *Id.* at 3:35–36. Thereafter, "[a]n upstream proxy server receives the URL request message from the downstream proxy server" and "selectively forwards the URL request message to a web server and receives the URL content from the web server." *Id.* at 3:38–42. Then, "[t]he upstream proxy server forwards the URL content to the downstream proxy server." *Id.* at 3:42–43. An exemplary system employing downstream and upstream proxy servers for accessing a web server is shown in Figure 1, reproduced below:

*FIG. 1*



As depicted in Border's Figure 1, user station 101, for example, a personal computer, uses standard web browser 103. *Id.* at 3:55–61. User station 101 is connected to downstream proxy server 105, which communicates over network 111 with upstream proxy server 107. *Id.* at 3:61–66. Proxy servers 105 and 107 are HTTP proxy servers with HTTP caches 115 and 117. *Id.* at 4:8–11. Upstream proxy server 107 is connected to web server 109 through

Case: 23-2146    Document: 16    Page: 145    Filed: 11/13/2023

IP network 113, for example, the Internet. *Id.* at 4:5–7. In this system, proxy servers 105 and 107 "act as an intermediary between one or more browsers and many web servers (e.g., server 109)." *Id.* at 4:30–31.

### 3. *MorphMix (Ex. 1008)*

MorphMix is a doctoral thesis that identifies the lack of anonymity on the Internet as a problem that "limits the privacy protection of Internet users." Ex. 1008, Abstract. Accordingly, MorphMix is focused on "achieving anonymous Internet access for low-latency applications such as web browsing." *Id.* MorphMix describes "a peer-to-peer-based mix network" where "[e]very node joining the system can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time." *Id.* at 118. An exemplary system is illustrated in Figure 5.1, reproduced below:

Case: 23-2146    Document: 16    Page: 147    Filed: 11/13/2023



**Figure 5.1:** *Basic idea of MorphMix.*

As depicted in Figure 5.1 of MorphMix, participating nodes have a virtual link to one or more other nodes at any time. Ex. 1008, 119. This "means that (1) there is a TCP [Transfer Control Protocol] connection between the two nodes and (2) they share a symmetric key that is only known to these two nodes." *Id.* In Figure 5.1, node *a* has five neighbors with which it has established virtual links. *Id.* In the example shown, "node *a* has established an anonymous tunnel via *b* and *c*." *Id.* "Within an anonymous tunnel, anonymous connections can be set up to anonymously communicate with a server." *Id.* at 120.

### 4. *RFC 2616 (Ex. 1013)*

RFC 2616 is a request for comments document concerning version 1.1 of the Hypertext Transfer Protocol (HTTP), which is "foundational to the World Wide Web." Pet. 23; Ex. 1005 ¶ 53. HTTP is an application-level

protocol for distributed, collaborative, hypermedia information systems. Ex. 1013, 1. HTTP is a generic, stateless, protocol which can be used for many tasks beyond its use for hypertext, such as name servers and distributed object management systems. *Id.* RFC 2616 specifies Internet standards track protocol for the Internet community, and requests discussion and suggestions for improvements. *Id.*

E. *Anticipation Based on Crowds*

    1. *Claim 1*

        *Preamble*

The preamble of claim 1 reads as follows:

*A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:*

Ex. 1001, 19:18–21.

Petitioner explains that in Crowds,

[a] user's request to a web server is not passed directly to the web server, but instead to a random member of the crowd, who either submits the request directly to the web server or forwards it again. The web request is eventually submitted to the web server by a random [crowd] member.

Pet. 24.

Petitioner's annotated Figure 2 from Crowds is shown below.

Case: 23-2146    Document: 16    Page: 149    Filed: 11/13/2023



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Figure 2 of Crowds (annotated

*Id.* at 25.

Petitioner asserts that its annotated Figure 2 from Crowds, above, "shows an example from Crowds path with one possible path, '5→4→6→server,' highlighted in green." *Id.* Petitioner asserts that "[i]n accordance with the preamble, a first client device (jondo 6) performs the claim steps, fetching requested content from a web server, "5". *Id.* According to Petitioner, "[t]he web server stores the first content." *Id.* at 26. (citing Ex. 1006, 74–75 (referring to web server "replies"), 85, Fig. 3 (referring to pages and 1-kilobyte embedded images resident on a web server), 88–89 (responding to HTTP requests). Petitioner explains that "jondo 6 corresponds to the first client device in the preamble, and the first content on the web server is identified by a first content identifier (a URL)." 6 (citing Ex. 1005 ¶¶ 55–58).

With respect to the preamble, Patent Owner argues that "Crowds does not disclose a 'first client device' as recited in the preamble of claim 1 under

Case: 23-2146    Document: 16    Page: 150    Filed: 11/13/2023

the purely role-based constructions." PO Resp. 31 (citing Ex. 2065 ¶ 152). Patent Owner argues that "[t]here is no way for a [person of ordinary skill in the art] to determine whether jondo 6 is a client device or a server under the purely role-based constructions because . . . jondo 6 operates in different roles at different points in time." *Id.* Patent Owner argues that "[t]he 'first client device' is necessarily and consistently a client device during the performance of method claim 1," and that "[f]or at least this reason, Crowds does not disclose the preamble of claim 1." *Id.* at 31–32 (citing Ex. 2065 ¶¶ 144–150).

We disagree with Patent Owner because Patent Owner's arguments reject the role-based claim construction adopted by the district court and applied here, wherein the recited "client device" is a "communication device that is operating in the role of a client." Patent Owner's argument improperly limits the operation of the "client device" to a single role, even though the district court recognized, consistent with the claim language, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

We, therefore, agree with Petitioner that Crowds meets the subject matter recited in the preamble.

> a) *establishing a Transmission Control Protocol (TCP) connection with a second server;*

Petitioner contends that "Crowds discloses establishing a TCP connection between jondo 6 (first client device) and jondo 4 (the second

server).” Pet. 26. Petitioner asserts that “[j]ondo 6 may be regarded as a client device in the example path (and thus the first client device) for at least the reason that (under the court's construction) it acts as in the role of a client in requesting the service of content from web server 5.” *Id.* Petitioner also asserts that “[j]ondo 4 may be regarded as a server (and thus the second server) for at least the reason that jondo 4 provides a service to requesting jondo 5.” *Id.* Petitioner points out that “Crowds explains that “[its] description uses client-server terminology, where one jondo is a client of its successor on the path.” *Id.* (citing Ex. 1006, 74). Referring to Crowds annotated Figure 2 (shown above), Petitioner argues that “jondo 5 is thus a client of jondo 4 (its successor on the path), and by the same ‘client-server terminology,’ jondo 4 serves in the role of a server to jondo 5.” Pet. 26.

Petitioner points out that “Crowds refers to jondos throughout as having involvement in the role of a server, with statements such as ‘[l]ike all network servers, jondos are identified by their IP address and port number.’” *Id.* at 26–27 (citing Ex. 1006, 90). Petitioner argues that “[j]ondo 4 may be regarded as a server under this disclosure.” Pet. 27 (citing Ex. 1005 ¶¶ 59–63).

Petitioner also asserts that “Crowds discloses communicating over a ‘static path’ of jondos, that is, ‘one path for all its users’ communications.’” Pet. 27 (citing Ex. 1006, 80–81). Petitioner asserts that “Crowds discloses that this path is established when jondo 5 receives a user request from a browser.” Pet. 27 (citing Ex. 1006, 73). Petitioner argues that Crowds “sets up these static paths over TCP, as reflected when it states that such a path would be ‘altered when failures are detected in the path,’ including where

'the TCP/IP connection to the jondo breaking or being refused.'" Pet. 27 (emphasis omitted) (citing Ex. 1006, 81). "This disclosure," Petitioner argues, "reflects that the static path over jondos as discussed in Crowds comprises TCP/IP connection between the jondos. Therefore, a TCP connection is established between the first client device and the second server, which are both jondos in the example path." Pet. 27.

Patent Owner argues that "[t]he portions of Crowds cited and relied upon by Petitioner only disclose establishing a TCP connection in the context of a jondo sending a request for content." PO Resp. 32 (citing Pet. 26–27; Ex. 2065 ¶ 154; Ex. 1004, 8). Patent Owner argues that "when jondo 6 receives a request from jondo 4, jondo 6 is operating in the role of a server, not a client." PO Resp. 32 (citing Ex. 2065 ¶ 156). "Therefore," Patent Owner concludes, "jondo 6 cannot be a client device during performance of this method step." *Id.*

"Moreover," Patent Owner argues, "when jondo 4 sends a request to jondo 6, jondo 4 is operating in the role of a client, not a server." PO Resp. 32 (citing Ex. 2065 ¶ 157). "Therefore," Patent Owner concludes, "jondo 4 cannot be a server during performance of this method step." *Id.*

We disagree with Patent Owner's argument for several reasons. First, Patent Owner's argument requires the recited "client device" to operate in a client role at all times and that the recited "second server" must operate in a server role at all times. But such a rigid restriction on the operational roles of the client device and the second server are contradicted by the express language of claim 1 and would make claim 1 incapable of being practiced. For example, claim 1 expressly requires that "a first client device . . .

Case: 23-2146   Document: 16   Page: 153   Filed: 11/13/2023

receive[] the first content from the web server," and also expressly requires that the "first client device . . . send[] the received first content, to the second server." Thus, claim 1 expressly requires that the "first client device" must sometimes operate in the role of a "client" and must also sometimes operate in the role of a "server."

Second, Patent Owner's rigid application of operational roles is inconsistent with the claim construction adopted by the district court and applied here. The district court expressly acknowledged, and we agree, that consistent with the claim language "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Accordingly, we agree with Petitioner that Crowds discloses the subject matter recited in limitation 1[a].

> b)   *sending, to the web server over an Internet, the first content identifier;*

Petitioner contends limitation 1[b] is disclosed by Crowds. Petitioner explains that "[i]n the example '5→4→6→server' path, the 'first client device' (jondo '6') sends the web request via HTTP to the target web server." Pet. 27 (citing Ex. 1006, 73–74, Fig. 2). Petitioner illustrates this step by annotating Figure 2 of Crowds, shown below.



Figure 2 of Crowds (annotated)

Petitioner explains that its annotated Figure 2 of Crowds, shown above, illustrates "[c]ircled in red . . . the step corresponding to first client device [jondo 6] sending to the web server [5] the HTTP request comprising the first content identifier ('FCI')." According to Petitioner, "[t]he arrows in Fig. 2 of Crowds each represent 'requests,' *i.e.*, requests for content residing on a web server, originating from one of the jondos and forwarded over a randomized path of jondos to the web server." Pet. 28 (citing Ex. 1006, 73).

Petitioner explains that "[t]he web server responds to the 'request' by returning the requested content." *Id.* (citing Ex. 1006, 73–74; Ex. 1005 ¶¶ 66–68). Petitioner asserts that "the 'request' itself may be regarded as the FCI," and that "each 'request' contains a URL." Pet. 28–29. According to Petitioner, "[t]he 'requests' are HTTP requests as understood by [a person of ordinary skill in the art], as reflected, *e.g.*, where Crowds notes that the requests have 'HTTP headers,'" because "[a]n HTTP request for content

43

available from a web server by definition contains a URL." *Id.* at 29–30 (emphasis omitted) (citing Ex. 1005 ¶¶ 70–71; Ex. 1006, 90).

Petitioner concludes that "the FCI limitation in this claim step may be considered met by either the disclosed 'request' itself, or the URL that the request contains." Pet. 30 (citing Ex. 1005 ¶ 72).

Patent Owner does not specifically dispute Petitioner's evidence and arguments with respect to limitation 1[b]. *See* PO Resp. 31–36.

We agree with Petitioner that Crowds discloses the subject matter described in limitation 1[b]. Petitioner's arguments are supported by the testimony of Mr. Teruya, which we credit. *See* Ex. 1005 ¶¶ 66–72. Mr. Teruya explains that in Crowds, a user (jondo) can begin browsing the Internet anonymously by making a "request" to a web server by opening a URL, where other jondos are acting as the user's HTTP proxy for the browser. *See id.* ¶ 70 (citing Ex. 1006, Fig. 6). Mr. Teruya explains that in Crowds, the "requests" are HTTP requests because they have HTTP headers and under the standards for HTTP protocol, HTTP requests for content from a web server contain a URL. Ex. 1005 ¶ 71 (citing Ex. 1006, 90; Ex. 1013 § 5.1.2).

> c)  *receiving, the first content from the web server over the Internet in response to the sending of the first content identifier;*

Petitioner contends limitation 1[c] is disclosed by Crowds:  "Having made the content request of the web server per step (b), jondo 6 now receives the requested content in response, per step (c)." Pet. 30. Petitioner explains that "the 'first client device' (jondo '6') sends the FCI to target web server '5'. The last jondo in the path then receives the 'first content,' such

Case: 23-2146    Document: 16    Page: 156    Filed: 11/13/2023

as the user specified web page." *Id.* Petitioner further explains that "[t]he initiating jondo establishes the random path of jondos 'that carries its users' transactions to **and from** their intended web servers.'" *Id.* (citing Ex. 1006, 73). "Further," Petitioner explains, "server replies traverse the **same path as the requests, only in reverse**." Pet. 30 (citing Ex. 1006, 74). "Accordingly," Petitioner explains, "the first client device in Crowds (the last jondo in the path before the target web server) receives the requested web page (first content) for sending back down the path to the requesting user." Pet. 30 (citing Ex. 1005 ¶¶ 73–75).

Patent Owner does not specifically dispute Petitioner's evidence and arguments with respect to limitation 1[c]. *See* PO Resp. 31–36.

We agree with Petitioner that Crowds discloses the subject matter described in limitation 1[c]. Petitioner's arguments are supported by the testimony of Mr. Teruya, which we credit. *See* Ex. 1005 ¶¶ 73–75.

> *d)    sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier*

Petitioner contends this step is disclosed by Crowds, because "[a] TCP connection exists between jondos '6' and '4', as part of the specified 'path.'" Pet. 31; *see also id.* at 27–30 (limitation (b)).

Petitioner explains that "[a]s also discussed above, the first client device (jondo '6' in the above example path) receives the first content from the web server, and the random path of jondos 'carries its users' transactions to **and from** their intended web servers,' and 'server replies traverse the **same path as the requests, only in reverse**.'" Pet. 31 (citing Ex. 1006, 73–74). Petitioner explains that "jondo '6' sends the first content (web page

content) back to the second server (here, jondo '4,' the prior jondo)," and "[j]ondo '4' can then send the web page content back to the requesting user (here, jondo '5')." Pet. 31 (citing Ex. 1005 ¶¶ 76–78).

> Patent Owner argues that
>
> Petitioner fails to apply the purely role-based constructions at the particular point in time, for the particular transaction, recited in step 4 of claim 1. EX.2065 at ¶160.
>
> Under the purely role-based constructions, when jondo 6 is sending a response to jondo 4, jondo 6 is operating in the role of a server, not a client. EX.2065 at ¶161. Therefore, under the purely role-based constructions, jondo 6 cannot be a client device during performance of this method step. *Id.*
>
> Moreover, under the purely role-based constructions, when jondo 4 is receiving a response from jondo 6, jondo 4 is operating in the role of a client, not a server. EX.2065 at ¶162. Therefore, jondo 4 cannot be a server during performance of this method step. *Id.*

PO Resp. 33.

We do not agree with Patent Owner's argument. The district court's claim construction for the "server" terms, which we adopted, makes it clear that a server is defined by its function, not its structure. Ex. 1020, 7–11. Thus, the district court clarified that the second server is "a device that is *operating in the role of a server* and that is not the first client device." *Id.* at 8, 11 (emphasis added). Patent Owner's argument is unavailing because it rigidly focuses on an alleged requirement that devices cannot operate in different roles, an argument that was rejected by the district court in its claim construction. Rather, the district court explained, and we agree, that "a component can be *configured* to operate in different roles—so long as it

Case: 23-2146     Document: 16     Page: 157     Filed: 11/13/2023

does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." *Id.* at 10 (internal quotation marks omitted).

Here, Petitioner points out, and we agree, the first client device (jondo "6" in Petitioner's example path) receives the first content from the web server, and the random path of jondos "carries its users" transactions to and from their intended web servers, and the web server's replies traverse the same path as the requests, only in reverse. *See* Pet. 31 (citing Ex. 1006, 73–74). Petitioner explains that jondo "6" sends the first content (web page content) back to the second server (here, jondo "4," the prior jondo), and jondo "4" can then send the web page content back to the requesting user, here, jondo "5." Pet. 31 (citing Ex. 1005 ¶¶ 76–78). Mr. Teruya's testimony supports Petitioner's position.

Petitioner's analysis is persuasive because it is based on the operation of jondos 4 and 6, and whether this operation meets the steps of the claimed method. In contrast, Patent Owner's opposition is based on a construction rejected by us and the district court.

We have considered Petitioner's evidence and arguments that each step of claim 1 is disclosed by Crowds, as well as Patent Owner's evidence and arguments. For the reasons discussed above, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses all the limitations of independent claim 1.

> 2. *Dependent Claims 6, 7, 15, 16, 18–24*
>> a) *Dependent Claim 6*

Dependent claim 6 recites the following limitations:

Case: 23-2146     Document: 16     Page: 158     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 159    Filed: 11/13/2023

> *The method according to claim 1, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP) server, the third server responds to HTTP requests and stores a second content identified by a second content identifier, the method by the first client device further comprising:*
>
> *receiving the second content identifier;*
>
> *sending, to the third server over the Internet in response to the receiving, the second content identifier; and*
>
> *receiving the second content from the third server over the Internet in response to the sending.*

Ex. 1001, 19:57–67.

Petitioner contends that Crowds discloses dependent claim 6 because "Figure 2 of Crowds discloses several exemplary paths of jondos and web servers." Pet. 31. Petitioner's annotated Figure 2 of Crowds is shown below.



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

Figure 2 of Crowds (annotated

*Id.* at 32 (citing Ex. 1006, 73). Petitioner explains with respect to its annotated Figure 2 of Crowds, shown above, that "[i]n addition to the

5→4→6→server '5' path discussed [in Petition] Section 8.1.1 (green), Crowds discloses a 3→1→6→server '3' path (in blue)." *Id.* Petitioner contends that "[f]or the same reasons the 5→4→6→server '5' path discloses Claim 1, the 3→1→6→server '3' path discloses Claim 6: jondo '6' (first client device) receives a request comprising a second content identifier from jondo '1,' which it sends to server '3' (the third server, which is a web server). Jondo '6' then receives the second content from server '3.'" *Id.* (citing Ex. 1006, 74; Ex. 1005 ¶¶ 79–81). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 79–81.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 6. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 6, in particular where Crowds discloses a 3→1→6→server "3" path, where jondo "6" (the first client device) receives a request comprising a second content identifier from jondo "1," which it sends to server "3" (the third server, which is a web server), and jondo "6" then receives the second content from server "3." Pet. 31–32 (citing Ex. 1006 73–74).

    *b)    Dependent Claim 7*

Dependent claim 7 recites the following limitations: "*[t]he method according to claim 6, further comprising executing, by the first client device, a web browser application or an email application.*" Ex. 1001, 20:1–3.

Case: 23-2146    Document: 16    Page: 160    Filed: 11/13/2023

Petitioner contends that Crowds discloses dependent claim 7 because "Crowds discloses every client device running a web browser as a GUI." Pet. 32 (citing Ex. 1006, 81, 88–89). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 82–86.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 6. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 7, because Crowds discloses a web browser being run by a client device (jondo). *See* Ex. 1006, 89.

<em>c)</em>   <em>Dependent Claim 15</em>

Dependent claim 15 recites the following limitations: "*[t]he method according to claim 1, further comprising receiving, by the first client device from the second server over the established TCP connection, the first content identifier.*" Ex. 1001, 20:41–44.

Petitioner contends that Crowds discloses dependent claim 15 because "The first client device is jondo '6,' the second server is jondo '4,' and a TCP connection exists between jondo '6' and jondo '4.'" Pet. 33 (citing *id.* at 25–31 (Pet. Section 8.1.1)). Petitioner provides an annotated version of Crowds' Figure 2, shown below.



Figure 2 of Crowds (annotated)

With respect to Petitioner's annotated version of Crowds' Figure 2, above, Petitioner explains that "[c]olored in green . . . is the '5→4→6→server' path in Figure 2, and the red circle corresponds to the first client device (jondo '6') receiving, from the second server (jondo '4'), the first content identifier *over the established TCP connection*." Pet. 33. Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 89–91.

Patent Owner argues that "Petitioner fails to show that Crowds discloses or teaches claim 15 under either construction." PO Resp. 40 (citing Pet. 33). Patent Owner argues that "[f]or the same reasons discussed above regarding step 1 of claim 1, during performance of this method step, under the purely role-based constructions, jondo 4 is operating in the role of a client, not a server, and therefore, jondo 4 cannot be a server." *Id.* at 41 (citing Ex. 2065 ¶ 189). "Also," Patent Owner argues, "under the purely role-based constructions, jondo 6 is operating in the role of a server, not a

Case: 23-2146     Document: 16     Page: 163     Filed: 11/13/2023

client, and therefore jondo 6 cannot be a client device." PO Resp. 41 (citing Ex. 2065 ¶ 190). "Under Patent Owner's proposed constructions . . . jondo 4 is not a server." PO Resp. 41 (citing Ex. 2065 ¶ 192).

We disagree with Patent Owner. Patent Owner's argument is unavailing because it rigidly focuses on an alleged requirement that devices cannot operate in different roles, an argument that was rejected by the district court in its claim construction. Rather, the district court explained, and we agree, that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." Ex. 1020, 10 (internal quotation marks omitted).

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 15, because Crowds discloses a first client device (jondo "") receiving, from a second server (jondo "4"), the first content identifier over an established TCP connection. *See* Ex. 1006, 89.

### d)     *Dependent Claim 16*

Dependent claim 16 recites the following limitations: "*[t]he method according to claim 1, wherein the sending of the first content identifier to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier.*" Ex. 1001, 20:45–48.

Petitioner contends Crowds discloses dependent claim 16 because "jondo '6' (the first client device) sends an HTTP request to the web server over the Internet that comprises the first content identifier." Pet. 34 (citing

Case: 23-2146    Document: 16    Page: 164    Filed: 11/13/2023

*id.* at 25–31 (Pet. Section 8.1.1)).  Petitioner's arguments are supported by the testimony of Mr. Teruya.  *See* Ex. 1005 ¶¶ 92–93.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16.  *See* PO Resp. 40–41.  Neither does Dr. Williams.  *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 16, because Crowds shows that jondo 6 (the first client device) sends an HTTP request to the web server over the Internet that comprises the first content identifier.  *See* Ex. 1006, 73–74, Fig. 2.

### e) Dependent Claim 18

Dependent claim 18 recites the following limitations:

> *The method according to claim 1, wherein the second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that communicates with the second server over the Internet based on, or according to, TCP/IP protocol.*

Ex. 1001, 20:52–59.

Petitioner contends that Crowds discloses dependent claim 18 because "[a] TCP connection is established between jondo '6' and jondo 4.'" Pet. 34 (*see also id.* at 25–31 (Section 8.1.1)).  Petitioner explains that in Crowds, "[e]ach jondo is a client of its successor on the path (Crowds, 74), and since paths are random, a jondo may participate in different paths as a TCP client or a TCP server." Pet. 34 (citing Ex. 1005 ¶¶ 94–95).  According to

Case: 23-2146    Document: 16    Page: 165    Filed: 11/13/2023

Petitioner, Crowds "states that FTP requests must also go through the crowd. The first client device therefore also *communicates over the Internet based on . . . FTP* (as well as TCP)." Pet. 34 (citing Ex. 1006, 73 n.1). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 94–96.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 18, because Crowds explains that its path failures are detected "by the TCP/IP connection to the jondo breaking or being refused," disclosing that connections between jondos, including connections between a first client device (*e.g.* jondo 6) and a second server (*e.g.* jondo 4) are TCP/IP connections. *See* Ex. 1006, 73–74, 81, Fig. 2.

> f)    *Dependent Claim 19*

Dependent claim 19 recites the following limitations: "*[t]he method according to claim 1, wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards.*" Ex. 1001, 20:60–63.

Petitioner relies on the same evidence and arguments for dependent claim 19 as is does for dependent claim 18. *See* Pet. 34. Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 94–96.

Case: 23-2146    Document: 16    Page: 166    Filed: 11/13/2023

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 19 for the reasons explained with respect to dependent claim 18.

### g) *Dependent Claim 20*

Dependent claim 20 recites the following limitations: "*[t]he method according to claim 1, wherein the first content comprises webpage, audio, or video content, and wherein the first content identifier comprises a Uniform Resource Locator (URL).*" Ex. 1001, 20:64–67.

Petitioner contends that Crowds discloses dependent claim 20 because "Crowds discloses that the first content is a web page identified by a URL." Pet. 34 (citing *id.* at 25–31 (Pet. Section 8.1.1). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 97–98.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 16. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 20 because as Petitioner explains with respect to claim 1 steps [b] and [c], in the example "5→4→6→server" path of Crowds, the "first client device" (jondo 6) sends a web request containing a URL via HTTP to the target web server 5, because as Crowds states in Figure 6, "[t]o

begin browsing anonymously, simply open a URL." *See* Pet. 27–30; Ex. 1006, 73–74, 88–89, Figs. 2, 6.

### h)  Dependent Claim 21

Dependent claim 21 recites the following limitations: "*[t]he method according to claim 1, further comprising executing, by the first client device, a web browser application or an email application.*" Ex. 1001, 21:1–3.

Petitioner relies on the same evidence and arguments for dependent claim 21 as is does for dependent claim 7. *See* Pet. 32. Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 82–86.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 21. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 21 for the reasons explained with respect to dependent claim 7.

### i)  Dependent Claim 22

Dependent claim 22 recites the following limitations: "*[t]he method according to claim 1, further comprising storing, operating, or using, a client operating system.*" Ex. 1001, 21:4–5.

Petitioner contends Crowds discloses dependent claim 22 because "Crowds discloses jondos "*storing, operating, or using, a client operating system,*" specifically SunOS 4.1.4. Pet. 35 (citing Ex. 1006, 82). Petitioner asserts that "Crowds further discloses that the jondo software application

was programmed to allow for 'portability across Unix and Microsoft platforms,'" and that a person of ordinary skill in the art "would understand Unix, Microsoft, and SunOS to refer to client operating systems." Pet. 35 (citing Ex. 1005 ¶¶ 99–101).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 22. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 22, in particular where Crowd discloses a crowd of four jondos operating on SunOS 4.1.4. *See* Ex. 1006, 82.

j) *Dependent Claim 23*

Dependent claim 23 recites the following limitations: "*[t]he method according to claim 1, wherein the steps are sequentially executed.*" Ex. 1001, 21:6–7.

Petitioner contends that Crowds discloses the method steps of claim 1 sequentially executed when after the random path is first established, the web request is then "forwarded along the path (*e.g.*, 5→4→6→server) such that the 'first client device' (here, jondo '6') receives the web request (and content identifier in the URL) from the 'second server' (here, jondo '4'), and sends the web request to the 'first server' or target web server." Pet. 35 (citing Ex. 1006, 73 and Fig. 2). Petitioner points out that Crowds explains that "[S]erver replies traverse the same path as the requests, only in reverse," such that "the 'first client device' receives the web content from the web server, and sends it back to the 'second server,'" thus utilizing the claimed

Case: 23-2146     Document: 16     Page: 168     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 169     Filed: 11/13/2023

sequence. Pet. 35 (citing *id.* at 25–31). Petitioner arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 102–104.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 22. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 23, in particular where the method steps of claim 1 are sequentially executed by Crowds in the manner described by Petitioner.

k)     *Dependent Claim 24*

Dependent claim 24 recites the following limitations: "*[a] non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1.*" Ex. 1001, 21:8–11.

Petitioner contends Crowds discloses dependent claim 24 because Crowds "discloses . . . a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of [claim 24]." Pet. 33 (citing Ex. 1006, 91). Mr. Teruya provides supporting testimony. *See* Ex. 1005 ¶¶ 87–88.

Crowds states that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at http://www.research.att.com/projects/crowds." Ex. 1006, Page 91. Patent Owner does not specifically address Petitioner's arguments or evidence

concerning dependent claim 24. *See* PO Resp. 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

Based on this record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Crowds discloses the limitations of dependent claim 24. The evidence shows that the Crowds' code has been distributed to users and the Crowds' blender is being maintained on the Internet for the operation of an active crowd. Crowds' disclosure of the method of claim 1 is discussed in Section III.E.1, above.

### 3. Conclusion on Anticipation - Crowds

Based upon consideration of the entire record, we are persuaded by Petitioner's arguments and evidence, notwithstanding Patent Owner's arguments and evidence, and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 6, 7, 15, 16, and 18–24 are anticipated by Crowds.

### F. Obviousness Based on Crowds and RFC 2616

Petitioner contends that claims 1, 2, 6–11, 13, 15, 16, and 18–24 would have been obvious in light of Crowds and RFC 2616. Pet. 36–41. Because we have already determined that independent claim 1 is anticipated by Crowds, as well as dependent claims 6, 7, 15, 16, and 18–24, we only consider whether claims 2, 8–11, and 13 would have been obvious in light of Crowds and RFC 2616 as Petitioner contends. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1373 (Fed. Cir. 2019) ("[I]t is well settled that a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for anticipation is the epitome of obviousness." (citations and internal quotation marks omitted)).

Case: 23-2146     Document: 16     Page: 170     Filed: 11/13/2023

Case: 23-2146　　Document: 16　　Page: 171　　Filed: 11/13/2023

### 1. Rationale to Combine

Petitioner asserts that "[w]orking in the field of the '510 patent assumes a basic understanding of computers and Internet communications, including the standards governing HTTP requests and the TCP/IP protocol." Pet. 36. Based in part upon the technology addressed by the '510 patent, we determined that a person of ordinary skill in this art would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems. *See* Section III.B. Such a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including HTTP and TCP/IP protocols. *Id.*

Petitioner points out that the '510 patent contemplates a web server as "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." Pet. 36 (citing Ex. 1001, 4:64–67). The '510 patent acknowledges that "[a]s is known by those having ordinary skill in the art, TCPIP is a relatively low-level protocol, as opposed to HTTP, which is a high level protocol." Ex. 1001, 17:23–25. The '510 patent also cites to RFC 2616 for a definition of HTTP. *Id.* at 16:21–28.

Petitioner points out that "Crowds concerns communications using these same protocols." Pet. 36 (citing Ex. 1006, 81 (TCP), 88–89 (HTTP)). Petitioner contends that "[s]ince Crowds was directed at improving the same types of communications, a [person of ordinary skill in the art] developing software for like applications would have had a powerful motivation to

Case: 23-2146    Document: 16    Page: 172    Filed: 11/13/2023

combine its disclosure with knowledge of Internet standards governing HTTP." Pet. 36 (citing Ex. 1005 ¶¶ 105–110).

Patent Owner does not specifically address Petitioner's stated rationale for combining the teachings of Crowds and RFC 2616. *See* PO Resp. 36–41. Instead, Patent Owner argues that "Crowds does not teach that a jondo may be a server," that "Crowds does not disclose or teach putting a server in the "mix," or that "Crowds also does not disclose or teach a crowd member that does not run its own web browser." *Id.* at 36. None of these arguments, however, addresses Petitioner's stated rationale for combining the teachings of Crowds and RFC 2616 described above. Rather, Patent Owner's arguments only address a contingent alternative proffered by Petitioner with respect to claim 1 "if the Board were to construe 'second server' as requiring a specialized data-center class device," which we did not adopt. *See* Pet. 37–38.

We find that Petitioner has demonstrated that one of ordinary skill in the art at the time of the claimed invention would have had sufficient reason to combine the teachings of Crowds and RFC 2616 in the manner described by Petitioner because both Crowds and RFC 2616 are directed to improving networked communications so that a person of ordinary skill in the art developing software for similar applications would have had an incentive to combine the teachings of Crowds with the knowledge of Internet standards governing HTTP described by RFC 2616.

## 2. *Teaching Away*

Patent Owner argues that Crowds teaches away from the claimed methods of the '510 patent because: 1) Crowds does not provide the initiator

with anonymity as to the target web server; 2) Crowds teaches that an increase in deniability results in an increase in latency; and 3) Crowds does not teach the initiator to purposefully select a jondo to form a pathway. PO Resp. 38–39.

For the first issue, Patent Owner argues that Crowds does provide anonymity, but anonymity is not a limitation of the claims. As to the third issue, a "purposeful" selection of a device is also not claimed. Evidence concerning whether the prior art teaches away from a given invention must relate to and be commensurate in scope with the ultimate claims at issue. *See, e.g., MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264–65 (Fed. Cir. 2013).

As to the second issue of Crowds' latency, Patent Owner does not explain, nor does Dr. Williams provide support, for why Crowds would teach away from the claimed invention, that is, "a person of ordinary skill, upon reading the reference . . . would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013). Moreover, Crowds discusses ways to mitigate latency problems in its system (Ex. 1006, 19) and in Crowds there is no criticizing, discrediting, misdirecting or otherwise discouraging of the approach taken in the claims. *See Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017); *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Accordingly, we do not find that Crowds teaches away from the claimed invention of the '510 patent as Patent Owner contends.

Case: 23-2146     Document: 16     Page: 173     Filed: 11/13/2023

### 3. Objective Indicia of Nonobviousness

Patent Owner asserts that non-obviousness is supported by objective indicia, including commercial success, long-felt need, copying, and industry praise. PO Resp. 55–73; PO Sur-reply 27–29. Petitioner disagrees, contending that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which do not have a nexus to the claims, and that Patent Owner's arguments regarding commercial success, long-felt need, copying, and industry praise suffer from additional infirmities. Pet. Reply 24–26.

#### a) Legal Standards

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). "[O]bjective indicia 'may often be the most probative and cogent evidence of nonobviousness in the record,'" and "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378. Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC,*

856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, their proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)).

On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.* Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Case: 23-2146    Document: 16    Page: 176    Filed: 11/13/2023

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

### b)    *Commercial Success*

Patent Owner argues that nonobviousness is supported by the fact that it "provides a residential proxy service that practices the methods claimed in the '510 patent" that uses residential consumer computers, such as a person's smartphone, tablet, laptop, or desktop having a residential IP address, as a proxy client device. PO Resp. 55 (citing Ex. 2065 ¶ 267). According to Patent Owner, it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service." PO Resp 55 (citing Ex. 2065 ¶ 268; Ex. 2038). Patent Owner asserts that its "residential proxy service has grown to dominate the market." PO Resp. 69. According to Patent Owner, in 2021 Bright Data's "residential proxy service generated revenues of $53.7 million." *Id.* Patent Owner further contends that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is evidence of commercial success. *Id.* at 68 (citing Ex. 2065 ¶ 274).

Patent Owner asserts that "the commercial success of Bright Data's residential proxy service is driven by the claimed methods' novel use of a proxy client device." PO Resp. 69 (citing Ex. 2065 ¶ 276). Patent Owner

Case: 23-2146    Document: 16    Page: 177    Filed: 11/13/2023

provides claim charts purporting to show how "this commercial embodiment practices at least claims 1–2, 6–9, 15–16, 18–20, and 22–24 of the '510 Patent." PO Resp. 57–66. Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '510 [p]atent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122." *Id.* at 67 (citing Ex. 2065 ¶ 271). According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims'" and "embodies the claimed features of the '510 Patent and is coextensive with them." PO Resp. 67.

Additionally, Patent Owner argues that "[t]he features driving the commercial success of [its] residential proxy service are (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses." *Id.* Finally, Patent Owner argues that "the district court found that sufficient nexus was established." PO Sur-reply 27, n.11.

Petitioner points out that Patent Owner "asserts that two things 'driv[e]' the commercial success of its 'residential proxy service': use of 'residential IP addresses' and 'scalability' from the 'large number' of clients with 'residential IP addresses.'" Pet Reply 24 (citing PO Resp. 67–68). Petitioner argues that Patent Owner "therefore admits a lack of nexus, because neither the use of 'residential IP addresses' or 'scalability' from a

Case: 23-2146     Document: 16     Page: 178     Filed: 11/13/2023

'large number' of clients with residential IP addresses are claimed." Pet. Reply 24.

Petitioner alleges that Dr. Williams "admits that use of 'residential' IP addresses is not claimed." *Id.* at 25 (citing Ex. 1111, 56:4–6, 56:19–57:6). Petitioner argues that Dr. Williams "cites to 2021 sales figures as showing 'commercial success,' but provides no analysis tying those sales figures to any allegedly embodying PO product." Pet. Reply 25 (citing Ex. 2065 ¶ 275). Petitioner argues that Dr. Williams "did nothing to determine commercial 'success,' other than observing 'revenues in the millions of dollars per month.'" Pet. Reply 25 (citing Ex. 1111, 168:23–169:3). Petitioner points out that Dr. Williams "did not have 'the data' to know what feature(s) drove revenue." Pet. Reply 25–26 (citing Ex. 1111, 176:7–177:21).

Based on this record, we find that Patent Owner has failed to establish a nexus between the challenged claims and the products that Patent Owner relies on to show commercial success. First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products that it relies on for commercial success embody and are coextensive with the challenged claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner relies on features of its products that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products.

For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing]

residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses." PO Resp. 67; *see id.* at 55 (pointing to Patent Owner's "residential proxy service [that] provides various users' client devices, such as a laptop, desktop, tablet, or smartphone, as a proxy to other user's requesting client devices"), 69 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" wherein its "residential proxy service generated revenues of $53.7 million in the year 2021").

The challenged claims, however, do not recite any limitations requiring residential proxies, residential computers, or residential IP addresses. Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer computer" or "consumer communication device." *See* Section III.C.1. At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to establish a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential

68

proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims. *See* PO Resp. 55–57, 67–69. Therefore, Patent Owner has failed to demonstrate that commercial success of its products is the "direct result" of the claimed invention's unique characteristics.

We also are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established." PO Sur-reply 27, n.10 (citing Ex. 2014, 4). Patent Owner relies on the district court's ruling on defendants' motion to strike the opinions of Patent Owner's expert Dr. Rhyne, where the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of nonobviousness" because it "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention." Ex. 2014, 4. The district court's order, however, does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing such an explanation. It is also not clear from the record whether the district court's finding was that nexus had been established, or simply that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony to establish nexus at trial.

### c) Long-Felt Need

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 70. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target web site," but "that website could still likely identify data center server IP addresses as proxy addresses" because they

Case: 23-2146    Document: 16    Page: 180    Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 181     Filed: 11/13/2023

"were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic location." *Id.* (citing Ex. 2065 ¶ 277). "In contrast," Patent Owner asserts, its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." PO Resp 70. Patent Owner further contends that its proxy client devices "can dramatically increase the scale of IP addresses that can be included in a proxy network." *Id.*

For similar reasons as for commercial success, Patent Owner has not established that there is a nexus between Patent Owner's evidence of long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a "long-felt need" are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 67. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

### d)    Copying

Patent Owner argues that "[d]uring the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service, then under the name as 'Hola,' was presented." PO Resp. 71 (citing Ex. 2065 ¶ 278). Specifically, Patent Owner argues that its representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas Okmanas) to incorporate its software development kit (SDK) in Oxylabs' applications, but that instead Oxylabs "subsequently released their own SDK for Oxylabs'

own residential proxy network." PO Resp. 71 (citing Ex. 2049, 202:12–204:8; Ex. 2047, 131:23–132:7; 152:8–153:6; Ex. 2065 ¶ 278). Patent Owner also asserts that Mr. Okmanas testified that he was looking for "a system that works like hola.org," that Oxylabs "wanted to develop its own residential proxy service," and that "he believed that he needed to do what Bright Data (previously known as Luminati and Hola) were doing to be successful." PO Resp. 71–72 (citing Ex. 2047, 95:20–97:1, 103:18–104:10, 149:13–150:8; Ex. 2065 ¶ 279). "This testimony," according to Patent Owner, "is strong evidence of copying." PO Resp. 72 (citing Ex. 2065 ¶ 279).

For similar reasons as for commercial success and long-felt need, no nexus has been shown between Patent Owner's evidence of copying and the challenged claims. Although Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied, it refers generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 71–72. As explained above, however, the challenged claims do not recite or require a residential proxy service. Therefore, Patent Owner has failed to make the requisite showing that the claimed invention was copied.

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '510 [p]atent as described above." PO Resp. 72–73 (citing Ex. 2065 ¶ 281). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." PO Resp. 73.

Case: 23-2146    Document: 16    Page: 182    Filed: 11/13/2023

For similar reasons as for the other objective indicia, no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. *Id.* Therefore, Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

### e) Conclusion

For the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise is entitled to little weight in our obviousness analysis because Patent Owner has not shown a sufficient nexus to the evidence presented and the claimed invention.

### 4. Dependent Claim 2

Dependent claim 2 recites the following limitations:

> *[t]he method according to claim 1, wherein the first client device is identified by a Media Access Control (MAC) address or a hostname, and wherein the method further comprising sending, by the first client device, during, as part of, or in response to, a start-up or power-up of the first client device, a first message to the second server, and wherein the first messages comprises the first client IP address, the MAC address, or the hostname.*

Ex. 1001, 19:32–39.

According to Petitioner, Crowds discloses that jondos have host names: "[t]he user selects this jondo as her web proxy by specifying its host name and port number in her web browser as the proxy for all services." Pet. 38 (citing Ex. 1006, 73; *see also id.* at Fig. 6 (identifying host names of multiple available jondos). Petitioner asserts that "Crowds also discloses a

setup phase for new jondos, such that other jondos learn information including their IP address shared password, and use this information when selecting a jondo as a proxy." Pet. 39. "In the setup phase," Petitioner explains, "the Blender gets the IP address of the joining jondo." *Id.* (citing Ex. 1006, 87). According to Petitioner, "[t]he blender then informs the other jondos of the new member and shared key, so that 'all members are equipped with the data they need for the new member to participate in the crowd.'" Pet. 39 (quoting Ex. 1006, 87).

According to Petitioner, it would be obvious to a person of ordinary skill in the art "that the other jondo (*e.g.*, the one participating as the second server) would receive a message from the first jondo (first client device), during the first jondo's initialization period, which includes the first jondo's IP address." Pet. 39 (Ex. 1005 ¶¶ 118–122).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. *See* PO Resp. 36–38, 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

We find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 2, wherein during the setup phase a new user selects a jondo as a web proxy by specifying a host name as the proxy for all services such that other jondos learn this information including the IP address shared password, and use this information when selecting a jondo as a proxy.

Case: 23-2146    Document: 16    Page: 185    Filed: 11/13/2023

5.    *Dependent Claim 8*

Dependent claim 8 recites the following limitations: "*[t]he method according to claim 1, further comprising periodically communicating over the TCP connection between the second server and the first client device.*" Ex. 1001, 20:4–6.

According to Petitioner, "Crowds discloses establishing a static path over a series of jondos, consisting of TCP connections, and that HTTP requests are passed over these connections." Pet. 39 (citing Ex. 1006, 80 (discussing static paths)). Petitioner asserts that "Crowds also discloses support for embedded images within webpages, which would cause HTTP clients and servers to re-use persistent connections to fetch both web objects using the same TCP/IP connection." Pet. 39 (citing Ex. 1006, 83; Ex. 1005 ¶ 124).

According to Petitioner "Crowds discloses group membership management techniques by which jondos track the liveness of other jondos in the system," such that a "jondo can also remove jondos from its list of crowd members, if it detects that those jondos have failed." Pet. 40 (citing Ex. 1006, Fig. 3, line 25). Petitioner explains that "jondos periodically communicate with one another, and thus detect when another jondo fails to respond to the periodic communication," and that a person of ordinary skill in the art "would understand that a peer-to-peer system such as Crowds would maintain group membership by periodically communicating to ensure the liveness of other jondos." Pet. 40 (citing Ex. 1005 ¶ 125).

Petitioner explains that "[u]nder RFC 2616, the then current specification for HTTP (version 1.1), the default behavior where HTTP is

Case: 23-2146    Document: 16    Page: 186    Filed: 11/13/2023

sent over TCP was (and is) to use persistent connections, so the two HTTP end-points can send and receive more than one HTTP request and response pair." Pet. 40 (citing Ex. 1013 § 8.1). Petitioner further explains that "[p]ersistent connections were also supported in HTTP/1.0 with the use of explicit Keep-Alive HTTP headers and also documented in HTTP/1.1" where "[e]xchanging keep alive messages was a standard feature of devices communicating via persistent HTTP connections." Pet. 40 (citing Ex. 1013 §§ 8.1.3, 13.5.1, 19.6; Ex. 1023 § 19.7.1).

Petitioner argues that it "would have been obvious to have used an implementation in accordance with RFC 2616, which would have entailed both periodic communication between the jondos, and doing so by exchanging "keep-alive" messages." Pet. 41 "Doing so," argues Petitioner, "would have been obvious because it was an existing, known implementation that could easily have been employed to implement the disclosed feature of detecting breaks in the TCP connection, with predictable results." *Id.* (citing Ex. 1005 ¶ 130).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. See PO Resp. 36–38, 40–41. Neither does Dr. Williams. See Ex. 2065 ¶¶ 183–193.

We find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616, such as through the use of periodic "keep-alive" messages or other periodic communications over persistent HTTP/TCP connections between jondos acting as a second server and first client device meet the recited limitations of dependent claim 8.

### 6.   Dependent Claim 9

Dependent claim 9 recites the following limitations: "*[t]he method according to claim 8, wherein the periodically communicating comprises exchanging 'keep alive' messages.*" Ex. 1001, 20:7–9.

Petitioner relies on the same arguments and evidence for dependent claim 9 as it does for dependent claim 8.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. *See* PO Resp. 36–38, 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 9 for the reasons explained with respect to dependent claim 8.

### 7.   Dependent Claim 10

Dependent claim 10 recites the following limitations: "*[t]he method according to claim 1, further comprising determining, by the first client device, that the received first content, is valid.*" Ex. 1001, 20:10–12.

Petitioner asserts that RFC 2616 discloses headers that implement the subject matter of claim 10. Pet. 41 (citing Ex. 1013 at § 14.9). Petitioner argues that "the techniques for this taught by RFC 2616 are identical to the 'Cache-Control' directives utilized in the ['510] Patent to implement this functionality." Pet. 40. The cache-control directives described in RFC 2616 include, for example, "[c]ontrols over cache revalidation and reload." *See* Ex. 1013 § 14.9.

Case: 23-2146     Document: 16     Page: 187     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 188     Filed: 11/13/2023

Figure 12 of the '510 patent provides a flow chart illustrating steps taken by an agent, client, or peer to determine whether a certain HTTP request is still valid. The '510 patent acknowledges that "the HTTP protocol, *defined by RFC 2616*, outlines specific methods . . . within the HTTP headers signifying the validity of certain data, such as, but not limited to, by using HTTP header information." Ex. 1001, 16:21–25 (emphasis added).

Petitioner argues that it "would have been obvious for [a person of ordinary skill in the art] faced with a like issue of data validation for retrieved web content to take advantage of this widely adopted standard to accomplish that end, as set forth in RFC 2616." *Id.* (citing Ex. 1005 ¶¶ 132–134).

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. See PO Resp. 36–38, 40–41. Neither does Dr. Williams. See Ex. 2065 ¶¶ 183–193.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 10.

### 8. Dependent Claim 11

Dependent claim 11 recites the following limitations: "*[t]he method according to claim 10, wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616.*" Ex. 1001, 20:13–15.

Petitioner uses the same arguments and evidence for dependent claim 11 that it used for dependent claim 10.

Patent Owner does not specifically address Petitioner's arguments or evidence concerning dependent claim 2. *See* PO Resp. 36–38, 40–41. Neither does Dr. Williams. *See* Ex. 2065 ¶¶ 183–193.

Based upon the complete record, we find that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 11 for the reasons discussed with respect to dependent claim 10.

        *9.    Dependent Claim 13*

Dependent claim 13 recites the following limitations:

> *The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by:*
>
> *downloading, by the first client device from the Internet, the software application; and*
>
> *installing, by the first client device, the downloaded software application.*

Petitioner contends that Crowds discloses dependent claim 13 because Crowds "discloses (and states how a user could download from the Internet for installation) a software package that implements a jondo, whose operation is per claim 1, meeting the limitations of [claim 13]." Pet. 33

Case: 23-2146    Document: 16    Page: 189    Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 190     Filed: 11/13/2023

(citing Ex. 1006, 91). Petitioner's arguments are supported by the testimony of Mr. Teruya. *See* Ex. 1005 ¶¶ 87–88.

Patent Owner argues that "Petitioner fails to show that Crowds discloses or teaches 'storing of the first content' and 'sending . . . the stored first content' as recited in claim 13." PO Resp. 40. Patent Owner also argues that "Petitioner does not show that the software package causes the processor on the jondo to store the first content or send the stored first content as recited in claim 13." *Id.* (citing Ex. 2065 ¶ 185). Patent Owner's arguments are supported by Dr. Williams' testimony. *See* Ex. 2065 ¶¶ 184–186.

> In its Reply, Petitioner points out that
>
> [c]laim 13, challenged by PO as to Crowds and MorphMix, adds two method steps regarding the downloading and installing of a software application. PO does not dispute that the prior art discloses those steps, but instead refers to the language "the receiving and storing of the first content" and "sending . . . stored first content" used in claim 13 to refer back to claim 1 (even though "the storing" has no antecedent basis). POR, 40, 52. PO's argument fails because claim 13 does not specify any particular means of storage of the HTTP content, and therefore the use of typical computer memory satisfies this step. Williams admits that typical "user computers" are disclosed in Crowds (EX-2065, ¶ 164).

Pet. Reply 23.

In its Sur-reply, Patent Owner does not address the issues raised by Petitioner in its Reply, but instead "focuses on independent claim 1 and defers to its analysis of the dependent claims as set forth in the [Patent Owner Response]," which related to the storage limitations. PO Sur-reply 22, n.9 (citing PO Resp. 40–41; 46–47; 52–53). However, as Petitioner

contends, and we agree, Crowds discloses typical user computers with memory that satisfies the storing step. Pet. Reply 23 (citing Ex. 2065 ¶ 164). Dr. Williams also acknowledges that the jondos of Crowds are "user computers". Ex. 2065 ¶ 164. A person of ordinary skill in the art at the time of the invention would understand that a "user computer" such as those described in Crowds would typically have computer memory and storage capabilities in order to function in the manner that Crowds operates. *See* Section III.B, above.

For downloading of the software application, Crowds expressly discloses that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at http://www.research.att.com/projects/crowds" (Ex. 1006, 91), and Patent Owner has presented no argument to rebut this evidence.

Based upon the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Crowds and RFC 2616 meet the recited limitations of dependent claim 13.

10.    *Conclusion on Obviousness - Crowds and RFC 2616*

Based upon consideration of the entire record, including Petitioner's arguments and evidence and Patent Owner's arguments and evidence of secondary considerations, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2, 8–11, and 13 would have been obvious over the combined teachings of Crowds and RFC 2616 and

that a person of ordinary skill in the art would have combined the teachings of Crowds and RFC 2616 in the manner described by Petitioner. As noted above, we give little weight to Patent Owner's evidence of secondary considerations in our obviousness analysis because Patent Owner has failed to establish a sufficient nexus between that evidence and the challenged claims.

## G. Anticipation Based on Border

Petitioner asserts that claims 1, 6, 10, 15–20, 23, and 24 are anticipated by Border. Pet. 42–55. Because we have already determined that claims 1, 6, 10, 15, 16, 18–20, 23, and 24 are unpatentable, we only consider whether claim 17 is anticipated by Border as Petitioner contends. However, in order to anticipate dependent claim 17, Border must first disclose the limitations of independent claim 1, which are incorporated into claim 17. For ease of reference, Figure 1 from Border is set out below.

FIG. 1

Figure 1 from Border, above, is a diagram depicting a communication system employing a downstream proxy server and an upstream proxy server for accessing a web server.

### 1. Independent Claim 1

The preamble of claim 1 reads as follows:

*A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:*

Ex. 1001, 19:18–21.

Petitioner asserts that the preamble of claim 1 is disclosed by Border. Pet. 45. Petitioner identifies the first client device recited in the preamble as upstream server 107 in Border. *Id.* Petitioner identifies the recited second server as downstream server 105. *Id.* Petitioner identifies the recited first server as web server 109. *Id.* Petitioner identifies the recited first content identifier as the requested URL. *Id.* And Petitioner identifies the recited first content as the requested web page at the requested URL. *Id.* (citing Ex. 1005 ¶¶ 137–145).

The remaining steps of claim 1 are as follows:

*[a] establishing a Transmission Control Protocol (TCP) connection with a second server;*

*[b] sending, to the web server over an Internet, the first content identifier;*

*[c] receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and*

Case: 23-2146   Document: 16   Page: 194   Filed: 11/13/2023

> *[d] sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.*

Ex. 1001, 19:22–31.

Petitioner's analysis continues by showing that each step of claim 1 is disclosed in Border. Pet. 42–50.

Petitioner asserts that step 1[a] is met because "Figure 1 of Border shows a persistent TCP ('P-TCP') connection between upstream server (107) (first client device) and downstream server 105 (second server)." Pet. 45–46 (citing Ex. 1012, 7:51–58; Ex. 1005 ¶ 146). Petitioner explains that

> downstream server 105 (expressly called a "server" in Border) is the "second server," as it accepts a connection from web browser 103 and sends back a response to web browser 103's GET request. Down-stream server 105 retrieves the requested first content by communicating with web server 109 (the "first server") through upstream server 107 ("first client device").

Pet. 46.

With respect to the second step 1[b], Petitioner asserts that this step is met when "[u]pstream server 107 (the first client device) issues a GET request to Web server 109," where the "request (GET) is for a URL." Pet. 47 (citing Ex. 1012, 5:18–24, 32–35, Fig. 2; Ex. 1005 ¶¶ 152–156) (footnote omitted).

As for the third step 1[c], Petitioner asserts that this step is met when "[i]n response to upstream server 107 'issu[ing] the GET URL HTML request the web server 109 for the HTML page . . . the web server 109 transmits the requested HTML page to the upstream server.'" Pet. 48 (citing Ex. 1012, 5:34–37, Fig. 2).

Case: 23-2146    Document: 16    Page: 195    Filed: 11/13/2023

For the fourth step 1[d], Petitioner asserts this step is met when "[a]fter receiving the web page from web server 109, upstream server 107 'forwards the HTML page to the downstream server 105,'" and "[d]ownstream server 105 then forwards the first content to web browser 103, in response to web browser 103's original GET request, in accordance with the second server's role as a 'server.'" Pet. 49–50 (citing Ex. 1012, 5:38–41; Ex. 1005 ¶¶ 160–162).

Petitioner explains that these communication steps are depicted in Border's Figure 2, shown below.



Border's Figure 2, above, is a sequence diagram showing the communications between the web server, upstream and downstream servers, and browser of Border.

For the preamble, Patent Owner relies on the same arguments it made with respect to Crowds. PO Resp. 41 ("For the same reasons discussed above regarding Crowds, Border does not disclose a 'first client device' as recited in the preamble of claim 1") (citing Ex. 2065 ¶ 201). Patent Owner's arguments concerning the preamble are unavailing for the same reasons we discussed with respect to Crowds. *See* Section III.E.1, above.

For claim 1 steps 1[a]–1[c], Patent Owner does not provide any specific arguments. *See* PO Resp. 41–43.

For step 1[d], Patent Owner argues that

[f]or the same reasons discussed above regarding Crowds, during performance of this method step, under the purely role-based constructions, upstream server 107 is operating in the role of a server, not a client, and therefore, upstream server 107 cannot be a client device. EX.2065 at ¶204. Also, under the purely role-based constructions, downstream server 105 is operating in the role of a client, not a server, and therefore downstream server 105 cannot be a server. EX.2065 at ¶205. For at least these reasons, Border does not disclose claim 1 under the purely role-based constructions. EX.2065 at ¶206.

PO Resp. 42.

Patent Owner's arguments with respect to claim 1 step [d] are unavailing for the same reasons discussed above with respect to Crowds. *See* Section III.E.1.d, above. Patent Owner's arguments are unavailing because they rigidly focus on an alleged requirement that devices cannot operate in different roles, an argument that was rejected by the district court

Case: 23-2146    Document: 16    Page: 196    Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 197     Filed: 11/13/2023

in its claim construction. Rather, the district court explained, and we agree, that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." Ex. 1020, 10 (internal quotation marks omitted).

Patent Owner's other arguments with respect to Border, for example that "Border does not disclose the architecture of claim 1 under Patent Owner's proposed constructions" (PO Resp. 42–43) are unavailing because they argue proposed claim constructions that we did not adopt. *See* Section III.C, above.

We have considered Petitioner's evidence and arguments that each step of claim 1 is disclosed by Border, as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Border discloses all the limitations of independent claim 1.

### 2. Dependent Claim 17

Dependent claim 17 recites the following limitations: "*[t]he method according to claim 1, further comprising storing, by the first client device in response to the receiving from the web server, the first content.*" Ex. 1001, 20:49–51.

For claim 17, Petitioner argues that "[i]n response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117." Pet. 53 (citing Ex. 1012, 5:36–38; Ex. 1005 ¶¶ 179–180).

Case: 23-2146     Document: 16     Page: 198     Filed: 11/13/2023

Patent Owner argues that "[b]ecause Border does not disclose or teach independent claim 1, Border does not disclose or teach dependent [claim 17]." PO Resp. 46 (citing Dec. 8; Ex. 2065 ¶ 216). Because we have already determined that Border discloses all the limitations of independent claim 1, Patent Owner's argument is unavailing. *See* Section III.G.1, above.

We have considered Petitioner's evidence and arguments as well as Patent Owner's evidence and arguments. For the reasons discussed, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that Border discloses all the limitations of dependent claim 17.

*H. Obviousness Based on Border and RFC 2616*

Petitioner contends that claims 1, 6, 8–11, 13, 15–20, and 22–24 would have been obvious in light of Border and RFC 2616. Pet. 53–57. Because we have determined that these claims are unpatentable on other grounds, we do not reach Petitioner's arguments on this ground.

*I. Anticipation Based on MorphMix*

Petitioner asserts that claims 1, 6–8, 13, 15, 16, and 18–24 are anticipated by MorphMix. Pet. 60–73. Because we have determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

*J. Obviousness Based on MorphMix and RFC 2616*

Petitioner contends that claims 1, 2, 6–11, 13, 15, 16, and 18–24 would have been obvious over MorphMix in light of RFC 2616. Pet. 73–78. Because we have determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

Case: 23-2146    Document: 16    Page: 199    Filed: 11/13/2023

## IV. MOTION TO SEAL AND PROTECTIVE ORDER[9]

Patent Owner has filed a Motion to Seal and to Enter the Joint Protective Order (Paper 32, "Motion"), which seeks to seal Exhibits 2039, 2041–2044, and 2065 and associated portions of the Patent Owner Response, and to enter an agreed-upon Joint Protective Order (Ex. 2071). Paper 32, 1. Patent Owner asserts that Exhibit 2039 contains sensitive technical network information, Exhibits 2041–2044 contain source code and related files, Exhibit 2065 is an expert declaration that references some of the sensitive information in the exhibits, and portions of the Patent Owner Response incorporate some of the sensitive information. *Id.* at 2–6. Patent Owner argues that it would be harmed by the public disclosure of its highly sensitive information, that it has taken steps to guard against disclosure, which outweighs the public's interests. *Id.* This Motion is unopposed.

We have reviewed the exhibits at issue, including the portions of the exhibits and Patent Owner Response, and the explanations of the confidential nature of the materials for which sealing is sought, as discussed in the Motion. We grant the Motion to Seal (Paper 32) and the associated request to enter the Protective Order (Ex. 2071).

## V. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6–11, 13,

---

[9]Petitioner has filed a Motion to Exclude Evidence (Paper 43), which was withdrawn at the Oral Hearing without objection by Patent Owner. *See* Paper 48, 5.

and 15–24 of U.S. Patent No. 10,484,510 B2 are unpatentable on the bases

set forth in the following table.[10]

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
Final Decision, we draw Patent Owner's attention to the April 2019 *Notice
Regarding Options for Amendments by Patent Owner Through Reissue or
Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg.
16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

Case: 23-2146     Document: 16     Page: 200     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 201    Filed: 11/13/2023

| Claims | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 6, 7, 13, 15, 16, 18–24 | 102 | Crowds | 1, 6, 7, 15, 16, 18–24 | |
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103 | Crowds, Knowledge of POSITA, RFC 2616 | 2, 8–11, 13 | |
| 1, 6, 10, 15–20, 23, 24 | 102 | Border | 17 | |
| 1, 6, 8–11, 13, 15–20, 22–24 | 103 | Border, Knowledge of POSITA, RFC 2616[11] | | |
| 1, 6–8, 13, 15, 16, 18–24 | 102 | MorphMix | | |
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103 | MorphMix, Knowledge of POSITA, RFC 2616 | | |
| **Overall Outcome** | | | 1, 2, 6–11, 13, 15–24 | |

---

[11] Because each of these challenged claims is held unpatentable on other grounds, we do not reach grounds 4–6 in the Petition.

## VI. ORDER

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6–11, 13, and 15–24 of U.S. Patent No. 10,484,510 B2 are unpatentable;

FURTHER ORDERED that the Motion to Seal (Patent Owner's Response (Paper 30), Exs. 2039, 2041–2044, and 2065) is *granted*;

FURTHER ORDERED that the request to enter the Protective Order (Ex. 2071) is *granted*;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Case: 23-2146     Document: 16     Page: 202     Filed: 11/13/2023

PETITIONER:

Liang Huang
Wensheng Ma
MAURIEL KAPOUYTIAN WOODS LLP
rhuang@mkwllp.com
wma@mkwllp.com


PATENT OWNER:

Thomas Dunham
Elizabeth O'Brien
CHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

Case: 23-2146 · Document: 16 · Page: 203 · Filed: 11/13/2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MAJOR DATA UAB,

Petitioner

v.

BRIGHT DATA LTD.,

Patent Owner

---

Case IPR2022-00916

Patent No. 10,484,510

---

**PATENT OWNER'S NOTICE OF APPEAL**

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Pursuant to 35 U.S.C. §§ 141, 142, and 319, and 37 C.F.R. §§ 90.2 and 90.3, notice is hereby given that Patent Owner Bright Data Ltd. appeals to the U.S. Court of Appeals for the Federal Circuit from the Final Written Decision (Paper 50) entered on September 13, 2023 in IPR2022-00916, and from all underlying orders, decisions, ruling, and opinions that are adverse to Patent Owner.[1,2] The public version of the Final Written Decision (Paper 51) entered on September 15, 2023 is

---

[1] Lead Case No. 23-2144, pending in its early stages before the Fed. Cir., involves the same patent, the same disputed claim terms, and the same primary prior art reference (Crowds).

[2] Patent Owner is simultaneously filing a Notice of Appeal in IPR2022-00915 and IPR2022-00916, which involve related patents having the same specification, the same disputed claim terms, and the same prior art references. There are also similar claim construction issues in pending administrative matters: IPR2021-01492, IPR2021-01493, and IPR2022-00687; as well as Reexamination Control Nos. 90/014,652, 90/014,816, 90/014,624, and 90/014,827; all which involve related patents having the same specification. There are also similar claim construction issues in stayed Reexamination Control Nos. 90/014,875 and 90/014,876, as well as stayed district court matters: Case Nos. 2:19-cv-395, 2:19-cv-396, and 2:19-cv-414 in the Eastern District Court of Texas.

Case: 23-2146     Document: 16     Page: 205     Filed: 11/13/2023

attached to this Notice as Exhibit A.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner intends to appeal at least the following issues:

    i.    Whether the Board's construction of the claim term "client device" was incorrect and/or not reasonable in light of the evidence of record;

    ii.    Whether the Board's construction of the claim term "second server" was incorrect and/or not reasonable in light of the evidence of record;

    iii.    Whether the Board erred in determining that Petitioner established by a preponderance of the evidence that claims 1, 6-7, 15-16, and 18-24 of U.S. Patent No. 10,484,510 ("the '510 Patent") are unpatentable as anticipated by Crowds[3];

    iv.    Whether the Board erred in determining that Petitioner established by a preponderance of the evidence that claims 2, 8-11, and 13 of the '510 Patent are unpatentable as obvious over the combination of Crowds and

---

[3] Michael Reiter & Aviel Rubin, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds").

Case: 23-2146    Document: 16    Page: 206    Filed: 11/13/2023

RFC 2616[4];

v.   Whether the Board erred in determining that Petitioner established by a preponderance of the evidence that claim 17 of the '510 Patent is unpatentable as anticipated by Border[5]; and

vi.   Whether the Board erred in any further findings or determinations supporting or relating to the issues above, including the Board's consideration of the expert testimony, prior art, secondary considerations of non-obviousness, and other evidence in the record.

Pursuant to 37 C.F.R. § 90.3, this Notice is timely, having been duly filed within 63 days after the date of the Final Written Decision.

A complete and entire copy of this Notice is being filed simultaneously with each of the Patent Trial and Appeal Board and the Clerk's Office for the U.S. Court of Appeals for the Federal Circuit, along with the required fee. A complete and entire copy of this Notice is being served simultaneously on each of the Director of the

---

[4] Fielding, et al., RFC 2616, Hypertext Transfer Protocol -- HTTP/1.1, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

[5] Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border").

U.S. Patent and Trademark Office and the petitioner.

No fees are believed to be due to the U.S. Patent and Trademark Office in connection with this filing, but authorization is hereby given for any requisite fees to be charged to Deposit Account No. 603803 (Customer No. 144371).

Respectfully submitted,

Date: September 18, 2023

By: /s/ *Thomas M. Dunham*
Thomas M. Dunham
Reg. No. 39,965

Cherian LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEY FOR PATENT OWNER,
BRIGHT DATA LTD.

Case: 23-2146     Document: 16     Page: 208     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 209     Filed: 11/13/2023

## CERTIFICATE OF FILING AND SERVICE

The undersigned hereby certifies a complete and entire copy of this paper

was served on the undersigned date by hand on the Director of the USPTO at the

following address:

> Office of the General Counsel
> United States Patent and Trademark Office
> Madison Building East, Room 10B20
> 600 Dulany Street
> Alexandria, VA 22314

The undersigned hereby certifies a complete and entire copy of this paper

was filed on the undersigned date with the Clerk's Office for the United States

Court of Appeals for the Federal Circuit and that the required docket fee was paid

electronically through the Court's CM/ECF system.

The undersigned hereby certifies a complete and entire copy of this paper

was served on the undersigned date via email, as authorized by Petitioner, at the

following email addresses:

rhuang@mkwllp.com

vma@mkwllp.com

jbartlett@mkwllp.com

Respectfully submitted,

Date: September 18, 2023

By: /s/ *Thomas M. Dunham*
Thomas M. Dunham
Reg. No. 39,965

Cherian LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEY FOR PATENT OWNER,
BRIGHT DATA LTD.

Case: 23-2146     Document: 16     Page: 210     Filed: 11/13/2023

Trials@uspto.gov
Tel: 571-272-7822

Paper 54
Entered: September 27, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

CODE200, UAB; TESO LT, UAB; METACLUSTER LT, UAB;
OXYSALES, UAB; AND CORETECH LT, UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

IPR2021-01492[1]
Patent 10,257,319 B2

Before THOMAS L. GIANNETTI, SHEILA F. McSHANE, and
RUSSELL E. CASS, *Administrative Patent Judges.*

GIANNETTI, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motion to Seal
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

---

[1] Joined by the petitioners in IPR2022-00861.

Case: 23-2146    Document: 16    Page: 211    Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 212    Filed: 11/13/2023

## I. INTRODUCTION

On September 3, 2021, NetNut Ltd. (NetNut") filed a Petition (Paper 2, "Pet.") requesting *inter partes* review of claims 1, 2, 12, 14, 15, 17–19, and 21–29 (the "challenged claims") of U.S. Patent No. 10,257,319 B2 (Ex. 1001, "the '319 patent"). Patent Owner, Bright Data Ltd.,[2] filed a Preliminary Response (Paper 9, "Prelim. Resp.").

We determined that NetNut's Petition established a reasonable likelihood that it would prevail with respect to at least one claim, and on March 21, 2022, we instituted *inter partes* review as to all challenged claims of the '319 patent and all grounds of unpatentability asserted in the Petition. Paper 12 ("Institution Dec.").

On April 18, 2022, Code200, UAB; Teso LT, UAB; Metacluster LT, UAB; Oxysales, UAB; and coretech lt, UAB (collectively, "Petitioner")[3] filed a "substantially identical" petition challenging the same claims of the '319 patent on the same grounds as the Petition filed by NetNut, accompanied by a request for joinder to this proceeding. IPR2022-00861 Papers 1, 7.

On May 24, 2022, NetNut and Patent Owner submitted a joint motion to terminate this proceeding as to NetNut, as a result of a settlement. Paper 17. On May 27, 2022, we granted the motion and terminated NetNut as a party to this proceeding but did not terminate the proceeding. Paper 20.

---

[2] Bright Data Ltd. was formerly known as Luminati Networks, Ltd. *See* Pet. 1; Prelim. Resp. 11 n.8.

[3] Our references to "Petitioner" also include NetNut prior to its termination as a party.

On October 19, 2022, we instituted *inter partes* review in IPR2022-00861 and granted the joinder request. IPR2022-00861 Paper 19.[4]

Following institution of this proceeding, Patent Owner filed a Response. Paper 31 ("PO Resp."), Petitioner filed a Reply (Paper 40, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 41, "PO Sur-reply").

An oral hearing was held on June 9, 2023. A transcript of that hearing is part of the record. Paper 51 ("Hearing Tr.").

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision issued pursuant to 35 U.S.C. § 318(a). For the reasons we discuss below, we determine that Petitioner has proven by a preponderance of the evidence that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of the '319 patent are unpatentable.

## II.  BACKGROUND
### A.  Related Matters

The parties identify several district court proceedings involving the '319 patent and a related patent, U.S. Patent No. 10,484,510 ("the '510 patent"), including *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) (the "*NetNut* Litigation");[5] and *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.) (the "*Teso* Litigation"). Pet. 2–3; Paper 4, 1–2.

---

[4] On August 23, 2022, the USPTO Director, *sua sponte*, vacated our initial decision denying *inter partes* review in IPR2022-00861 and remanded the case to the Board. *See* IPR2022-00861 Paper 18.

[5] Patent Owner alternatively refers to this case as the "*NetNut II* Litigation." *See* Prelim. Resp. 25.

Case: 23-2146      Document: 16      Page: 213      Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 214    Filed: 11/13/2023

The parties also identify a number of district court actions involving patents related to the '319 patent. *See* Pet. 3–4; Paper 4, 2–3.

The '319 patent was previously before the Board in IPR2020-01266 (institution denied). Pet. 4; Paper 4, 1. The '510 patent is involved in IPR2021-01493 (pending), and was previously before the Board in IPR2020-01358 (institution denied). Pet. 5; Paper 4, 1. The parties also identify a number of other USPTO proceedings involving patents related to the '319 patent. *See* Pet. 4–5; Paper 4, 2.

In addition, Patent Owner identifies *ex parte* reexaminations requested for the '319 and '510 patents, respectively, Control No. 90/014,875 and Control No. 90/014,876. Paper 6, 1–2; Prelim. Resp. 17. Those reexamination proceedings have been stayed by the Board. IPR2021-01492, Paper 14; IPR2021-01493, Paper 13.

## B. Real Parties-in-Interest

The Petition filed by NetNut identifies NetNut Ltd. as the only real party-in-interest. Pet. 2. The petition in IPR2022-00861 identifies Code200, UAB; Teso LT, UAB; Metacluster LT, UAB; Oxysales, UAB; and coretech lt, UAB as the real parties-in-interest. IPR2022-00861 Paper 1, 3. Patent Owner identifies Bright Data Ltd. as the only real party-in-interest. Paper 4, 1.

## C. The '319 Patent (Ex. 1001)

The '319 patent is titled "System Providing Faster and More Efficient Data Communication." Ex. 1001, (54). According to the '319 patent, there is a "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs." *Id.* at 1:54–56. The patent states that other "attempts

at making the Internet faster for the consumer and cheaper for the

broadcaster," such as proxy servers and peer-to-peer file sharing, have

various shortcomings. *Id.* at 1:58–59; 2:24–2:32; 2:59–3:3.

The '319 patent describes a system and method "for faster and more

efficient data communication within a communication network," such as in

the network illustrated in Figure 3, reproduced below (*id.* at 4:41–44):



**FIG. 3**

Figure 3 is a schematic diagram depicting communication network 100

including a number of communication devices. *Id.* at 4:43–45. Due to the

functionality provided by software stored within each communication

Case: 23-2146     Document: 16     Page: 215     Filed: 11/13/2023

device, "each communication device may serve as a client, peer, or agent, depending upon requirements of the network 100." *Id.* at 4:46–50.

Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:56–58. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of the many such servers on the Internet." *Id.* at 4:63–67. Acceleration server 162 includes an acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein." *Id.* at 5:8–14.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser. *See id.* at 12:62–13:3. If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162. *Id.* at 13:8–15. Acceleration server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36.

Each agent responds to the client with information which "can help the client to download the requested information from peers in the network." *Id.* at 13:53–57. "Specifically, each agent responds with whether the agent has seen a previous request for this resource that has been fulfilled. In such

Case: 23-2146   Document: 16   Page: 216   Filed: 11/13/2023

a case, the agent may then provide the client with the list of peers and checksums of the chunks[6] that each of them have." *Id.* at 13:57–61.

The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have the necessary information to service a request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

### D. Illustrative Claim

The '319 patent has 29 claims. As noted, claims 1, 2, 12, 14, 15, 17–19, and 21–29 are challenged in the Petition. Pet. 1. Claim 1, the only independent claim in the '319 patent, is illustrative of the claimed subject matter and is reproduced below:[7]

> 1. [Preamble] A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:
>
> [1a] receiving, from the second server, the first content identifier;

---

[6] "[C]hunks . . . are defined as equally sized pieces of data that together form the whole content of the URL, namely, the entire content whose location is described by the URL." Ex. 1001, 10:60–63.

[7] Paragraph references in brackets tracking Petitioner's analysis have been added.

Case: 23-2146     Document: 16     Page: 217     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 218    Filed: 11/13/2023

[1b] sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

[1c] receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and

[1d] sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.

Ex. 1001, 19:16–32.

### E. Prior Art References and Other Evidence

Petitioner relies on the following references:

1. Michael Reiter & Aviel Rubin, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds");

2. Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border");

3. Marc Rennhard, *MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access* (2004) (Ex. 1008, "MorphMix");

4. Fielding, et al., RFC 2616, *Hypertext Transfer Protocol -- HTTP/1.1*, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

In addition to these references, Petitioner relies on a Declaration of Keith J. Teruya. Ex. 1005 ("Teruya Decl."). Patent Owner submitted a Declaration of Dr. V. Thomas Rhyne with its Preliminary Response. Ex. 2006.[8] After institution, Patent Owner submitted a Declaration of Dr.

---

[8] According to Patent Owner, Dr. Rhyne's declaration was previously submitted in IPR2020-01266.

Tim A. Williams. Paper 2065 ("Williams Decl.").[9] Petitioner has submitted a transcript of Dr. Williams's deposition. Ex. 1111 ("Williams Dep."). Patent Owner has submitted a transcript of Mr. Teruya's deposition from IPR2022-00861, also involving the '319 patent and whose petitioners have been joined with this proceeding. Ex. 2067.

### E. The Asserted Grounds of Unpatentability

Petitioner asserts the following grounds of unpatentability. Pet. 10.

| Claim(s) Challenged | Basis 35 U.S.C. § | Reference(s)[10] |
|---|---|---|
| 1, 19, 21–29[11] | 102[12] | Crowds |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | Crowds, RFC 2616 |
| 1, 12, 14, 21, 22, 24, 25, 27–29 | 102 | Border |

---

[9] Patent Owner submitted both confidential and public (redacted) versions of Dr. Williams's declaration.

[10] The Petition's obviousness challenges additionally refer to the "[k]nowledge of [a person of ordinary skill in the art]." Pet. 10. We understand this to refer to a person of ordinary skill in the art's understanding of the applied references and not attempting to supply missing limitations or incorporating an unspecified disclosure by reference.

[11] Although the Petition's listing of the asserted grounds excludes claim 23 for this ground (*see* Pet. 10), the Petition includes claim 23 in its analysis of anticipation based on Crowds (*see id.* at 38). Accordingly, we include claim 23 here.

[12] Because the application from which the '319 patent issued has an earliest effective filing date before March 16, 2013 (Ex. 1001, (60)), citations to 35 U.S.C. §§ 102 and 103 are to the pre-AIA versions. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29.

Case: 23-2146     Document: 16     Page: 219     Filed: 11/13/2023

| Claim(s) Challenged | Basis 35 U.S.C. § | Reference(s)[10] |
|---|---|---|
| 1, 12, 14, 15, 17–19, 21, 22, 24, 25, 27–29[13] | 103 | Border, RFC 2616 |
| 1, 17, 19, 21–29 | 102 | MorphMix |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | MorphMix, RFC 2616 |

## III. ANALYSIS OF THE CHALLENGED CLAIMS

### A. Anticipation and Obviousness

The Federal Circuit addressed the legal standard for anticipation in

*Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331 (Fed. Cir. 2016):

> Under 35 U.S.C. § 102(b), a prior art reference will anticipate if it "disclose[s] each and every element of the claimed invention . . . arranged or combined in the same way as in the claim."

815 F.3d at 1341 (citation omitted) (footnote omitted). The Federal Circuit

went on to explain:

> However, a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination.

*Id.* (quoting *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376,

1381 (Fed. Cir. 2015))

A claim is unpatentable as obvious under 35 U.S.C. § 103 "if the

differences between the claimed invention and the prior art are such that the

claimed invention as a whole would have been obvious before the effective

---

[13] Although the Petition's listing of the asserted grounds does not identify claim 19 for this ground (*see* Pet. 10), the Petition includes claim 19 in its analysis of obviousness based on Border and RFC 2616 (*see id.* at 58). Accordingly, we include claim 19 here.

Case: 23-2146     Document: 16     Page: 220     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 221    Filed: 11/13/2023

filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103 (2011). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) so-called "secondary considerations," including commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Patent Owner has presented any evidence on the fourth *Graham* factor. *See infra*, Section III.F.3.

### B. Level of Ordinary Skill in the Art

According to Petitioner, a person of ordinary skill in the pertinent art "would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems as of the Priority Date." Pet. 20 (citing Teruya Decl. ¶¶ 25–27). Petitioner continues that "[s]uch a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols." *Id.*

Patent Owner submits that a person of ordinary skill in the art would have "a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet Communications" as of 10/8/2009. Prelim. Resp. 47; PO Resp. 2. But Patent Owner acknowledges that its analysis "does not change under the Board's preliminary definition." PO Resp. 2.

In our Institution Decision, we adopted Petitioner's formulation. Institution Dec. 17–18. We regarded Petitioner's more specific definition as consistent with the '319 patent and the prior art before us. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill). For this reason, for the purpose of this decision, we continue to apply Petitioner's formulation. We find, however, that this definition and Patent Owner's definition of a person of ordinary skill in the art are not materially different, and furthermore, that our decision would be the same using either definition.

### C. Claim Construction

For this *inter partes* review, the Board applies the same claim construction standard as that applied in federal courts. *See* 37 C.F.R § 42.100(b) (2019). Under this standard, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (citations omitted). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (citation omitted).

Case: 23-2146     Document: 16     Page: 222     Filed: 11/13/2023

Petitioner asserts that the district court's claim constructions in the *Teso* Litigation,[14] are appropriate in this case. Pet. 21. In particular, Petitioner points to two claim construction orders in that case—the "*Teso* Order" (Ex. 1017) and the "*Teso* Supplemental Order" (Ex. 1020). Pet. 21–22.

In the *Teso* Litigation, the parties agreed to certain constructions that were subsequently adopted by the district court. *Id.* at 21. Thus, the district court construed the preamble of claim 1 of the '319 patent to be limiting, and construed certain other terms to have their "plain and ordinary meaning." *Id.* In addition, the district court construed certain disputed terms, including "client device" and "second server." *Id.* at 21–22. The district court construed "client device" as "communication device that is operating in the role of a client." Ex. 1017, 12.[15] The district court initially construed "second server" as "server that is not the client device." *Id.* at 14. Later, the court granted the defendants' request for clarification as to the scope of this construction, and in a supplemental order, determined that a "second server" is "a device that is operating in the role of a server and that is not the first client device." Ex. 1020, 8, 11.

Initially, Patent Owner agreed that we should apply the claim constructions in the *Teso* Order for the preamble, "client device," and "second server." Prelim. Resp. 48. For "second server," Patent Owner

---

[14] *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv-395 (E.D. Tex.). The case caption in this litigation was later changed to identify plaintiff as Bright Data Ltd. Ex. 1020, 1.

[15] Unless otherwise specified, citations to exhibits use the page numbers assigned by the parties and not the original page numbers.

Case: 23-2146     Document: 16     Page: 223     Filed: 11/13/2023

initially proposed that we apply the district court's construction of that term from the *Teso* Order ("server that is not the client device"). *Id.* (citing Ex. 1017, 14). Patent Owner quoted from the *Teso* Supplemental Order (Ex, 1020) which states that the district court "is not now changing the scope of the terms in any way," and alleged that Petitioner is "seeking a broader construction of the term 'second server' to remove the requirements that it be a server." Prelim. Resp. 49.

For the purposes of our Institution Decision, we adopted the district court's construction for the "second server" as clarified in the *Teso* Supplemental Order. Institution Dec. 19 (citing Ex. 1020, 11). Thus, we adopted the district court's original construction, with the clarification that the second server is "a device that is operating in the role of a server and that is not the first client device." *Id.* (citing Ex. 1020, 8). We determined that this construction is consistent with the extrinsic evidence offered by Petitioner, as well as the construction of "server" adopted by the Board in IPR2021-00458, involving a patent similar to the '319 patent. *Id.* at 19–20 (citing Ex. 1018, 5; IPR2021-00458, Paper 11. 21). Specifically, we adopted the district court's clarification that "a component can be *configured* to operate in different roles—so long as it does not simultaneously serve as more than one of: the client device, the first server/second server, and the web server." *Id.* at 20 (citing Ex. 1020, 10 (internal quotation marks omitted)).

Post-institution, Patent Owner objects to what it describes as the Petitioner's "purely role-based" constructions. PO Resp. 8–27. Patent Owner contends that "[t]he purely role-based constructions contradict the Court's Orders because they refer to generic devices operating in a particular

Case: 23-2146    Document: 16    Page: 224    Filed: 11/13/2023

role." *Id.* at 10. Patent Owner continues, '[t]he purely role-based constructions fail to account for the *physical/structural differences* between client devices and servers." *Id.* (emphasis added)

More specifically, Patent Owner now contends that the Petitioner "deviated from the Court's construction for the term 'client device' and do[es] not attribute any special meaning to the term 'communication device.'" *Id.* at 8. Patent Owner further contends that Petitioner "treat[s] client devices and servers as interchangeable general purpose computers. " *Id.* at 9.

For the reasons that follow, we do not agree with Patent Owner's argument that we should not follow Petitioner's proposed constructions for "client device" and "second server," which adopt the district court's constructions of these terms. Instead, we maintain the construction for those terms we adopted for our Institution Decision.

### 1. Contentions of the Parties

#### a) Client Device

As noted *supra*, Patent Owner's position on construction issues has shifted during the course of this proceeding. Initially, Patent Owner agreed that we should apply the role-based claim construction for client device in the *Teso* Order: "'client device' means [a] 'communication device that is operating in the role of a client.'" Prelim. Resp. 48 (quoting Ex. 1017, 12) (emphasis omitted). As the case progressed, while maintaining its support for the district court's constructions, Patent Owner presented a few twists. Referring both to "client device" and "second server," according to Patent Owner's new theory, the district court "expressly rejected referring to these terms as generic devices operating in a particular role." PO Resp. 9. Patent

Case: 23-2146   Document: 16   Page: 225   Filed: 11/13/2023

Owner now contends that "[t]he Court found that a "client device" is a physical communication device, which has a special meaning in the context of the specification." *Id.* Patent Owner argues that "[a] communication device in the context of the specification is not simply any device that communicates over the Internet." *Id.* According to Patent Owner, in the *NetNut* Litigation (*see supra*), NetNut "proposed a construction of "client" as 'a device operating in the role of a client.'" *Id.* at 10 (citing Ex. 2021, 14). Patent Owner argues that "the Court expressly rejected removing the word 'communication' from its construction of this term." *Id.* (citing Ex. 2021, 14) (emphasis omitted). From this, Patent Owner concludes that "'communication device' has a special meaning in the context of the specification as referring to a 'client device.'" *Id.* Further, Patent Owner contends a "'client device' in the context of the specification is not merely a general-purpose computer." *Id.* at 10–11.

Patent Owner expands on this newly-proposed construction of "client device" by equating the term "client device" with "consumer computer" or, alternatively, a "consumer communication device." PO Resp. 22. Patent Owner contends these newly-proposed constructions are "consistent with the claim language, the specification, and the prosecution histories distinguishing client devices and servers." *Id.* at 22–23.

In its Sur-reply, Patent Owner relies on an additional theory, based on the alleged "novel architecture" of the claims. PO Sur-reply 6–7. And at oral argument Patent Owner relied heavily on yet another theory, the "at-every-moment construction." Hearing Tr. 42:7–10. *See* discussion *infra*.

Petitioner responds that "[t]he District Court rejected [Patent Owner's] 'consumer computer' argument three times." Pet. Reply 12.

Case: 23-2146    Document: 16    Page: 226    Filed: 11/13/2023

Petitioner argues that "Judge Payne ruled that 'client device' is 'defined by the role' and not 'by the components of the device.'" *Id.* (citing Ex. 1112, 13).[16] Petitioner also points to an order in the *Teso* litigation, in which Patent Owner's former expert Dr. Rhyne was instructed by Judge Gilstrap "not to testify before the jury that a client device cannot be a server." *Id.* at 13 (citing Ex. 1116, 4).

Petitioner argues that the district court's constructions are consistent with the intrinsic evidence in the case. Pet. Reply 13–17. Petitioner points out that the specification describes a communication device 200 that can "function in different 'roles,'" e.g., client, peer or agent. *Id.* at 14 (citing Ex. 1001 9:20–26). Petitioner points to an annotated Figure 3 submitted to the district court by Patent Owner which equates client 202 with the claimed second server and the claimed client device with agent 222. *Id.*

Petitioner cites RFC ("Request for Comment") 2616, which describes the protocol for HTTP, as support for its role-based construction. *Id.* at 15. This RFC, which is cited in the '319 patent, states that "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." Ex. 1013, 8. Finally, Petitioner argues that the Patent Owner's prosecution history arguments, based on a parent patent, are incorrect for several reasons. *Id.* at 15–17. Among other reasons, Petitioner argues, the cited history refers to a "cache server," and the different clams of the parent application do not recite "client device." *Id.* at 16.

---

[16] Petitioner cites Judge Gilstrap's order adopting Magistrate Judge Payne's constructions. Pet. Reply 12 (citing Exs. 1113, 1114).

Case: 23-2146      Document: 16      Page: 228      Filed: 11/13/2023

b)    *Second Server*

Patent Owner contends that the district court "acknowledged that servers are not disclosed as a type of 'communication device' in the specification." PO Resp. 11. From this, Patent Owner reasons that "[t]he purely role-based constructions are not appropriate because they fail to recognize the special meaning of 'communication device' in the context of the specification." *Id.* at 12.

Petitioner responds that "[a]lthough [Patent Owner] cites to a selective excerpt stating that 'a server is not a communication device,' the Court's actual statement rejected PO's argument 'that a client device is specifically not a server.'" Pet. Reply 13 (citing Ex. 1020, 10).

2.    *Analysis – Client Device and Second Server*

Patent Owner's representations of the district court's rulings on claim construction are incomplete and inaccurate. For the reasons discussed, we find that the claim construction rulings by the district court in the *Teso* and *NetNut* district court litigations support Petitioner and do not favor Patent Owner.

In the earlier *Teso* litigation, Patent Owner argued that "client device" in the '319 patent should be construed as a "consumer computer." Ex. 1017, 10. The district court rejected that construction: "[T]he Court finds the language on which [Patent Owner] relies is not sufficient to redefine the meaning of the term to 'consumer computer.'" *Id.* at 11. The district court also rejected Patent Owner's argument that "a client device is specifically not a server." *Id.* The district court reasoned that "[the '319 patent] do[es] not include servers as a type of 'communication device,' but that is not sufficient to construe 'client device' as unable to act as a server in all cases."

Case: 23-2146     Document: 16     Page: 229     Filed: 11/13/2023

*Id.* at 12. Instead, the district court adopted a role-based construction for "client device": a "communication device that is operating *in the role* of a client." *Id.* (emphasis added).

The district court in the *Teso* Litigation also rejected Patent Owner's structural argument that a client device must have a "client dedicated operating system." *Id.* at 14–15. In reaching this conclusion, the district court explained that "[Patent Owner] cites nothing from the intrinsic record showing a client device *must* have a 'client dedicated operating system.'" *Id.* at 15.

In the later claim construction order in the *NetNut* Litigation, the district court referred to its earlier *Teso* claim construction orders and concluded that "[n]either [Patent Owner] nor Defendant persuasively justifies departing from the Court's prior construction and analysis." Ex. 1115, 13. The court specifically rejected again Patent Owner's argument trying to limit the construction of "client device" to a consumer device. *Id.* The court reasoned that "[Patent Owner's] argument that it is indisputable that the specification *never* refers to a server as a communication device . . . does not justify limiting the Court's construction to consumer devices." *Id.* at 13–14 (internal quotation marks omitted). And the court reminded the parties that "the Court has previously found that 'a component can be configured to operate in different roles--so long as it does not '*simultaneously* serve as more than one of: the client device, the first server/second server, and the web server.'" *Id.* at 14 (citing Ex. 1017, 10).

The *Teso* district court also construed "second server." Ex. 1017, 13–14. The court noted that "[t]he parties dispute whether the second server must be a distinct device from the client device and the web server." *Id.* at

13. The court concluded that "[b]oth the claims and specification show that the client device and second server are different devices." *Id.* at 13-14. However, the court also made it clear that a given device can perform multiple roles: "Client, peer, agent, and server are roles a device can perform." *Id.* at 14. The court provided the following example: "Nothing in the intrinsic record suggests one device cannot perform both the role of a web server and a second server. To construe the claim in such a way would improperly import a limitation into the claim language." *Id.* at 14.

The district court clarified this statement in the supplemental *Teso* order, explaining that "a component can be *configured* to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10. In making this clarification, the district court explained that "[t]he Court is not changing the construction of 'first server' and 'second server,' as this understanding is already embedded in those terms' construction." *Id.* at 11. Further, in the *NetNut* Litigation, the district court endorsed the statement in the *Teso* supplemental order that 'a component can be configured to operate in different roles--so long as it does not '*simultaneously* serve as more that one of: the client device, the first server/second server, and the web server.'" Ex. 1115, 20 (quoting Ex 1020, 10). We find these decisions and their reasoning support Petitioner's position on the proper constructions for "client device" and "second server."

We find insufficient support for Patent Owner's position on the construction of "client device" and "second server" in the claim language, patent specification, or the prosecution history. The term "consumer computer" that is central to Patent Owner's argument does not appear in the

Case: 23-2146     Document: 16     Page: 230     Filed: 11/13/2023

patent claims, and consumer computers are referenced only once in the specification, in connection with the description of prior art peer-to-peer networks. *See* Ex. 1001, 2:45. The '319 patent criticizes such peer-to-peer networks as not suitable for use with the Internet. *Id.* at 2:64–3:3. We find that this disclosure does not equate client devices with consumer computers, and further find that a person of ordinary skill would not look to this disclosure for guidance in construing "client device."

Instead, we agree with the district court and find that the '319 patent specification supports Petitioner's role-based constructions. Thus, the specification informs us that "[d]ue to functionality provided by software stored within each communication device, . . . each communication device may serve as a client, peer, or agent, depending upon requirements of the network 100." Ex. 1001, 4:46–51. The specification also reminds us that "[a]s previously mentioned, it should be noted that the communication device 200 of FIG. 4 may serve as a client, agent, or peer." *Id.* 5:55–57. Similarly, the specification discloses that each of the modules shown in Figure 6 (including client module 224) "comes into play according to the specific role that the communication device 200 is partaking in the communication network 100 at a given time." *Id.* at 9:22–26.

Patent Owner refers us to the prosecution history of the related '936 patent.[17] PO Resp. 25–28. Patent Owner asserts that to overcome a rejection, "[a]pplicant repeatedly argued that client devices are different from servers." *Id.* at 19. Patent Owner contends that "[t]he examiner recognized a server cannot be equated to a client device regardless of the

---

[17] U.S. Patent No. 10,069,936.

Case: 23-2146     Document: 16     Page: 231     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 232     Filed: 11/13/2023

role being performed at a given moment in time." *Id.* We do not find these arguments to be persuasive. Patent Owner relies on a statement in the Examiner's Notice of Allowance as evidence that "the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture." *Id.* at 20. This is an overstatement. The Examiner's Reasons for Allowance lists several limitations from the independent claims: Ex. 2026, 43–44. The examiner's statement that "the limitations of the independent claims, within its environment, is allowable subject matter" could refer to any one of these limitations or to all of them together. We do not find that the inclusion of "within its environment" in the examiner's statement provides any clarity on the examiner's basis for allowance of the claims. The same ambiguity exists in Patent Owner's arguments based on the '319 and '510[18] patent prosecution histories. PO Resp. 21–22.

As a general rule, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005). In light of the much clearer statements in the '319 patent specification, referred to *supra*, and in the district court claim construction analysis, we are not persuaded by Patent Owner's arguments based on ambiguous prosecution history.

Finally, we find that other evidence of record favors a role-based construction for these terms. For example, RFC 2616 is version 1.1 of

---

[18] U.S. Patent No. 10,484,510.

"Hypertext Transfer Protocol – HTTP/1.1," which defines the HTTP protocol used in Internet communications. Ex. 1013, 1, 7. RFC 2616 explains that "[a]ny given program may be capable of being both a client and a server, our use of these terms refers only to the role being performed by the program for a particular connection." Ex. 1013, 8.

Patent Owner bases another argument on comparing Figures 1 and 3 of the '319 patent. PO Resp. 14–18. Patent Owner contends that "[i]f one were to apply the purely role-based constructions, there is nothing to distinguish the architectures of Figure 1 and Figure 3." *Id.* at 18 (emphasis omitted). We do not find this argument to be persuasive. We find it telling that Patent Owner's previous expert, Dr. Rhyne, identified client 202 in Figure 3 of the '319 patent as the claimed "second server" in a claim construction submission to the district court in the *Teso* litigation. *See* Ex. 1126, 8–9, 15. The annotations to Figure 3 provided by Dr. Rhyne[19] include a color code that associates the server, client device, and web server in claim 1 of the '319 patent with corresponding components of the figure. *Id.* at 8. From the accompanying text it is clear, and we therefore find, that the purpose of the submission was to explain how the various elements of the claim (including the "second server," color-coded in green) are depicted in the specification for the purpose of influencing claim construction.

Dr. Rhyne's color code was carried through Patent Owner's claim construction analysis of the "second server" limitation. *See, e.g., id.* at 18–19 (quoting Dr. Rhyne's testimony highlighted to include a green color code

---

[19] Petitioner attributes this drawing to Dr. Rhyne. Hearing Tr. 20:10–14. Patent Owner does not dispute that Dr. Rhyne prepared the drawing. *Id.* at 44:12–19.

Case: 23-2146     Document: 16     Page: 233     Filed: 11/13/2023

for "second server"). We find Patent Owner's explanation, including that Dr. Rhyne was merely arguing that "instead of client 102, you can have a server sit between two clients," or its later arguments comparing Figure 3 to Figure 1, are not credible. *See* Hearing Tr. 45:1–4.

Two other claim construction arguments by Patent Owner bear mentioning. The first is based on the alleged "novel architecture" claimed in the '319 patent. *See, e.g.*, PO Resp. 44 ("Border does not disclose a first client device located between a second server and a web server as recited in claim 1"); PO Sur-reply 6–7. We will discuss this further in connection with our analysis of the prior art. Suffice it to say, for now, that this allegedly novel architecture is not described in the '319 patent. To illustrate this architecture, Patent Owner relies on a diagram that merges various elements from Figures 1 and 3 in the '319 patent:



Case: 23-2146    Document: 16    Page: 235    Filed: 11/13/2023

PO Resp. 8.  This diagram modifies Figure 3 of the '319 patent by inserting the prior art proxy server (in green) from Figure 1.  Because this diagram does not appear anywhere in the '319 patent and this configuration is not described in the patent, it is a not part of the intrinsic record.  We do not find this made-up configuration supports Patent Owner's claim construction arguments based on "novel architecture."

Likewise, we do not find merit in Patent Owner's "particular point in time" theory, namely, that Petitioner's role-based constructions "focus only on the role being performed by a network component at a particular point in time and not the physical structure of the component." PO Resp. 1.  We reject this theory as attempting to add a limitation to the claims, and as a variation on arguments already made by Patent Owner and rejected by the district court and by us as contrary to the finding that "a component can be configured to operate in different roles--so long as it does not '*simultaneously* serve as more that one of: the client device.'"  Ex. 1115, 14 (quoting *Teso* supplemental order, Ex. 1020, 10).

### 3.    Other Constructions

We only construe terms that are necessary to resolve disputed disputes.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").  We determine that no other terms require explicit construction.  To the extent we need to interpret any other terms, we will do so in the context of the analysis of the prior art that follows.

4. *Conclusion on Claim Construction*

For the reasons given by Petitioner and the district court, and those summarized *supra,* we maintain or previous constructions for "client device" and "second server." *See* Institution Dec. 18–20.

D. *Description of the Principal Prior Art References*

1. *Crowds (Ex. 1006)*

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions." Ex. 1006, 2. In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server. *Id.* In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator." *Id.* In Crowds, "[a] user is represented by a process on her computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)." *Id.* at 8. "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd." *Id.* Exemplary paths for web requests from crowd users are shown in Figure 2 (*id.* at 9), reproduced below:

Case: 23-2146    Document: 16    Page: 236    Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 237    Filed: 11/13/2023



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." *Id.* at 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "1 → 5 → server; 2 → 6 → 2 → server; 3 → 1 → 6 → server; 4 → 4 → server; 5 → 4 → 6 → server; and 6 → 3 → server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

### 2. Border (Ex. 1012)

Border is a patent titled "System and Method of Reading Ahead of Objects for Delivery to an HTTP Proxy Server." Ex. 1012, (54). Border describes "[a] communication system for retrieving web content." *Id.* at (57). In Border, "[a] downstream proxy server receives a URL request message from a web browser." *Id.* at 3:35–36. Thereafter, "[a]n upstream proxy server receives the URL request message from the downstream proxy server" and "selectively forwards the URL request message to a web server

and receives the URL content from the web server." *Id.* at 3:38–42. Then, "[t]he upstream proxy server forwards the URL content to the downstream proxy server." *Id.* at 3:42–43. An exemplary system employing downstream and upstream proxy servers for accessing a web server is shown in Figure 1, reproduced below:

*FIG. 1*



As depicted in Border's Figure 1, user station 101, for example, a personal computer, uses standard web browser 103. *Id.* at 3:55–61. User station 101 is connected to downstream proxy server 105, which communicates over network 111 with upstream proxy server 107. *Id.* at 3:61–66. Proxy servers 105 and 107 are HTTP proxy servers with HTTP caches 115 and 117. *Id.* at 4:8–11. Upstream proxy server 107 is connected to web server 109 through IP network 113, for example, the Internet. *Id.* at 4:5–7. In this system, proxy servers 105 and 107 "act as an intermediary between one or more browsers and many web servers (e.g., server 109)." *Id.* at 4:30–31.

Case: 23-2146     Document: 16     Page: 238     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 239     Filed: 11/13/2023

### 3. *MorphMix (Ex. 1008)*

MorphMix is a doctoral thesis that identifies the lack of anonymity on the Internet as a problem that "limits the privacy protection of Internet users." Ex. 1008, Abstract. Accordingly, MorphMix is focused on "achieving anonymous Internet access for low-latency applications such as web browsing." *Id.* MorphMix describes "a peer-to-peer-based mix network" where "[e]very node joining the system can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time." *Id.* at 118. An exemplary system is illustrated in Figure 5.1, reproduced below:



**Figure 5.1:** *Basic idea of MorphMix.*

As depicted in Figure 5.1 of MorphMix, participating nodes have a virtual link to one or more other nodes at any time. *Id.* at 119. This "means that (1) there is a TCP [Transfer Control Protocol] connection between the two nodes and (2) they share a symmetric key that is only known to these two

29

Case: 23-2146     Document: 16     Page: 240     Filed: 11/13/2023

nodes." *Id.* In Figure 5.1, node *a* has five neighbors with which it has established virtual links. *Id.* In the example shown, "node *a* has established an anonymous tunnel via *b* and *c*." *Id.* "Within an anonymous tunnel, anonymous connections can be set up to anonymously communicate with a server." *Id.* at 120.

### 4. RFC 2616 (Ex. 1013)

This RFC (Request for Comments) documents version 1.1 of the HTTP protocol, which is "foundational to the World Wide Web." Pet. 27; Teruya Decl. ¶ 53.

### E. Anticipation Based on Crowds

Petitioner asserts that claims 1, 19, and 21–29 are anticipated by Crowds. Pet. 28–39. Petitioner provides an element-by-element claim analysis, supported by expert testimony, in relation to Crowds. *Id.*; Teruya Decl. ¶¶ 55–89.

### 1. Claim 1

#### Preamble

Petitioner contends the preamble of claim 1 is disclosed in Crowds. Pet. 29–31. Petitioner asserts "Crowds discloses a layout in which (*e.g.*, in one instance) jondo 6 serves as the first client device, jondo 4 serves as the second server, and Web Server 5 is the first server." *Id.* at 29. Petitioner provides an annotated version of Crowds's Figure 2, *supra*, to illustrate the correspondences between Crowds's disclosure and certain of the preamble elements recited in claim 1. *Id.* at 30. This annotated figure is reproduced below:

Case: 23-2146     Document: 16     Page: 241     Filed: 11/13/2023



*Id.* Annotated Figure 2 of Crowds is a diagram showing multiple paths between jondos and web servers. *Id.* at 30. Figure 2 has been annotated by Petitioner to show the elements in Crowds corresponding to the "first client device," "first server," and "second server" recited in claim 1. *Id.* at 29. Specifically, Petitioner identifies the recited "first client device" with jondo 6. *Id.* Petitioner identifies the "first server" with Web Server 5. *Id.* Petitioner identifies the "second server" with jondo 4. *Id.* Petitioner explains that "[j]ondo 4 may be regarded as a server (and thus the second server) for at least the reason that jondo 4 provides a service to requesting jondo 5." *Id.* at 30.

Petitioner addresses each step of claim 1 in relation to Crowds as follows (Pet. 31–36):

> *a)*    *receiving, from the second server, the first content identifier*

Petitioner contends this step 1a is disclosed by the path "5→ 4→ 6→ server" in Figure 2 of Crowds. Pet. 31. Petitioner explains that "Crowds

discloses that jondo 6 (first client device) receives a 'request' (first content identifier or 'FCI') from jondo 4 (the second server)." *Id.* Petitioner further explains that "[t]he arrows in Fig. 2 of Crowds each represent 'requests,' *i.e.*, requests for content residing on a web server, originating from one of the jondos and forwarded over a randomized path of jondos to the web server." *Id.* (citing Ex. 1006, 8; Teruya Decl. ¶¶ 58–59).

> b) *sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier*

Petitioner contends that this step 1b is disclosed when "[j]ondo 6, having received the FCI per step (a), then sends it in an HTTP request to the web server, according to step (b)." Pet. 33. Petitioner explains that the jondos "operate as HTTP proxies." *Id.* at 33–35. Petitioner explains further, "[i]n the example '5→4→6→server' path discussed above, the 'first client device' (jondo '6') sends the web request via HTTP to the target web server, or 'first server.'" *Id.* at 34.

> c) *receiving, the first content from the first server over the Internet in response to the sending of the first content identifier*

Petitioner contends step 1c is disclosed by Crowds: "Having made the content request of the web server per step (b), jondo 6 now receives the requested content in response, per step (c)." *Id.* at 35. Petitioner explains further, "the 'first client device' (jondo '6' above) sends the FCI to the first server, or target web server '5'. The last jondo in the path then receives the 'first content,' such as the user specified web page." *Id.* at 35–36.

> d)      *sending, the first content by the first client device
> to the second server, in response to the receiving of the
> first content identifier*

Petitioner contends this step 1d is met in Crowds when "[a]s discussed regarding step (c) above, the first client device (jondo 6) receives the first content from the web server. In response, it then sends the content on to the requester, jondo 4, per step (d)." Pet. 36.

> e)      *Analysis – Anticipation of Claim 1 by Crowds*

Patent Owner contends that Crowds does not disclose claim 1. PO Resp. 31–36. Patent Owner contends that "Crowds does not disclose a 'first client device' or a 'second server' as recited in the preamble of claim 1 under the purely role-based constructions." PO Resp. 31–32. Likewise, Patent Owner contends that Crowds does not disclose steps 2 and 4 (corresponding, respectively, to claim limitations 1a and 1d) "under the purely role-based constructions." *Id.* at 32–33. Patent Owner presents various other arguments, many of which were previously presented in the Preliminary Response and addressed in the Institution Decision. *Id.* at 33–39.

Fundamentally, however, Patent Owner's arguments fail because they demonstrate a lack of recognition that Patent Owner's claim constructions, based on various structural distinctions between components and system architecture, were rejected by the district court in the *Teso* and *NetNut* Litigations, and by the Board in the Institution Decision and in Section III.C, *supra*. Petitioner's anticipation analysis is persuasive because it is based on the operation of jondos 4 and 6, which is not disputed by Patent Owner, and because it demonstrates how this operation meets the steps of the claimed method under the claim constructions we have adopted. In contrast, Patent

Case: 23-2146      Document: 16      Page: 243      Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 244    Filed: 11/13/2023

Owner's opposition is based on its proposed claim constructions that have been rejected by us and the district court.

For example, Patent Owner insists that "[t]here is no way for a [person of ordinary skill] to determine whether jondos 6 and 4 are client devices or servers under the purely role-based constructions because . . . jondos 6 and 4 operate in different roles at different points in time." PO Resp. 31. As Petitioner points out, this argument is based on the "at all times" mis-application of the claims discussed in Section III.C, *supra*. Pet. Reply 17. That is, Patent Owner's argument assumes that the claims require the first client device to act as a client at all times and the second server to act as a server at all times. *Id.* This argument is unavailing because it is contrary to a role-based construction, and as Petitioner points out, it is undermined by claim 1 of the '319 patent. *Id.* at 17–18. Claim 1 requires the first client device to receive a request for content from the second server in one step and send a response with content to the second server in another. In this scenario, the first client device sometimes acts in the role of a server in responding to the content request from the second server and the second server sometimes acts in the role of a client in making the content request. Patent Owner's "at all times" argument would eviscerate claim 1 and, as Patent Owner's expert, Dr. Williams, conceded, this does not "make sense." Williams Dep. 137:8–15. We find, therefore, that Patent Owner's "at all times" argument would make claim 1 "impossible to practice," and is therefore is unavailing for the reasons given by Petitioner and summarized above. Pet. Reply 17–19.

We find Patent Owner's other arguments equally unpersuasive. PO Resp. 33–30. For example, Patent Owner's argues that Petitioner "fail[s] to

distinguish the jondos other than the role being performed *at a particular point in time.*" *Id.* at 33 (emphasis added). This "point in time" argument is a variation of Patent Owner's "at all times" argument discussed *infra.* As we have stated, we do not agree with this argument because it is contrary to our role-based construction and to the language of the claims.

Patent Owner's structural arguments based on "system architecture" fail because they, too, are based on its rejected claim construction theories. *See* PO Resp. 33–35. For example, Patent Owner reprises its previous arguments that "[a]ll jondos of Crowds are identical user computers," and "Petitioner[] fail[s] to distinguish the jondos other than the role being performed at a particular point in time." *Id.* at 33. We do not agree with these arguments because they ignore the claim language and claim constructions adopted by us and the district court for reasons previously given.

As another example, Patent Owner contends that "Petitioners arbitrarily identify one jondo as a 'client device' and another identical jondo as a 'server' to improperly map Crowds onto the claims." PO Resp. 34. We do not agree with this argument. The district court's claim constructions for the terms "server" and "client device," which we have adopted, make it clear that these components are defined by their function, not their structure. Ex. 1020, 7–11. Thus, for example, the district court clarified that the second server is "a device that is operating *in the role of a server* and that is not the first client device." *Id.* at 11 (emphasis added); *see also* discussion in Section III.C, *supra.*

Patent Owner presents several more "structural" arguments. For example, Patent Owner contends Petitioner "ignore[s] the specific

architecture in which the claimed methods operate." PO Resp. 35. Patent Owner argues that "the jondos of Crowds are user computers and there is no indication that the jondos are dedicated network elements." *Id.* Patent Owner argues that there is no indication that the jondos remain online with greater availability and maximum up time. *Id.* Patent Owner argues that "[t]here is no disclosure that jondos of Crowds are capable of a large number of connections." *Id.* All of these and the related structural arguments ignore the language of claim 1, a method claim that does not impose the characteristics on the recited client device and second server that Patent Owner seeks to impose, and the rulings of the district court we have adopted, including that "a component can be *configured* to operate in different roles-- so long as it does not 'simultaneously serve as more that one of: the client device.'" Ex. 1020, 10.

Patent Owner's arguments based on perceived structural differences and differences in system architecture are fundamentally wrong because they focus on the alleged need for devices that are not identical or interchangeable, i.e., on alleged differences in structure between the server and the client device. This same argument was dismissed by the district court as "an oversimplification of the issue." Ex. 1020, 10. As noted *supra*, the district court went on to explain that "a component can be *configured* to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server." *Id.* (internal quotation marks omitted) (emphasis in original)." As is discussed *supra*, for the reasons given, we agree with Petitioner and the district court that "a component can be *configured* to operate in different roles." Ex. 1020, 10. We find, therefore, that Crowds discloses a first client

Case: 23-2146     Document: 16     Page: 247     Filed: 11/13/2023

device (jondo 6) located between a second server (jondo 4) and Web Server 5 for the reasons given by Petitioner including those summarized above. We are persuaded by Petitioner's analysis that Petitioner has demonstrated anticipation of claim 1 by Crowds by a preponderance of the evidence.

2.    *Claims 19, 21–29*

These claims depend, directly or indirectly, from claim 1. Petitioner provides a claim-by-claim analysis for each of these claims in relation to Crowds. Pet. 37–39. Petitioner's analysis shows that Crowds discloses the additional limitations of these claims. For example, Petitioner demonstrates that Crowds discloses (and states how a user could download from the Internet for installation) a software package that implements a jondo whose operation meets the limitations of claims 19, 28, and 29. *See* Pet. 7 (citing Ex. 1006, 91[20]; Teruya Decl. ¶¶ 76–77).

Patent Owner responds to Petitioner's analysis of dependent claims 18, 19, and 24. PO Resp. 40–41. Claim 18 is not challenged in this ground and will be discussed further in the following sections in connection with Petitioner's obviousness challenges. *See, e.g.*, Section III.F, *infra*.

Claim 19 calls for downloading and installing a computer application that causes the computer processor to send an HTTP request for and to receive and store the "first content." Claim 19 recites:

> The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the

---

[20] This cite is to the original page number and corresponds to page 26 of the exhibit.

> part of, or the whole of, the stored first content, the method is further preceded by:
>
> > downloading, by the first client device from the Internet, the software application; and installing, by the first client device, the downloaded software application.

Ex. 1001, 20:62–21:6. Patent Owner contends that Petitioner fails to show that Crowds discloses or teaches the recited "storing of the first content" and "sending... the stored first content" as recited in claim 19. PO Resp. 40.

We disagree. As Petitioner points out, Crowds discloses typical user computers with memory that satisfies the storing and sending steps. Pet. Reply 23 (citing Williams Decl. ¶ 161). Claim 19 does not specify any particular means of "storing of the first content" and "sending . . . the stored first content." We, therefore, agree with Petitioner and find that Crowds discloses "user computers," and that the use of typical computer memory would satisfy those steps. *See* Pet. Reply 23. We find that a person of ordinary skill in the art at the time of the invention would have understood that a "user computer" such as those described in Crowds would typically have computer memory and storage capabilities in order to function in the manner that Crowds operates, which satisfies the limitations required by claim 19. *See* Section III.D.1, above.

As Petitioner observes, Patent Owner does not dispute Petitioner's evidence that Crowds discloses downloading and installing the software application. Pet. Reply 23. Crowds expressly discloses that "we have distributed over 1400 copies of the Crowds code free-of-charge in response to user requests, and we are maintaining the blender for an active crowd on the Internet. Information about obtaining the Crowds code can be found at http://www.research.att.com/projects/crowds." Ex. 1006, 26. Mr. Teruya

Case: 23-2146    Document: 16    Page: 248    Filed: 11/13/2023

testifies that this disclosure in Crowds "states how a user could download from the Internet for installation" "a software package that implements a jondo, whose operation is per Claim 1." Teruya Decl. ¶ 76. We find that for the reasons given by Petitioner, and not disputed by Patent Owner, Crowds discloses downloading and installing the software application.

Patent Owner's argument for claim 24 repeats the "at all times" theory discussed *supra*. PO Resp. 41–42. For reasons given, above and by Petitioner, we reject this argument. *See* Pet. Reply 23.

### 3. *Conclusion on Anticipation by Crowds*

For the reasons given by Petitioner, including those summarized above, we find that Petitioner demonstrates that Crowds anticipates claims 1, 19, and 21–29 of the '319 patent by a preponderance of the evidence.

### F. *Obviousness Based on Crowds and RFC 2616*

Petitioner contends that the claims anticipated by Crowds (claims 1, 19, and 21–29), as well as claims 2, 14. 15, 17, and 18, would have been obvious in light of Crowds and RFC 2616. Pet. 39–44.

Petitioner refers to RFC 2616 and contends that "[s]ince Crowds was directed at improving the same types of communications, a [person of ordinary skill] developing software for like applications would have had a powerful motivation to combine its disclosure with knowledge of Internet standards governing HTTP." *Id.* at 40.

Regarding Patent Owner's proposed claim constructions, Petitioner contends that "[e]ven if the Board were to construe 'second server' as requiring a specialized data-center class device, such an adaptation would have been obvious." *Id.* at 41 (citing Ex. 1006, 15–19). Petitioner contends "[a person of ordinary skill] would have been aware, in 2009, of equipment

Case: 23-2146     Document: 16     Page: 249     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 250     Filed: 11/13/2023

commonly used as 'servers,' including workstation computers and computers running UNIX and Microsoft operating systems as disclosed by Crowds." *Id.* (citing Ex. 1006, 17). For support, Petitioner relies on testimony from Mr. Teruya. Teruya Decl. ¶¶ 98–99.

Patent Owner combines its response to this obviousness challenge with its response to the anticipation challenge based on Crowds. PO Resp. 36–39. We have addressed Patent Owner's structural arguments and why we reject them in Section III.E, *supra*.

### 1. Analysis

Because we have already determined that they are anticipated by Crowds, we do not separately address claims 1, 19, and 21–29 under this ground. For those claims, we rely on the Petition and our anticipation analysis in Section III.E to show that they would also have been obvious in light of Crowds and RFC 2616.

#### a) Claims 2, 4, 15, 17

As noted *supra,* these dependent claims are not included in Petitioner's anticipation ground. Petitioner presents analysis of claims 2, 14, 15, and 17 in light of Crowds and RFC 2616. Pet. 41–44. Petitioner relies of RFC 2616 for disclosures such as the validity check in claims 14 and 15. *See id.* at 42.

Patent Owner does not respond separately to Petitioner's analysis of these claims. *See* PO Resp. 39–41. We are persuaded by Petitioner's analysis that Petitioner has demonstrated each limitation of those claims is taught or suggested by Crowds and RFC 2616.

Case: 23-2146    Document: 16    Page: 251    Filed: 11/13/2023

### b)  Claim 18

Claim 18 depends indirectly from claim 1 and recites "wherein the periodically communicating comprises exchanging 'keep alive' messages." Ex. 1001, 20:59–61. Petitioner contends that Crowds discloses that jondos communicate over TCP/IP connections and detect TCP/IP connection failures, and that "keep-alive" messaging for TCP/IP connections is disclosed in RFC 1122. Pet. 43 (citing Ex. 1016 § 4.2.3.6). Mr. Teruya testifies that "[a] [person of ordinary skill] would know that this shows that Crowds relies upon TCP connections. It would have been obvious to a [person of ordinary skill] to have performed this disclosed 'detecting' by using the 'keep-alive' implementation taught by RFC 1122." Teruya Decl. ¶ 105.

Patent Owner responds that RFC 1122 "is not a reference" in this ground. PO. Resp. 40. Petitioner responds that "keep-alive" messages are mentioned in the '319 patent and in RFC 1122. Pet. Reply 22. We agree with Petitioner that this proves that such messages would be part of a person of ordinary skill's general knowledge. *Id.*; *see also Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015) ("Art can legitimately serve to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness.").

We therefore do not credit Patent Owner's arguments and find that Petitioner demonstrates that the cited prior art teaches or suggests the limitations of claim 18. PO Resp. 40.

### 2.  Teaching Away

Patent Owner contends that Crowds "teaches away" and that "a [person of ordinary skill] would not be motivated to arrive at the claimed

Case: 23-2146    Document: 16    Page: 252    Filed: 11/13/2023

methods based on the teachings of Crowds." PO Resp. 38–40. For example, Patent Owner contends that Crowds does not provide the "initiator" (the requesting jondo) with "anonymity as to the target web server." *Id.* at 38. Patent Owner continues, "Crowds states that it merely offers an initiator 'some degree of deniability' that it originated a particular request." *Id.* (quoting Ex. 1004, 2).

Patent Owner's "teaching away" argument based on alleged shortcomings of Crowds is unavailing. "A prior art reference does not teach away if it merely expresses a general preference for an alternative invention but does not criticize, discredit or otherwise discourage investigation into the invention claimed." *Incept LLC v. Palette Life Scis., Inc.*, No. 2021-2063, 2023 WL 5248043, at *5 (Fed. Cir. Aug. 16, 2023) (quoting *UCB, Inc. v. Actavis Laby's UT, Inc.*, 65 F.4th 679, 692 (Fed. Cir. 2023) (internal quotation marks omitted)). Moreover, Petitioner points out that the alleged "teachings" focused on by Patent Owner that Crowds allegedly "teaches away" from are not reflected in the claims. Pet. Reply 24. We agree with Petitioner that "[n]one of the proposed combinations [of references] concern anonymity, latency, or anything else in PO's 'teaching away' arguments." *Id.* For the reasons given, we find that Patent Owner's "teaching away" argument has little relevance and we accord it minimal weight.

### 3. *Objective Indicia*

Patent Owner relies on objective indicia of nonobviousness, including commercial success, long-felt need, copying, and industry praise. PO Resp. 68–75; PO Sur-reply 27–29. Petitioner responds that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which do not have a nexus to the claims, and that Patent Owner's

arguments regarding commercial success, long-felt need, copying, and industry praise suffer from additional evidentiary infirmities. Pet. Reply 24–26.

### a) Legal Standards

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, the proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). A showing of nexus can be made in two ways: (1) via a presumption of nexus, or (2) via a showing that the evidence is a direct result of the unique characteristics of the claimed invention. *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, No. 2022-1765, 2023 WL 5440530, at *5 (Fed. Cir. Aug. 24, 2023).

Case: 23-2146     Document: 16     Page: 253     Filed: 11/13/2023

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130; *see also Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 2023 WL 5440530, at *5 ("A presumption of nexus requires both that the product embodies the invention and is coextensive with it.")

On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Brown & Williamson*, 229 F.3d at 1130. Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944

Case: 23-2146     Document: 16     Page: 254     Filed: 11/13/2023

F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

### b) Commercial Success

Patent Owner argues that nonobviousness is supported by the fact that it "provides a residential proxy service that practices the methods claimed in the '319 Patent." PO Resp. 57 (citing Williams Decl. ¶ 262). Patent Owner contends its proxy service "provides various users' client devices." *Id.* Patent Owner states it "currently provides approximately 72 million residential IP addresses associated with real users, in approximately 195 countries, to be used as proxy client devices in its residential proxy service." *Id.* (citing Ex. 2038). According to Patent Owner, in 2021, its "residential proxy service generated revenues of $53.7 million." *Id.* at 70 (citing Williams Decl. ¶ 270). Patent Owner contends also that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is further evidence of commercial success. *Id.* (citing Williams Decl. ¶ 269).

Patent Owner asserts that its residential proxy service "practices the methods claimed in the '319 Patent," and Patent Owner provides claim charts and source code purporting to show how "this commercial embodiment practices at least claims 1–2, 17–18, and 21–29 of the '319 Patent." PO Resp. 57–68. Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '319 Patent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6,

Case: 23-2146　　　Document: 16　　　Page: 255　　　Filed: 11/13/2023

Case: 23-2146          Document: 16          Page: 256          Filed: 11/13/2023

and the proxy client device corresponds to agent 122." *Id.* at 68. According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims'" and "embodies the claimed features of the '319 Patent and is coextensive with them." *Id.* Additionally, Patent Owner argues that "[t]he features driving the commercial success of [its] residential proxy service are (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP addresses." *Id.* at 68–69. Finally, Patent Owner argues that "the district court found that sufficient nexus was established." PO Sur-reply 23 n.11.

Petitioner responds that the alleged commercial success lacks nexus to the claimed invention. Pet. Reply 24–26. Petitioner points to the two features allegedly "driving" the alleged commercial success (use of "residential IP addresses" and "scalability") cited by Patent Owner. *Id.* at 24. Petitioner argues that in naming those features, Patent Owner "admits a lack of nexus because neither feature is claimed." *Id.* Petitioner points out that the '319 patent "never uses the words 'residential,' 'scalable,' or 'scalability.'" *Id.* Petitioner argues that Dr. Williams, Patent Owner's expert, admits that the use of residential IP addresses is not claimed in the '319 patent. *Id.* (citing Williams Dep. 56:4–6, 56:19–57:6). Petitioner also takes issue with Dr. Williams's testimony regarding Patent Owner's sales figures. *Id.* at 24–25 ("Williams did nothing to determine commercial 'success,' other than observing 'revenues in the millions of dollars per month.'").

Case: 23-2146    Document: 16    Page: 257    Filed: 11/13/2023

We find for the following reasons and those given by Petitioner, including those summarized above, that Patent Owner has failed to establish a nexus between the challenged claims and the products that Patent Owner relies on to show commercial success. First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products it relies on for commercial success embody and are "coextensive" with the challenged claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner relies on features of its products that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products. For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing] residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices having residential IP addresses." PO Resp. 68; *see id.* at 57 (pointing to Patent Owner's "residential proxy service" that uses laptops, desktops, tablets, laptop, or smartphones), 71 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" and pointing to a market report examining "residential proxy services")). The challenged claims, however, do not include these limitations allegedly "driving" commercial success.

At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to show a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims. Therefore, Patent Owner fails to prove that commercial success of its products is the "direct result" of the claimed invention's unique characteristics.

We are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established." PO Sur-reply 27 n.11. Patent Owner relies on the district court's ruling on defendants' motion to strike the opinions of Patent Owner's district court expert, Dr. Rhyne. *See* Ex. 2004, 4. In its order, the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of non-obviousness." *Id.* The district court "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention." *Id.* The district court's two-sentence order does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing an explanation. Moreover, Patent Owner does not show us where the district court actually made a finding on the existence of a nexus. It appears to us that the district court was simply determining that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony on nexus at trial.

Case: 23-2146     Document: 16     Page: 259     Filed: 11/13/2023

### c)  *Long-Felt Need*

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 71. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target web site," but "that website could still likely identify data center server IP addresses as proxy addresses." *Id.* at 71 (citing Williams Decl. ¶ 272). Patent Owner asserts, in contrast, that its "proxy client devices have residential IP addresses that vary widely from one another without being limited to one block of IP addresses and can have a wide variety of geographic locations." *Id.* at 72.

To establish a long-felt need, three elements must be proven: First, the need must have been a persistent one that was recognized by ordinarily skilled artisans. *In re Gershon*, 372 F.2d 535, 538 (CCPA 1967). Second, the long-felt need must not have been satisfied by another before Patent Owner's invention. *See Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988). Third, the invention must, in fact, satisfy the long-felt need. *In re Cavanagh*, 436 F.2d 491, 496 (CCPA 1971). Patent Owner has failed to provide the necessary evidence or present the analysis necessary to establish long-felt need.

To demonstrate long felt need, a patentee must point to an "articulated identified problem and evidence of efforts to solve that problem" which were, before the invention, unsuccessful. *Tex. Instruments v. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993). Patent Owner's reliance on generalities fails to provide us with persuasive evidence of an "articulated identified problem," much less evidence of failed efforts to solve that problem.

As noted, for objective evidence of secondary considerations to be relevant, there must be a nexus between the merits of the claimed invention and the objective evidence. *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, 2023 WL 5440530, at *5 (citing *In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)). Petitioner responds that there is no nexus shown here between the products and the challenged claims. Pet. Reply 24–26. For similar reasons as for commercial success, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of alleged long-felt need and the challenged claims. The key features that Patent Owner points to as satisfying a long-felt need are its "residential proxy service" including proxy client devices that "have residential IP addresses." PO Resp. 72. As explained above, however, the challenged claims do not recite or require a residential proxy service or residential IP addresses. Therefore, for the reasons given, we find that Patent Owner has failed to make the requisite showing that a long-felt need was met by its claimed invention.

> *d)* *Copying*

Patent Owner argues that "[d]uring the jury trial in the Teso Litigation, evidence of Oxylabs copying Bright Data's residential proxy service, then under the name 'Hola,' was presented." PO Resp. 72 (citing Williams Decl. ¶ 273). Patent Owner argues that its representative Ofer Vilenski asked an employee of Oxylabs Tomas Okmanas to incorporate Patent Owner's software development kit (SDK) in Oxylabs' applications. *Id.* Mr. Okmanas did not agree, but Oxylabs "subsequently released their own SDK for Oxylabs' own residential proxy network." *Id.* at 73 (citing Ex. 2047, 94:23–95:9, 65:20–97:3; Williams Decl. ¶ 273).

Case: 23-2146     Document: 16     Page: 260     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 261    Filed: 11/13/2023

Patent Owner also asserts that Mr. Okmanas testified that he sent an email to a third party stating he was looking for "a system that works like hola.org," and that that Oxylabs "wanted to develop its own residential proxy service." *Id.* He testified that "he believed that he needed to do what Bright Data . . . were doing to be successful." *Id.* at 73–74 (citing Ex. 2047, 95:20–97:1, 103:18–104:10, 149:13–150:8, 152:18–153:6; Williams Decl. ¶ 274). This testimony, according to Patent Owner, "is strong evidence of copying." *Id.* at 74 (citing Williams Decl. ¶ 274).

The standard for proving copying requires "duplication of features of the patentee's work based on access to that work, lest all infringement be mistakenly treated as copying." *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019). The proponent of objective evidence offered to prove copying must show that a nexus exists between the evidence and the claimed features of the invention. *See Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1082 (Fed. Cir. 2016); *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d at 1138.

For similar reasons as for commercial success and long-felt need, we find that no nexus has been shown between Patent Owner's evidence of copying and the challenged claims. Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied. Patent Owner refers only generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 73–74. As explained above, however, the challenged claims do not recite or require a residential proxy service or an SDK. Nor does Patent Owner provide a product comparison that would suggest copying.

Therefore, we find that Patent Owner has failed to make the requisite showing that the claimed invention was copied.

      *e)*     *Industry Praise*

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '319 Patent." PO Resp. 74 (citing Williams Decl. ¶ 276). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." *Id.* (citing Williams Decl. ¶ 276).

Petitioner responds the industry praise evidence fails for the same reasons as that for commercial success. Pet. Reply 26.

For similar reasons as for the other objective indicia identified by Patent Owner, we find that no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. PO Resp. 75. Moreover, three of the four articles cited by Patent Owner to support its "industry praise" argument do not even mention Patent Owner's products, but instead promote products of its competitors. *See* Exs. 2052–2054. Therefore, we find that Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

      *4.*     *Conclusion on Obviousness*

For the reasons explained above, we find that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise is entitled to little weight because it does not show a nexus with the claimed invention. Thus, we find that secondary

Case: 23-2146    Document: 16    Page: 262    Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 263     Filed: 11/13/2023

considerations are not sufficient to outweigh Petitioner's evidence of obviousness. We therefore determine for the reasons given by Petitioner and those summarized above that Petitioner has demonstrated by a preponderance of evidence that challenged claims 1, 2, 14, 15, 17–19, and 21–29 of the '319 patent would have been obvious in view of Crowds and RFC 2616.

### G. Anticipation Based on Border

Petitioner asserts that claims 1, 12, 14, 21, 22, 24, 25, and 27–29 are anticipated by Border. Pet. 44–46. Petitioner provides an element-by-element claim analysis, supported by expert testimony. *Id.* at 46–55; Teruya Decl. ¶¶ 107–123.

#### 1. Claim 1

Petitioner contends that Border anticipates claim 1. Pet. 46–51. Petitioner asserts that the preamble is disclosed by Border. *Id.* at 46. For example, Petitioner identifies the first client device recited in the preamble as upstream server 107 in Border. *Id.* Petitioner identifies the recited second server as downstream server 105. *Id.* Petitioner identifies the recited first server as web server 109. *Id.* Petitioner identifies the recited first content identifier as the requested URL. *Id.* And Petitioner identifies the recited first content as the web page referenced by the requested URL. *Id.* (citing Teruya Decl. ¶¶ 107–108).

Petitioner's analysis continues by showing that each step of claim 1 is disclosed in Border. *Id.* at 46–52. For example, Petitioner asserts that the "receiving" step (step 1a) is met when "[w]eb content is retrieved from a web server that stores the web content by forwarding a 'URL request message to a web server and receiv[ing] the URL content from the web

server.'" *Id.* at 47 (citing Ex. 1012, 2:52–54). Similarly, the "sending" step (step 1b) is met when "[u]pstream server 107 (the first client device) issues a GET request to web server 109 for the content at a specified URL." *Id.* at 49 (citing Ex, 1012, Fig. 2, 5:33–36) (footnote omitted). Petitioner provides similar analyses for the additional steps (steps 1c and 1d) of claim 1. Mr. Teruya provides supporting testimony. Teruya Decl. ¶¶ 109–123.

Patent Owner's response to this challenge echoes its response to the challenge based on Crowds. *Compare* PO Resp. 42–46 *with id.* at 31–36. For example, Patent Owner contends Border does not disclose a "first client device" or "second server" because "[t]here is no way for a [person of ordinary skill] to determine whether upstream/downstream servers 107, 105 are client devices or servers under the purely role-based constructions." *Id.* at 42. Patent Owner contends also that "upstream/downstream servers 107,105 operate in different roles at different points in time." *Id.*

As with Crowds, Patent Owner focuses on steps 1a and 1d (referred by Patent Owner as steps 1 and 4, respectively). PO Resp. 42–43. Patent Owner reprises its argument that a server cannot operate in the role of a client, and vice versa. *Id.* For the reasons given in our discussion of Crowds in Section III.E, *supra*, we do not agree with those arguments as they are contrary to the claim constructions we have adopted and the claim language. Similarly, we have rejected Patent Owner's arguments based upon "the architecture of claim 1," as exemplified in Patent Owner's redrawing of Figure 3, as not supported by the '319 patent disclosure. *See* PO Resp. 44–45. Patent Owner again asserts: "Petitioner[] fail[s] to explain why one proxy server would be a server and another proxy server would be a client device under Patent Owner's proposed constructions." *Id.* at 45. For the

Case: 23-2146     Document: 16     Page: 264     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 265     Filed: 11/13/2023

reasons previously given, we do not agree with these structural arguments as they are based on an arrangement not disclosed in the patent specification and rely on Patent Owner's rejected claim construction arguments. *See supra*, Section III.C.

Patent Owner's argument that "Border does not teach claim 1" (PO Resp. 45–46) and Border teaches away (*id.* at 47–48) mirror the similar arguments directed to Crowds. *See* PO Resp. 36–39. For the reason given in our discussion of Crowds, *supra* in Sections III.E and III.F, we do not agree with those arguments. We find that for the reasons given by Petitioner and those summarized above, Border teaches or suggests each limitation of claim 1 and Petitioner has shown by a preponderance of evidence that Border anticipates that claim.

> ### 2. Claims 12, 14, 21, 22, 24, 25, and 27–29

These claims depend, directly or indirectly, from claim 1. Petitioner provides an analysis for each of these claims in relation to Border. Pet. 52–55; Teruya Decl. ¶¶ 124–134. Petitioner's analysis shows that Border discloses the additional limitations of these claims. For example, Petitioner demonstrates that Border discloses storing the received content in claim 12: "In response to receiving the web page at the requested URL from web server 109, upstream server 107 stores the first content in HTTP cache 117." *Id.* at 52 (citing Ex. 1012, 5:36–38).

Patent Owner does not respond separately to Petitioner's analysis of these dependent claims. For the reasons given we are persuaded by Petitioner's analysis that Petitioner has demonstrated by a preponderance of the evidence that claims 12, 14, 21, 22, 24, 25, and 27–29 are anticipated by Border.

Case: 23-2146   Document: 16   Page: 266   Filed: 11/13/2023

### H. Obviousness Based on Border and RFC 2616

Petitioner contends that the claims anticipated by Border alone (claims 1, 12, 14, 19, 21, 22, 24, 25, and 27–29), as well as claims 15 and 17–19, would have been obvious in light of Border and RFC 2616. Pet. 55–59.

### 1. Claim 1

Petitioner contends claim 1 would have been obvious in light of Border and RFC 2616: "Since Border is also directed at improving those communications . . . within the same standards-defined environment, a [person of ordinary skill] developing software for like applications would have had a powerful motivation, for the same reasons, to combine its disclosure with other knowledge of Internet standards and/or RFC 2616 governing HTTP." Pet. 56 (citing Teruya Decl. ¶¶ 135–137).

Addressing Patent Owner's proposed claim constructions, Petitioner contends that "[t]here is no question that downstream server 105 (the "second server") [in Border] is disclosed as a "server" and that the GET request disclosed in Border transmits a content identifier (URL). Nor is there any difference between the data flow recited in claim 1 and that disclosed in Border. Id. (citing Teruya Decl. ¶¶ 138–39). Further, Petitioner asserts "[a]s for the 'first client device'—Border expressly discloses that its proxy servers can be implemented on personal computers." Id. (citing Ex. 1012, 3:58–61, 4:51–53; 10:6–11:8). Petitioner continues: "To the extent that is deemed insufficient disclosure of a consumer computer (should that even be required), it would have been obvious to a [person of ordinary skill in the art], based on general Internet knowledge, that any computing device capable of operating a 'proxy' as defined in RFC 2616, could serve as a first

client device, and that this would include most consumer computers with a network interface." *Id.* (citing Teruya Decl. ¶¶ 140–142).

Patent Owner combines its response to this obviousness challenge with its response to the anticipation challenge based on Border. PO Resp. 44–48. We have addressed Patent Owner's nearly identical arguments directed to Crowds in Sections III.E and III.F, *supra*. We incorporate those discussion here.

Addressing dependent claims 12, 14, 15, 17–19, 21, 22, 24, 25, and 27–29, Petitioner demonstrates that the combination of Border and RFC 2616 discloses the additional limitations of those claims. Pet. 57–59; Teruya Decl. ¶¶ 143–151.

Because we have already determined that they are anticipated by Border, we do not separately address claims 12, 14, 22, 24, 25, and 27–29 under this ground. For those claims, we rely on our anticipation analysis in Section III.G. and the analysis in the Petition to show that they would also have been obvious in light of Border and RFC 2616.

### 2. *Claims 15 and 19*

As noted *supra*, these dependent claims are not included in Petitioner's anticipation ground. Petitioner presents analyses of claims 15 and 19 in light of Border and RFC 2616. Pet. 57–58, Teruya Decl. ¶¶ 143–145.

Claim 15 recites a validity check. Petitioner presents an obviousness analysis of claim 15 in light of Crowds and RFC 2616. Pet. 57. Petitioner relies on Border for its disclosure of "the first client device determining the received (and cached) first content valid." *Id.* Petitioner relies of RFC 2616 for disclosing "highly similar, standardized, mechanisms for accomplishing

Case: 23-2146     Document: 16     Page: 267     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 268     Filed: 11/13/2023

this." *Id.* Petitioner explains that "[i]t would have been advantageous, and obvious to a [person of ordinary skill], in view of the additional (and standardized) cache control mechanisms of RFC 2616, to have incorporated those further mechanisms into an implementation making use of the other teachings of Border, with predictable results. *Id.* (citing Teruya Decl. ¶ 145).

Claim 19, discussed in Section III.E.2, *supra*, calls for downloading software. Petitioner contends "it is routine and would have been obvious to download and install such software applications, in this case, software to run the proxy devices in Border." Pet. 58 (citing Teruya ¶ 134).

Patent Owner does not respond separately to Petitioner's analysis of these claims. *See* PO Resp. 48. We are persuaded by Petitioner's analysis and find that Petitioner has demonstrated these claims are taught or suggested by Border and RFC 2616.

### 3. Claims 17 and 18

Claim 17 depends from claim 1 and calls for periodic communications between the first server and the first client device. Ex. 1001, 20:56–58. Claim 18 depends from claim 17 and recites "wherein the periodically communicating comprises exchanging 'keep alive' messages." Ex. 1001, 20:59–61. Patent Owner does not separately address claim 17. PO Resp. 48.

We have addressed Patent Owner's similar arguments for claim 18 in connection with Crowds. *See supra*, Section III.E.1. Petitioner contends "keep-alive" messaging is disclosed in RFC 1122. Pet. 53. Mr. Teruya testifies that "[a] person of ordinary skill] knowing that Border used persistent connections would have been motivated to use keep alives as

taught by RFC 1122 as a standard manner of maintaining such connections."
Teruya Decl. ¶ 149. Patent Owner responds that RFC 1122 "is not a
reference" in this ground. PO Resp. 48. Petitioner responds that "keep-
alive" messages are mentioned in the '319 patent and in RFC 1122. Pet.
Reply 22. As previously stated, we agree with Petitioner that this proves
that such messages would be part of a person of ordinary skill's general
knowledge. *Id.; see also Ariosa Diagnostics*, 805 F.3d at 1365 ("Art can
legitimately serve to document the knowledge that skilled artisans would
bring to bear in reading the prior art identified as producing obviousness.");
Section III.F.1, *supra*. We therefore do not credit Patent Owner's argument
that the cited prior art in this ground fails to teach or suggest the limitations
of claim 18. PO Resp. 49.

### 4. Conclusion on Obviousness

For the reasons explained above, we find that Patent Owner's
evidence purportedly showing commercial success, long-felt need, copying,
and industry praise is entitled to little weight. Thus, secondary
considerations are not sufficient to outweigh Petitioner's evidence of
obviousness.

We therefore determine for the reasons given that Petitioner
demonstrates by a preponderance of the evidence that challenged claims 1,
2, 14, 15, 17–19, 21, 22, 24, 25, and 27–29 of the '319 patent would have
been obvious in view of Border and RFC 2616.

### I. Anticipation Based on MorphMix

Petitioner asserts that claims 1, 17, 19, and 21–29 are anticipated by
MorphMix. Pet. 59–61. Petitioner provides an element-by-element claim

Case: 23-2146     Document: 16     Page: 269     Filed: 11/13/2023

analysis, supported by expert testimony. *Id.* at 61–71; Teruya Decl. ¶¶ 152–193.

### 1. Claim 1

Petitioner contends claim 1 is disclosed by MorphMix. Pet. 61–67. For example, Petitioner identifies the claimed first client device as last node (c) in MorphMix. *Id.* at 61. Petitioner identifies the claimed second server as intermediate node (b). *Id.* at 62. Petitioner identifies the claim's first server as server (s). *Id.* Petitioner identifies the claimed first content identifier as "the 'application data' or the requested URL it contains." *Id.* And Petitioner identifies the first content as the "requested web page at the requested URL." *Id.* (citing Teruya Decl. ¶¶ 159–160).

Petitioner's analysis continues by showing that each step of claim 1 is disclosed in MorphMix. *Id.* at 61–67. For example, the "receiving" step (step 1a) is met because "Figure 5.4 of MorphMix shows that in the course of servicing a request from node a, 'application data' (for the request) is passed from node b (second sever) to node c (first client device), which then connects with the web server." *Id.* at 62. Further, the "sending" step (step 1b) is met because "[n]ode c (first client device) sends a HTTP request comprising the FCI (AD and/or the URL within the AD) to the first server (s)." *Id.* at 65. Petitioner provides analyses for the additional steps (steps 1c and 1d) of claim 1. *Id.* at 66–67. Mr. Teruya provides supporting testimony. Teruya Decl. ¶¶ 152–180.

Patent Owner responds with a repeat of the arguments previously discussed. PO Resp. 48–54. For example, Patent Owner argues that "[f]or the same reasons discussed above regarding Crowds and Border, MorphMix does not disclose a 'first client device' or a 'second server' as recited in

Case: 23-2146     Document: 16     Page: 271     Filed: 11/13/2023

claim 1 under the purely role-based constructions." *Id.* at 48. Patent Owner contends MorphMix does not disclose steps 1a and 1d. *Id.* at 49–50. For step 1a, Patent Owner argues that "[f]or the same reasons discussed above regarding Crowds and Border, during performance of this method step, under the purely role-based constructions, node (b) is operating in the role of a client, not a server, and therefore node (b) cannot be a server…Also, under the purely role-based constructions, node (c) is operating in the role of a server, not a client, and therefore node (c) cannot be a client device." *Id.* at 49 (citation omitted). Patent Owner makes a similar argument for step 1d. *Id.* at 50. We do not agree with these arguments for reasons previously discussed. Among other reasons, they are not based on the language of the claims or the disclosure in the specification, and we have rejected Patent Owner's claim constructions that Patent Owner contends support these arguments. *See* Section III.C.

We find, for the reasons given by Petitioner and those summarized above, that MorphMix teaches or suggests each limitation of claim 1. We find that Petitioner has demonstrated by a preponderance of the evidence that MorphMix anticipates claim 1.

### 2. *Claims 17, 19, and 21–29*

Petitioner provides an analysis for each of these dependent claims in relation to MorphMix. Pet. 67–71; Teruya Decl. ¶¶ 181–193. Petitioner's analysis shows that MorphMix discloses the additional limitations of these claims. For example, Petitioner demonstrates that MorphMix discloses the periodic communication step in claim 17: "The 'second server' and 'first client device' of MorphMix are nodes, and each communicates via the MorphMix protocol for establishing and maintaining virtual tunnels. Each

Case: 23-2146    Document: 16    Page: 272    Filed: 11/13/2023

sends HTTP protocol messages through this tunnel to handle web requests." *Id.* at 67–68 (internal citation omitted).

Patent Owner does not respond separately to Petitioner's analysis of these dependent claims. PO Resp. 54. For the reasons given, we are persuaded by Petitioner's analysis and therefore find that Petitioner has demonstrated by a preponderance of evidence that claims 17, 19, and 21–29 are anticipated by MorphMix.

### J.   *Obviousness Based on MorphMix and RFC 2616*

Petitioner contends that the claims anticipated by MorphMix alone (claims 1, 17, 19, and 21–29), as well as claims 2, 14, 15, and 18, would have been obvious in light of MorphMix and RFC 2616. Pet. 71–76.

### 1.   *Analysis*

Petitioner contends that claim 1 would have been obvious in light of MorphMix and RFC 2616. Pet. 71–72. Petitioner explains, because MorphMix is also directed at improving communications (in this case, providing anonymity) using standard protocols such as TCP/IP, "within the same-standards defined environment, a [person of ordinary skill] developing software for like applications would have had a powerful motivation, for the same reasons, to combine its disclosure with other knowledge of Internet standards and/or RFC 2616 governing HTTP." *Id.* at 71 (citing Teruya Decl. ¶¶ 194–195).

Addressing claim 1, Petitioner contends that "Patent Owner sought to construe 'client device' as a 'consumer computer.'" *Id.* at 72. Petitioner continues, "[t]here is no § 102 issue with MorphMix on that score, as MorphMix (expressly called a 'peer-to-peer' based system) clearly contemplates the use of consumer-class computers." *Id.* at 72. Petitioner

further explains that "[a]s for the 'second server,'... node b acts in the role of a server to node a." *Id.* Still further addressing the claimed "first content identifier," Petitioner points out that MorphMix discloses a "continuous series of user activity via URL requests." *Id.* at 72 (citing Ex. 1008 at 94). Furthermore, "the [person of ordinary skill] would know from RFC 2616 § 5.1.2 that a URL includes a content identifier." *Id.*

Patent Owner combines its response to this obviousness challenge with its response to the anticipation challenge based on MorphMix. PO Resp. 51–54. We have addressed Patent Owner's similar arguments in Section III.I, *supra*, and in our discussions of Crowds and Border, *supra*. We incorporate those discussions here.

Addressing dependent claims 2, 14, 15, 18, 19, and 21–29, Petitioner demonstrates that MorphMix and RFC 2616 disclose the additional limitations added by those claims. *Id.* at 71–76; Teruya Decl. ¶¶ 200–211.

We have already determined that claims 17, 19, and 21–29 are anticipated by MorphMix. For those claims, we rely on our anticipation analysis in Section III.I to show that they would also have been obvious in light of MorphMix and RFC 2616.[21]

For claims 18 and 19, Patent Owner repeats arguments from the Crowds and Border challenges that we have addressed. *See* Sections III.F.1 and III.H.1, *supra*. Patent Owner does not further address this obviousness ground. PO Resp. 54–33.

---

[21] Although claim 17 is listed in the section heading for this obviousness challenge, the Petition does not directly address claim 17 in this analysis of obviousness. *See* Pet. 71, 75. Previously, we determined that claim 17 is anticipated by MorphMix. *See* Section III.I.2, *supra*. For this reason, we find that claim 17 is also obvious over MorphMix and RFC 2616.

Case: 23-2146     Document: 16     Page: 273     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 274    Filed: 11/13/2023

## 2. *Conclusion*

For the reasons explained above, we find that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise are entitled to little weight. Thus, secondary considerations are not sufficient to outweigh Petitioner's evidence of obviousness.

We therefore determine for the reasons given that Petitioner demonstrates by a preponderance of the evidence that claims 1, 2, 14, 15, 17–19, and 27–29, of the '319 patent would have been obvious in view of MorphMix and RFC 2616.

## IV. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of the '319 patent are unpatentable.

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1, 19, 21–29 | 102 | Crowds | 1, 19, 21–29 | |
| 1, 2, 14, 15, 17–19, 21–29 | 103 | Crowds, RFC 2616 | 1, 2, 14, 15, 17–19, 21–29 | |
| 1, 12, 14, 21, 22, 24, 25, 27–29 | 102 | Border | 1, 12, 14, 21, 22, 24, 25, 27–29 | |
| 1, 12, 14, 15, 17–19, 21, 22, 24, 25, 27– | 103 | Border, RFC 2616 | 1, 12, 14, 15, 17–19, 21, 22, 24, 25, 27–297 | |

Case: 23-2146    Document: 16    Page: 275    Filed: 11/13/2023

| 297 | | | | |
|---|---|---|---|---|
| 1, 17, 19, 21–29 | 102 | MorphMix | 1, 17, 19, 21–29 | |
| 1, 2, 14, 15, 17–9, 21–29 | 103 | MorphMix, RFC 2616 | 1, 2, 14, 15, 17–9, 21–29 | |
| **Overall Outcome** | | | 1, 2, 12, 14, 15, 17–19, 21–29 | |

## V. MOTION TO SEAL

Patent Owner has filed an unopposed Motion to Seal. Paper 33. The Motion requests sealing of Exhibits 2039 (network diagram), 2041–2044 (source code files), and 2065 (expert declaration), and Patent Owner's Response (Paper 31). Paper 33, 2. The Motion also includes a request to enter an agreed protective order. *See* Exhibit 2068.

We have reviewed this Motion and the documents at issue and have considered the explanations of the confidential nature of the materials for which sealing is sought. We find there is good cause and therefore we grant the Motion to Seal and the associated request to enter the parties' agreed protective order.[22]

## VI. ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1, 2, 12, 14, 15, 17–19, and 21–29 of the '319 patent are unpatentable;

---

[22] Petitioner also filed a Motion to Exclude New Evidence (Paper 46), which was withdrawn at the oral hearing, without objection by Patent Owner. *See* Hearing Tr. 5:5–12.

FURTHER ORDERED that the request to enter the parties' agreed protective order (Ex. 2068) is granted;

FURTHER ORDERED that the Motion to Seal (Papers 33) is granted;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Decision that can be made publicly available;

FURTHER ORDERED that the present Decision shall remain under seal until any joint motion to seal the Decision is resolved;

FURTHER ORDERED that the present Decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.[23]

---

[23] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

Case: 23-2146    Document: 16    Page: 276    Filed: 11/13/2023

PETITIONER:

Ronald Abramson
Mord Lewis
Ari Jaffess
LISTON ABRAMSON LLP
ron.abramson@listonabramson.com
michael.lewis@listonabramson.com
ari.jaffess@listonabramson.com

PATENT OWNER:

Thomas Dunham
Elizabeth O'Brien
RUYAKCHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

CODE200, UAB; TESO LT, UAB; METACLUSTER LT, UAB;
OXYSALES, UAB; and CORETECH LT, UAB,

Petitioners

v.

BRIGHT DATA LTD.,

Patent Owner

---

Case IPR2021-01492[1]

Patent No. 10,257,319

---

**PATENT OWNER'S NOTICE OF APPEAL**

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

---

[1] Petitioners in IPR2022-00861 were joined to this case, with IPR2022-00861 then terminated.

Pursuant to 35 U.S.C. §§ 141, 142, and 319, and 37 C.F.R. §§ 90.2 and 90.3, notice is hereby given that Patent Owner Bright Data Ltd. appeals to the U.S. Court of Appeals for the Federal Circuit from the Final Written Decision (Paper 53) entered on September 22, 2023 in IPR2021-01492, and from all underlying orders, decisions, ruling, and opinions that are adverse to Patent Owner.[2,3,4] The public

---

[2] Lead Case No. 23-2144, pending in its early stages before the Fed. Cir., involves the same patent, the same disputed claim terms, the same primary prior art reference (Crowds), and the same petitioners.

[3] Case No. 23-2414, pending in its early stages before the Fed. Cir., involves the same patent, the same disputed claim terms, and the same primary prior art references (Crowds, Border).

[4] Patent Owner is simultaneously filing a Notice of Appeal in IPR2021-01492 and IPR2021-01493, which involve related patents having the same specification, the same disputed claim terms, and the same prior art references. There are also similar claim construction issues in pending administrative matters: IPR2022-00687 and IPR2023-01425; as well as Reexamination Control Nos. 90/014,652, 90/014,816, 90/014,624, and 90/014,827; all which involve related patents having the same specification. There are also similar claim construction issues in stayed Reexamination Control Nos. 90/014,875 and 90/014,876, as well as stayed district

Case: 23-2146    Document: 16    Page: 279    Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 280    Filed: 11/13/2023

version of the Final Written Decision (Paper 54) entered on September 27, 2023 is attached to this Notice as Exhibit A.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner intends to appeal at least the following issues:

i.   Whether the Board's construction of the claim term "client device" was incorrect and/or not reasonable in light of the evidence of record;

ii.  Whether the Board's construction of the claim term "second server" was incorrect and/or not reasonable in light of the evidence of record;

iii. Whether the Board erred in determining that Petitioners established by a preponderance of the evidence that claims 1, 19, and 21-29 of U.S. Patent No. 10,257,319 ("the '319 Patent") are unpatentable as anticipated by Crowds[5];

iv.  Whether the Board erred in determining that Petitioners established by

---

court matters: Case Nos. 2:19-cv-395, 2:19-cv-396, and 2:19-cv-414 in the Eastern District Court of Texas.

[5] Michael Reiter & Aviel Rubin, Crowds: Anonymity for Web Transactions, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds").

a preponderance of the evidence that claims 1, 2, 14, 15, 17-19, and 21-29 of the '319 Patent are unpatentable as obvious over the combination of Crowds and RFC 2616[6];

v.     Whether the Board erred in determining that Petitioners established by a preponderance of the evidence that claims 1, 12, 14, 21, 22, 24, 25, and 27-29 of the '319 Patent are unpatentable as anticipated by Border[7];

vi.     Whether the Board erred in determining that Petitioners established by a preponderance of the evidence that claims 1, 12, 14, 15, 17-19, 21, 22, 24, 25, and 27-29 of the '319 Patent are unpatentable as obvious over the combination of Border and RFC 2616;

vii.     Whether the Board erred in determining that Petitioners established by a preponderance of the evidence that claims 1, 17, 19, and 21-29 of the

---

[6] Fielding, et al., RFC 2616, Hypertext Transfer Protocol -- HTTP/1.1, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

[7] Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border").

Case: 23-2146    Document: 16    Page: 281    Filed: 11/13/2023

'319 Patent are unpatentable as anticipated by MorphMix[8];

viii.   Whether the Board erred in determining that Petitioners established by a preponderance of the evidence that claims 1, 2, 14, 15, 17-19, and 21-29 of the '319 Patent are unpatentable as obvious over the combination of MorphMix and RFC 2616; and

ix.   Whether the Board erred in any further findings or determinations supporting or relating to the issues above, including the Board's consideration of the expert testimony, prior art, secondary considerations of non-obviousness, and other evidence in the record.

Pursuant to 37 C.F.R. § 90.3, this Notice is timely, having been duly filed within 63 days after the date of the Final Written Decision.

A complete and entire copy of this Notice is being filed simultaneously with each of the Patent Trial and Appeal Board and the Clerk's Office for the U.S. Court of Appeals for the Federal Circuit, along with the required fee. A complete and entire copy of this Notice is being served simultaneously on each of the Director of the U.S. Patent and Trademark Office and the petitioners.

---

[8] Marc Rennhard, MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access (2004) (Ex. 1008, "MorphMix").

No fees are believed to be due to the U.S. Patent and Trademark Office in connection with this filing, but authorization is hereby given for any requisite fees to be charged to Deposit Account No. 603803 (Customer No. 144371).

Respectfully submitted,

Date: September 27, 2023

By: /s/ *Thomas M. Dunham*
Thomas M. Dunham
Reg. No. 39,965

Cherian LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEY FOR PATENT OWNER,
BRIGHT DATA LTD.

Case: 23-2146    Document: 16    Page: 283    Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 284    Filed: 11/13/2023

## CERTIFICATE OF FILING AND SERVICE

The undersigned hereby certifies a complete and entire copy of this paper was served on the undersigned date via USPS Priority Mail Express® on the Director of the USPTO at the following address:

> Mail Stop 8
> Office of the General Counsel
> United States Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22313-1450

The undersigned hereby certifies a complete and entire copy of this paper was filed on the undersigned date with the Clerk's Office for the United States Court of Appeals for the Federal Circuit and that the required docket fee was paid electronically through the Court's CM/ECF system.

The undersigned hereby certifies a complete and entire copy of this paper was served on the undersigned date via email, as authorized by Petitioners, at the following email addresses:

> jscott@ccrglaw.com
>
> jheuton@ccrglaw.com
>
> ctolliver@ccrglaw.com

Respectfully submitted,

Date: September 27, 2023

By: /s/ *Thomas M. Dunham*
Thomas M. Dunham
Reg. No. 39,965

Cherian LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEY FOR PATENT OWNER,
BRIGHT DATA LTD.

Case: 23-2146    Document: 16    Page: 285    Filed: 11/13/2023

Trials@uspto.gov
571-272-7822

Paper: 55
Entered: September 25, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

CODE200, UAB, TESO LT, UAB, METACLUSTER LT, UAB,
OXYSALES, UAB, AND CORETECH LT, UAB,
Petitioner,

v.

BRIGHT DATA LTD.,
Patent Owner.

———————

IPR2021-01493[1]
Patent 10,484,510 B2

———————

Before THOMAS L. GIANNETTI, SHEILA F. McSHANE, and
RUSSELL E. CASS, *Administrative Patent Judges*.

McSHANE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Granting Motion to Seal
*35 U.S.C. § 318(a); 37 C.F.R. § 42.14*

---

[1] The Petitioners in IPR2022-00862 were joined to this case, with IPR2022-00862 then terminated. *See* Paper 24, 35–38.

Case: 23-2146     Document: 16     Page: 286     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 287    Filed: 11/13/2023

## I. INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons discussed herein, we determine that Petitioner has shown by a preponderance of the evidence that challenged claims 1, 2, 6–11, 13, and 15–24 (the "challenged claims") of U.S. Patent No. 10,484,510 B2 (Ex. 1001, "the '510 patent") are unpatentable.

### A. Procedural Background

In IPR2022-00862, Code200, UAB; Teso LT, UAB; Metacluster LT, UAB; Oxysales, UAB; and Coretech LT, UAB (collectively, "Code200" or "Petitioner") filed a Petition requesting *inter partes* review of claims 1, 2, 6–11, 13, and 15–24 of the '510 patent, along with the supporting Declaration of Keith J. Teruya. IPR2022-00862, Paper 1 ("Pet."); IPR2022-00862, Ex. 1005 ("Teruya Decl."). Bright Data Ltd.[2] ("Patent Owner") filed a Preliminary Response to the Petition. IPR2022-00862, Paper 15. With the Petition, Petitioner also filed a Motion for Joinder with this case, IPR2021-01493. IPR2022-00862, Paper 7, Paper 13.

On July 25, 2022, we issued a Decision in IPR2022-00862 exercising discretion to deny institution based on an assessment of factors set forth in *General Plastic Industrial Co. Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 (PTAB Sept. 6, 2017) (precedential as to § II.B.4.i) (*General Plastic*). IPR2022-00862, Paper 17. Our Decision also denied joinder of the parties in IPR2022-00862 to this case, IPR2021-01493. *Id.* at

---

[2] Bright Data Ltd. was formerly known as Luminati Networks Ltd. *See* PO Resp. 68.

Case: 23-2146    Document: 16    Page: 288    Filed: 11/13/2023

17. The Director reviewed our Decision *sua sponte*, vacated the Decision, and remanded the case to the panel, with orders that our Decision denying institution and joinder be reconsidered consistent with the review. IPR2022-00862, Paper 18 ("Remand Decision").

Pursuant to and consistent with the Remand Decision, we considered the Petition, Joinder Motion, and Preliminary Response in IPR2022-00862, instituted *inter partes* review, and granted joinder of the parties to this case. Paper 24 ("Inst. Dec."). More specifically, we instituted *inter partes* review based on the following grounds:

| Claims Challenged | 35 U.S.C. §[3] | Reference(s)/Basis[4] |
|---|---|---|
| 1, 6, 7, 13[5], 15, 16, 18–24 | 102(b) | Crowds[6] |

---

[3] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013. Because the '510 patent claims priority to a provisional application that was filed before this date, with Petitioner not contesting that priority, the pre-AIA versions of §§ 102 and 103 apply. *See* Ex. 1001, code (60); Pet. 17.

[4] Petitioner's obviousness challenges additionally refer to the "[k]nowledge of [a person of ordinary skill in the art]." Pet. 10. We understand this to refer to a person of ordinary skill in the art's understanding of the applied references and not to supplying missing limitations or incorporating an unspecified disclosure by reference to supply missing claim limitations.

[5] The Petition includes assertions for claim 13 under the Crowds anticipation ground. Pet. 33. Accordingly, we include this claim in the summary table, although not included in the Petition's summary table. *Id.* at 10.

[6] Michael K. Reiter, *Crowds: Anonymity for Web Transactions*, ACM Transactions on Information and System Security, Vol. 1, No. 1, November 1998, at 66–92 (Ex. 1006).

| Claims Challenged | 35 U.S.C. §[3] | Reference(s)/Basis[4] |
|---|---|---|
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103(a) | Crowds, RFC 2616[7] |
| 1, 6, 10, 15–20, 23, 24 | 102(b) | Border[8] |
| 1, 6, 8–11, 13, 15–20, 22–24 | 103(a) | Border, RFC 2616 |
| 1, 6–8, 13, 15, 16, 18–24 | 102(b) | MorphMix[9] |
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103(a) | MorphMix, RFC 2616 |

Pet. 10; Inst. Dec. 5[10], 38.

Patent Owner filed a Patent Owner Response ("PO Resp."), along with the Declaration of Tim Williams, Ph.D. Paper 30; Ex. 2065. Petitioner filed a Reply ("Pet. Reply") to the Patent Owner Response. Paper 40. Patent Owner filed a Sur-reply ("PO Sur-reply"). Paper 41.

An oral hearing was conducted on June 9, 2023. A transcript of the hearing is included in the record. Paper 51 ("Tr.").

*B. Related Matters*

The '510 patent has been the subject of numerous proceedings in district court and the Board. Pet. 3–5; IPR2022-00862, Paper 10, 1–5. In particular, the parties identify four district court proceedings involving the

---

[7] Hypertext Transfer Protocol—HTTP/1.1, Network Working Group, RFC 2616, The Internet Society, 1999 (Ex. 1013).
[8] U. S. Patent No. 6,795,848, issued September 21, 2004 (Ex. 1012).
[9] Marc Rennhard, MorphMix—A Peer-to-Peer-based System for Anonymous Internet Access (2004) (Ph.D. dissertation, Swiss Federal Institute of Technology) (Ex. 1008).
[10] In the Institution Decision, the summary table inadvertently includes claim 22 in the Border anticipation ground, which Petitioner did not challenge under this ground. *See* Pet. 10; Inst. Dec. 5.

Case: 23-2146     Document: 16     Page: 289     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 290    Filed: 11/13/2023

'510 patent and a related patent (U.S. Patent No. 10,257,319 ("the '319 patent")):

> *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) (pending);
>
> *Luminati Networks Ltd. v. Teso LT, UAB, et al.*, No. 2:19-cv395 (E.D. Tex.) (pending) ("the Teso litigation");
>
> *Luminati Networks Ltd. v. BI Science (2009) Ltd.*, No. 2:19-cv397 (E.D. Tex.) (dismissed); and
>
> *Luminati Networks Ltd. v. Tefincom S.A.*, No. 2:19-cv-414 (E.D. Tex.) (pending).

Pet. 3; IPR2022-00862, Paper 10, 2–3.

The '510 patent has also been before the Board in IPR2020-00138 and IPR2022-00916. Pet. 5; IPR2022-00862, Paper 10, 1–2.

In addition, Patent Owner identifies *ex parte* reexaminations, Control No. 90/014,875 and Control No. 90/014,876, that have been ordered for U.S. Patent No. 10,257,319, a patent related to the '510 patent, and for the '510 patent, respectively. IPR2022-00862, Paper 10, 2. Those reexaminations have been stayed. *See* IPR2021-01492, Paper 14; IPR2021-01493, Paper 13.

### C. The '510 Patent

The '510 patent is titled "System Providing Faster and More Efficient Data Communication" and issued on November 19, 2019 from an application filed on February 17, 2019. Ex. 1001, codes (22), (45), (54). The patent is subject to a terminal disclaimer. *Id.* at code (*). The application for the '510 patent claims priority to several applications, including U.S. Provisional Application No. 61/249,624, filed October 8, 2009. *Id.* at code (60).

Case: 23-2146      Document: 16      Page: 291      Filed: 11/13/2023

The '510 patent is directed to addressing the "need for a new method of data transfer that is fast for the consumer, cheap for the content distributor and does not require infrastructure investment for ISPs." Ex. 1001, 1:57–59. The '510 patent states that other "attempts at making the Internet faster for the consumer and cheaper for the broadcaster," such as proxy servers and peer-to-peer file sharing, have various shortcomings. *Id.* at 1:61–3:6. The '510 patent provides a system and method "for faster and more efficient data communication within a communication network," such as in the network illustrated in Figure 3, reproduced below. *Id.* at 3:16–18, 4:5–7.



FIG. 3

Figure 3 is a schematic diagram depicting communication network 100 including a number of communication devices. Ex. 1001, 4:56–48. Client 102 is capable of communicating with peers 112, 114, and 116, as well as with one or more agents 122. *Id.* at 4:58–60. Web server 152 may be "a typical HTTP server, such as those being used to deliver content on any of

6

the many such servers on the Internet." *Id.* at 4:65–5:2. Acceleration server 162 includes an acceleration server storage device 164 with an acceleration server database, which "stores Internet Protocol (IP) addresses of communication devices within the communication network 100 having acceleration software stored therein." *Id.* at 5:14–17.

In operation, a client may request a resource on the network, for example, through the use of an Internet browser. Ex. 1001, 12:62–13:3. If server 152 is the target of the request, the client sends the IP address of server 152 to acceleration server 162. *Id.* at 13:8–15. Acceleration server 162 then prepares a list of agents that can handle the request, which includes communication devices "that are currently online, and whose IP address is numerically close to the IP of the destination Web server 152." *Id.* at 13:19–29. The client then sends the original request to the agents in the list to find out which "is best suited to be the one agent that will assist with this request." *Id.* at 13:31–36. The connection established between the agent and client may be a Transmission Control Protocol ("TCP") connection. *Id.* at 17:61–64.

Each agent responds to the client with information as to "whether the agent has seen a previous request for this resource that has been fulfilled," and "which can help the client to download the request information from peers in the network." Ex. 1001, 13:51–57. The client selects an agent based on a number of factors, and the selected agent determines whether data stored in its memory or the memory of the peers "still mirrors the information that would have been received from the server itself for this request." *Id.* at 13:62–14:1, 14:35–38. If the selected agent does not have

Case: 23-2146     Document: 16     Page: 292     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 293    Filed: 11/13/2023

the necessary information to service the request, it may "load the information directly from the server in order to be able to provide an answer to the requesting client." *Id.* at 14:62–67.

The '510 patent has twenty-four claims. Claim 1, the only independent claim, is illustrative of the claimed subject matter and is reproduced below, with bracketed designations added to the limitations for reference purposes.

> 1. [pre] A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:
>
> > [a] establishing a Transmission Control Protocol (TCP) connection with a second server;
> >
> > [b] sending, to the web server over an Internet, the first content identifier;
> >
> > [c] receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and
> >
> > [d] sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.

Ex. 1001, 19:18–31.

## II. ANALYSIS OF PATENTABILITY OF CLAIMS 1, 2, 6–11, 13, AND 15–24

### A. The Parties' Arguments

In our Decision on Institution, we concluded that the arguments and evidence advanced by Petitioner demonstrated a reasonable likelihood that at least one claim of the '510 patent is anticipated or would have been obvious. Inst. Dec. 23–35. Here, we must consider whether Petitioner has established

by a preponderance of the evidence that claims 1, 2, 6–11, 13, and 15–24 of the '510 patent are anticipated or would have been obvious. 35 U.S.C. § 316(e). We previously instructed Patent Owner that "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived." Paper 25, 9; *see also In re NuVasive, Inc.*, 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding patent owner waived an argument in the preliminary response by not raising the same argument in the patent owner response). Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis for that belief." Consolidated Trial Practice Guide (Nov. 2019)[11] ("TPG"), 66.

Patent Owner has chosen not to address certain arguments and evidence advanced by Petitioner to support its unpatentability contentions. In this regard, the record contains persuasive arguments and evidence presented by Petitioner regarding the manner in which the prior art discloses or teaches the corresponding limitations of claims 1, 2, 6–11, 13, and 15–24 of the '510 patent and the rationale for combining the asserted obviousness references.

### B. Level of Ordinary Skill in the Art

According to Petitioner, a person of ordinary skill in the pertinent art "would have at least a bachelor's degree in Computer Science or related field (or equivalent experience), and two or more years' experience working with and programming networked computer systems as of the Priority Date."

---

[11] *Available at* https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf?MURL=.

Case: 23-2146     Document: 16     Page: 294     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 295     Filed: 11/13/2023

Pet. 15 (citing Teruya Decl. ¶¶ 25–27). Petitioner further states that "[s]uch a person would be familiar with the underlying principles of Web, Internet, or network communication, data transfer, and content sharing across networks, including the HTTP and TCP/IP protocols." *Id.*

Patent Owner submits that a person of ordinary skill in the art "would have a Master's Degree or higher in the field of Electrical Engineering, Computer Engineering, or Computer Science or as of that time had a Bachelor's Degree in the same fields and two or more years of experience in Internet Communications." PO Resp. 2 (citing Ex. 2065 ¶ 25). Patent Owner states that "Patent Owner's analysis herein does not change under the Board's preliminary definition of a" person of ordinary skill in the art. *Id.* at 2 (citing IPR2022-01493, Paper 11, 18; Ex. 2065 ¶ 26).

In the Decision on Institution, we adopted the assessment of qualifications offered by Petitioner, which we also adopt here. Inst. Dec. 14–15. The assessment offered by Petitioner is consistent with the '510 patent and the prior art before us. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

### C. Claim Construction

In this *inter partes* review, claims are construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2021). Under the principles set forth by the Federal Circuit, the "words of a claim 'are generally given their ordinary and customary meaning,'" as would be understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)

Case: 23-2146     Document: 16     Page: 296     Filed: 11/13/2023

(en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

### 1. "client device"

#### a. Petitioner's Assertions

Petitioner asserts that the district court's constructions in the *Teso* district court litigation should apply in this case. Pet. 15–20. In particular, Petitioner points to two claim construction orders in that case—an original order (Ex. 1017) and a supplemental order (Ex. 1020). Petitioner also relies on a claim construction order in *Bright Data Ltd. v. Code200, UAB*, Case No. 2:19-cv-00396 (E.D. Tex.) ("the Code200 Litigation"), which is directed to related patents. Pet. Reply 13 (citing Ex. 1112).

As Petitioner notes, the magistrate judge construed "client device" as "communication device that is operating in the role of a client," and found that "role-based construction applies 'regardless of any additional role the device may serve, including as a server.'" Pet. Reply 13 (citing Ex. 1017, 10–12; Ex. 1112, 13 (emphasis omitted)). Petitioner argues that the district court has repeatedly addressed and rejected Patent Owner's arguments on the claim construction for this term. *Id.* (citing Ex. 1112). Petitioner indicates that the magistrate judge's constructions were adopted by the district judge. *Id.* (citing Ex. 1113; Ex. 1114). Petitioner also refers to the

Case: 23-2146    Document: 16    Page: 297    Filed: 11/13/2023

district court's ruling that precluded Patent Owner from arguing that "a client device cannot be a server." *Id.* (citing Ex. 1116, 4). Petitioner additionally refers to the claim construction order in *Bright Data Ltd. v. NetNut Ltd.*, No. 2:21-cv-225 (E.D. Tex.) ("the *NetNut* litigation"), in which the district court rejected a proposed construction of the term "client device" as a "consumer computer." *Id.* at 13 n.6 (citing Ex. 1115, 10–16). Petitioner refers to RFC 2616, which is referenced in the '510 patent, and asserts that it "confirms that 'client' means 'program that establishes connections for the purpose of sending requests,'" where "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." *Id.* at 15–16 (citing Ex. 1013, 8 (emphases omitted); Ex. 1001, 16:21–22.).

In further support, Petitioner points to the '510 patent Specification, where "a 'client device' is an entity that receives the content from the intermediate agent device." Pet. 20 (citing Ex. 1001, 9:27–36). Petitioner asserts that "the same device [client device], thus acting as a 'client' for one content retrieval, can also act, in another content retrieval in the same system, as one the of the intermediate 'agent' nodes, and also operate in the role of a server," which is consistent with the district court's construction.

Petitioner also refers to a mapping of Figure 3 of the '510 patent showing the claimed elements, as shown in annotated Figure 3 below. Pet. 18–19.



FIG. 3

As shown in annotated Figure 3, above, Petitioner contends that the "second server" is marked in green (client 102), the "client device" is marked in red (agent 122), and the "first server" is marked in blue (web server 152), which is "a logical and reasonable mapping." Pet. 18–19. Petitioner points out that this is the mapping that Patent Owner used in briefing in a related litigation. *Id.* (citing Ex. 1004, 19–20).

Petitioner also asserts that under Patent Owner's proposed claim construction a "client device" has to: (1) be a "consumer computer;" (2) be "typically portable and easily moved;" (3) be "not a dedicated network element;" (4) use single or relatively few connections;" (5) be "resource limited (e.g., bandwidth and storage), unlike a server;" (6) be "regularly switched off and taken offline;" (7) be "capable of processing only a limited number of requests at any given time;" and (8) have "lesser fault tolerance, lesser reliability, and lesser scalability, prioritizing value to client device users over system costs." Pet. Reply 1–2 (citing PO Resp. 25–28; Ex. 2065 ¶¶ 120, 124–125; Ex. 1111, 53:24–54:8:1). Petitioner argues that these

13

characteristics are highly subjective, indefinite, and not supported by the Specification. *Id.* at 2–6.

### b. Patent Owner's Assertions

Patent Owner asserts that a person of ordinary skill in the art would understand the term "client device" to mean "a consumer computer" or a "consumer communication device." PO Resp. 23 (citing Ex. 2065 ¶ 114). Patent Owner argues that these constructions are consistent with the term's plain and ordinary meaning, the Specification, the prosecution histories, and extrinsic evidence. *See id.* at 23–28. Patent Owner contends that the district court claim constructions should be applied, but argues that Petitioner has deviated from the district court's construction of the term "client device" because there is no attribution of special meaning to the term "communication device." *Id.* at 8. Patent Owner further asserts that in the *NetNut* litigation, the district court "expressly rejected removing the word 'communication' from its construction of" the term "client device." *Id.* at 10 (citing Ex. 2021, 14) (emphases omitted)). Patent Owner argues that Petitioner only applies role-based constructions and "treat[s] client devices and servers as interchangeable general purpose computers." *Id.* at 9. Instead, Patent Owner argues, the district court "found that a 'client device' is a physical communication device, which has a special meaning in the context of the specification. A communication device . . . is not simply any device that communicates over the Internet." *Id.* Patent Owner argues that purely role-based constructions "contradict the Court's Orders because they refer to generic devices operating in a particular role," and they "fail to

Case: 23-2146    Document: 16    Page: 300    Filed: 11/13/2023

account for the physical/structural differences between client devices and servers." *Id.* at 10.

Patent Owner alleges that the Specification discloses how a communication device can be configured to be a client, agent, or peer so a person of ordinary skill in the art would understand client 102 and agent 122 to both be client devices. PO Resp. 6 (citing Ex. 1001, 4:46–52, 5:23–31, 9:14–51, 15:39–42, 15:51–52, Fig. 6; Ex. 2065 ¶¶ 56–58). Patent Owner contends that a person of ordinary skill "would understand that proxy server 6 of Figure 1 could be inserted between client 102 and agent 122 of Figure 3," with the result being modified Figure 3, reproduced below. *Id.* at 7–8 (citing Ex. 2065 ¶ 59).



Patent Owner alleges that, as shown in modified Figure 3 above, a person of ordinary skill in the art would understand that client device ↔ second server ↔ first client device ↔ web server would correspond to client 102 (purple) ↔ proxy server 6 (green) ↔ agent 122 (red) ↔ web server 152 (blue) of

modified annotated Figure 3. PO Resp. 7–8 (citing Ex. 2065 ¶ 59). Patent
Owner further argues that the Specification distinguishes between servers
and client devices and "[u]nder Petitioners' application of their purely role-
based constructions, there would be nothing to distinguish intermediary
proxy server 6 (which is a server) from intermediary agent 122 (which is a
client device)." PO Sur-reply 8 (citing PO Resp. 14–18).

Patent Owner further asserts that a person of ordinary skill in the art
would understand that "a client device is typically portable and easily
moved, like, for example, a laptop, desktop, tablet or smartphone." PO
Resp. 26 (citing Ex. 2065 ¶ 124). Patent Owner contends that a person of
ordinary skill's understanding is evidenced by extrinsic evidence, with "a
definition of a client as 'an application that runs on a personal computer or
workstation and relies on a server to perform some operations.'" *Id.* at 27
(citing Ex. 2035; Ex. 2036, 5; Ex. 2037, 7; Ex. 2065 ¶ 126). Patent Owner
contends that a person of ordinary skill in the art would understand that a
client device typically (a) is regularly switched off and taken offline; (b) is
capable of processing only a limited number of requests; and (c) has lesser
fault tolerance, lesser reliability, and lesser scalability. *Id.* (citing Ex. 2065
¶ 125). Patent Owner argues that a person of ordinary skill in the art "would
understand there are structural differences between client devices and
servers in the context of the specification." *Id.* at 28 (citing Ex. 2065 ¶ 128).
Patent Owner contends that a person of ordinary skill in the art would be
informed by statements made during prosecution that a client device is not a
dedicated network device, typically uses a single or relatively few

Case: 23-2146     Document: 16     Page: 301     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 302     Filed: 11/13/2023

connections, and is resource limited (e.g., bandwidth and storage), unlike a server. *Id*. at 26–27 (citing Ex. 2065 ¶ 124).

Patent Owner acknowledges that the district court rejected Patent Owner's construction equating "client device" with "consumer computer." PO Resp. 23. Patent Owner argues, however, that the district court's rejection of its proposed construction of a "client device" as "consumer computer" is wrong for three reasons. *Id*. at 23–25. First, Patent Owner asserts that, although the district court found that there was no express lexicography in the Specification, the Specification states that "computers of consumers" are "referred to herein as client devices." *Id*. at 23 (citing Ex. 1001, 2:47–49). Patent Owner further contends that the Specification indicates a special meaning for the term and a person of ordinary skill in the art "would understand a 'client device' is a consumer computer in the context of the '510 Patent." *Id*. at 23–24 (citing *Kyocera Senco Indus. Tools, Inc. v. ITC*, 22 F.4th 1369, 1379 (Fed. Cir. 2022)). Second, Patent Owner disagrees with the district court's finding that in the Specification the term "consumer" refers to the consumer of content, as opposed to a broadcaster of content. *Id*. at 24 (citing Ex. 1017, 11). Rather, Patent Owner argues, the common understanding of "consumer" is "a person who buys goods or services for their own use" or "someone who buys goods or services for personal use." *Id*. (citing Ex. 2030; Ex. 2031, 5; Ex. 2032, 4; Ex. 2033; Ex. 2034, 4; Ex. 2065 ¶ 121; 15 U.S.C. § 6809(9); 12 C.F.R. § 332). Third, Patent Owner disagrees with the district court's finding that the term "consumer" does not appear to be used in connection with the claimed invention, contending that the Specification refers to "computers of

Case: 23-2146     Document: 16     Page: 303     Filed: 11/13/2023

consumers," and that relevant statements were made in the prosecution history. *Id.* at 25 (citing Ex. 1017, 11).

Patent Owner contends that in the context of the '510 patent, "a client device is not a server." PO Resp. 25. Patent Owner disagrees with the district court's view that there was insufficient support for including a negative limitation in the construction of client device, namely, that a client device is unable to act as a server in all cases. *Id.* (citing Ex. 1017, 12). Patent Owner further asserts that the district court did not have the benefit of the detailed discussion provided by Patent Owner concerning Figures 1 and 3. *Id.* (citing Ex. 2065 ¶ 131). Patent Owner submits that "under the purely role-based constructions, a client device may operate in the role of a server at some points in time, but that does not transform a physical client device into a physical server," and a person of ordinary skill in the art would understand that a client device is not a server in view of the '510 patent. *Id.*

Patent Owner contends that, in view of the recited architecture of the '510 patent claims that distinguishes between client devices and servers, the use of three interchangeable devices in a pathway would not disclose that architecture. PO Resp. 13 (citing Ex. 2065 ¶¶ 75–76). Patent Owner also argues that the recited architecture in the '510 patent claims, that is, a second server ↔ first client device ↔ web server architecture, also distinguishes the non-interchangeability and non-role-based nature of the devices, and these distinctions are consistent with an *Alice*[12] order in the *Teso* district court litigation. *Id.* at 12–13 (citing Ex. 2065 ¶¶ 75–76, 80; Ex. 2024, 6–11); PO Sur-reply 6–7. Patent Owner refers to the district court's finding that found

---

[12] *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

that "it is not the individual steps of the method that render the Asserted Claims non-abstract, it is the network architecture as a whole." *Id.* at 13 (citing Ex. 2024, 9).

Patent Owner also contends that, upon reviewing Figures 1 and 3 of the Specification, a person of ordinary skill in the art would have understood that proxy server 6 must be structurally different from agent 122 and that "a server is not a client device and that a client device is not a server." PO Resp. 15 (citing Ex. 2065 ¶ 83). Patent Owner argues that under "purely role-based constructions, proxy server 6 of Figure 1 and agent 122 of Figure 3 would be operating in the same roles at a given point in time," so under the Board's preliminary constructions "Figure 3 collapses onto Figure 1" and fails to account for structural differences between a proxy server and a client device. *Id.* More specifically, Patent Owner contends that, as shown in Figure 1, under role-based constructions, "proxy server 6 (i) receives requests from client devices 14, 16 and (ii) sends requests to web server 32," so "proxy server 6 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.* at 16 (citing Ex. 2065 ¶ 86). Patent Owner asserts that for Figure 3, under role-based constructions, "agent 122 (i) receives requests from client devices and (ii) sends requests to web server 152," so "agent 122 would be (i) operating in the role of a server and (ii) operating in the role of a client." *Id.* at 17–18 (citing Ex. 2065 ¶¶ 91– 92). Patent Owner argues that with proxy server 6 of Figure 1 and agent 122 of Figure 3 operating in the same roles at a given point in time, "there is nothing to distinguish the architectures of Figures 1 and 3." *Id.* at 18 (citing Ex. 2065 ¶ 93). Patent Owner asserts that "purely role-based constructions

Case: 23-2146    Document: 16    Page: 305    Filed: 11/13/2023

are not appropriate because they fail to account for these structural differences between proxy servers and proxy client devices." *Id.* at 18 (citing Ex. 2065 ¶ 94).

Patent Owner additionally refers to the prosecution history of U.S. Patent No. 10,069,936 ("the '936 patent"), the grandparent of the '510 patent. PO Resp. 19–22. Patent Owner argues that this prosecution history "clearly distinguishes client devices from servers." *Id.* at 19 (citing Ex. 2065 ¶ 97). Patent Owner asserts that during prosecution, the applicant "repeatedly argued that client devices are different from servers." *Id.* (citing Ex. 2026, 163–164, 96–97). Patent Owner points to the applicant's statement that "[t]here is a clear distinction in the art and as taught by the Garcia reference between clients and servers," and "[c]lient devices, such as client 105 in the Garcia reference, are end-units that request information from servers, use client-related software such as Web browser software, communicate over the Internet using ISP connection, and are typically consumer owned and operated." *Id.* at 20 ((citing Ex. 2026, 163) (emphases omitted)).

Additionally, Dr. Williams refers to the examiner's statement that "Garcia fails to teach a group of clients for data communication; (a) each of the devices sending its identifier to the first server; (b) the first server receiving and storing the identifiers of the devices; (d) the first server selecting one of the clients from the group; and (f) the selected client receiving the content from the web server; and (g) the requesting client receiving the content from the selected client." Ex. 2065 ¶ 98 (citing Ex. 2026, 124). Dr. Williams testifies that "the examiner recognized a

20

server cannot be equated to a client device regardless of the role being performed at a given moment in time." *Id.* ¶ 99.

Patent Owner asserts that "the examiner acknowledged that 'the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification.'" PO Resp. 21 (citing Ex. 2026, 44 (emphasis omitted)). Patent Owner contends that this "shows that the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture." *Id.* (citing Ex. 2065 ¶ 102). Patent Owner also refers to the prosecution history of the '319 patent, which is the parent of the '510 patent, asserting that it shows that servers and client devices are not interchangeable general use computers. PO Resp. 21 (citing Ex. 2065 ¶ 104). During prosecution of the '319 patent, the applicant contended that "the claims involve specific networking of physical elements such as servers and clients, connected via various networks forming a specific structure and relationships, which are physical apparatuses, and are NO[T] a 'generic computer' as stated in the Action." *Id.* (citing Ex. 2066, 282). Patent Owner further cites to the applicant's statement that "the claimed components as a combination perform functions that are not merely generic – It is respectfully submitted that the conventional arrangement involves fetching data by a client device from a server device, while the claims disclose a server receiving information from another server via a client device, which

is unique and solves a specific problem such as anonymity when fetching information." *Id.* at 22 (citing Ex. 2066, 282–283 (emphases omitted)).

Patent Owner also refers to the prosecution history of the '510 patent, arguing that the examiner acknowledged the "environment" of the claimed method, which "shows that the examiner appreciated the unique architecture disclosed in the common specification and the novel use of a proxy client device within that architecture." *Id.* at 22–23 (Ex. 2065 ¶ 108).

### c. Analysis

For the reasons discussed below, we determine that the evidence of record supports the district court's construction of the term "client device" as a "communication device that is operating in the role of a client" which we adopted in our Institution Decision and we apply here in view of the full record. *See* Inst. Dec. 17. Conversely, we find that the evidence does not support Patent Owner's view that a "client device" is a "consumer computer," or alternatively, a "consumer communication device," where the "client device" cannot be a server. *See* PO Resp. 23.

### i. Claim Language

Under *Phillips*, we begin with the language of the claims themselves. *See Phillips*, 415 F.3d at 1314. In claim 1, the steps of the claims are performed by a "first client device." In step 1[b], the first client device, "send[s], to the web server over the Internet, the first content identifier," which serves to request content from the web server. *See* Ex. 1001, 19:24–25. In step 1[b], the first client device is acting as a client in requesting content. In step 1[d], the first client device "send[s] the received first

content, to the second server." *See id.* at 19:29–30. In step 1[d], the first client device is acting as a server to forward content.

The parties address the issue that the "first client device" acts in differing roles in claim 1. Petitioner asserts that the claim's required functionality is consistent with the district court's determinations on the role-based nature of the term. Pet. 16, 18–19 (citing Ex. 1020, 10); Pet. Reply 13–16 (citing Ex. 1017, 10–12; Ex. 1112, 13; Ex. 1020, 8–11; Ex. 1113; Ex. 1114; Ex. 1001, 5:51–6:42, 9:21–27; Ex. 1126, 8; Ex. 1004, 19–20). Patent Owner agrees that if the role-based construction were adopted, for Figure 3, "agent 122 (i) receives requests from client devices and (ii) sends requests to web server 152," so "agent 122 would be (i) operating in the role of a server and (ii) operating in the role of a client." PO Resp. 17–18 (citing Ex. 2065 ¶¶ 91–92).

Petitioner refers to Patent Owner's assertions in the *Teso* district court litigation, where Patent Owner identified client 102 with the "second server" and agent 122 with the "first client device" as shown in annotated Figure 3 and an annotated version of claim 1 of the '510 patent, reproduced below. Pet. Reply 14–15 (citing Ex. 1126, 8; Ex. 1004, 19–20).

Case: 23-2146　Document: 16　Page: 309　Filed: 11/13/2023

Although each of the Asserted Claims involve methods performed within a server – client

device – web server architecture, the claim terms differ in that the "first" server in the '319 and

'510 Patents is referred to as the "second"

server in the '614 Patent. Fig. 3 is annotated

below to illustrate the claimed steps [A],

[B], [C], [D], and/or [E] performed by the

client device in conjunction with the server

and web server.



FIG. 3

1. A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first **client device** comprising:
　　[A] establishing a Transmission Control Protocol (TCP) connection with a second server;
　　[C] sending, to the web server over an Internet, the first content identifier;
　　[D] receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and
　　[E] sending the received first content, to the second server over the established TCP connection, [B] in response to the receiving of the first content identifier.

Ex. 1126, 8–9 (omitting assertions for '319 patent). As shown in annotated

Figure 3 above, Patent Owner equated client 102 (green) to the "second

server" and agent 122 (red) to the "first client device" in accordance with the

roles required in the claim elements.[13]

---

[13] We recognize that Patent Owner modified its position in its Response to assert that both client 102 and agent 122 are client devices. PO Resp. 6–7 (citing Ex. 2065 ¶¶ 56–59). We address the issue of two devices acting as

Case: 23-2146     Document: 16     Page: 310     Filed: 11/13/2023

That is, Patent Owner asserted that the "first client device" (shown in red) is equivalent to agent 122, which sends the first content identifier to the web server, receives content requested from the web server, and sends that content to client 102 (the second server). Thus, under Patent Owner's presentation, the "first client device" (agent 122) is acting as a client when it sends the first content identifier to the web server and receives content in response, and is acting as a server when it sends content to client 102. This assertion by Patent Owner reflects a role-based interpretation of the claim terms; different devices shown in Figure 3 are identifiable as the recited clients or servers based on their functionality.

The district court found that the interpretation of the term "client device" should be consistent with its role and claimed functionality, and we agree. More particularly, the district court indicated that the function performed by a recited component serves to define the recited component. Ex. 1020, 7–11. For instance, the district court found that under the steps of a claim, a "client device" operates as an intermediary to perform steps including "send[ing], to [a] web server over an Internet, the first content identifier" to request content and also "sending the received first content." Ex. 1017, 3–4; *see also* Ex. 1020, 10. Consistent with the claim language, the district court recognized that "a component can be *configured* to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10. That is, although the district court determined that a single

---

client devices below in the discussion on modified Figure 3 under Dr. Williams' testimony.

Case: 23-2146     Document: 16     Page: 311     Filed: 11/13/2023

component could not simultaneously serve more than one function at any particular time, components could operate in different roles, such as the claimed "client device." *Id*. We agree with the district court's construction of "client device" as a "communication device that is operating in the role of a client" because this interpretation is consistent with the limitations of the claims. *See* Ex. 1017, 12.

We note that Patent Owner's argument that a client device is not a server (PO Resp. 15, 25) is not supported by the claim language, which describes a "client device" acting as a client to request content from the web server, as well as acting as a server to forward content under the method claims. We discuss this issue further below in more detail.

### ii. Specification

The district court's interpretation of the term "client device," adopted here, is also consistent with the '510 patent Specification. The '510 patent Specification, when describing the "multiple communication devices" depicted in Figure 3, states that the same components may assume different roles:

> *Due to the functionality provided by software stored within each communication device*, which may be the same in each communication device, *each communication device may serve as a client, peer, or agent*, depending upon requirements of the network.

Ex. 1001, 4:46–50 (emphases added). Accordingly, the Specification states that the components identified in Figure 3 may perform different functions based on their stored software. *Id*. More specifically, the Specification explains that "each of [the software modules] comes into play *according to the specific role that the communication device 200 is partaking* in the

communication network 100 *at a given time*." Ex. 1001, 9:20–25 (emphasis added). The Specification thus supports the role-based identification of the network components, with components operating in different roles at different times, which is consistent with the claim language.

In opposition, Dr. Williams testifies that a person of ordinary skill in the art, when considering Figure 6 and associated text, would understand that "one 'client device' may be configured to be the *requesting client device* and another 'client device' may be configured to be the *proxy client device*." Ex. 2065 ¶ 117 (emphases added). Dr. Williams further testifies, similar to the discussion for modified Figure 3, reproduced *supra,* Section II.C.1.b (Patent Owner's assertions), that a person of ordinary skill in the art would understand that client 102 (in purple) corresponds to the *requesting client device* and agent 122 (in red) corresponds to the *proxy client device. Id.* ¶¶ 118–119. Dr. Williams testifies that "[a]gent 122 is disclosed as a client device (as opposed to a server) that is selected, for example, because agent 122 is closest to the web server 152." *Id.* ¶ 119.

We do not find that the evidence of record supports Patent Owner's assertions on this issue. Dr. Williams' testimony, and Patent Owner's arguments, are based upon a modified version of Figure 3, in which Patent Owner has inserted "proxy server 6" between "client device" and "agent." We do not discern that this configuration is shown in any figure of the '510 patent or disclosed in the Specification, and, consistent with this, Dr. Williams testifies that proxy server 6 shown in prior art Figure 1 was cut out and pasted into Figure 3. *See* Ex. 1001; Ex. 1111, 112:20–24. Dr. Williams also testifies that a person of ordinary skill in the art "would understand that

Case: 23-2146     Document: 16     Page: 312     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 313     Filed: 11/13/2023

proxy server 6 of Figure 1 *could be* inserted between client 102 and agent 122 of Figure 3." Ex. 2065 ¶ 59 (emphasis added). Dr. Williams combines the "proxy server 6" of the prior art shown in Figure 1 and the invention of Figure 3. Ex. 1001, 2:8–18, 2:24–32, 4:41–45. But Dr. Williams provides no specific explanation or a rationale to combine this prior art with this embodiment of the invention.[14] Further, Dr. Williams testifies that different "client devices," i.e., a "requesting client device" and a "proxy client device," are disclosed, but we do not find that these characterizations are disclosed in the Specification. In view of the lack of record support, we afford little weight to Dr. Williams' testimony on this issue.

Thus, in view of the '510 patent Specification's disclosures, we do not agree that it discloses the architecture of a requesting client device ↔ proxy server ↔ proxy client device ↔ web server in the first place, as Patent Owner asserts. *See* PO Resp. 7–8 (citing Ex. 2065 ¶ 59). Moreover, we do not agree that Patent Owner's argument based upon alleged "architecture" (*id.* at 13) should govern the construction of "client device" in light of the

---

[14] At his deposition, Dr. Williams further testified that "a POSA [person of ordinary skill in the art] would understand that other network elements can be present within the diagram of Figure 3. And a well understood network element would be a proxy server, as is clearly disclosed in Figure 1, that a proxy server can be inserted into a network," as well as "just as with routers, a POSA would understand that a proxy server is a normal network element to be inserted within a network, as was disclosed in Figure 1." Ex. 1111, 112:7–12, 113:8–11. However, even if a person of ordinary skill in the art knew that the modification *could* be done, Figure 3, as modified by Patent Owner, is not disclosed in the '510 patent and Patent Owner does not explain why the modified version of the Figure should direct claim construction.

Case: 23-2146     Document: 16     Page: 314     Filed: 11/13/2023

claim language and the Specification's disclosures demonstrating that communications devices may serve in different roles due to the functionality provided by software stored within each communication device, which comes into play depending on the specific role that the communication device takes at a given time. *See* Ex. 1001, 4:46–53, 9:20–26. The district court agreed, finding that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" Ex. 1020, 10 (emphasis omitted).

Patent Owner also argues that the district court's findings in the *Alice* order in the *Teso* district court litigation (Ex. 2024) are consistent with its understanding of the architecture required by the claims of the '510 patent. PO Resp. 12–13 (citing Ex. 2065 ¶¶ 75–76, 80; Ex. 2024, 6–11). We do not find that the district court's *Alice* order alters or modifies the claim construction the court adopted there, and that we adopt here. The order addressed a Motion for Judgement on the Pleadings Under Fed. R. Civ. P. 12(c). Ex. 2024, 1. The *Alice* order addressed patent eligibility, not claim construction. *See id.* at 1–12. Moreover, the district court's *Alice* order acknowledged the court's prior claim construction, that is, the construction of the term "client device" as "communication device that is operating in the role of a client," and did not modify that construction. *Id.* at 5. Further, after the *Alice* order issued in February, 2021, the district court consistently

Case: 23-2146     Document: 16     Page: 315     Filed: 11/13/2023

maintained its claim constructions with the adoption of the magistrate judge's claim construction order in September, 2021. *Id.* at 16; Ex. 1114.

Patent Owner argues that in the '510 patent, "a client device is not a server." PO Resp. 15, 25. We do not agree. As discussed above, we discern no limitation in the intrinsic record that a client device could not operate as a server. To the contrary, as also discussed above, the claim language provides that the first client device acts as a client in step 1[b] to request content, and acts as a server in step 1[d] to forward content. *See* Ex. 1001, 19:24–31. Patent Owner has agreed that under the claim language, a device can have different functionality, as discussed above. This is also consistent with the district court's view that Patent Owner's argument "that a client device is specifically not a server—is not supported by the specification." Ex. 1020, 10 (quoting Ex. 1017, 11). The district court refers to the Specification's disclosure that a "communication device" may act as a client, peer, or agent. Ex. 1017, 11–12 (citing related '319 patent, 4:48–49). The district court also found, and we agree, that although the patent does not list "servers" as "communication devices," "that is not sufficient to construe 'client device' as unable to act as a server in all cases," in view of the case law that negative claim limitations are "supported when the specification describes a reason to exclude the relevant limitation." *Id.* at 12 (citing *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012). Moreover, we note that under Patent Owner's analysis in the *Teso* district court litigation, the claimed "first client device," which may act as a server in claim 1, is identified as "Agent 122" of Figure 3. Ex. 1126, 8–9. As discussed, the Specification provides support that an agent can act in

different roles with software modules allowing different functions. Ex. 1001, 4:46–50.

Patent Owner also asserts that under a "role-based" construction, "Figure 3 collapses onto Figure 1." PO Resp. 15. According to Patent Owner, such constructions "do not account for structural differences between a proxy server (in Figure 1) and a proxy client device (in Figure 3)." *Id.* Patent Owner casts the alleged invention as being directed to the exclusion of "a proxy client device encompassing a proxy server." *Id.* at 43–44 (Ex. 2065 ¶ 50). We do not agree with Patent Owner's arguments as they are based solely on an alleged proxy server and its structure as the point of differentiation between the invention and the prior art. The Specification makes it clear that the devices identified by Patent Owner are capable of assuming different roles, and the Specification instead points to other alleged improvements, such as the agent performing different functions and the use of an acceleration server, that serve to differentiate the disclosed invention from the prior art. Ex. 1001, code (57), Fig. 10. Here, the language that the applicant ultimately chose for claim 1 does not recite some improvements, such as the use of an acceleration server, described in the Specification. Instead, the applicant more broadly recited in claim 1 the use of a "first client device" that functions as a proxy, that is, it acts as a client and as a server at different times, as discussed above.

Accordingly, we agree with the district court's finding that "the client device is defined by the role of the communication device as a client rather than by the components of the device and regardless of any additional role the device may serve, including as a server." Ex. 1112, 13. Petitioner also

Case: 23-2146     Document: 16     Page: 316     Filed: 11/13/2023

points to buttressing evidence in RFC 2616, which defines the terms "client" and "server" based on their roles, whereby "[a]ny given program may be capable of being both a client and a server; our use of these terms refers only to the role being performed by the program for a particular connection." *See* Pet. Reply 15–16 (citing Ex. 1013, 8 (emphases omitted); Ex. 1001, 16:21– 22.). Thus, we determine that the weight of the evidence supports the conclusion that a "client device" as recited in the claims of the '510 patent may act as a server as well as a client.

Patent Owner asserts that under an "application of the purely role-based constructions, an intermediary device would be both a 'client device' and a 'second server' albeit at different points in time," that is, Patent Owner's view is that a device must operate as a client or server device only. PO Sur-reply. 13. We disagree with Patent Owner's assertions that under a proper construction of the term "client device," the device has to act exclusively in only one role with one function at all times. As discussed, the claim language and Specification support that specific devices may operate to perform different functions and roles. In fact, to require that a device operate exclusively only in a single role and not be able to operate in different roles at different times is inconsistent with the language of claim 1, where the first client device has to act as a client and as a server at different times. The district court considered the issue of whether one component could *simultaneously* serve as more than one of: the client device, the first server/second server, and the web server. Ex. 1112, 14. The district found that a single component could not simultaneously do so because the components were separately recited, which indicated a distinction between

Case: 23-2146     Document: 16     Page: 317     Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 318    Filed: 11/13/2023

the components. *Id.* at 14–15. Nevertheless, the district court further characterized Patent Owner's argument as asserting that Petitioner was seeking "to treat client devices and servers interchangeably" as "general user computers," but the court explained that this was "an oversimplification of the issue" because Petitioner was not seeking to "reduc[e] the recited server ↔ client device ↔ web server architecture . . . and the recited client device ↔ server ↔ web server architecture . . . *as an indistinguishable computer ↔ computer ↔ computer architecture.*" Ex. 1020, 10 (emphasis added). Rather, the district court determined, and we agree, that "a component can be configured to operate in different roles—so long as it does not 'simultaneously serve as more than one of: the client device, the first server/second server, and the web server.'" *Id.* (emphasis omitted).

Patent Owner additionally argues that a "client device" is a "consumer computer" because the Specification states that "computers of consumers" are "referred to herein as client devices." See PO Resp. 23 (citing Ex. 1001, 2:44–46). Our view is that Patent Owner takes the Specification's disclosure out of context. The "computers of consumers" discussed in the Specification are computers used in the prior art peer-to-peer filing sharing system known as BitTorrent. Ex. 1001, 2:40–52. The Specification identifies "client devices 60," but this designation is used only in the prior art peer-to-peer filing sharing system, which is distinguished from the invention. *See id.* at 2:40–3:9, 4:1–2, Fig. 2. The district court agreed, finding that "[n]otably, 'consumer' does not appear in connection with the description of the claimed inventions." Ex. 1017, 11 (emphasis omitted). We also agree with the district court's finding that the Specification

Case: 23-2146     Document: 16     Page: 319     Filed: 11/13/2023

discloses that "'consumer' simply means a consumer of content, as opposed to a broadcaster of that content," which is contrary to Patent Owner's argument that the client device should be a consumer device for personal use. Ex. 1017, 11; *see also* Ex. 1001, 1:54–59; PO Resp. 23.

Patent Owner additionally asserts that a person of ordinary skill would have understood that, among other things, a client device is portable and would be regularly switched off and taken offline, would be capable of processing only a limited number of requests at any given time, and would have lesser fault tolerance. PO Resp. 26–27. Patent Owner contends that a person of ordinary skill in the art would have understood that a consumer device is not a dedicated proxy server. *Id.* at 26 (citing Ex. 2065 ¶ 120). Dr. Williams testifies that his understanding is based on the Specification, statements made during prosecution, and by comparison with a server. Ex. 2065 ¶ 120. We discuss the prosecution history below, but notably, Dr. Williams does not identify any portions of the Specification that support the alleged structure and nature of the client device, except for the discussion related to the prior art BitTorrent peer-to-peer system, which we do not find applicable for the reasons discussed above. *Id.* Petitioner argues that the alleged characteristics for a "client device" are highly subjective and indefinite and are not supported by the Specification (Pet. Reply 2–6), and we agree.

Accordingly, we find that the '510 patent Specification's disclosures support the interpretation of the term "client device" as a "communication device that is operating in the role of a client."

### iii. Prosecution History

Patent Owner argues that the prosecution history of the '510 patent, its parent (the '319 patent), and its grandparent the '936 patent support the conclusion that the claimed "client device" should be distinguished from a server. PO Resp. 18–23.

Patent Owner points to statements in the prosecution history of the grandparent '936 patent concerning the Garcia prior art reference that was used as the basis of an examiner rejection. PO Resp. 19–21 (citing Ex. 2026, 44, 77, 96–97, 163–164, 172, 215; Ex. 2065 ¶¶ 97, 99, 102). More specifically, Patent Owner asserts that the applicant argued that the cache server 306 of Garcia is clearly a dedicated device and performs a server functionality. *Id.* at 19 (citing Ex. 2026, 215). Patent Owner refers to the examiner's responses and asserts that "[t]he examiner recognized a server cannot be equated to a client device regardless of the role being performed at a given moment." *Id.* at 20 (citing Ex. 2065 ¶ 99). Patent Owner also refers to statements made by the applicant distinguishing Garcia, including that in Garcia client devices "are typically consumer owned and operated." *Id.* at 20 (citing Ex. 2026, 163) (emphasis omitted). Patent Owner asserts that in the Notice of Allowance, the examiner stated that "the limitations of the independent claims, **within its environment**, is allowable subject matter over the prior art." *Id.* at 21 (citing Ex. 2026, 44).

The claims that were under consideration in the '936 patent's prosecution were different than the claims at issue here. A "client device" was not recited in the claims that were under examination then; rather, the claims recited either a "device," "client communication device," or

Case: 23-2146     Document: 16     Page: 320     Filed: 11/13/2023

"client(s)." *See, e.g.,* Ex. 2026, 205–215. Similarly, the issued claims in the '936 patent recite a "requesting client" and a separate "client," and the issued claims have multiple steps that differ from those of the '510 patent. *See* Ex. 2025, 19:16–52. Given these differences, we discount the significance of statements made during the patentability assessment of the '936 patent's claims to the assessment of claim construction for the '510 patent's claims.[15] Further, considering the varying terms used, we do not find that the applicant's statements during prosecution of the '936 patent regarding a recited "device" or "client" are sufficient to act as a disclaimer of the scope of the "client device" term used in the claims here. *See* Ex. 2026, 205–215; *In re Am. Acad. Of Sci. Tech Ctr.*, 367 F.3d 1359, 1365 (Fed. Cir. 2004); *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (disavowal of claim scope by a patentee requires "expressions of manifest exclusion or restriction."). Also, the examiner's statements do not reflect an understanding of any disavowal of the scope of any claim terms. *See* Ex. 2026, 44.

Additionally, as discussed above, the '510 patent's claim language and Specification clearly support a role-based interpretation of the term "client device." In contrast, the '936 patent prosecution is for a grandparent of the '510 patent and also involved evolving claim terms undergoing amendments. *See Telcordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1375 (Fed. Cir. 2010) ("[P]rosecution history comments cannot trump the

---

[15] We note that although the examiner found that Garcia alone did not teach some steps of the '936 patent's claims, the examiner nonetheless found that Garcia taught a "client" for many of the limitations. Ex. 2026, 124–125, 173–175, 458–460.

Case: 23-2146    Document: 16    Page: 321    Filed: 11/13/2023

Case: 23-2146    Document: 16    Page: 322    Filed: 11/13/2023

plain language of the claims and the direct teaching of the specification.").
For this reason, we find the '936 patent prosecution history to be less
pertinent to the construction of the '510 patent's claims than the claim
language and Specification of the '510 patent itself. As the Federal Circuit
has explained, because the prosecution history represents an ongoing
negotiation between the PTO and the applicant, rather than the final product
of that negotiation, it often lacks the clarity of the specification and thus is
less useful for claim construction purposes. *See Inverness Med. Switz.
GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380–82 (Fed. Cir. 2002)
(the ambiguity of the prosecution history made it less relevant to claim
construction); *Phillips*, 415 F.3d at 1317. This is particularly true here,
where the prosecution history at issue involves a grandparent application
with different claims having different claim language from the patent and
claims under review.

Patent Owner also presents arguments based on the prosecution
history of the '319 patent, which is a parent to the '510 patent. PO Resp.
21–22. Patent Owner refers to the applicant's argument that "the claims
involve specific networking of physical elements such as servers and clients,
connected via various networks forming a specific structure and
relationships, which are physical apparatuses, and are NO[T] a 'generic
computer' as stated in the Action." *Id.* at 21 (citing Ex. 2066, 282). Patent
Owner also cites the applicant's assertion that: "[i]t is respectfully submitted
that the conventional arrangement involves fetching data by a client device
from a server device, while the claims disclose a server receiving
information from another server via a client device." *Id.* at 22 (citing

Ex. 2066, 282–283 (emphases omitted)). Patent Owner further cites the examiner's statement in the Notice of Allowance that "the limitations of the independent claims, within its environment, is allowable subject matter over the prior art, in light of the specification." *Id.* (citing Ex. 2066, 50 (emphases omitted)).

Patent Owner's arguments based on the '319 patent's prosecution history concern patent eligibility, not claim construction. Based on our review of this prosecution history, we find that the applicant's statement addressed specific issues relating to patent eligibility, such as whether the claim recited the use of generic computers and functions for purpose of eligibility under 35 U.S.C. § 101, and that the applicant made no statement that indicated disclaimer of the scope of the claim term "client device." *See* Ex. 2066, 282–283.

Patent Owner additionally refers to the prosecution history of the '510 patent and the examiner's statement that the "environment" of the claimed methods supported patentability. PO Resp. 22–23. We do not discern that there is any disavowal of claim scope by the applicant in the prosecution history of the '510 patent, nor does the examiner indicate an understanding of any disclaimer.

*iv. Conclusion*

Based on evidence of record, we maintain our construction of the term "client device" as a "communication device that is operating in the role of a client."

Case: 23-2146     Document: 16     Page: 323     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 324     Filed: 11/13/2023

2. *"second server"*

The district court construed the term "second server" as a "server that is not the client device," and the defendant in the litigation requested the following clarification: that the term is "a device that is operating in the role of a server and that is not the first client device." Ex. 1017, 14; Ex. 1014, 8. The district court determined that "the clarifications Defendants seek are not inconsistent with the Court's previous findings about the nature of the . . . second server." Ex. 1020, 11.

Petitioner proposes the adoption of the district court's construction of the term. Pet. 16. Patent Owner appears to propose that a server is not a client device, and, more specifically, that the server is structurally different from the client device. PO Resp. 28–31.

Patent Owner's arguments, in the most part, repeat those presented for the "client device." *Compare* PO Resp. 9–23 *with id.* at 28–31. That is, Patent Owner argues that: 1) the recited architecture of the claims is not satisfied by a generic computer ↔ computer ↔ computer architecture; 2) the claim language, specification, and prosecution histories distinguish client devices and servers; 3) a server is structurally different from a client device; and 4) a server is not a communication device or consumer computer and would be a commercial device with certain operational properties. *Id.* at 28–31.

We continue to agree with the district court's interpretation of the claim term, which we have adopted, because it is consistent with the evidence in the record. Of note, the construction requires that the "second server" be a "server," with the court agreeing that it is "a device that is

operating in the role of a server." Ex. 1017, 14; Ex. 1020, 8. This construction is consistent with the role-based interpretation of the claim components, which we discuss *supra* Section II.C.1. That is, the "second server" operates in the "role of a server," but it does not have structural requirements, as Patent Owner argues, short of being able to function in the role of a server. We also agree with the district court's cabining of the "second server" construction to exclude the "first client server." Claim 1 recites that it is the "first client device" that "send[s] the received first content, to the second server" in limitation 1[d], so the "second server" has to be a separate component.

We have addressed the majority of Patent Owner's arguments, *supra* Section II.C.1, that concern alleged required architectural and structural requirements, and the assertion that a "client device" cannot be a server. Patent Owner also argues that the district court indicated that a "server" is not a communication device. PO Resp. 29 (citing Ex. 1020, 10). However, the district court found, and we agree, that "a component can be *configured* to operate in different roles," so long as it does not serve in different roles simultaneously, and that although the Specification does "not include servers as a type of 'communication device,' [] that is not sufficient to construe 'client device' as unable to act as a server in all cases." Ex. 1020, 10. Additionally, in view of the role-based construction for the components, we reject Patent Owner's other arguments on required structure and characteristics of a server. PO Resp. 29–31.

Case: 23-2146      Document: 16      Page: 325      Filed: 11/13/2023

### 3. Other Terms

We determine that we need not expressly construe any other claim terms to resolve the parties' disputes. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g*, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D. Principles of Law

A claim is unpatentable under 35 U.S.C. § 102 if a prior art reference discloses each and every limitation of the claimed invention, either explicitly or inherently. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995); *see MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention;" any limitation not explicitly taught must be inherently taught and would be so understood by a person experienced in the field.); *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991) (the dispositive question is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the limitations of the claimed invention).

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

Case: 23-2146    Document: 16    Page: 326    Filed: 11/13/2023

factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of obviousness or nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### E. Anticipation of Claims 1, 6, 7, 13, 15, 16, 18–24 By Crowds

Petitioner contends that claims 1, 6, 7, 13, 15, 16, 18–24 are unpatentable under 35 U.S.C. § 102 because they are anticipated by Crowds. Pet. 22–35. Patent Owner argues that Crowds does not disclose all the limitations of the claims. PO Resp. 31–41.

We begin our discussion with summary of Crowds, and then address the evidence and arguments presented.

#### 1. Crowds (Ex. 1006)

Crowds is an article that "introduce[s] a new approach for increasing the privacy of web transactions." Ex. 1006, 2.[16] In this approach, a user joins a "crowd" of other users, wherein the user's request to a web server is passed to a random member of the crowd, and possibly forwarded to one or more other members, prior to being submitted to the end server. *Id.* In this way, "[w]hen the request is eventually submitted, it is submitted by a random member, thus preventing the end server from identifying its true initiator." *Id.* In Crowds, a user is represented "by a process on her

---

[16] Unless otherwise stated, citations to exhibits are to the pagination designations added to Crowds, and not to its original pagination. Petitioner uses the pagination designations of the original document.

Case: 23-2146     Document: 16     Page: 327     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 328     Filed: 11/13/2023

computer called a *jondo* (pronounced 'John Doe' and meant to convey the image of a faceless participant)." *Id.* at 8. "When the jondo is started, it contacts a server called the *blender* to request admittance to the crowd." *Id.* Exemplary paths for web requests from crowd users are shown in Figure 2, reproduced below:



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In Figure 2 of Crowds, above, when a jondo receives a user request from a browser, it "initiates the establishment of a random *path* of jondos that carries its users' transactions to and from their intended web servers." Ex. 1006, 8. For example, the paths in Figure 2 among the jondos labeled 1 to 6 are as follows: "1 → 5 → server; 2 → 6 → 2 → server; 3 → 1 → 6 → server; 4 → 4 → server; 5 → 4 → 6 → server; and 6 → 3 → server." *Id.* "[S]erver replies traverse the same path as the requests, only in reverse." *Id.* at 9.

*2. Discussion*

*a. Claim 1*

The Petition asserts that Crowds discloses all the limitations of claim 1. Pet. 20–29. Below we consider the claim 1 limitations in turn.

*i. Limitations of the Preamble*

Petitioner asserts that Crowds discloses the claimed web server of the preamble limitations[17] that stores the first content. Pet. 24. Petitioner refers to annotated Figure 2 of Crowds, reproduced below. *Id.*



Figure 2 of Crowds (annotated)

As shown in Petitioner's annotated version of Figure 2 of Crowds, Petitioner refers to the path 5→4→6→server (highlighted in green), with boxed "5"

_____

[17] The preamble provides antecedent basis for the terms "first client device" and "web server," among others. We determine that the preamble is limiting. *See* Ex. 1017, 9 (parties agree preambles of claims in related patents are limiting).

Case: 23-2146    Document: 16    Page: 329    Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 330     Filed: 11/13/2023

acting as the web server. Pet. 23–24. Petitioner asserts that "[i]n accordance with the preamble, a first client device (jondo 6) performs the claim steps, fetching requested content from a web server, '5.'" *Id.* We agree with Petitioner that jondo 6 is operating in the role of a client because it serves as a client of web server 5 when requests originating at jondo 5 (circled) are sent by jondo 6 to web server 5 in the identified path. Ex. 1006, 8–9.

Patent Owner contends that Crowds does not disclose a "first client device" as recited in the preamble under a role-based construction because a person of ordinary skill in the art would not be able to determine whether jondo 6 is a client device or a server under the purely role-based constructions because "jondo 6 operates in different roles at different points in time." PO Resp. 31.

Patent Owner's arguments are based on the premise that if a device is operating in a certain role performing a certain function *at one point in time* and in a different role performing a different function at *another point in time*, it cannot be the claimed element. In other words, Patent Owner is asserting that a component has to operate exclusively in a single role at all times in order to disclose a claim element. We are not persuaded by this contention because we have not adopted Patent Owner's proposed claim constructions.

As discussed *supra*, Section II.C.2, we have adopted the district court's role-based construction, where a "client device" is a "client device" as a "communication device that is operating in the role of a client." As Petitioner asserts, and we agree, Crowds' jondo 6 operates in the role of a "first client device" because "it acts as in the role of a client in requesting the

service of content from web server 5." Pet. 25, *see also id.* at 26–28; Teruya Decl. ¶ 60. We also agree with Petitioner's assertion that communication paths are established between, for instance, jondo 6 (first client device) and jondo 4 (second server), as discussed for limitation 1[a] below, which supports Petitioner's contention that jondo 6 acts as a communication device. Pet. 25–26; Teruya Decl. ¶ 64. Accordingly, jondo 6 meets the claim construction for the term "first client device" adopted here. That jondo 6 may at times also act as a server is acceptable—as discussed *supra* Section II.C.1.c, a device may perform different roles with different functions at different times.

Patent Owner additionally argues that Crowds does not disclose the architecture of claim 1. PO Resp. 33–36. Patent Owner asserts that Crowds "does not disclose a 'first client device' between a 'second server' and a 'web server.'" *Id.* at 33 (citing Ex. 2065 ¶ 165). Patent Owner argues that the jondos of Crowds are identical user computers and Petitioner has failed to distinguish them "other than the role being performed at a particular point in time." *Id.* at 33–34. Patent Owner contends that jondo 4 of Crowds does not correspond to the "second server" of claim 1, where a person of ordinary skill in the art "would understand the 'second server' of claim 1 to be, for example, a proxy server located between a requesting client device and a proxy client device." *Id.* at 34 (citing Ex. 2065 ¶ 165). Patent Owner asserts that Petitioner's identification of identical jondos as "client device[s]" or "server[s]" is "arbitrary." *Id.* (citing Ex. 2065 ¶ 166). Patent Owner argues that a person of ordinary skill in the art would understand that jondo 4 is a client device, and not a server, and Petitioner's expert testified that "all

Case: 23-2146     Document: 16     Page: 331     Filed: 11/13/2023

jondos are client devices." *Id.* at 35 (citing IPR2021-01492, Teruya Decl. ¶ 55; Ex. 2065 ¶ 167). Patent Owner also asserts that there is no indication that Crowds' jondos are dedicated network devices, are capable of a large number of connections, or provide for scalability for increasing resources. *Id.* at 35 (citing Ex. 1004, 14– 15, 17; Ex. 2065 ¶ 167).

Most of Patent Owner's arguments are based on claim constructions that we have not adopted, for example, that certain components have specific structural requirements or a component has to operate exclusively in a single role in order to disclose a claim element. We are not persuaded by these contentions for the reasons discussed above. Further, although Crowds' jondos may act as "client devices," as Petitioner's expert, Mr. Teruya testifies (IPR2021-01492, Teruya Decl. ¶ 55), the jondos may also take different roles.

We additionally do not agree with Patent Owner's assertions that Crowds does not disclose the second server ↔ first client device ↔ web server architecture of the '510 patent's claims. As shown in annotated Figure 2 of Crowds, and in Petitioner's reliance on the path 5→4→6→server as discussed for the preamble above, Crowds explicitly discloses the architecture of second server ↔ first client device ↔ web server. *See* Pet. 24; Ex. 1006, Fig. 2. This is the configuration arranged in the claim. As also discussed, we find that Crowds' disclosures support Petitioner's contention that jondo 6 acts as the claimed "first client device," server 5 acts as the claimed "web server," and, as discussed below, jondo 4 acts as the claimed "second server." As such, Petitioner demonstrates that Crowds discloses the components as arranged in the claim, and which could

Case: 23-2146     Document: 16     Page: 332     Filed: 11/13/2023

be understood by one of ordinary skill in the art as depicted in the configuration of Figure 2.

We have reviewed the evidence and argument, and on the complete record, we determine that Petitioner has demonstrated that Crowds discloses the limitations of the preamble of claim 1.

### ii. Limitation 1[a]

Petitioner asserts that limitation 1[a] is performed by Crowds by the establishment of a TCP connection between jondo 6 (first client device) and jondo 4 (the second server). Pet. 27–28. Petitioner asserts that jondo 6 is a client device because "it acts as in the role of a client in requesting the service of content from web server 5." *Id*. at 27. Petitioner further asserts that jondo 4 is a server because it provides a service to requesting jondo 5 consistent with Crowds' "description [which] uses client-server terminology, where one jondo is a client of its successor on the path." *Id*. (citing Ex. 1006, 8). Petitioner argues that a communication path is established when jondo 5 receives a user request and sets up static paths over TCP, and, more specifically, when "a TCP connection is established between the first client device and the second server." *Id*. at 28 (citing Ex. 1006, 8, 16). We agree with Petitioner that Crowds discloses that jondo 6 (first client device) establishes a TCP connection with jondo 4 (second server). *See* Ex. 1006, 8, 15–16; Teruya Decl. ¶ 64.

Patent Owner argues that under role-based construction, when jondo 6 receives a request from jondo 4, jondo 6 is operating in the role of server, and not a client and when jondo 4 sends a request to jondo 6, jondo 4 is operating in the role of a client and not a server. PO Resp. 32 (citing

Case: 23-2146    Document: 16    Page: 334    Filed: 11/13/2023

Ex. 2065 ¶ 157). Patent Owner also refers to Petitioner's assertion that "higher-powered devices" to run proxy servers, without running their own web browsers, and asserts that "Petitioner's alleged modification of Crowds is contrary to the teachings of Crowds." *Id.* at 36–37 (citing Pet. 37).

As discussed above for the preamble, a device may perform different roles with different functions at different times. We have adopted the district court's role-based construction, *supra*, Section II.C.2, where a "server" is a "server that is not the client device," that is, the term means "a device that is operating in the role of a server and that is not the first client device." As Petitioner asserts, we agree that Crowds' jondo 4 operates in the role of a server by providing a service to requesting jondo 5. Pet. 27; Teruya Decl. ¶¶ 61–62. Further, jondo 4 is not the same physical device as jondo 6 (the first client device). Under the role-based claim construction adopted here, we need not reach the issue of Crowds' teaching of higher-powered devices. *See* Pet. 37–38 (Petitioner making the alternative assertion "if the Board were to construe 'second server' as requiring a specialized data-center class device."). Further, we do not agree with Patent Owner that relying on a component that meets the claim construction and also is in a configuration that is explicitly disclosed would require any "modification."

We have reviewed the evidence and argument, and on the complete record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[a].

### iii. Limitation 1[b]

For limitation 1[b], Petitioner asserts that in Crowds' 5→4→6→server example, the first client device (jondo 6) sends a web

Case: 23-2146    Document: 16    Page: 335    Filed: 11/13/2023

request via HTTP to the target web server (boxed element 5). Pet. 28 (citing Ex. 1006, 8–9, Fig. 2). Petitioner asserts that the HTTP request comprises the first content identifier, that is, the request contains a URL. *Id.* at 27. Petitioner contends that the first content identifier may be considered to be either "the disclosed 'request' itself, or the URL that the request contains." *Id.* at 28 (citing Teruya Decl. ¶¶ 70–72).

Patent Owner does not make any arguments specific to this limitation.

We have reviewed the evidence and argument, and on the complete record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[b].

### iv. Limitation 1[c]

For limitation 1[c], Petitioner asserts that under the Crowds' example path, jondo 6, the recited first server device, will receive the requested content in response to sending the first client identifier. Pet. 30–31. Petitioner argues that this content routing is in accordance with Crowds' disclosure that the "server replies traverse the same path as the requests, only in reverse." *Id.* (citing Ex. 1006, 8–9) (emphasis omitted). Patent Owner does not make any arguments specific to this limitation.

We have reviewed the evidence and argument, and on the complete record, we determine that Petitioner has demonstrated that Crowds discloses the limitation 1[c].

### v. Limitation 1[d]

For limitation 1[d], Petitioner asserts that a TCP connection exists between jondos 6 and 4. Pet. 31–32. And consistent with Crowds' disclosure that replies travels on the same path, but in reverse, Petitioner

Case: 23-2146     Document: 16     Page: 336     Filed: 11/13/2023

argues that jondo 6 sends the requested content to jondo 4, the second server. *Id.* at 31.

Patent Owner asserts that under "the purely role-based constructions, when jondo 6 is sending a response to jondo 4, jondo 6 is operating in the role of a server, not a client" and "when jondo 4 is receiving a response from jondo 6, jondo 4 is operating in the role of a client, not a server." PO Resp. 33 (citing Ex. 2065 ¶¶ 161–162). As such, Patent Owner argues that Crowds does not teach that jondo 6 is a client device or jondo 4 is a server. *Id.* (citing Ex. 2065 ¶ 163). We have addressed this argument above and do not find it persuasive.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has demonstrated that Crowds discloses limitation 1[d].

### vi. Conclusion

We note that Patent Owner has presented evidence of secondary considerations. *See* PO Resp. 57–75. Evidence of secondary considerations is not pertinent to an anticipation rejection under 35 U.S.C. § 102. *See In re Malagari*, 499 F.2d 1297, 1302 (CCPA 1974).

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 1 of the '510 patent.

### b. Claims 6, 7, and 21

Claim 6 recites

6. The method according to claim 1, for use with a third server that comprises a web server that is Hypertext Transfer Protocol (HTTP)

server, the third server responds to HTTP requests and stores a second content identified by a second URL, the method by the first client device further comprising:

receiving the second URL;

sending, to the third server over the Internet in response to the receiving, the second URL; and

receiving the second content from the third server over the Internet in response to the sending.

Ex. 1001, 19:51–61.

Claim 7 depends from claim 6, and further recites "executing, by the first client device, a web browser application or an email application." Ex. 1001, 20:2–3. Claim 21 depends from claim 1 and recites a similar limitation to claim 7.

Petitioner asserts that Crowds discloses the limitations of claim 6 by the additional path 3→1→6→server, as shown in blue in annotated Figure 2 of Crowds, reproduced below. Pet. 32–33.



Fig. 2. Paths in a crowd (the initiator and web server of each path are labeled the same).

In annotated Figure 2, above, the path 3→1→6→server is shown in blue. Pet. 32–33 (citing Ex. 1006, 8–9; Teruya Decl. ¶¶ 79–81). Petitioner asserts that web server 3 (in square box) meets the claimed third server and, in the blue path, jondo 6 (first client device) receives a request comprising the second content identifier from jondo 1, which it sends that URL to web server 3. *Id.* For claims 7 and 21, Petitioner asserts that the client devices in Crowds run web browsers. *Id.* at 33.

Patent Owner does not present any arguments specific to these claims.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claims 6, 7, and 21.

### c. Claims 13 and 24

Claim 13 recites:

13. The method according to claim 1, for use with a software application that includes computer instructions that, when executed by a computer processor, cause the processor to perform the sending of the Hypertext Transfer Protocol (HTTP) request, the receiving and storing of the first content, the receiving of the first content identifier, and the sending of the part of, or the whole of, the stored first content, the method is further preceded by:

> downloading, by the first client device from the Internet, the software application; and
>
> installing, by the first client device, the downloaded software application.

Ex. 1001, 20:13–38. Claim 24 recites: "A non-transitory computer readable medium containing computer instructions that, when executed by a computer processor, cause the processor to perform the method according to claim 1." *Id.* at 21:8–11.

Case: 23-2146     Document: 16     Page: 338     Filed: 11/13/2023

For both claims, Petitioner asserts that Crowds discloses the download of a software package that implements a jondo. Pet. 33 (citing Ex. 1006, 26; Teruya Decl. ¶¶ 87–88). Patent Owner contends that Petitioner fails to show that Crowds discloses or teaches the recited "storing of the first content" and "sending . . . the stored first content" as recited in claim 13. PO Resp. 40 (citing Ex. 2065 ¶ 185). However, as Petitioner contends, and we agree, Crowds discloses the use of typical user computers with memory that satisfy this storing step. Pet. Reply 23 (citing Ex. 2065 ¶ 164). Patent Owner does not present any arguments specific to claim 24.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claims 13 and 24.

### d. Claim 15

Claim 15 depends from claim 1 and recites "further comprising receiving, by the first client device from the second server over the established TCP connection, the first content identifier." Ex. 1001, 20:41–44. Petitioner relies on the 5→4→6→server path shown in green in annotated Figure 2 of Crowds, reproduced below.

Case: 23-2146    Document: 16    Page: 340    Filed: 11/13/2023



Petitioner asserts that in the path shown in annotated Figure 2, above, the first client device (jondo 6) receives from the second server (jondo 4), the first content identifier over an established TCP connection. Pet. 33–34 (citing Teruya Decl. ¶¶ 89–91).

Patent Owner argues that, as for claim 1, jondo 4 is operating as a client, not a server, and jondo 6 is operating as a server, not a client. PO Resp. 41 (citing Ex. 2065 ¶¶ 189–190). We have not adopted Patent Owner's proposed claim construction and, for the reasons discussed above for claim 1, we are not persuaded by Patent Owner's arguments.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 15.

### e. Claim 16

Claim 16 depends from claim 1 and recites "wherein the sending of the first content identifier to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier." Ex. 1001, 20:45–48. Petitioner asserts, that as

Case: 23-2146     Document: 16     Page: 341     Filed: 11/13/2023

discussed for claim 1, jondo 6 (the first client device) sends an HTTP request to the web server over the Internet that comprises the first content identifier. Pet. 34 (citing Teruya Decl. ¶¶ 92–93). Patent Owner does not present any arguments specific to claim 16.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 16.

### f. Claims 18 and 19

Claims 18 depends from claim 1 and is directed to a TCP/IP server, wherein the first client device is a TCP/IP client. Ex. 1001, 20:52–59. Claim 19 depends from claim 1 and recites "wherein the first client device communicates over the Internet based on, or according to, one out of UDP, DNS, TCP, FTP, POP#, SMTP, or SQL standards." *Id.* at 20:60–63. Petitioner asserts that a TCP connection is established between jondo 4 and jondo 6, and paths are random, so a jondo may participate as a TCP client or server. Pet. 34 (citing Teruya Decl. ¶¶ 94–95). Petitioner also relies on Crowds' disclosure that the devices may operate over the Internet based on FTP. *Id.* at 35 (citing Ex. 1006, 8 n.1). Patent Owner does not present any arguments specific to claims 18 and 19.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claims 18 and 19.

### g. Claim 20

Claim 20 depends from claim 1, further reciting: "wherein the first web-page comprises audio, or video content, and wherein the first content

identifier comprises a Uniform Resource Locator (URL)." Ex. 1001, 20:64–67. Petitioner asserts that, as discussed for claim 1, Crowds discloses that the first content is a web page identified by a URL. Pet. 35. Patent Owner does not present any arguments specific to claim 20.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 20.

### h. Claim 22

Claim 22 depends from claim 1 and recites "further comprising storing, operating, or using, a client operating system." Ex. 1001, 21:4–5. Petitioner refers to Crowds' disclosure that the jondo software was programmed for "portability across Unix and Microsoft platforms" and SunOS, and a person of ordinary skill in the art would understand that these refer to client operating systems. Pet. 35 (citing Teruya Decl. ¶ 100). Patent Owner does not present any arguments specific to claim 22.

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 22.

### i. Claim 23

Claim 23 depends from claim 1 and recites "wherein the steps are sequentially executed." Ex. 1001, 21:6–7. Petitioner refers to the steps disclosed in Crowds and identifies that they are performed sequentially. Pet. 35–36 (citing Teruya Decl. ¶¶ 102–104; Ex. 1006, 8–9, Fig. 2). Patent Owner does not present any arguments specific to claim 23.

Case: 23-2146     Document: 16     Page: 342     Filed: 11/13/2023

We have reviewed the evidence and argument, and on this complete record, we determine that Petitioner has shown by a preponderance of the evidence that Crowds anticipates claim 23.

### F. Obviousness of Claims 1, 2, 6–11, 13, 15, 16, 18–24 over Crowds and RFC 2616

Petitioner contends that the claims anticipated by Crowds (claims 1, 6, 7, 13, 15, 16, and 18–24), as well as claims 2 and 8–11, would have been obvious in light of Crowds and RFC 2616. Pet. 35–41. Because we have already determined that clams 1, 6, 7, 13, 15, 16, and 18–24 are anticipated by Crowds, we do not separately address them under this ground. For those claims, we rely on the Petition and our anticipation analysis under Crowds to show that they would also have been obvious in light of Crowds and RFC 2616.

### 1. Analysis of Obviousness Assertions

RFC 2616 documents version 1.1 of the HTTP protocol, which is "foundational to the World Wide Web." Ex. 1013; Teruya Decl. ¶ 53. Petitioner asserts that the '510 patent cited to RFC 2616 for a definition of HTTP, and Crowds concerns communications using the same protocols. Pet. 36–37 (citing Ex. 1001, 16:21–28; Ex. 1006, 16, 23–24). Petitioner contends that those "[w]orking in the field of the '510 patent assumes a basic understanding of computers and Internet communications, including the standards governing HTTP requests and the TCP/IP protocol." *Id.* at 35 (citing Teruya Decl. ¶ 106). Petitioner argues that a person of ordinary skill in the art "developing software for like applications [like Crowds] would

Case: 23-2146     Document: 16     Page: 343     Filed: 11/13/2023

have had a powerful motivation to combine its disclosure with knowledge of Internet standards governing HTTP." Teruya Decl. ¶¶ 105–110.

Claim 2 depends from claim 1, where the first client device is identified by a Media Access Control (MAC) address or a hostname, and where the first client device sends in response to a start-up or power-up, a first message comprising the first client IP address, the MAC address, or the hostname. Ex. 1001, 19:32–39. Petitioner asserts that Crowds discloses that jondos have host names and a set-up phase, where other jondos learn information including their IP address, shared password, and use this information when selecting a jondo as a proxy. *Id.* at 38 (citing Ex. 1006, 8, 22, Fig. 6). Mr. Teruya testifies that it would have been obvious to a person of ordinary skill that a jondo (participating as the second server) would receive a message from the first jondo (first client device) during the first jondo's initialization period, which includes the first jondo's IP address. Teruya Decl. ¶ 122.

Claim 8 depends from claim 1 and recites "further comprising periodically communicating over the TCP connection between the second server and the first client device." Ex. 1001, 20:4–6. Claim 9 depends from claim 8 and recites "wherein the periodically communicating comprises exchanging 'keep alive' messages." *Id.* at 20:7–10. Petitioner argues that Crowds discloses that the static communication paths "are clearly 'persistent' connections," that last for more than one transaction. Pet. 39–40 (citing Teruya Decl. ¶ 123). Petitioner refers to RFC 2616, where the default behavior is "to use persistent connections, so the two HTTP end-points can send and receive more than one HTTP request and response pair,"

Case: 23-2146     Document: 16     Page: 345     Filed: 11/13/2023

and asserts that claims 8 and 9 would have been obvious to a skilled artisan based on Crowds in view of RFC 2616 and their knowledge. *Id.* (citing Ex. 1013 § 8.1).

Claim 10 depends from claim 1 and recites "further comprising determining, by the first client device, that the received first content, is valid." Ex. 1001, 20:11–13. Claim 11 depends from claim 10 and recites "wherein the determining is based on the received HTTP header according to, or based on, IETF RFC 2616." *Id.* at 20:14–16. Petitioner argues that RFC 2616 discloses headers that implement these claims. Pet. 41 (citing Ex. 1013 § 14.9). Petitioner refers to the techniques utilized in the '510 patent, which are identical to those of RFC 2616, and asserts that a person of skill in the art would "take advantage of this widely adopted standard." *Id.* at 41 (citing Teruya Decl. ¶¶ 132–134).

Patent Owner does not respond separately to Petitioner's analysis of claims 2 and 8–11. *See* PO Resp. 31–38. We are persuaded by Petitioner's analysis that Petitioner has demonstrated each limitation of these claims is taught or suggested by the combination of Crowds and RFC 2616.

Patent Owner argues, however, that the Petitioner's obviousness analysis is deficient because Crowds teaches away from the claimed methods of the '510 patent. PO Resp. 38–39. We disagree. Patent Owner more specifically argues that Crowds teaches away from the claimed methods of the '510 patent because: 1) Crowds does not provide the initiator of a request with anonymity as to the target web server; 2) Crowds teaches that an increase in deniability results in an increase in latency; and 3)

Case: 23-2146     Document: 16     Page: 346     Filed: 11/13/2023

Crowds does not teach the initiator to purposefully select a jondo to form a pathway. *Id.*

For the first issue, Patent Owner argues that Crowds does not provide anonymity for the originating requesting jondo. PO Resp. 38–39. More specifically, Patent Owner asserts that based on the flip of a biased coin, a jondo may send a request directly to the target web server. *Id.* (citing Ex. 2065 ¶ 179). We do not find this argument persuasive because Crowds discloses that a goal of the use of the jondos is to provide anonymity by routing the messages through other jondos. *See* Ex. 1006, 2–5. And, while the jondo can select itself for routing, given that multiple jondos are selected in a path, other jondos will generally be selected for anonymity. *See id.* at 8. Moreover, anonymity is not a limitation of the claims. As to the third issue, a "purposeful" selection of a device is also not claimed. Evidence concerning whether the prior art teaches away from a given invention must relate to and be commensurate in scope with the ultimate claims at issue. *See, e.g., MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*, 731 F.3d 1258, 1264–65 (Fed. Cir. 2013). As to the second issue concerning Crowds' alleged latency, Patent Owner does not explain, nor does Dr. Williams provide support for, why Crowds would teach away from the claimed invention, that is, "a person of ordinary skill, upon reading the reference . . . would be led in a direction divergent from the path that was taken" in the claim. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013). Moreover, Crowds discusses ways to mitigate latency problems in its system (Ex. 1006, 19) and in Crowds there is no criticizing, discrediting, misdirecting or otherwise discouraging the approach taken in

the claims. *See Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017); *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Additionally, there is no claim limitation related to process speed or latency. Accordingly, we do not find that Crowds teaches away from the claimed invention of the '510 patent.

We find that Petitioner's evidence and argument show that one of ordinary skill in the art would have been motivated to combine Crowds and RFC 2616 as asserted by Petitioner and the combination teaches the limitations of claims 1, 2, 6–11, 13, 15, 16, 18–24.

Patent Owner also asserts that the nonobviousness of the claims is supported by objective indicia of nonobviousness, including commercial success, long-felt need, copying, and industry praise, and we address those issues below.

### 2. Objective Indicia of Nonobviousness

Patent Owner asserts that nonobviousness is supported by objective indicia, including commercial success, long-felt need, copying, and industry praise. PO Resp. 57–73; PO Sur-reply 27–29. Petitioner disagrees, contending that Patent Owner's arguments rely on the use of residential proxies with residential IP addresses, which it contends do not have a nexus to the claims, and that Patent Owner's arguments regarding commercial success suffer from additional evidentiary infirmities. Pet. Reply 24–26.

### a. Legal Standards

Objective indicia of nonobviousness may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz &*

Case: 23-2146     Document: 16     Page: 347     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 348     Filed: 11/13/2023

*Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). "[O]bjective indicia 'may often be the most probative and cogent evidence of nonobviousness in the record,'" and "help turn back the clock and place the claims in the context that led to their invention." *Id.* at 1378. Evidence of objective indicia of nonobviousness "must always when present be considered en route to a determination of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012); *see also Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

Objective indicia of nonobviousness are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). For objective indicia of nonobviousness to be accorded substantial weight, their proponent must establish a nexus between the evidence and the merits of the claimed invention. *ClassCo, Inc. v. Apple Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). A showing of nexus can be made in two ways: (1) via a presumption of nexus, or (2) via a showing that the evidence is a direct result of the unique characteristics of the claimed invention. *Volvo Penta of the Americas, LLC v. Brunswick Corp.*, No. 2022-1765, 2023 WL 5440530, at *5 (Fed. Cir. Aug. 24, 2023).

As the Federal Circuit has explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted

Case: 23-2146   Document: 16   Page: 349   Filed: 11/13/2023

evidence is tied to a specific product and that the product '*is* the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). In other words, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). On the other hand, "'[w]hen the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process,' the patentee is not entitled to a presumption of nexus." *Id.* Once "the patentee has presented a *prima facie* case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger . . . to adduce evidence to show that the commercial success was due to extraneous factors other than the patented invention." *Demaco*, 851 F.2d at 1393.

Additionally, "[a] finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. Even in the absence of a presumption, "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74.

### b. *Commercial Success*

Patent Owner argues that nonobviousness is supported by commercial success due to "[t]he features driving the commercial success of Bright

Case: 23-2146     Document: 16     Page: 350     Filed: 11/13/2023

Data's residential proxy service [which] are (a) the proxy client devices have residential IP addresses that lower the risk of blocking by the web server and (b) the scalability of this architecture given the large number of proxy client devices having residential IP." PO Resp. 69 (citing Ex. 2065 ¶ 272). According to Patent Owner, its "residential proxy service generated revenues of $53.7 million." *Id.* at 69 (citing Ex. 2065 ¶ 275). Patent Owner contends that "Bright Data's residential proxy service has grown to dominate the market." *Id.* Patent Owner further contends that EMK Capital's acquisition of a majority stake in Patent Owner "at an enterprise value of $200 million in 2017" is further evidence of commercial success. *Id.* at 68 (citing Ex. 2065 ¶ 274).

Patent Owner asserts that its residential proxy service practices the methods claimed in the '510 [p]atent, and provides claim charts purporting to show how "this commercial embodiment [for the residential proxy service] practices at least claims 1–2, 6–9, 15–16, 18–20, and 22–24 of the '510 [p]atent." PO Resp. 57–67. Patent Owner argues that its "residential proxy service directly corresponds to the network architecture of the modified version of Figure 3 of the '510 [p]atent where the requesting client device corresponds to client 102, the Super Proxy corresponds to proxy server 6, and the proxy client device corresponds to agent 122." *Id.* at 67. According to Patent Owner, its "residential proxy service is 'reasonably commensurate in scope with the scope of the claims.'" *Id.*

Petitioner asserts that Patent Owner's secondary considerations arguments and evidence do not demonstrate a nexus with the challenged claims. Pet. Reply 24–26. More specifically, Petitioner points to the two

features allegedly "driving" the alleged commercial success (use of "residential IP addresses" and "scalability") cited by Patent Owner. *Id.* at 24. Petitioner argues that in naming those features, Patent Owner "admits a lack of nexus because neither feature is claimed." *Id.* at 24. Petitioner points out that the '510 patent "never uses the words 'residential,' 'scalable,' or 'scalability.'" *Id.* Petitioner argues that Dr. Williams, Patent Owner's expert, admits that the use of residential IP addresses is not claimed in the '510 patent. *Id.* at 25 (citing Ex. 1111, 56:4–6, 56:19–57:6). Petitioner also disputes Dr. Williams' testimony regarding Patent Owner's sales figures, arguing that "Williams did nothing to determine commercial 'success,' other than observing 'revenues in the millions of dollars per month.'" *Id.* (citing Ex. 1111, 168:23–169:3)

We find that Patent Owner has failed to establish a nexus between the challenged claims and the products and processes that Patent Owner relies on to show commercial success. First, we find that Patent Owner has not established a presumption of nexus because it has not shown that the products or processes that it relies on for commercial success embody and are coextensive with the challenged claims. *See Fox Factory*, 944 F.3d at 1373. To the contrary, Patent Owner relies on features of its products and processes that are not claimed, including the use of a residential proxy service, residential consumer computers, and residential IP addresses, as the basis for the commercial success of its products. For example, Patent Owner identifies "[t]he features driving the commercial success" of its products as "the proxy client devices hav[ing] residential IP addresses" and the scalability of its architecture "given the large number of proxy client devices

Case: 23-2146      Document: 16      Page: 351      Filed: 11/13/2023

having residential IP addresses." PO Resp. 67; *see id.* at 55 (pointing to Patent Owner's "residential proxy service" that uses laptops, desktops, or smartphones), 69 (asserting that Patent Owner's "residential proxy service has grown to dominate the market" and pointing to a market report examining "residential proxy services").

The challenged claims, however, do not include any limitations requiring residential proxies, residential computers, or residential IP addresses or their operation. Moreover, as discussed above, we do not adopt Patent Owner's proposed construction limiting the term "client device" to mean a "consumer computer" or "consumer communication device." *See supra* Section II.C.1. At most, Patent Owner presents evidence that the challenged claims broadly cover the products relied on for commercial success, which is insufficient to show a nexus. *See Fox Factory*, 944 F.3d at 1377 (holding that a presumption of nexus cannot be established by simply showing that "the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

As noted above, even in the absence of a presumption of nexus, Patent Owner may "prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74. As discussed above, however, the "unique characteristics" that Patent Owner points to as "driving the commercial success" of its products—the use of a residential proxy service, residential consumer computers, and residential IP addresses—are not recited in the challenged claims. *See* PO Resp. 55–69. Therefore, Patent Owner has failed to prove that commercial success of its

Case: 23-2146   Document: 16   Page: 352   Filed: 11/13/2023

products is the "direct result" of the claimed invention's unique characteristics.

We also are not persuaded by Patent Owner's argument that "the district court found that sufficient nexus was established." PO Sur-reply 27 n.11 (citing Ex. 2004, 4). Patent Owner relies on the district court's ruling on defendants' motion to strike the opinions of Patent Owner's expert Dr. Rhyne, where the district court stated that it was denying the portion of "the motion requesting the Court to preclude Dr. Rhyne from testifying regarding secondary considerations of non-obviousness" because it "found that Dr. Rhyne established a sufficient nexus between the secondary considerations and the claimed invention." Ex. 2004, 4. The district court's order, however, does not explain the basis for its ruling, and Patent Owner does not point to anything in the record providing such an explanation. It is also not clear from evidence of record in this proceeding whether the district court actually made a finding on the merits of nexus, or simply determined that Dr. Rhyne had provided sufficient disclosure in his expert report to offer testimony on nexus at trial.

### c. Long-Felt Need

Patent Owner argues that its residential proxy service "solved a long felt, but unresolved need." PO Resp. 69–70. According to Patent Owner, "traditional data center server proxies could provide some anonymity for the user in accessing a target web site," but "that web site could still likely identify data center server IP addresses as proxy addresses" because they "were usually (a) associated with commercial IP addresses; and (b) limited to a block of IP addresses sharing the same IP address prefix and geographic

Case: 23-2146    Document: 16    Page: 353    Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 354     Filed: 11/13/2023

location." *Id.* at 70 (citing Ex. 2065 ¶ 277). "In contrast," Patent Owner
asserts, its "proxy client devices have residential IP addresses that vary
widely from one another without being limited to one block of IP addresses
and can have a wide variety of geographic locations." *Id.* Patent Owner
further contends that its "proxy client devices" solves the need to
"dramatically increase the [number] of IP addresses that can be included in a
proxy network." *Id.* (citing Ex. 2065 ¶ 193; Ex. 2048, 4; Ex. 2049, 182:22–
197:21).

As noted, for objective evidence of secondary considerations to be
relevant, there must be a nexus between the merits of the claimed invention
and the objective evidence. *Volvo*, 2023 WL 5440530, at *5. Petitioner
argues that there is no nexus shown here between the products and the
challenged claims. Pet. Reply 24–26. For similar reasons as for commercial
success, we agree with Petitioner that no nexus has been shown between
Patent Owner's evidence of alleged long-felt need and the challenged
claims. The key features that Patent Owner points to as satisfying a "long-
felt need" are its "residential proxy service" including proxy client devices
that "have residential IP addresses." PO Resp. 70. As explained above,
however, the challenged claims do not recite or require a residential proxy
service or residential IP addresses. Therefore, Patent Owner has failed to
make the requisite showing that a long-felt need was met by its claimed
invention.

### d. Copying

Patent Owner argues that "[d]uring the jury trial in the Tex. Litigation
[*Teso* district court litigation], evidence of Oxylabs copying Bright Data's

residential proxy service, then under the name 'Hola,' was presented." PO Resp. 71 (citing Ex. 2065 ¶ 278). Specifically, Patent Owner argues that its representative (Ofer Vilenski) asked an employee of Oxylabs (Tomas Okmanas) to incorporate its software development kit (SDK) in Oxylabs' applications, but that instead Oxylabs "subsequently released their own SDK for Oxylabs' own residential proxy network." *Id.* (citing Ex. 2049, 202:12–204:8; Ex. 2047, 131:23–132:7, 152:8–153:6; Ex. 2065 ¶ 278). Patent Owner also asserts that Mr. Okmanas testified that he was looking for "a system that works like hola.org," that Oxylabs "wanted to develop its own residential proxy service," and that "he believed that he needed to do what Bright Data (previously known as Luminati and Hola) were doing to be successful." *Id.* at 71–72 (citing Ex. 2047, 95:20–97:1, 103:18–104:10, 149:13–150:8, 152:18–153:6; Ex. 2065 ¶ 278). "This" testimony, according to Patent Owner, "is strong evidence of copying." *Id.* at 72 (citing Ex. 2065 ¶ 279).

Petitioner argues that there is no nexus shown here between the products and the challenged claims. Pet. Reply 24–26. For similar reasons as for commercial success, we agree with Petitioner that no nexus has been shown between Patent Owner's evidence of alleged copying and the challenged claims. Although Patent Owner does not point to specific aspects of Patent Owner's products that it alleges were copied, it refers generally to "Bright Data's residential proxy service" known as "Hola" and the software development kit relating to it. PO Resp. 71–72. As explained above, however, the challenged claims do not recite or require a residential

Case: 23-2146    Document: 16    Page: 356    Filed: 11/13/2023

proxy service. Therefore, Patent Owner has failed to make the requisite showing that the claimed invention was copied.

### e. Industry Praise

Patent Owner argues that its "residential proxy service has received industry praise including from competitors, and that . . . praise is tied to the claims of the '510 [p]atent as described above." PO Resp. 72 (citing Ex. 2051, 23–24; Ex. 2065 ¶ 197). Patent Owner further contends that "competitors like Oxylabs, Smartproxy, and Microleaves have praised the advantages of using a residential proxy service." *Id.* at 72–73 (citing Exs. 2052–2054; Ex. 2065 ¶ 281).

Petitioner argues that there is no nexus shown here between the products and the challenged claims. Pet. Reply 24–26. For similar reasons as for the other objective indicia, no nexus has been shown between Patent Owner's evidence of industry praise and the challenged claims. Patent Owner ties the evidence of industry praise to its "residential proxy service," which is not recited in the challenged claims. PO Resp. 71–72. Therefore, Patent Owner has failed to make the requisite showing that the alleged industry praise has a nexus to the claimed invention.

### 3. Conclusion on Obviousness

For the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit and is entitled to little weight because Patent Owner has not shown nexus with the claimed invention. Thus, weighing Patent Owner's secondary considerations evidence together with Petitioner's evidence of obviousness, we find Petitioner has established the obviousness

of challenged claims 1, 2, 6–11, 13, 15, 16, 18–24 of the '510 patent in view of Crowds and RFC 2616.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6–11, 13, 15, 16, 18–24 would have been obvious over Crowds and RFC 2616.

### G. *Anticipation of Claims 1, 6, 10, 15–20, 23, and 24 By Border*

Petitioner asserts that claims 1, 6, 10, 15–20, 23, and 24 are anticipated by Border. Pet. 41–54. We begin with a description of Border and then analyze the arguments and evidence presented.

#### 1. *Border (Ex. 1012)*

Border is a patent titled "System and Method of Reading Ahead of Objects for Delivery to an HTTP Proxy Server." Ex. 1012, code (54). Border describes "a system for retrieving web content." *Id.* at code (57). In Border, "[a] downstream proxy server receives a URL request message from a web browser. *Id.* at 3:35–36. Thereafter, "[a]n upstream proxy server receives the URL request message from the downstream proxy server" and "selectively forwards the URL request message to a web server and receives the URL content from the web server." *Id.* at 3:38–42. Then, "[t]he upstream proxy server forwards the URL content to the downstream proxy server." *Id.* at 3:42–43. An exemplary system employing downstream and upstream proxy servers for accessing a web server is shown in Figure 1, reproduced below:

*FIG. 1*



As depicted in Border's Figure 1, user station 101, for example, a personal computer, uses standard web browser 103. *Id.* at 3:55–61. User station 101 is connected to downstream proxy server 105, which communicates over network 111 with upstream proxy server 107. *Id.* at 3:61–66. Proxy servers 105 and 107 are HTTP proxy servers with HTTP caches 115 and 117. *Id.* at 4:8–11. Upstream proxy server 107 is connected to web server 109 through IP network 113, for example, the Internet. *Id.* at 4:5–7. In this system, proxy servers 105 and 107 "act as an intermediary between one or more browsers and many web servers (e.g., server 109)." *Id.* at 4:30–31.

### 2. Analysis

#### a. Claim 1

Referring to Figure 1 of Border, Petitioner asserts that the recited "first client device" is upstream server 107, the recited "second server" is downstream server 105, the recited "web server" is web server 109, the

Case: 23-2146     Document: 16     Page: 358     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 359     Filed: 11/13/2023

recited "first content identifier" is the requested URL, and the recited "first content" is the requested web page at the requested URL.  Pet. 44.

For limitation 1[a], Petitioner asserts that a persistent TCP connection is established between upstream server 107 and downstream server 105 in Border.  Pet. 44 (citing Ex. 1012, 7:51–58; Teruya Decl. ¶ 146).  Petitioner asserts that downstream server 105 is the "second server" because "it accepts a connection from web browser 103 and sends back a response to web browser 103's GET request." *Id.* at 45.  Petitioner also contends that "upstream server 107 acts in the role of a 'client,' as commonly understood, because it requests a service of another computer system by requesting web content at a URL from a web server." *Id.*

For limitation 1[b], Petitioner contends that Figure 2 of Border depicts upstream server 107 issuing a GET request to web server 109, and the request is for a URL.  Pet. 46 (citing Ex. 1012, 5:32–35, Fig. 2).  For limitation 1[c], Petitioner argues that, in response to the upstream server 107 request, "the web server 109 transmits the requested HTML page to the upstream server." *Id.* at 47 (citing Ex. 1012, Fig. 2).  Petitioner contends that, based on this disclosure, "Border teaches the first client device receiving the first content (the web page at the requested URL) from the web server in response to sending the first content identifier (the requested URL)." *Id.*

For limitation 1[d], Petitioner contends that in Border, "[a]fter receiving the web page from web server 109, upstream server 107 'forwards the HTML page to the downstream server 105'" as shown in Figure 2.  Pet. 48.  More specifically, Petitioner contends that "[d]ownstream server 105

then forwards the first content to web browser 103, in response to web browser 103's original GET request, in accordance with the second server's role as a 'server.'" *Id.* Petitioner asserts that "the same persistent TCP connection exists between upstream server 107 and downstream server 105," and communications go through this connection. *Id.* at 48–49 (citing Teruya Decl. ¶¶ 160–162).

Patent Owner's presents similar arguments for Border as those presented for Crowds. PO Resp. 42–44. For example, Patent Owner contends Border does not disclose a "first client device" or "second server" because the devices are similar "except for the role being performed at a particular point in time." *Id.* at 42. Patent Owner repeats its argument that, for example, a server cannot operate in the role of a client, and vice versa; the architecture of the '510 patent is not disclosed in Border; and Border's disclosure of general-purpose computers is not sufficient. *Id.* at 43–44. For the reasons provided in our above discussion of Crowds, we do not agree with those arguments as they are contrary to the claim constructions we adopted. Similarly, we have rejected Patent Owner's arguments based upon the alleged architecture of claim 1 and failure to disclose certain limitations for the reasons discussed above.

Accordingly, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Border anticipates claim 1 of the '510 patent.

> b. *Claims 6, 10, 15–20, 23, and 24*

Petitioner asserts that Border discloses all the limitations of claims 6, 10, 15–20, 23, and 24. Pet. 49–54. Patent Owner presents no arguments

Case: 23-2146     Document: 16     Page: 360     Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 361     Filed: 11/13/2023

specific to any of these claims, except for claim 15. PO Resp. 46–47. Patent Owner argues that Border does not disclose the limitations of claim 15 because, for instance, "under the purely role-based constructions, downstream server 105 cannot be a server." *Id.* at 46. This and other arguments directed to claim 15 are similarly based on claim constructions not adopted here. *See id.* at 46–47. For the reasons provided in our above discussion of Crowds, we do not agree with those arguments as they are contrary to the claim constructions we have adopted and the claim language.

Thus, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that Border anticipates claims 6, 10, 15–20, 23, and 24 of the '510 patent.

### H. Obviousness of Claims 1, 6, 8–11, 13, 15–20, and 22–24 Over Border and RFC 2616

Petitioner contends that the claims anticipated by Border (claims 1, 6, 10, 15–20, 23, and 24), as well as claims 8, 9, 11, 13, and 22, would have been obvious in light of Border and RFC 2616. Pet. 54–58. Because we have already determined that clams 1, 6, 10, 15–20, 23, and 24 are anticipated by Border, we do not separately address them under this ground. For those claims, we rely on the Petition and our anticipation analysis under Border to show that they would also have been obvious in light of Border and RFC 2616.

Petitioner states that Border discloses a system for retrieving web content, and that "HTTP is an application level protocol that is employed for information transfer over the Web." Pet. 54 (citing Ex. 1012, 7:26–29.) Petitioner argues that "Border expressly incorporates RFC 2616," and a

person of ordinary skill in the art would have been motivated to combine Border with general internet knowledge and the disclosures of RFC2616. *Id.*

For claims 8 and 9, Petitioner asserts that it would have been obvious for a person of ordinary skill in the art to rely on knowledge of TCP and HTTP communication protocols for keep-alive messages, which would, for instance, be beneficial in settings like those disclosed by Border. Pet. 55–56 (citing Teruya Decl. ¶¶ 200–204). For claim 11, Petitioner asserts that it would have been obvious to utilize the methods of RFC 2616 in Border's checking of cache validity. *Id.* at 56–57 (citing Teruya Decl. ¶¶ 205–208). For claim 13, Petitioner argues that it is routine to download and install software, such as software that configures the proxy devices in Border. *Id.* at 57 (citing Teruya Decl. ¶¶ 212–213). For claim 22, Petitioner asserts that it would "be obvious that a device performing client functions, such as requesting services comprising content delivery from a web server, would have a suitable O/S to support the making and receiving of such requests." *Id.* at 58 (citing Teruya Decl. ¶¶ 214–217).

In addition to the arguments that it presented for Border's anticipation grounds, Patent Owner presents similar arguments for Border's obviousness grounds as it had presented for Crowds' obviousness grounds, that is, that Broder teaches away because it does not address initiator anonymity and it uses a different network structure. PO Resp. 44–46. We are not persuaded by these arguments because anonymity is not a limitation of the claims nor is the alleged network structure relevant because we have not adopted Patent Owner's claim construction, as discussed above.

Case: 23-2146    Document: 16    Page: 362    Filed: 11/13/2023

Additionally, for the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit and is entitled to little weight because Patent Owner has not shown nexus with the claimed invention. Thus, weighing secondary considerations together with Petitioner's evidence of obviousness, we find Petitioner has established the obviousness of challenged claims 1, 6, 8–11, 13, 15–20, and 22–24 of the '510 patent in view of Border and RFC 2616.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 6, 8–11, 13, 15–20, and 22–24 would have been obvious over Border and RFC 2616.

*I. Anticipation of Claims 1, 6–8, 13, 15, 16, and 18–24 By MorphMix*

Petitioner asserts that claims 1, 6–8, 13, 15, 16, and 18–24 are anticipated by MorphMix. Pet. 59–72. We begin with a description of MorphMix and then analyze the arguments and evidence presented.

*1. MorphMix (Ex. 1008)*

MorphMix is a doctoral thesis that identifies the lack of anonymity on the Internet as a problem that "limits the privacy protection of Internet users." Ex. 1008, Abstract. Accordingly, MorphMix is focused on "achieving anonymous Internet access for low-latency applications such as web browsing." *Id.* MorphMix describes "a peer-to-peer-based mix network" where "[e]very node joining the system can itself establish circuits via other nodes to access a server anonymously, but can also be part of circuits established by other nodes and relay data for them at the same time."

*Id.* at 118. An exemplary system is illustrated in Figure 5.1, reproduced below:



**Figure 5.1:** *Basic idea of MorphMix.*

As depicted in Figure 5.1 of MorphMix, above, participating nodes have a virtual link to one or more other nodes at any time. Ex. 1008, 119. This "means that (1) there is a TCP [Transfer Control Protocol] connection between the two nodes and (2) they share a symmetric key that is only known to these two nodes." *Id.* In Figure 5.1, node *a* has five neighbors with which it has established virtual links. *Id.* In the example shown, "node *a* has established an anonymous tunnel via *b* and *c*." *Id.* "Within an anonymous tunnel, anonymous connections can be set up to anonymously communicate with a server." *Id.* at 120.

Case: 23-2146    Document: 16    Page: 364    Filed: 11/13/2023

Case: 23-2146     Document: 16     Page: 365     Filed: 11/13/2023

### 2. Analysis

#### a. Claim 1

In its assertions directed to claim 1, Petitioner identifies the recited "first client device" as the last node (c) of MorphMix, the recited "second server" as intermediate node (b), the recited "first server" as server (s), the recited "first content identifier" as the application data (or the requested URL it contains), and the recited "first content" as the requested web page at the requested URL. Pet. 60–61.

For limitation 1[a], Petitioner contends that a TCP connection is established between nodes, and node (c) acts as a first client device and intermediate node (b) acts as a second server. Pet. 61–62. For limitation 1[b], Petitioner asserts that node (c) sends the application data and/or the URL within the application data to the first server(s), as shown in Figure 5.4. *Id.* at 63. For limitation 1[c], Petitioner contends that the node (c) receives the "first content," such as the web page, where MorphMix "[s]end[s] data back from the server to the client works exactly in the opposite way" as the information is sent to the server. *Id.* at 64 (citing Ex. 1008, 105). Accordingly, in MorphMix, Petitioner argues, the first client device (the last node before the target web server) receives the requested first content for sending back down the path to the requesting user. *Id.* at 63–64. For limitation 1[d], Petitioner contends that "[t]he first client device (node c) sends the first content (or web page content) back to the second server (node b, the prior node in the path)." *Id.* at 65.

Patent Owner has similar arguments for MorphMix as those previously discussed for Crowds. PO Resp. 47–51. For example, Patent

Case: 23-2146     Document: 16     Page: 366     Filed: 11/13/2023

Owner argues that "[f]or the same reasons discussed above regarding
Crowds and Border, MorphMix does not disclose a 'first client device' as
recited in claim 1 under the purely role-based constructions." *Id.* at 47.
Patent Owner also contends MorphMix does not disclose step 1[d] of claim
1. *Id.* at 47–48. Patent Owner argues that "[f]or the same reasons discussed
above regarding Crowds and Border, during performance of this method
step, under the purely role-based constructions, node (c) is operating in the
role of a server, not a client, and therefore node (c) cannot be a client device
. . . Also, under the purely role-based constructions, node (b) is operating in
the role of a client, not a server, and therefore node (b) cannot be a server."
*Id.* Patent Owner also contends that Petitioner does not analyze the claims
under Patent Owner's claim constructions and MorphMix does not disclose
the architecture of claim 1. *Id.* at 48–50. We do not agree with these
arguments for reasons previously discussed for Crowds. Among other
reasons, the arguments are not based on the language of the claims or the
disclosure in the Specification, and we have rejected Patent Owner's claim
constructions.

### b. Claims 6–8, 13, 15, 16, 18–24

Petitioner asserts that MorphMix discloses all the limitations of claims
6–8, 13, 15, 16, 18–24. Pet. 65–72. Patent Owner presents no arguments
specific to any of these claims, except that Patent Owner argues that
MorphMix does not disclose the limitations of claims 13 and 15. PO Resp.
52–53. For claim 13, Patent Owner asserts that Petitioner does not show that
"the software application causes the processor on node (c) to store the first
content or send the stored first content as recited in [the] claim." *Id.* For

Case: 23-2146     Document: 16     Page: 367     Filed: 11/13/2023

claim 15, Patent Owner asserts that "under the purely role-based constructions, node (b) is operating in the role of a client, not a server, and therefore node (b) cannot be a server" and "node (c) is operating in the role of a server, not a client, and therefore node (c) cannot be a client device." *Id.* at 53. Other arguments directed to claim 15 are similarly based on claim constructions not adopted here. *See id.* at 52–53.

For claim 13, as Petitioner contends, and we agree, MorphMix discloses the use of typical user computers with memory that satisfies this storing step. Pet. Reply 23 (citing Ex. 2065 ¶ 241). For claim 15, we do not agree with Patent Owner's arguments as they are contrary to the claim constructions we have adopted and the claim language.

Thus, having considered the arguments and evidence, we determine that Petitioner has shown by a preponderance of the evidence that MorphMix anticipates claims 6–8, 13, 15, 16, 18–24 of the '510 patent.

*J. Obviousness of Claims 1, 2, 6–11, 13, 15, 16, and 18–24 Over Border and RFC 2616*

Petitioner contends that the claims anticipated by MorphMix (claims 1, 6–8, 13, 15, 16, and 18–24), as well as claims 2 and 9–11, would have been obvious in light of MorphMix and RFC 2616. Pet. 72–77. Because we have already determined that claims 1, 6–8, 13, 15, 16, and 18–24 are anticipated by MorphMix, we do not separately address them under this ground. For those claims, we rely on the Petition and our anticipation analysis under MorphMix to show that they would also have been obvious in light of MorphMix and RFC 2616.

Petitioner relies on the rationale provided for combining Crowds and RFC 2616 for the combination of RFC 2616 with MorphMix. Pet. 72. For

Case: 23-2146     Document: 16     Page: 368     Filed: 11/13/2023

claim 2, Patent Owner argues that when a node joins the MorphMix network, it sends a message to other nodes comprising the node's IP address, port, public key, and other information, and a person of ordinary skill in the art would know that a MAC address is an element of the data link layer of the open systems interconnection (OSI) underlying network communications over the Internet, so MorphMix discloses that, upon second server startup, there would have been a message sent that included an IP address. *Id.* at 74–75 (citing Teruya Decl. ¶¶ 283–89). For claim 9, Petitioner asserts that it would have been obvious for a person of ordinary skill in the art to rely on knowledge of TCP and HTTP communication protocols and RFC 2616 for keep-alive messages which would, for instance, be beneficial in settings like those disclosed by MorphMix for the reasons discussed for Crowds and Border. Pet. 75 (citing Teruya Decl. ¶¶ 290–293). For claims 10 and 11, Petitioner asserts that it would have been obvious to utilize the methods of RFC 2616 in MorphMix for validity checking, as discussed above for Crowds. *Id.* at 76 (citing Teruya Decl. ¶¶ 294–297).

In addition to the arguments presented for MorphMix's anticipation grounds, Patent Owner presents similar arguments for MorphMix's obviousness grounds as those presented for Crowds' obviousness grounds, that is, that MorphMix teaches away because it suffers from poor performance, increased latency and has problems like lack of a centralized lookup service and "free riding." PO Resp. 51–52. We are not persuaded by these arguments because none of these arguments relate to a limitation of the claims or why a person of ordinary skill in the art would not have considered RFC 2616 in combination with MorphMix.

Case: 23-2146    Document: 16    Page: 369    Filed: 11/13/2023

Additionally, for the reasons explained above, we conclude that Patent Owner's evidence purportedly showing commercial success, long-felt need, copying, and industry praise lacks merit and is entitled to little weight because Patent Owner has not shown nexus with the claimed invention. Thus, weighing Patent Owner's secondary considerations evidence together with Petitioner's evidence of obviousness, Petitioner has established the obviousness of challenged claims 1, 6, 8–11, 13, 15–20, and 22–24 of the '510 patent in view of MorphMix and RFC 2616.

Accordingly, Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 6–11, 13, 15, 16, and 18–24 would have been obvious over MorphMix and RFC 2616.

## III. MOTION TO SEAL[18]

Patent Owner filed a Motion to Seal and To Enter the Proposed Protective Order, which seeks to seal Exhibits 2039, 2041–2044, and 2065 and associated portions of the Patent Owner Response, and to enter an agreed-upon Joint Protective Order. Paper 32; Ex. 2068. Patent Owner asserts that Exhibit 2039 contains sensitive technical information, Exhibits 2041–2044 contain source code and related files, Ex. 2065 is an expert declaration that references some of the sensitive information in the exhibits, and portions of the Patent Owner Response incorporates some of the sensitive information. Paper 32, 2–6. Patent Owner argues that it would be harmed by the public disclosure of its highly sensitive information, which

---

[18] Petitioner filed a Motion to Exclude Evidence (Paper 46), which was withdrawn. *See* Tr. 5:5–12.

it has taken steps to guard against disclosure, which outweighs the public's interests. *Id.* This Motion is unopposed.

We have reviewed the exhibits at issue, including the redacted portions of the exhibits and Patent Owner Response, and the explanations of the confidential nature of the materials for which sealing is sought, as discussed in the Motion. We grant the Motion to Seal and the associated request to enter the Protective Order. Paper 32; Ex. 2068.

## IV. CONCLUSION[19]

For the foregoing reasons, we conclude that Petitioner has shown by a preponderance of the evidence that challenged claims 1, 2, 6–11, 13, and 15–24 of the '510 patent are unpatentable. In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 6, 7, 13, 15, 16, 18–24 | 102(b) | Crowds | 1, 6, 7, 13, 15, 16, 18–24 | |
| 1, 2, 6–11, 13, | 103(a) | Crowds, RFC | 1, 2, 6–11, 13, | |

---

[19] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2). Patent Owner is further reminded that under 37 C.F.R. 42.73(d)(3)(i), a patent owner is precluded from taking action inconsistent with the adverse judgment, including obtaining in any patent a claim that is not patentably distinct from a cancelled claim.

Case: 23-2146     Document: 16     Page: 370     Filed: 11/13/2023

| Claim(s) | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 15, 16, 18–24 | | 2616 | 15, 16, 18–24 | |
| 1, 6, 10, 15–20, 23, 24 | 102(b) | Border | 1, 6, 10, 15–20, 23, 24 | |
| 1, 6, 8–11, 13, 15–20, 22–24 | 103(a) | Border, RFC 2616 | 1, 6, 8–11, 13, 15–20, 22–24 | |
| 1, 6–8, 13, 15, 16, 18–24 | 102(b) | MorphMix | 1, 6–8, 13, 15, 16, 18–24 | |
| 1, 2, 6–11, 13, 15, 16, 18–24 | 103(a) | MorphMix, RFC 2616 | 1, 2, 6–11, 13, 15, 16, 18–24 | |
| Overall Outcome | | | 1, 2, 6–11, 13, 15–24 | |

## V. ORDER

Accordingly, it is

ORDERED that claims 1, 2, 6–11, 13, and 15–24 of U.S. Patent No. 11,044,510 B2 have been shown to be unpatentable;

FURTHER ORDERED that the Motion to Seal (Paper 32) is *granted*;

FURTHER ORDERED that the request to enter the protective order is *granted*;

FURTHER ORDERED that, no later than ten business days after the issuance of this Final Written Decision, the parties may file a joint motion to seal portions of this Final Written Decision, explaining why portions of it should remain under seal, and including as an attachment a redacted version of the Final Written Decision that can be made publicly available;

FURTHER ORDERED that the present decision shall remain under seal until any joint motion to seal the Final Written Decision is resolved;

Case: 23-2146     Document: 16     Page: 371     Filed: 11/13/2023

FURTHER ORDERED that the present decision shall be made public if, after the expiration of the time for the parties to file a joint motion to seal, no such motion has been filed; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Case: 23-2146    Document: 16    Page: 372    Filed: 11/13/2023

IPR2021-01493
Patent 10,484,510 B2

PETITIONER:

Craig Tolliver
George "Jorde" Scott
John C. Heuton
CHARHON CALLAHAN ROBSON
& GARZA, PLLC
ctolliver@ccrglaw.com
jscott@ccrglaw.com
jheuton@ccrglaw.com

PATENT OWNER:

Thomas M. Dunham
Elizabeth A. O'Brien
RUYAKCHERIAN LLP
tom@dunham.cc
elizabetho@ruyakcherian.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

CODE200, UAB; TESO LT, UAB; METACLUSTER LT, UAB;
OXYSALES, UAB; and CORETECH LT, UAB,

Petitioners

v.

BRIGHT DATA LTD.,

Patent Owner

---

Case IPR2021-01493[1]

Patent No. 10,484,510

---

**PATENT OWNER'S NOTICE OF APPEAL**

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

---

[1] Petitioners in IPR2022-00862 were joined to this case, with IPR2022-00862 then

terminated.

Pursuant to 35 U.S.C. §§ 141, 142, and 319, and 37 C.F.R. §§ 90.2 and 90.3, notice is hereby given that Patent Owner Bright Data Ltd. appeals to the U.S. Court of Appeals for the Federal Circuit from the Final Written Decision (Paper 53) entered on September 22, 2023 in IPR2021-01493, and from all underlying orders, decisions, ruling, and opinions that are adverse to Patent Owner.[2,3,4] The public

---

[2] Lead Case No. 23-2144, pending in its early stages before the Fed. Cir., involves the same patent, the same disputed claim terms, the same primary prior art reference (Crowds), and the same petitioners.

[3] Case No. 23-2415, pending in its early stages before the Fed. Cir., involves the same patent, the same disputed claim terms, and the same primary prior art references (Crowds, Border).

[4] Patent Owner is simultaneously filing a Notice of Appeal in IPR2021-01492 and IPR2021-01493, which involve related patents having the same specification, the same disputed claim terms, and the same prior art references. There are also similar claim construction issues in pending administrative matters: IPR2022-00687 and IPR2023-01425; as well as Reexamination Control Nos. 90/014,652, 90/014,816, 90/014,624, and 90/014,827; all which involve related patents having the same specification. There are also similar claim construction issues in stayed Reexamination Control Nos. 90/014,875 and 90/014,876, as well as stayed district

Case: 23-2146    Document: 16    Page: 375    Filed: 11/13/2023

Case: 23-2146   Document: 16   Page: 376   Filed: 11/13/2023

version of the Final Written Decision (Paper 55) entered on September 25, 2023 is attached to this Notice as Exhibit A.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner intends to appeal at least the following issues:

i. Whether the Board's construction of the claim term "client device" was incorrect and/or not reasonable in light of the evidence of record;

ii. Whether the Board's construction of the claim term "second server" was incorrect and/or not reasonable in light of the evidence of record;

iii. Whether the Board erred in determining that Petitioners established by a preponderance of the evidence that claims 1, 6, 7, 13, 15, 16, and 18-24 of U.S. Patent No. 10,484,510 ("the '510 Patent") are unpatentable as anticipated by Crowds[5];

iv. Whether the Board erred in determining that Petitioners established by

---

court matters: Case Nos. 2:19-cv-395, 2:19-cv-396, and 2:19-cv-414 in the Eastern District Court of Texas.

[5] Michael Reiter & Aviel Rubin, Crowds: Anonymity for Web Transactions, ACM Transactions on Information and System Security, Vol. 1, No. 1 (Nov. 1998) (Ex. 1006, "Crowds").

Case: 23-2146     Document: 16     Page: 377     Filed: 11/13/2023

a preponderance of the evidence that claims 1, 2, 6-11, 13, 15, 16, and 18-24 of the '510 Patent are unpatentable as obvious over the combination of Crowds and RFC 2616[6];

v.    Whether the Board erred in determining that Petitioners established by a preponderance of the evidence that claims 1, 6, 10, 15-20, 23, and 24 of the '510 Patent are unpatentable as anticipated by Border[7];

vi.    Whether the Board erred in determining that Petitioners established by a preponderance of the evidence that claims 1, 6, 8-11, 13, 15-20, and 22-24 of the '510 Patent are unpatentable as obvious over the combination of Border and RFC 2616;

vii.    Whether the Board erred in determining that Petitioners established by a preponderance of the evidence that claims 1, 6-8, 13, 15, 16, and 18-

---

[6] Fielding, et al., RFC 2616, Hypertext Transfer Protocol -- HTTP/1.1, Internet Engineering Task Force, Network Working Group (June 1999) (Ex. 1013, "RFC 2616").

[7] Border, et al., U.S. Patent No. 6,795,848 B1 (Sep. 21, 2004) (Ex. 1012, "Border").

24 of the '510 Patent are unpatentable as anticipated by MorphMix[8];

viii.   Whether the Board erred in determining that Petitioners established by a preponderance of the evidence that claims 1, 2, 6-11, 13, 15, 16, and 18-24 of the '510 Patent are unpatentable as obvious over the combination of MorphMix and RFC 2616; and

ix.   Whether the Board erred in any further findings or determinations supporting or relating to the issues above, including the Board's consideration of the expert testimony, prior art, secondary considerations of non-obviousness, and other evidence in the record.

Pursuant to 37 C.F.R. § 90.3, this Notice is timely, having been duly filed within 63 days after the date of the Final Written Decision.

A complete and entire copy of this Notice is being filed simultaneously with each of the Patent Trial and Appeal Board and the Clerk's Office for the U.S. Court of Appeals for the Federal Circuit, along with the required fee. A complete and entire copy of this Notice is being served simultaneously on each of the Director of the U.S. Patent and Trademark Office and the petitioners.

---

[8] Marc Rennhard, MorphMix – A Peer-to-Peer-based System for Anonymous Internet Access (2004) (Ex. 1008, "MorphMix").

Case: 23-2146   Document: 16   Page: 378   Filed: 11/13/2023

No fees are believed to be due to the U.S. Patent and Trademark Office in connection with this filing, but authorization is hereby given for any requisite fees to be charged to Deposit Account No. 603803 (Customer No. 144371).

Respectfully submitted,

Date:  September 27, 2023

By: /s/ *Thomas M. Dunham*
Thomas M. Dunham
Reg. No. 39,965

Cherian LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEY FOR PATENT OWNER,
BRIGHT DATA LTD.

## CERTIFICATE OF FILING AND SERVICE

The undersigned hereby certifies a complete and entire copy of this paper was served on the undersigned date via USPS Priority Mail Express® on the Director of the USPTO at the following address:

> Mail Stop 8
> Office of the General Counsel
> United States Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22313-1450

The undersigned hereby certifies a complete and entire copy of this paper was filed on the undersigned date with the Clerk's Office for the United States Court of Appeals for the Federal Circuit and that the required docket fee was paid electronically through the Court's CM/ECF system.

The undersigned hereby certifies a complete and entire copy of this paper was served on the undersigned date via email, as authorized by Petitioners, at the following email addresses:

> jscott@ccrglaw.com
>
> jheuton@ccrglaw.com
>
> ctolliver@ccrglaw.com

Respectfully submitted,

Date:  September 27, 2023

By: /s/ *Thomas M. Dunham*
Thomas M. Dunham
Reg. No. 39,965

Cherian LLP
1901 L Street NW, Suite 700
Washington, D.C. 20036
(202) 838-1567

ATTORNEY FOR PATENT OWNER,
BRIGHT DATA LTD.